WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
John K. Cunningham
Mark P. Franke

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Richard S. Kebrdle (*pro hac vice* pending)
Jason N. Zakia (*pro hac vice* pending)
Laura L. Femino (*pro hac vice* pending)

*Attorneys for Ojas N. Shah*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| OI S.A., et al..[1] | ) | Case No. 16-11791 (SHL) |
| | ) | |
| Debtors in a Foreign Proceeding. | ) | Chapter 15 |
| | ) | |

**DECLARATION OF OJAS N. SHAH IN SUPPORT OF THE VERIFIED PETITION**
**FOR RECOGNITION OF THE BRAZILIAN RJ PROCEEDING**
**AND MOTION FOR ORDER GRANTING RELATED RELIEF PURSUANT**
**TO 11 U.S.C. §§ 1515, 1517, AND 1520 AND MOTION FOR PROVISIONAL**
**RELIEF PURSUANT TO 11 U.S.C. §§ 1519, 1521(a)(7), AND 362**

I, Ojas N. Shah, declare under penalty of perjury under the laws of the United States of

America that the following is true and correct:

      1.      I submit this Declaration in support of the *Verified Petition for*

*Recognition of the Brazilian RJ Proceeding and Motion for Order Granting Related Relief*

---

[1]      The debtors in these chapter 15 cases and the last four digits of the tax identification number of each are: Oi S.A. ("**Oi**") (5.764), Telemar Norte Leste S.A. ("**Telemar**") (0.118), Oi Brasil Holdings Coöperatief U.A. ("**Coop**") (8518), and Oi Móvel S.A.("**Móvel**") (3.963) (collectively, the "**Debtors**").

*Pursuant to 11 U.S.C. §§ 1515, 1517, and 1520,* [2] (together with the Form of Voluntary Petition

filed contemporaneously therewith, the "**Petition**") [ECF Nos. [1] and [3]], which seeks entry of

an order (i) granting the Petition in these cases and recognizing the Brazilian RJ Proceeding

(defined below) as a foreign main proceeding with respect to each of the Debtors pursuant to

section 1517 of title 11 of the United States Code, United States Code 11 U.S.C. §§ 101-1532

(2012) (the "**Bankruptcy Code**"),[3] (ii) recognizing the Petitioner as the "foreign representative,"

as defined in section 101(24) of the Bankruptcy Code, of each of the Debtors with respect to the

Brazilian RJ Proceeding (defined below), and (iv) granting such other and further relief as the

Court deems just and proper ("**Requested Relief**").

2.      I am a Senior Vice President in the professional services firm of

McKinsey Recovery & Transformation Services U.S., LLC ("**McKinsey**"), with an office at 55

East 52nd Street, New York, NY, 10055. I have more than 15 years of experience in interim

management, Chapter 11 restructuring advisory, cost reduction, cash management, capital

structure refinancing, and business plan development. I was previously a Director in the

Turnaround and Restructuring Services practice at AlixPartners, LLP. Other prior experience

includes working at Bear Stearns and the restructuring practices of XRoads Solutions Group and

Deloitte Consulting. I have a B.S. in Economics and a B.S. in Computer Science and

Engineering from the University of Pennsylvania (1996) and an MBA from Columbia Business

School (2004).

3.      On June 20, 2016, the Debtors duly commenced the Brazilian RJ

Proceeding by filing a voluntary bankruptcy petition (the "**Brazilian Bankruptcy Petition**") in

the Brazilian RJ Court seeking relief under the Brazilian Bankruptcy Law.  A certified

---

[2]      Except as otherwise indicated, capitalized terms used herein carry the meanings ascribed to them in the Petition
         (defined below).

[3]      Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

translation of the Brazilian Bankruptcy Petition from Portuguese to English is attached hereto as Exhibits H and I.

4.      McKinsey has been working with the Oi Group on different engagements over the last 5 years in several areas of business, helping the Company with strategy and designing and implementing various commercial and operational improvements. In furtherance of McKinsey's work with the Oi Group, Oi has requested McKinsey´s assistance in connection with the Brazilian judicial restructuring proceeding filed by Oi in Brazil on June 20, 2016. On June 21, 2016, Oi retained McKinsey to assist the Oi Group in connection with the Brazilian restructuring proceeding and to seek chapter 15 protection in the US. Over the past week, I have been actively preparing to be the Debtors' foreign representative in the Chapter 15 proceeding and I have become familiar with the history, operations, debt structure, assets, business affairs, restructuring goals, future business plans, management and direction of the Oi Group, with the assistance of the Company and their counsels BMA and White & Case.

5.      As a result of these efforts, I believe I am now adequately familiar with all aspects of the Debtors and their businesses and therefore sufficiently qualified to serve as its foreign representative in these Chapter 15 Cases.  Unless otherwise indicated, all facts set forth in this Declaration are based upon:  (a) my review of relevant information, data and documents (including oral information) furnished to me by the Company and its legal advisors; (b) information supplied to me by the Debtors' officers, directors, and employees, or professionals retained by the Debtors, including, with respect to matters of U.S. bankruptcy law, information provided to me by White & Case; or (c) my analyses of the information I have received on the Debtors' operations and financial condition.

3

6.      On June 20, 2016, pursuant to resolutions and powers of attorney (collectively, the "**Resolutions of Appointment**") signed by authorized representatives of each of the Debtors, each Debtor duly appointed me as its foreign representative. Copies of the Resolutions of Appointment, and certified translations of the same into English, are attached hereto as Exhibits J - T.  As such, the Company´s counsels BMA and White and Case have confirmed that I am fully authorized to act on behalf of the Debtors to commence these chapter 15 cases and take related action in support of their ongoing reorganization in the Brazilian RJ Proceeding (defined below) as foreign representative (the "**Foreign Representative**") of the above-captioned Debtors with respect to the jointly administered judicial reorganization (*recuperação judicial* or "**RJ**") (the "**Brazilian RJ Proceeding**") in the Federative Republic of Brazil ("**Brazil**") pursuant to Federal Law No. 11.101 of February 9, 2005 (the "**Brazilian Bankruptcy Law**") before the Seventh Business Court of Rio de Janeiro (the *7ª Vara Empresarial do Rio de Janeiro* or "**Brazilian RJ Court**").

7.      I am an individual over the age of 18.  If I am called to testify, I will do so competently and based on the facts set forth herein.

## Background

### A.  The Oi Group

#### i.  History and Operations

8.      The Oi Group is one of the world's largest integrated telecommunications service providers, with more than 70 million customers, and forms a critical component in Brazil's modern telecommunications infrastructure.  Originally born out of the privatization of the Brazilian fixed-line telecommunications industry that resulted from the breakup of telecom giant *Telecomunicações Brasileiras S.A. – Telebrás* by the Brazilian Federal Government in

4

1998 following a comprehensive reform of Brazil's telecommunications regulatory system, the Oi Group today remains one of Brazil's principal telecommunications enterprises. It maintains all or nearly all of its operations, management, principal executive offices, customers, assets, and employees in Brazil. As the operations and services of its various affiliates are highly interdependent, the Oi Group operates as a single, integrated economic unit headquartered and managed from the principal executive office of Oi, located at Rua Humberto de Campos No. 425, 6 1/2th floor–Leblon, 22430-190 Rio de Janeiro, RJ, Brazil ("**Oi Group Headquarters**"), where every aspect of the Oi Group's operations, finances, corporate management, employee management and payroll, and short- and long-term strategic planning is directed. The city of Rio de Janeiro also houses the Oi Group's substantive operating control center, in which the Group's network operations and management teams perform failure monitoring, manage and configure data banks, and complete safety and performance analyses for the Oi Group's telecommunications networks. Finally, Rio de Janeiro is a physical hub for Oi Group operations, serving as a international transmission point for the Group's submarine cables and the base capturing point for satellite signals.

9.     The Oi Group's services are vital to telecommunications in Brazil today, including, critically, (i) internet services, which it offers throughout the country and in more than one million Wi-Fi hotspots in public places such as airports and shopping malls, (ii) fixed-line telecommunication services, including network usage, television and data transmission services, for which it services approximately 34.5% of the market, and (iii) mobile telecommunications, of which it has an 18.6% market share nationally, with 48.1 million mobile subscribers as of December 31, 2015 and a network covering residential and/or commercial locations for approximately 93.0% of the urban population of Brazil. The Oi Group operates 651,000 public

5

telephones across Brazil and has approximately 330,000 kilometers of fiber optic cables installed throughout the country. It provides broadband to more than 51,000 public schools and supplies telecom services to rural areas lacking in other basic services such as mail, banks, and hospitals. The Group services all 5,570 Brazilian municipalities and meets a broad expanse of telecommunication needs for a large and varied customer base that includes residential customers, corporate customers of various sizes, and governmental agencies. Oi technology is also responsible for such critical operations as tallying electronic votes in political elections, and was a key player in infrastructure preparations for the 2014 FIFA World Cup.

10.     Oi is a major player in the Brazilian economy: it employs approximately 140,000 direct and indirect employees in Brazil, including 45,125 full-time employees as of December 31, 2015. The Oi Group is responsible for substantial social as well as economic contributions to its country. It sponsors Oi Future, a social responsibility institute, and has in the last four years invested R$145 million in projects in education, sustainability, sports, and culture.

11.     Oi Group services are inextricably wound up with those of other global telecom giants through a series of mutual services agreements. In two examples, roaming contracts between the Oi Group and its U.S. counterparts permit the Company's mobile phone customers to access mobile networks in the U.S., and U.S. customers of the Oi Group's counterparties to do the same in Brazil; other contracts facilitate long distance international calling or texting between, for example, an Oi Group customer in Rio de Janeiro and a Sprint customer in New York.

*ii.   Regulation Governing Company Operations in Brazil*

12.     The Oi Group's Brazilian operations are heavily regulated under concessions and similar authorizations granted by Brazil's national telecommunications agency, *Agência*

6

*Nacional de Telecomunicações* ("**ANATEL**") and by Brazilian regulations promulgated by the federal Ministry of Communications.  ANATEL operates to implement policies set by the Ministry of Communications and exercises regulatory authority to impose on concessionaries various service and customer satisfaction targets driven by policy goals of "universalizing" telecommunication access to all persons, regardless of location or socio-economic status, improving the quality of existing services, and utilizing telecommunications services for essential public services.

13.    Target milestones are determined in the course of discussions between ANATEL, the Ministry of Communication, and concessionaires, are informed by the ongoing research and analysis of special working groups, and are subject to ongoing revision driven by shifts in Brazil's telecommunication needs, with an opportunity for formal revisions every five years. These service and infrastructure targets require constant investment by concessionaires, who must maintain profitability while satsifying investment requirements not neccsarily justified by their economic benefit.

14.    ANATEL oversees implementation of these service targets and is empowered to impose fines or, in extreme cases, terminate concessions in the event targets are not met.

15.    One of the two largest concession holders in the sector, the Oi Group presently holds concessions or similar authorizations from ANATEL for the provision of local, fixed-line telephone services, national and international long-distance services, mobile telephone services, the use of certain radio frequencies, multimedia services (including data, voice, and image transmission), and Pay-TV throughout specified regions in Brazil.  The Company holds its concessions for fixed-line services in Region I and Region II of the three regions into which ANATEL divides Brazil's territory for the purposes of concessions—regions substantially less

populous and with substantially poorer consumers as compared to Region III, the state of Sao Paulo. As discussed further below, regulatory service targets in these rural areas have proven substantially more burdensome than equivalent targets in Region I, precisely because of their lower population density and consumer purchasing power.

### iii. Oi Group Assets

16.    As of March 31, 2016, Oi Group assets amounted to R$87,506 million, the vast majority of which are located in Brazil and, as of March 31, 2015, 96.8% of Oi Group revenues were derived from Brazilian operations.  Outside of Brazil, the Oi Group owns certain interests purchased in May 2014 which the Company is currently seeking to sell.  These include the assets of Oi's subsidiary in West Timor, Telecomunicações Públicas de Timor, S.A., as well as less significant assets and operations in Angola, Cape Verde, Namibia, São Tomé and Príncipe, all held indirectly by the Oi Group through Oi's 75%-owned subsidiary Africatel Holding B.V. ("**Africatel**").  As the Oi Group has always been a Brazil-based enterprise primarily operating in Brazil, it elected in 2014 to further concentrate its operations domestically, and as such authorized management to market the Oi Group's shares in Africatel on September 16, 2014. Africatel remains on the market today.  Aside from these *de minimus* and temporary operations through Africatel's subsidiaries, and a short-lived expansion into Portugal as part of its acquisition of PT Portugal in 2014 (which it sold shortly thereafter in 2015), the Oi Group has always operated the vast majority of its business in Brazil, as it still does today.

17.    In addition to its above-described foreign holdings, the Oi Group also owns certain limited U.S. assets.  At present, these assets are comprised primarily of i) a bank account in the name of Oi S.A.[4] at Banco do Brasil (New York) containing approximately $70,000, ii) interests in certain U.S.-located equipment and related tangible property used in the course of Oi,

---

[4] The account is actually held by Tele Norte Leste Participacoes S.A., the former name of Oi S.A.

Telemar, and Móvel's telecom services in conjunction with U.S. telecom companies (e.g., routers, lines for network access to internet data hubs that allow Brazilian-located customers to access the global internet); (iii) certain intangible assets which may be found to be U.S.-located property, including licenses, mutual service agreements (the "**Mutual Service Agreements**") common in the telecommunications sector, and accounts receivable.  In addition, each of the Debtors presently holds $10,000 in a client trust account at Citibank (New York).

### B.  The Oi Group's Debt Structure

18.    As a single, integrated economic unit, the Oi Group employs a capital structure designed to minimize its cost of capital and maximize value for its customers and stakeholders. As the Oi Group generates substantial cash revenues from its operations, the vast majority of its debt is in the form of long-term financial indebtedness issued under bonds or borrowed under bank lending facilities.  When issuing long-term debt and as is customary for corporate enterprises, the Oi Group makes use of special purpose financing companies, intercompany guarantees, and intercompany transfers to reduce its cost of capital.

19.    The Group issues debt primarily through parent company Oi and subsidiaries Telemar, Coop, PTIF, and Movel (together, the "**Oi Obligors**"), and with the use, as detailed below, of subsidiaries Copart 4 and Copart 5.  The structural position of each of these entities is shown in the simplified corporate chart below.



20.     The Oi Group's present financial indebtedness totals approximately

R$65,000,000,000, consisting primarily of four types of debt: i) unsecured export credit facilities

with various export credit agencies or other quasi-governmental financial institutions (the "**ECA**

**Facilities**"); ii) unsecured bonds and similar securities issued, varyingly, under New York law

(the "**U.S. Notes**"), English law (the "**U.K. Notes**"), and Brazilian law (the "**Brazilian**

**Debentures**"); (iii) two series of *certificados de recebíveis imobiliários* (the "**CRIs**"), securities

issued through Brazilian financial institutions which consist of interests in lease payments owed

by Telemar, Móvel, and Oi for the use of certain real property leased from Oi Group affiliates

Copart 4 and Copart 5, and (iv) secured (by accounts receivable and similar intangible collateral)

and unsecured bilateral and syndicated Brazilian bank debt (the "**Brazilian Bank Debt**").

21.     Proceeds from debt issued by the Oi Obligors is used to fund Oi Group operations

and for general corporate purposes, including the payment of maturing debt obligations and

interest payments as they come due.  When debt proceeds or operating income is lent from one

Oi Group entity to another—as is typical for large corporate enterprises—lender entities receive

intercompany receivables in return for funds transferred.  As a consequence, various Oi Group entities also have various intercompany debts outstanding.

### C.  The Debtors

22.    The following provides an overview of the role of each Debtor within the Oi Group enterprise.

#### i.  *Oi*

23.    Oi, formerly known as Brasil Telecom S.A., is incorporated under the laws of Brazil and serves as the parent company of the Oi Group.  As such, it directly holds 100% of the equity in each of Telemar and Coop, and directly or indirectly holds equity in all other members of the Oi Group.  As one of the Group's principal operating entities, Oi also owns substantial tangible assets, including fixed-line cables installed throughout Region II of Brazil.

24.    Oi is a primary obligor on the following long-term third-party financial indebtedness: (i) four series of the U.S. Notes, namely, the 9.75% notes due 2016 (the "**2016 U.S. Notes**"), the 5.125% notes due 2017 (the "**2017 U.S. Notes**"), the 9.5% notes due 2019 (the "**2019 U.S. Notes**"), and the 5.5% notes due 2020 (the "**2020 U.S. Notes**"); (ii) four series of the Brazilian Debentures; (iii) the CRIs; (iv) a limited number of the ECA Facilities; and (v) a limited number of Brazilian Bank Debt facilities.

25.    Oi has unconditionally guaranteed the following indebtedness of its subsidiaries: (i) two series of the U.S. Notes, namely, the 5.625% U.S. Notes due 2021 (the "**2021 U.S. Notes**") and the 5.75% U.S. Notes due 2022 (the "**2022 U.S. Notes**"), issued by Coop; (ii) all of the U.K. Notes, issued by PTIF; (iii) a limited number of the ECA Facilities, all with Telemar as primary obligor; and (v) a limited number of Brazilian Bank Debt facilities, all with either Telemar or Móvel as primary obligor.

26.     Oi maintains its registered office in Brazil at Rua Do Lavradio No. 71, 2nd floor 30070-202, Rio de Janeiro, RJ, Brazil.  Copies of Oi's Registration Certificate, along with a certified translation of the same from Portuguese to English, are attached to the Petitioner Declaration as Exhibits A and B.

ii.     *Telemar*

27.     Telemar, a company incorporated under the laws of Brazil, became a part of the present-day Oi Group following the 2012 merger between its then-parent Tele Norte Leste Participações S.A. and Brasil Telecom S.A. (now Oi), a horizontal merger that combined these entities' integrated telecommunications services in Regions I and II of Brazil.  As a consequence of the structural reorganization that followed, Telemar became a direct and 100%-owned subsidiary of Oi.  Telemar today operates the Oi Group's "Region I" fixed-line telecommunications services.  As such, its assets consist primarily of operating assets used to run segments of Oi Group operations, such as fixed-line cables installed throughout Region I, as well as equity in other Oi Group entities, including 100% of the equity of Móvel, which owns and operates the Company's internet and mobile phone businesses.

28.     Telemar's primary obligations under long-term third-party financial indebtedness consist of debt owed under: (i) one series of the Brazilian Debentures; (ii) the CRIs; (iii) most of the ECA Facilities, and (iv) certain of the Brazilian Bank Debt.  In addition, Telemar has guaranteed the following primary obligations of other Oi Group entities: (i) the 2017, 2019, and 2020 U.S. Notes, all issued by Oi; and (ii) a limited number of Brazilian Bank Debt facilities, all with either Móvel or Oi as primary obligor.

29.     Telemar maintains its registered office in Brazil at Rua Do Lavradio No. 71, 2nd floor 30070-202, Rio de Janeiro, RJ, Brazil.  Copies of the Registration Certificate, along with

certified translations of the same from Portuguese to English, are attached to the Petitioner

Declaration as Exhibits C and D.

      iii.  *Coop*

      30.    Coop was incorporated by the Company as a foreign special purpose financing

company in 2011 under the laws of the Netherlands.  As is customary for multi-billion dollar

enterprises, the Oi Group makes use of foreign subsidiary financing in order to facilitate access

to the international debt markets and thereby minimize its cost of capital.  Coop exists

exclusively to service the financing needs of the economically integrated Oi Group; it has no

subsidiaries, owns no substantial real assets, and operates no business of its own beyond the

issuing of debt to finance the Oi Group's operations.[5]  Indeed, Coop is prohibited under the

indenture governing the 2021 U.S. Notes (the "**2021 U.S. Notes Indenture**") from engaging in

any activity other than those related to borrowing debt and on-lending the proceeds to its Oi

Group affiliates.

      31.    Coop's activity in the Netherlands is limited to that required to maintain its

corporate existence under the laws of the Netherlands and comply with the minimum substance

requirements for Dutch tax purposes and respect, as between it and Oi, the regulatory regimes of

both jurisdictions.  Specifically, Coop maintains its registered office in the Netherlands at

Naritaweg 165, Amsterdam, 1043 BW, Netherlands, and is governed by two directors, one of

whom resides in the Netherlands.  Coop enters routine filings with the Dutch Chamber of

Commerce to maintain its corporate existence, files tax returns with the Dutch tax authorities,

employs Baker Tilly International as auditor, and completes other ministerial activities required

under Dutch law.

---

[5]      Supplement dated August 21, 2012 to the Irish Listing Particulars dated February 17, 2012 (the "**Irish Listing Supplement**") at p. 2 ("The Issuer does not have any operations independent from Oi.").

32.     Aside from addressing these existential legal requirements, Coop has no business or operational presence in the Netherlands.  Coop and its directors have always worked with the Oi Group to coordinate a unified, enterprise-wide strategy, including the retention of advisory firms for the Group6 (prior to the Dutch Litigation, when Coop hired independent Dutch counsel to ensure the protection of its interests in a joint defense with its Oi Group affiliates).  While Coop's board of directors, all of whom are appointed by Oi as the sole member (equityholder) of Coop, hold meetings in the Netherlands, as is required under Dutch and Brazilian law to respect the corporate separateness of Coop, Coop remains functionally centered at, and economically and strategically coordinated from, Oi Group Headquarters in Brazil.

33.     Coop's assets consist solely of receivables owed to it by its Brazilian Oi Group affiliates on account of the proceeds of debt issued or assumed by Coop and on-lent for use in the Company's Brazilian operations.  As Coop owns no other property, all its substantial assets— namely, intercompany receivables against Brazilian entities—are presently located in Brazil.

34.     Coop's long-term third-party financial indebtedness consists entirely of its obligations as issuer of the N.Y. law-governed Coop Notes.  Because Coop is a special-purpose vehicle (an "**SPV**") with no ability to generate a return on cash proceeds itself, any proceeds from debt issuances at Coop must be on-lent to (eventually) an operating Oi Group entity capable of earning a profit for Coop's creditors.  For the same reason, any debt issued by Coop has always been guaranteed by an operating Oi Group affiliate—Oi, in the case of the Coop Notes.  Coop is also the obligor on any intragroup loans received by it from Oi Group affiliates in its capacity as an intragroup financing company in the Oi Group.

---

[6]     For example, Coop relied on the Oi Group's U.S. counsel, White & Case LLP, for the issuance of its 2021 U.S. Notes.

35.    Coop is in fact restricted under the terms of its own debt documents from "engag[ing] in any business" or entering any transaction other than those related to issuing debt and on-lending the proceeds to affiliates in its corporate group.  2021 U.S. Notes Indenture, § 4.17.  When Coop provides its investors a return on capital, it is with Oi Group profits earned in Brazil from services provided to Brazilian customers under a Brazilian regulatory regime.

36.    Coop and its affiliates collaborate to effect in their respective jurisdictions unified, enterprise-wide direction—all in support of the Brazilian Group's operations in Brazil.  Coop's direct and sole equityholder, Oi, is a Brazilian entity headquartered in and run from Rio de Janeiro.  As the sole member (shareholder) of Coop, Oi, has the power to elect Coop's directors and dictate any actions of a magnitude requiring member approval.

37.    The offering memorandum accompanying the 2022 U.S. Notes (the "**2022 U.S. Notes OM**"), which warned of the risks associated with investing in a Brazilian telecommunications company and cautioned bondholders of investment risk related to competition and regulation in Brazilian telecom, as well as general "political, regulatory and economic conditions in Brazil."  2021 U.S. Notes OM, p. *viii*.

38.    Bondholders of the 2022 U.S. Notes originally invested in Brazil when Oi first issued the notes in February of 2012, and became creditors of Coop only later that year when Coop was substituted as issuer (supported by an Oi-issued guarantee) as permitted under the terms of the governing indenture.

39.    The 2021 Notes OM cautions of the "extensive risk factors relating to our company, the telecommunications industry and Brazil," (2021 U.S. Notes OM, p. 15), and that a substantial portion of the Group's assets consisted of fixed telecom lines in Brazil which in the case of bankruptcy or attachment would "revert to the Brazilian government" under governing

Brazilian law.  2021 U.S. Notes OM, p. 19.  As the 2012 Irish Listing Supplement stated: "The

Issuer [Coop] does not have subsidiaries or hold any equity investments. The Issuer does not

have any operations independent from Oi.  The Issuer's obligations under the Notes have been

fully and unconditionally guaranteed by Oi. Accordingly, the ability of the Issuer to pay

principal, interest and other amounts due on the Notes will depend upon the financial condition

and results of operations of Oi and its consolidated subsidiaries."  2012 Irish Listing Supplement,

p. 2.

40.     Financial and other covenants in the documents governing the Coop Notes largely

restrict Oi, rather than Coop, from actions that might compromise its ability to pay creditors,[7]

and repurchase requirements under the indentures are triggered by a change of control and

ratings decline at Oi, rather than Coop, again reiterating that payment is ultimately to derive from

Oi or another operating Oi Group entity—not from the SPV.[8]  Also as expected, Coop's

financials were not included in the 2021 U.S. Notes OM.  2021 U.S. Notes OM, p. *iv*.

41.     The indentures governing the Coop Notes permitted Oi, at any time prior to

default and without the consent of or notice to the bondholders, to substitute Coop as the issuer

of the 2021 U.S. Notes with any other wholly-owned subsidiary of Oi, in any jurisdiction, so

long as the bondholders were compensated for the tax consequences thereof.  2021 U.S. Notes

OM, § 10.

### D.  Operating and Financing Connections to the United States

42.     As a large telecommunications enterprise, the Oi Group's operations necessarily

require that it do business with its corporate counterparts in other countries, including the United

---

[7] *See* 2021 Notes Indenture, section 4; 2022 First Supplemental Indenture, Article 2 ("Article 4 of the [i]ndenture (*covenants*) . . . and [s]ection 6.01 of the [i]ndenture (*events of default*) shall continue to apply to [Oi] in respect of the [s]ecurities if no . . . [issuer] substitution had occurred.")
[8] 2021 Notes Indenture, section 4.06; 2022 Notes Indenture, section 4.06 (same).

States.  The Oi Group therefore maintains hundreds of contracts governed by U.S. law and/or

with U.S. counterparties to facilitate telecommunications as between Brazil and the United

States.

43.    As landline operators, Oi and Telemar maintain various service, equipment, and

usage contracts needed to connect their fixed-line networks in Brazil to those in the United States

through "submarine lines" running between the countries and emanating from the Company's

operational nerves center in Rio de Janeiro and Fortaleza (the "Submarine Line Contracts").

They also contract for the use of satellites, including satellites owned directly or indirectly by

U.S. firms, to send and receive data from various points of contact throughout Brazil (the

"**Satellite Usage Agreements**").  The Satellite Usage Agreements govern the "space segment"

component of the Company's operations, that is, the network of uplink and downlink

connections between grounded points of contact and a satellite or coordinated group of satellites

(known as a satellite 'constellation').  The Satellite Usage Agreements govern, among other

telecom services, the Company's HDTV and voice, data, and mobile broadcast services. Oi and

Telemar also contract with U.S. firms in broadcasting licenses grating the Company the right to

broadcast U.S. television content in Brazil (the "**Broadcast Licenses**").

44.    Móvel, which operates the Oi Group's mobile operations, maintains roaming

agreements (the "**Roaming Agreements**") with U.S. companies Verizon, Sprint, T-Mobile and

AT&T to allow, varyingly, the customers of one or both providers to use the networks of the

other for voice, SMS, and data when outside the reach of their home networks.  Móvel's

Roaming Agreements with T-Mobile and AT&T are Mutual Services Agreements, in that they

provide for Móvel's customers to use the counterparties' networks in the United States and for

the counterparties' customers to use Móvel's networks in Brazil.  Móvel customers' coverage

under the T-Mobile and AT&T networks is complementary, meaning that impairment of

contracts with either party would translate to lost services in certain areas of the United States.

Móvel's Roaming Contracts with Sprint and Verizon, by contrast, are unilateral service

agreements; Móvel sells but does not buy network coverage under these agreements, because

these U.S. operators use a network signal not compatible with Móvel's technology.  For this

reason, Móvel's Mutual Services Agreements with T-Mobile and AT&T cannot be easily

replaced by contracts with their U.S. competitors.

45.     Oi Group customers in Brazil rely heavily on the Company's U.S. Contracts to

access international content on the World Wide Web—which comprises the majority of high-use

websites such as Amazon, Yahoo, and Skype, among others—through IP hubs located in New

York and Miami.  These data centers serve as vital connection points not only to U.S.-based

network content, but also to networks and content hosted in other countries.  Company access to

the World Wide Web is governed by contracts of three types, maintained by one or more of the

Operating Debtors: (i) Submarine Line Contracts with GlobeNet, a group of telecom companies

that includes U.S. entities; (ii) co-location contracts with data centers in New York and Miami

that allow Oi to access necessary telecom infrastructure like servers and routers, including

agreements with the Telx Group, Inc., a Delaware corporation and NAP of Americas (a Verizon

Company); and (iii) contracts with U.S. telecom companies for use of their IP Ports (the "IP Port

Contracts"), including a critical contract between Telemar and Verizon.

46.     In addition to paying for the services of foreign firms, the Operating Debtors also

contract to sell their services unilaterally to foreign firms (such contracts, the "Unilateral Sale

Contracts"), including U.S. companies, in need of telecom services in Brazil.  For example, U.S.

firms with offices in Brazil contract to buy a variety of Oi Group services, including fixed-line

and mobile access to the Company's Brazilian telecom networks.

47.     In addition to its operating connections to the United States, the Oi Group also

strategically accesses the international capital markets to broaden its sources of available

financing, to minimize its cost of capital, and to benefit from larger, more liquid, and less volatile

securities markets.   As a special-purpose financing vehicle, Coop serves as a critical point of

connection between the Oi Group and foreign capital.   Through Coop and the other Debtors, the

Oi Group issues debt governed by New York; it borrows, denominates, and repays certain of its

financial indebtedness in U.S. dollars; and it sells both equity and debt securities to qualified

U.S. investors.

48.     Oi lists its shares on the New York Stock Exchange ("**NYSE**") in the form of

American Depository Receipts ("**ADRs**") (in addition to their listing on the Sao Paulo stock

exchange), and counts among its 1.1 million shareholders qualified U.S. residents holding an

aggregate of 99,329,988 common shares and 76,478,434 preferred shares.   Each of Oi, Telemar,

and Coop have issued and/or guaranteed all of the New York law-governed U.S. Notes,[9] which

consist of six series of unsecured notes with a total principal of $2,526,252,642 outstanding as of

June 2016.   Telemar is the borrower of two New York law-governed, U.S. dollar-denominated

ECA facilities with the China Development Bank (the "**CDB Facilities**"), one of which Oi has

guaranteed.   Further, all of the New York law-governed debt instruments contain forum-selection

clauses in which the obligors consent to the jurisdiction of New York state courts and U.S.

federal courts sitting in New York.   Oi and Coop, with respect to the U.S. Notes, and Telemar,

---

[9]       The 2019, 2020, and 2022 U.S. Notes are denominated and payable in USD.   The 2016 U.S. Notes are
denominated in *reais* but payable in USD using a conversion rate determined at the time of payment; the
2017 and 2021 U.S. Notes are denominated and payable in euro.

with respect to the CDB Facilities, engage agencies in the U.S. where notices and demands related to these debt issuances may be served.[10]

### E.  Events Precipitating Commencement of the Brazilian RJ Proceeding

#### i.  Financial Distress

49.     As noted, the Oi Group is severely burdened by regulatory obligations imposed through concessions granted by ANATEL and policies set by the Ministry of Communications. These operation milestones, designed to increase access and quality in Brazil's telecom sector, impose on concessionaires, among other obligations, the requirement to make fixed telephone services universally available throughout the country—a regulatory burden that weighs most heavily on operators servicing rural sectors, whose low population densities and meager purchasing power generate insufficient revenue to economically justify expansion costs.

50.     The Oi Group is distinct from its domestic competitors in that it holds concessions to provide fixed-line services in Regions I and II of Brazil, which span large, sparsely populated areas (e.g., the State of Amazonas) in the north, northeast, and midwest of Brazil—areas on average ten times less dense than the State of Sao Paulo comprising Region II and serviced by the Group's competitors.  Over the last decade, the Oi Group has struggled to meet these ambitious requirements as mobile phones replaced landlines and the use of fixed-line services plummeted; revenues from certain fixed-line services, for example, have dropped 33% since 2006, while Oi remains obligated to continue installing new fixed lines for improved access and to satisfy what some have described as "ultra-high" quality standards.

---

[10]     Barclay Street, Floor 4E, New York, NY 10286 (2016 U.S. Notes Indenture, §4.12); 10 E. 40th Street, 10th Floor, New York, NY 10016 (2017 and 2020 U.S. Notes Indenture, §4.12) ; 111 Eight Avenue, New York, NY 10011 (2019 U.S. Notes Indenture, §4.12); 101 Barclay Street, Floor 7E, New York, NY 10286 (2021 U.S. Notes Indenture, §4.12); Barclay Street, Floor 4E, New York, NY 10286 (2022 U.S. Notes Indenture, §4.12).

51.     Brazil's Ministry of Communications has recognized the need for a

comprehensive review and revision of its regulatory framework.  In September of 2015 it

formed, in conjunction with ANATEL, a working group tasked with evaluating outstanding

concessions and proposing guidelines for amendments to outstanding concession agreements.

The joint evaluation yielded a series of studies, published by the Ministry of Communications on

April 8, 2016, noting the decreasing need for fixed-line services in Brazil and acknowledging

that the financial burden weighing on concessionaires—particularly those servicing poor or rural

areas—could have a net negative present value that ultimately "compromise[s] the sustainability

and continuity of the public [telecom services] under concessions."  Regulators have since

published a proposal for a new regulatory framework that would substantially alleviate the

financial situation presently plaguing rural operators.

52.     The Oi Group struggled financially in 2015 under competitive pressures in the

shifting telecommunications sector, as marketplace demand for mobile services rapidly rose

while the demand for fixed-line services—the primary operational focus of Oi and Telemar—

declined just as quickly.[11]  Saddled with a significant debt load following expansion efforts from

2000-2014, the Oi Group faced-off against financially nimbler competitors in the sector-wide

scramble to meet shifting customer demands.

53.     The Group's financial woes worsened in recent years as economic conditions in

Brazil deteriorated, with exacerbating elements such as political instability; contraction of the

Brazilian economy; strong devaluation of *real*;[12] and inflationary pressure and high interest rates.

These declining domestic conditions further rendered Oi uncompetitive as against international

---

[11]     During the three-year period ended December 31, 2015, the number of Oi mobile subscribers declined at an
average rate of 4.3% per year, while the number of fixed lines in service declined by an average rate of
6.3% per year in the same time period.  Oi year 2015 20-F, p.103.

[12]     The Brazilian *real* plummeted from R$2.184 to USD$1.00 in October 2013 to R$4.019 in January 2016.

servicers such as TIM (a member of the Telecom Italia Group), Claro (a member of the Mexican Telmex group), and Vivo (a subsidiary of Telefónica S.A., a Spanish company with global operations).

54.    Oi and the telecommunications industry have been affected by factors such as: intensive investment and increased competition; reduced margins; faster technology life cycles; outdated regulations; increased labor costs; greater leverage; expensive and scarce credit; risk assessment downgrades; increased operating costs; and high financial costs.

55.    The Company sought to strengthen its market position in a contemplated merger with telecom giant TIM, financed by a $4 billion equity infusion from Letter One, but these efforts proved fruitless when negotiations terminated on February 25, 2016.

        ii.    *The Dutch Litigation*

56.    As the Oi Group began considering the need to optimize its long-term debt profile at the end of 2015, certain of the Debtors began receiving letters from certain aggressive creditors.  In particular, counsel to U.S.-run hedge fund Capricorn Capital Ltd. ("**Capricorn**") threatened Oi, Coop, and Oi PTIF (the "**Dutch Writ Defendants**") with legal action to the immediate detriment of Oi Group operations. ,Capricorn then commenced litigation against the Dutch Writ Defendants and their current and former directors in the Court of Amsterdam— notwithstanding no-action clauses in the governing debt documents barring these suits and choice-of-law provisions unrelated to the Netherlands.  Capricorn then filed further, related summary action against Coop, notwithstanding that Capricorn then held and, to the best of the Oi Group's knowledge, still holds no debt of Coop whatsoever.

57.     On May 2, 2016, the Dutch court flatly denied Capricorn's motion for a freezing order, thereby allowing Coop to continue on-lending to the Oi Group as needed for Company operations.  The court agreed with Coop in holding that individual creditors (holding no debt of Coop, no less) have no right to question the transfer of funds by a financial company to its operating affiliates.

58.     On May 19, 2016, Capricorn appealed the Dutch court's judgment and continues to block Coop from on-lending further funds to the Company.  The appeal hearing was held on June 15, 2016 and the judgment in respect appeal is expected on July 19, 2016.

     *iii.*    *Bondholder Negotiations*

59.     On March 9, 2016, the Company announced that it had retained advisors to assist in optimizing its long-term debt structure.  In the following months, the Oi Group began engaging in what continue to be productive conversations with many of its creditors, including several of the largest financial institutions in Brazil, various export credit agencies, and bondholder groups in an ongoing effort to reach a consensual global solution to its financial distress.

60.     On May 16, 2016, the Oi Group announced that it would begin formal discussions with Moelis & Company, advisor for an ad hoc group of bond holders issued by Oi and its subsidiaries (the "**Ad Hoc Group**").  On the same date, it issued a press release formally announcing these negotiations and asking creditors with Oi Group bond debt to join the Ad Hoc Group.  As of May 31, 2016, the Ad Hoc Group holds a total of $ 2,526,252,642 or 27.6% of Oi Group bond debt, consisting of holdings of various series of the U.S. Notes, the U.K. Notes, and the Brazilian Debentures.

23

61.     On June 6, 2016 and June 7, 2016, representatives of the Oi Group and the

Group's financial and legal advisors met in New York with certain members of the Ad Hoc

Group (the "**Steering Committee**") and the Steering Committee's financial and legal advisors

(the "**Noteholder Advisors**") to negotiate the terms of a potential restructuring.

62.     On June 6, 2016, the Company provided the Noteholder Advisors with a term

sheet (the "**Company Term Sheet**") setting forth an out-of-court exchange proposal intended to

address the capital structure and liquidity challenges faced by the Company, while keeping the

Company out of a Brazilian court process.  Pursuant to the Company Term Sheet, lenders of the

Brazilian Bank Debt and the ECA Facilities were offered extended maturities, while the majority

of bondholders were offered secured take-back debt and equity in Oi at a premium to market

prices.

63.     In response to the Company Term Sheet, on June 11, 2016, the Noteholder

Representatives provided the Company with a counterproposal for a potential Transaction (the

"**Noteholder Term Sheet**").  The Noteholder Term Sheet proposed, among other things, (i) the

issuance of two series of new secured notes to bondholders in the aggregate principal amount of

R$9 billion, payable in cash and denominated in U.S. dollars and euro, with 95% participation

from the bondholders; (ii) the extension of the maturities of bank and ECA debt and (iii) the

receipt by bondholders and existing shareholders of 95% and 5% of equity, respectively.  The

Noteholder Term Sheet further provided that the exchange offer include consents for

a *recuperação extrajudicial* on the same economic terms as the exchange offer, and that the

Company execute a restructuring support agreement including an agreed plan for a *recuperação*

*judicial* in the event the exchanges failed.

### F.  The Brazilian RJ Proceeding

64.     On June 20, 2016, the RJ Debtors duly commenced the Brazilian RJ Proceeding by filing a joint voluntary petition (the "**RJ Petition**") in the Brazilian RJ Court.  A copy of the Petition and a certified translation of the same from Portuguese to English are attached to the Petitioner Declaration as Exhibits H and I.

### G.  Present Status and Ongoing Operations

65.     Despite its financial distress, the Oi Group is poised to successfully emerge from restructuring and to continue to provide its customers with the highest level of telecom services.

66.     Most significantly, Oi stands to benefit greatly from the proposed overhaul of Brazil's telecom regulation, published by ANATEL and the Ministry of Finance on April 8, 2016.  The regulators' joint working group has suggested a new regulatory framework, most notably featuring the grant of operating rights in the form of unilateral government authorizations rather than bilateral concessions.  This alternative structure will relieve concessionaires of the many well-intended but ultimately infeasible requirements responsible for much of the Oi Group's recent financial difficulties.  The proposal also suggests the use of governmental funds to subsidize service in areas of low population density that currently generate operating losses, a critical benefit for the Oi Group given its operations in Region I and Region II of Brazil and one likely to render it more competitive as against its counterparts operating in Sao Paulo.

67.     While the Oi Group stands to benefit enormously from these proposed regulatory changes, it has also undertaken, with much early success,[13] a comprehensive internal overhaul of

---

[13]     For example, the Group's cost-minimization efforts have already reduced total expenses by 8%, which represents a real gain of about 20%.

business operations aimed at cutting costs and improving operational efficiency.  Oi's internal

"transformation plan" is led by an internal division responsible for coordinating concrete

improvements and promoting a corporate culture of increased productivity and reduced costs.  It

features more than 370 initiatives, most of which have already been implemented, including:

- downsizing personnel and reducing overtime work and employee expenses;
- renegotiating contracts with suppliers to obtain more favorable terms;
- reducing energy costs;
- installing new controls on corporate spending
- increasing field force productivity
- reducing call center costs per minute

68.     On the sales front, Oi has launched, with great initial success, a series of new and

improved consumer services.[14]  These programs, designed to address the shifting demands of its

customers as wireless and data-driven telecommunications continue to claim an increasingly

dominant share of the telecommunications sector, have proven immensely successful,[15] and offer

a promising indication of the Oi Group's likely economic recovery.[16]  Extrinsic measures of Oi

Group services are equally optimistic, as the Group continues to receive improved quality

indicators from ANATEL for its 3G coverage and quality.  The Oi Group intends to leverage its

recent success into improved competitive dominance in the Brazilian telecommunications market

---

[14]     For example, the Oi Group in Q4 2015 and Q1 2016 introduced new products to meet the increased
demand for wireless data usage and the increasing penetration of 3G/4G smartphones.  Its "Oi Livre" and
"Oi Mais" plans offer customers prepaid plans with increased data usage, and the recently launched "Oi
Total nationwide," which offers customers bundled services (landline, broadband, pay-TV, and wireless),
capitalizes on Oi's existing base of fixed-line customers to grow its mobile market share while increasing
the profitability of its customer base.  See generally Oi 1Q16 Report, March 31, 2016; Oi 2015 20-F.

[15]     For example, Oi's new telephone service plans, have increased sales of unlimited post-paid plans and
recharges under pre-paid plans. The convergence of services under the new "Oi Total" plans, designed to
leverage the ease of maintaining existing clients as compared to the expense of winning new ones, has
significantly improved revenue generation and operational efficiency.

[16]     For example, in March 2016, 19% of Oi total residential sales were to new customers,[16] and by end of Q1
2016 Oi's 3G and 4G coverage had expanded to reach 79% and 51%, respectively, of the Brazilian urban
population,[16] leading to the Oi Group's Glomo Award in the Outstanding LTE Contribution category for
implementing the first RAN Sharing project for 4G/LTE networks in Brazil and one of the largest of such
projects in the world.  Oi 1Q15 Report, March 31, 2016 at pp. 2-15.

throughout and following its restructuring; indeed, the Oi Group just recently, on May 19, 2016, received approval from ANATEL for a R\$3.2 billion investment plan that will expand mobile coverage and upgrade its fixed-line assets to fiber optic capable, ensuring that the Group will continuing to offer its customers the highest quality of services in the rapidly advancing telecom sector.[17]

69.     Presently and throughout the course of its above-described restructuring efforts, the Oi Group continues to provide uninterrupted critical telecommunication services such as internet, landlines, and mobile phone network coverage to its roughly 74.5 million Brazilian customers, as well as to customers of its telecom counterparties to its mutual services contracts.[18] Oi Group management is confident that through its centralized, court-supervised restructuring in Brazil, and with the protection against individual creditor actions afforded by ancillary proceedings such as these Chapter 15 Cases, it will be able to continue providing these vital services during the Brazilian RJ Proceeding.

### NO PENDING U.S. BANKRUPTCY CASES FILED BY THE DEBTORS

70.     None of the Debtors have a pending petition with the Court for relief under chapter 15 (other than the Petition), or any other chapter of title 11 of the U.S. Code.

### NO OTHER PENDING FOREIGN PROCEEDINGS

71.     The Petitioner is not aware of any pending foreign proceeding other than the Brazilian RJ Proceeding.

### OTHER PERSONS AUTHORIZED TO ADMINISTER FOREIGN PROCEEDINGS

72.     Mr. Richard Hudson has been authorized by Debtors Oi, Movel and Telemar to

---

[17]     Reorge Research Alert, "Oi's 3.2B Reais 4-Year Investment Plan Approved, Will be in Lieu of Anatel Fines" (May 20, 2016).

[18]     As of the end of 2014 Oi had 74.5 million clients. Corporate Profile, http://ri.oi.com.br/conteudo_en.asp?idioma=1&conta=44&tipo=43737.

act as foreign representative over any foreign proceeding in respect of such entities in the United

Kingdom, however Mr. Hudson has not as of the date hereof commenced any such foreign

proceeding.

### PARTIES TO LITIGATION IN THE UNITED STATES

73.    As of the date of the filing of this Petition, the Petitioner in not aware of

any pending litigation in the United States.

### ENTITIES AGAINST WHOM PROVISIONAL
### RELIEF IS SOUGHT UNDER SECTION 1519

74.    The Debtors are seeking provisional relief against the following entities:

- Capricorn Capital LTD;

- Syzygy Capital Management Ltd;

- Falceri Ivano

- The Bank of New York Mellon, as an Indenture Trustee for the 2016, 2017, 2019, 2020, 2021, and 2022 U.S. Notes
- HSBC Bank USA

each other creditor or contract counterparty listed on Exhibit A to the proposed order

related to the *Ex Parte Motion to Shorten Notice and Setting Procedures for Hearing to Consider*

*Petitioner's Motion for Provisional Relief* submitted contemporaneously herewith.


### CORPORATE OWNERSHIP STATEMENT PURSUANT TO BANKRUPTCY
### RULES 1007(a)(4) AND 7007.1

75.    In accordance with Bankruptcy Rule 7007.1, I hereby state that Bridge

Administradora De Recursos Ltda. holds 22.24% of Oi's preferred shares and Pharol, SGPS S.A.

holds 48.66% of Oi's common stock.

I, Ojas N. Shah, declare under penalty of perjury pursuant to 28 USC 1746, that the foregoing is true and correct to the best of my information and belief.

Dated:  June 21, 2016

Respectfully submitted,

_____
Ojas N. Shah