WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020-1095
(212) 819-8200
J. Christopher Shore
John K. Cunningham
Mark P. Franke

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Richard S. Kebrdle (*admitted pro hac vice*)
Jason N. Zakia (*admitted pro hac vice*)
Laura L. Femino (*admitted pro hac vice*)

*Attorneys for Antonio Reinaldo Rabelo Filho*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | )<br>) |
| OI S.A., et al.[1] | )<br>) |
| | )<br>) |
| Debtors in a Foreign Proceeding. | )<br>) |
| | ) |

Case No. 16-11791(SHL)
(Jointly Administered)

Chapter 15

**DECLARATION OF ANTONIO REINALDO RABELO FILHO PURSUANT TO 28 U.S.C. § 1746 IN SUPPORT OF MOTION FOR ORDER GRANTING RELIEF PURSUANT TO 11 U.S.C. §§ 105(a), 1145, 1507(a), 1521(a) AND 1525(a) TO (I) ENFORCE THE BRAZILIAN REORGANIZATION PLAN AND (II) GRANT RELATED RELIEF**

I, Antonio Reinaldo Rabelo Filho, hereby declare pursuant to 28 U.S.C. § 1746 and under

penalty of perjury under the laws of the United States, as follows:

---

[1]    The debtors in these Chapter 15 proceedings and the identifying four digits of the tax identification number of each are:  Oi S.A. (*in judicial reorganization*) ("**Oi**") (5.764), Telemar Norte Leste S.A. (*in judicial reorganization*) ("**Telemar**") (0.118), Oi Brasil Holdings Coöperatief U.A. (*in judicial reorganization*) ("**Coop**") (8518), and Oi Móvel S.A. (*in judicial reorganization*) ("**Móvel**") (3.963) (collectively, the "**Chapter 15 Debtors**").  Three affiliates of Oi—Portugal Telecom International Finance B.V. (*in judicial reorganization*) ("**PTIF**"), Copart 4 Participações S.A. (*in judicial reorganization*) ("**Copart 4**"), and Copart 5 Participações S.A. (*in judicial reorganization*) ("**Copart 5**") (PTIF, Copart 4, and Copart 5, collectively with the Chapter 15 Debtors, the "**Brazilian RJ Debtors**")—are also debtors in the Brazilian RJ Proceeding (as defined below), but are not debtors in these Chapter 15 proceedings.

I submit this declaration (the "**Declaration**") in support of the *Motion for Order Granting Relief Pursuant to 11 U.S.C. §§ 105(a), 1145, 1507(a), 1509(b), and 1521 to (I) Enforce the Brazilian Reorganization Plan and (II) Grant Related Relief* (the "**FFE Motion**"),[2] which is to be filed contemporaneously herewith and which seeks relief (the "**Relief Requested**") in support of the foreign restructuring Plan (the "**RJ Plan**")[3] approved by creditor vote and confirmed by the Seventh Business Court of Rio de Janeiro (the *7ª Vara Empresarial do Rio de Janeiro* or "**Brazilian RJ Court**") in the jointly administered judicial reorganization proceeding (*recuperação judicial*) (the "**Brazilian RJ Proceeding**") in respect of the Debtors, commenced by order of the Brazilian RJ Court on June 20, 2016 and presently ongoing pursuant to Federal Law No. 11.101 of June 9, 2005 (the "**Brazilian Bankruptcy Law**") of Brazil.

## BACKGROUND AND QUALIFICATIONS

1.      I am currently engaged as a consultant to Oi and have been duly appointed to act as foreign representative of the Brazilian RJ Proceeding of each of the Chapter 15 Debtors in these existing Ch. 15 Cases pending under chapter 15 of title 11 of the U.S. Code, 11 U.S.C. §101-1532 under Case No. 16-11791.

2.      I make the statements herein on the basis of facts and matters that are known to me and on documentation or information provided to me by the Chapter 15 Debtors, the Chapter 15 Debtors' counsel and my counsel.  Where I have been informed by others, such information is true to the best of my knowledge and belief

3.      To assist this Court's consideration of the Petition, I submit this Declaration to describe for the Court the factual background relevant to the FFE Motion and Relief Requested,

---

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the FFE Motion, and unless otherwise specified, all citations to ECF docket numbers herein are in reference to case number 16-11791.

[3]    A copy of the RJ Plan and its certified English translation is attached hereto as Exhibit A.

including the contents of the Plan and the processes of notice, voting, distribution to creditors, and confirmation of the Plan in the Brazilian RJ Proceeding.

## DECLARATION

### A.  General Background

4.      The Oi Group is one of the world's largest integrated telecommunications service providers, with more than 70 million customers, and remains a critical source of telecommunications services in most of Brazil.  The Oi Group is the largest fixed telephone service provider in Brazil representing a market share of 34.5% of the total fixed-lines in service in the country.  The Oi Group has always been and remains a Brazilian enterprise, with nearly all of its operations, management, principal executive offices, customers, assets and employees in Brazil.

5.      The Oi Group is a major participant in the Brazilian economy: it employs approximately 140,000 direct and indirect employees in Brazil, including 45,125 full-time employees as of December 31, 2015.  Between 2013 and 2016 alone, the Oi Group paid approximately BRL $34 billion in Brazilian taxes.

6.      The Brazilian RJ Debtors include: (i) Oi, which is incorporated under the laws of Brazil, and is the parent company of the Oi Group, operating the Oi Group's "Region II"[4] fixed line telecommunications services; (ii) Telemar, a wholly-owned subsidiary of Oi that operates the Oi Group's "Region I" fixed-line telecommunications services; and (iii) Móvel, a wholly-owned subsidiary of Telemar which operates the Oi Group's mobile telecommunications service

---

[4]    ANATEL's (as defined below) regulatory framework divides Brazil into three regions: (i) Region I consists of 16 Brazilian states located in the northern, northeastern, and southeastern regions and represents approximately 64% of the country's total land area and 54.7% of the total population; (ii) Region II consists of the Federal District and nine Brazilian states located in the western, central and southern regions and represents approximately 33.5% of the country's total land area and 23.7% of the total population; and (iii) Region III consists of the State of São Paulo and represents approximately 2.9% of the country's total land area and 21.6% of the total population of Brazil.

3

and satellite television services.  The Brazilian RJ Debtors also include four special-purpose financing companies, two of them special-purpose investment entities incorporated in the Netherlands and wholly owned by Oi: Coop and PTIF.  Also included as Brazilian RJ Debtors are two special-purpose investment entities incorporated in Brazil and wholly owned by Oi, which own certain of the Oi Group's real estate in Brazil: Copart 4 and Copart 5.  The Brazilian RJ Debtors, combined together with additional non-debtor affiliates, make up the Oi Group.  The corporate structure of the Brazilian RJ Debtors is represented in the organizational chart below:



### B.  Connections to the United States

7.      Oi's shares are listed on the New York Stock Exchange in the form of American Depository Shares ("**ADSs**") (in addition to the listing of the underlying shares on the B3 stock exchange located in São Paulo), and counts among its 1.1 million shareholders U.S. residents holding an aggregate of 114,948,173 common shares and 54,479,348 preferred shares in total.

8.      Oi, Telemar, and Coop are obligors of U.S. dollar-denominated, New York law-governed debt.  Oi and Coop have issued and/or guaranteed all of the Oi Group's six series of

New York law-governed notes (the "**U.S. Notes**"),[5] with a total principal amount of approximately United States Dollars ("**USD**") $5,100,000,000 outstanding. Telemar is the borrower under two USD-denominated, New York law-governed export credit agency facilities with the China Development Bank (the "**CDB Facilities**"), one of which Oi has guaranteed. Further, all of the New York law-governed debt instruments contain forum-selection clauses in which the obligors consent to the jurisdiction of New York state courts and U.S. federal courts sitting in New York, New York. Oi and Coop, with respect to the U.S. Notes, and Telemar, with respect to the CDB Facilities, engage agencies in the U.S. where notices and demands related to these debt issuances may be served. Móvel, one of the Oi Group's principal operating companies, along with Telemar and Oi, are party to a number of contracts that are related to the Oi Group's operating telecom connections with telecom companies operating in the United States.

### C. Assets and Liabilities

9.      The Oi Group's third-party financial indebtedness subject to the Brazilian RJ Proceeding primarily consists of four types of debt: (i) unsecured export credit facilities guaranteed or insured by various export credit agencies or other quasi-governmental financial institutions (the "**ECA Facilities**"); (ii) unsecured bonds and similar securities issued, varyingly, under New York law (the U.S. Notes discussed above), under English law (the "**U.K. Notes**"), and under Brazilian law (the "**Brazilian Debentures**"); (iii) two series of *certificados de recebíveis imobiliários* (the "**CRIs**"), securities issued through Brazilian financial institutions which consist of interests in lease payments owed by Telemar and Oi for the use of certain real

---

[5]     The 2019, 2020, and 2022 U.S. Notes are denominated and payable in United States Dollars. The 2016 U.S. Notes are denominated in Brazilian Reais, but payable in United States Dollars using a conversion rate determined at the time of payment; the 2017 and 2021 U.S. Notes are denominated and payable in euros.

property leased from Copart 4 and Copart 5; and (iv) secured and unsecured bilateral and syndicated Brazilian bank debt (the "**Brazilian Bank Debt**").

10.    As the Oi Group is financially integrated, various group entities engage in intercompany borrowing and lending. Consequently, certain of the Brazilian RJ Debtors owe intercompany debt, which debt is subject to restructuring under the RJ Plan.

    a.    Financial Debts of Oi

11.    Oi is a primary obligor on four series of the U.S. Notes, namely, (i) BRL $1,055,406,000 principal outstanding of 9.75% notes due 2016 (the "**2016 U.S. Notes**") governed by an indenture dated September 15, 2011 (the "**2016 Notes Indenture**"); (ii) €578,181,000 principal outstanding of 5.125% notes due 2017 (the "**2017 U.S. Notes**") governed by an indenture dated December 15, 2010 and supplemented February 27, 2012 (the "**2017 Notes Indenture**"); (iii) USD $138,058,000 principal outstanding of 9.5% notes due 2019 (the "**2019 U.S. Notes**") governed by an indenture dated April 23, 2009 and supplemented September 27, 2010 and February 27, 2012 (the "**2019 Notes Indenture**"); and (iv) USD $1,787,025,000 principal outstanding of 5.5% notes due 2020 (the "**2020 U.S. Notes,**" and together with the 2016 U.S. Notes, the 2017 U.S. Notes, and the 2019 U.S. Notes, the "**Oi U.S. Notes**") governed by an indenture dated September 15, 2010 and supplemented February 27, 2012 (the "**2020 Notes Indenture,**" and together with the 2016 Notes Indenture, the 2017 Notes Indenture, and the 2019 Notes Indenture, the "**Oi U.S. Notes Indentures**"). The Oi U.S. Notes Indentures are governed by New York law and designate New York as the forum for any disputes related to the Oi U.S. Notes. Oi is also the primary obligor on (i) two issuances of the Brazilian Debentures totaling approximately BRL $3,850,000; (ii) the CRIs; (iii) a limited number of the ECA Facilities; and (iv) a limited number of Brazilian Bank Debt facilities.

12.    Additionally, Oi has guaranteed the following indebtedness of its subsidiaries: (i) the two series of U.S. Notes issued by Coop (described below); (ii) all of the U.K. Notes,[6] of which the outstanding amount is over €4 billion; (iii) a limited number of the ECA Facilities; and (iv) a limited number of the Brazilian Bank Debt facilities.

13.    Oi is a borrower and lender, varyingly, on a number of intercompany loans governed by Brazilian law.  In particular, Oi is the borrower on the following loans:

(a)    August 29, 2012 Loan from Coop to Oi (the "**Aug. 29, 2012 Loan**") – Coop as lender and Oi as borrower entered into a USD $1,500,000,000 credit agreement on August 29, 2012 with final maturity on February 7, 2022;

(b)    June 18, 2015 Loan from Coop to Oi (the "**June 18, 2015 Loan**") – Coop as lender and Oi as borrower entered into a €400,000,000 credit agreement on June 18, 2015 with a final maturity on June 18, 2016.  The June 18, 2015 Loan was amended on several occasions to alter the outstanding amount and maturity dates; and

(c)    February 24, 2016 Loan from Coop to Oi (the "**Feb. 24, 2016 Loan**") – Coop as lender and Oi as borrower entered into a €245,248,715 Credit Agreement on February 24, 2016, with interest payments due beginning on June 20, 2016 and maturing on June 20, 2021.

b.    Financial Debts of Telemar

14.    Telemar's primary obligations under long-term private third-party financial indebtedness consist of debt owed under: (i) one issuance of the Brazilian Debentures; (ii) the CRIs; (iii) most of the ECA Facilities; and (iv) certain of the Brazilian Bank Debt.  In addition, Telemar has guaranteed the following primary obligations of other of the Brazilian RJ Debtors:

---

[6]    The U.K. Notes include 7 series of notes issued by PTIF and guaranteed by Oi: (i) €400,000,000 of 6.25% Notes due 2016, (ii) €500,000,000 of 4.375% Notes due March 2017, (iii) €250,000,000 of 5.242% Notes due November 2017, (iv) €750,000,000 of 5.875% Notes due 2018, (v) €750,000,000 of 5.00% Notes due 2019, (vi) €1,000,000,000 of 4.625% Notes due 2020, and (vii) €500,000,000 of 4.50% Notes due 2025, (all together, the "**PTIF Notes**").]

(i) the 2017, 2019, and 2020 U.S. Notes, all issued by Oi; and (ii) a limited number of the Brazilian Bank Debt facilities.

### c.    Financial Debts of Móvel

15.    Móvel's primary obligations under long-term third-party financial indebtedness consist of debt owed under certain of the Brazilian Bank Debt facilities.  In addition, Móvel has guaranteed one series of the Brazilian Debentures issued by Telemar.

16.    Móvel is also a borrower and lender, varyingly, on a number of intercompany loans.  In particular, Móvel is the borrower and Coop the lender on a €1,560,000,000 Credit Agreement, dated March 3, 2016, scheduled to mature on June 20, 2021 and with an interest rate of 5.725% (the "**March 3, 2016 Loan**").

### d.    Financial Debts of Coop

17.    Coop's most relevant assets are intercompany claims against Oi and Móvel on account of the proceeds of debt issued or assumed by Coop and on-lent for use in the Oi Group's Brazilian operations.

18.    Coop is the issuer of two series of the U.S. Notes, namely: (i) USD $1,431,703,000 of the 5.75% Notes due 2022 (the "**2022 U.S. Notes**"), which are governed by an indenture agreement dated February 10, 2012, and a first supplemental indenture dated July 27, 2012 (the "**2022 Notes Indenture**"); and (ii) €600,000,000 of the 5.625% Notes due 2021 (the "**2021 U.S. Notes,**" and together with the 2022 U.S. Notes, the "**Coop Notes**"), which are governed by an indenture agreement dated June 22, 2015 (the "**2021 Notes Indenture**" and, together with the 2022 Notes Indenture, the "**Coop Notes Indentures**").  The Coop Notes Indentures are governed by New York law and designate New York as the forum for any disputes related to the Coop Notes.

8

19.      Since Coop's formation, it has lent money to Oi and Móvel under the Aug. 29, 2012 Loan, the June 18, 2015 Loan, the Feb. 24, 2016 Loan and the March 2, 2016 Loan (together, the "**Coop Loan Agreements**").   Coop's balance sheet includes intercompany receivables that have been restructured under the RJ Plan.   As of early August 2016, the aggregate principal amount outstanding under the Coop Loan Agreements totaled approximately €5,518,656,925.

### D.      Commencement of the Brazilian RJ Proceeding

20.      On June 20, 2016, the Brazilian RJ Debtors duly commenced the Brazilian RJ Proceeding by filing a joint voluntary bankruptcy petition in the Brazilian RJ Court to restructure approximately BRL $65 billion in third-party debt, the largest restructuring case in Brazil's history.   On the same day, Ojas N. Shah was appointed as the foreign representative for the Brazilian RJ Proceeding with respect to each of the Chapter 15 Debtors.

21.      On June 21, 2016, the Brazilian RJ Court issued a decision on an interim basis granting the Brazilian RJ Debtors, among other relief, (i) a 180 business day stay of all collection lawsuits against the Brazilian RJ Debtors (the "**RJ Interim Order**").   On June 29, 2016, it issued an order formally accepting the Brazilian RJ Debtors into the Brazilian RJ Proceeding ("**RJ Acceptance Order**").   On October 3, 2016, the RJ Acceptance Order was appealed by a number of creditors seeking, among other things, orders from the Brazilian Court of Justice of the State of Rio de Janeiro (the "**Brazilian Court of Appeals**"): (i) requiring separate creditors' lists for each Brazilian RJ Debtor instead of the single unified creditors' list that the Brazilian RJ Debtors had submitted, and (ii) excluding Coop and PTIF from the Brazilian RJ Proceeding.[7] The first request was resolved when the Judicial Administrator (as defined below) presented

---

[7]      Interlocutory Appeal 0051668-49.2016.8.19.0000, filed by Capricorn and Syzygy.

separate lists on October 11, 2017, and the latter was denied on appeal in a decision by the
Brazilian Court of Appeals confirming the RJ Acceptance Order, which is currently subject to
appeal with the higher court (the "**Brazilian Superior Court of Justice**").  In its decision, the
Brazilian Court of Appeals agreed with the Brazilian RJ Court, in holding that Coop and PTIF
were properly included as debtors in the Brazilian RJ Proceeding because the operational
activities of the Oi Group were conducted mainly in Brazil, and PTIF and Coop were wholly-
owned subsidiaries of Oi with the sole purpose of obtaining international financing for the
operations of the Brazilian companies; and that it was necessary to restructure Coop and PTIF in
the Brazilian RJ Proceeding in order for the debtors to overcome their economic and financial
crisis.[8]

22.     As part of the RJ Acceptance Order, the Brazilian RJ Court ratified the180
business day stay of all collection lawsuits against the Brazilian RJ as determined by the RJ
Interim Order.  On May 15, 2017, the Brazilian RJ Court granted a request filed by the Brazilian
RJ Debtors to extend the stay period for an additional 180 business days or until approval of the
RJ Plan at the General Meeting of Creditors (the "**GCM**"), whichever came first.

23.     On July 22, 2016, the Brazilian RJ Court appointed two judicial administrators for
the proceeding: *PricewaterhouseCoopers Assessoria Empresa Ltd.* ("**PwC**") (responsible for
verification of claims and opinions on financial matters) and *Escritório de Advocacia Arnoldo
Wald e Advogados Associados* ("**Wald**") (responsible for opinion on legal matters and
verification of claims) (each in its capacity as judicial administrator, a "**Judicial Administrator**"
or "**JA**").  On March 31, 2017, the Brazilian RJ Court substituted PwC with BDO Consultoria
from its position as Judicial Administrator, but the latter declined, and on a hearing held on April

---

[8]     Brazilian Court of Appeals Decision to Interlocutory Appeal number 0051668-49.2016.8.19.0000, page 830.

10, 2017, Wald was confirmed as the sole Judicial Administrator of both financial and legal matters in the Brazilian RJ Proceeding.  In compliance with the Brazilian Bankruptcy Law, the Judicial Administrator presents monthly financial and economic reports on the activities of the Brazilian RJ Debtors as well as updates on the Brazilian RJ Proceeding itself, thus ensuring adequate disclosure to creditors, a topic further detailed below.

24.    On September 20, 2016 the Brazilian RJ Debtors published the first creditors' list of the Brazilian RJ Debtors in the State of Rio de Janeiro´s Official Gazette (the "**Official Gazette**") on September 20, 2016.  All creditors had the chance to present to the Judicial Administrator their proof of claims and objections to this list within a 15 business day term. After analyzing all proofs of claims and objections presented by creditors, the JA prepared, and on May 29, 2017 published in the Official Gazette, a second creditor's list.

### E.    Creditor Participation and Negotiation in the Restructuring Process

25.    Since the commencement of the Brazilian RJ Proceeding, the Brazilian RJ Debtors have negotiated extensively with stakeholders to address the demands of all parties and to reach a consensual solution to their restructuring.  These discussions took place over the course of a contentious, year-and-a-half-long, multijurisdictional restructuring process that has ultimately led to the consensual approval and subsequent confirmation of the RJ Plan in Brazil.

26.    Various Bondholder groups participated robustly in the restructuring process, including through litigation in the Brazilian courts.  Both the Ad Hoc Group of Bondholders of Oi (the "**Ad Hoc Group**"), led by its steering committee (the "**Steering Committee**"), and the International Bondholder Committee ("**IBC**"), filed pleadings with and requested relief from the Brazilian RJ Court throughout the Brazilian RJ Proceeding.  Creditors of Coop and PTIF, two entities of particular contention in this process, also actively participated, with creditors Syzygy

Capital Management, LTD. ("**Syzygy**") and Capricorn Capital Ltd. ("**Capricorn**"), funds managed by Aurelius, both filing pleadings with and requesting relief from the Brazilian RJ Court.

27.     Throughout the Oi Group's restructuring and in particular in the last half of 2017, the Oi Group and various creditor constituencies engaged in extensive restructuring negotiations.  Prior to and following the filing of its first draft RJ Plan on September 5, 2016 (which was filed in compliance with the strict timeline set forth by the Brazilian Bankruptcy Law), Company management attended in-person meetings in New York and Brazil with various parties-in-interest, including the Oi Group's Brazilian bank creditors, the Brazilian telecommunications regulator (*Agência Nacional de Telecomunicações* or "**ANATEL**"), lenders under the Oi Group's ECA Facilities, and representatives of bondholder groups, such as the Steering Committee, members of the IBC, and other significant holders of the Oi Notes, the Coop Notes, and the PTIF Notes (all together, the "**Bonds**").

        a.      Modifications to the RJ Plan

28.     As noted, the Debtors were required by the Brazilian Bankruptcy Law to file their first draft of an RJ plan on September 5, 2016.  Notice of that filing was published in the Official Gazette on September 30, 2016, after which creditors of the Brazilian RJ Debtors had 30 business days to file any objections to the RJ Plan.  Following the entry of various objections (detailed below), the Brazilian RJ Court set the GCM for October 9, 2017 on first call and, if needed, October 23, 2017 on second call.  The GCM was subsequently postponed several times by the Brazilian RJ Court, with final dates set for December 19 and 20, 2017 on first call and, if needed, February 1 and 2, 2018 on second call.

29.    On March 28, 2017 and in the course of the extensive negotiations discussed above, the Brazilian RJ Debtors filed its first series of proposed modifications to the RJ Plan, on the basis of requests of parties in negotiation.  Further modifications were considered in the following months, and another version of the RJ Plan was filed on October 11, 2017.

30.    On multiple occasions in October, November and December 2017 – prior to the filing of the RJ Plan – representatives from certain creditors met with the Company and the Company's financial and legal advisors to discuss further modifications to the RJ Plan. On November 27, 2017, the Brazilian RJ Debtors again filed a new version of the RJ Plan.

31.    In anticipation of the pending creditor vote, the Brazilian RJ Court revoked the power of conflicted members of Oi's executive officers that had been appointed by Oi's board of directors on November 3, 2017 (i.e., members nominated or appointed by certain of Oi's shareholders) from participating in the restructuring process.  On November 29, the Brazilian RJ Court vested sole authority of the restructuring process with Oi's chief executive officer (the "**CEO**") and directed him to present the final RJ Plan no later than December 12, 2017. Following this Court order, the Brazilian RJ Debtors filed a new version of the RJ Plan on December 12, 2017.  The GCM was held on December 19 and 20, 2017, and during the course of the meeting, the RJ Plan was further modified with input from voting parties, and consolidated into a final version dated December 20, 2017—the version approved by the creditors and confirmed (with certain modifications discussed *infra*) by the Brazilian RJ Court.

    b.    Disclosures to Creditors throughout Negotiations and Leading up to the GCM

32.    As noted, the Company's NDAs allowed them to share relevant information in the course of negotiations, but then required public disclosure of all material information (the "**Cleansing Materials**") pursuant to so-called "blow-out provisions" in the NDAs.  Beginning

13

on August 31, 2017 and continuing on multiple days throughout September and October 2017, the Company published in both English and Portuguese several notices of material fact on its website (the "**Material Fact Notices**") in compliance with the NDAs. The Cleansing Materials granted to all interested parties access to a wide range of information useful to evaluating the RJ Plan and preparing for the GCM, including, among others, a cash flow analysis of the Company, a summary of its capital expenditure needs, an overview of its mobile and broadband investment strategy, summaries of its working capital needs, projected cash flows, and projected EBITDA scenarios, as well as a summary of judicial claims outstanding against the Company and judicial deposits cash flow referred to in such claims. Blow-out materials also included a draft plan support agreement and term sheet outlining material economic provisions of a revised plan, as well as disclosures of information shared orally at the negotiations, which included the Company's expectations, intentions and assumptions regarding its restructuring and post-RJ operations.

33.    In addition to disclosure from the Company directly, the Judicial Administrator published monthly reports providing updates on the status of the Brazilian RJ Proceeding in particular and the Company's restructuring process generally (the "**JA Monthly Reports**"). The JA Monthly Reports included relevant notices to the market published by the Company, managerial cash flow statements, and also summarized the filings in the Brazilian RJ Proceeding. The JA Monthly Reports were publicly available along with all other case records from the Brazilian RJ Proceeding.

34.    Further and as discussed above, creditors who participated in the extensive negotiation period preceding the vote on the final RJ Plan had ample opportunity to review the

14

draft plan, discuss proposed changes, and seek additional materials that would ultimately inform their vote.

35.    The RJ Plan itself also included various attachments aimed at giving creditors full information with which to make their decision, most notably an economic-financial report published by Ernst & Young Assessoria Empresarial Ltda ("**EY**", and the financial report, the "**EY Report**").  The EY Report assessed the feasibility of the Oi Group in the context of the RJ Plan.  In addition to providing a broad overview of the Brazilian RJ Debtors and their business, it also provided financial projections and analyzed alternatives to the restructuring.

36.    All changes made to the RJ Plan during the GCM were shown and explained by power point to all creditors and representatives present at the meeting and a version of the amended RJ Plan was available for those interested in reading the document in its entirety.

37.    The Brazilian RJ Debtors' initial joint petition commencing the Brazilian RJ Proceeding included, among other things, (A) a description of the causes of their financial distress, (B) their financial statements, (C) a listing of their creditors and claims, (D) a list of all legal actions to which they were a party, with an estimate of the respective amounts claimed, and (E) other pertinent information.

38.    The Brazilian RJ Court ordered the issuance of a public notice in the Official Gazette containing (A) a summary of the Oi Group's petition and the decision permitting the Brazilian RJ Proceeding to proceed; (B) a nominal list of the Oi Group's creditors, specifying the updated amount, kind and rating of each claim; and (C) notices of the deadlines for creditors to challenge the claims listed in the list of creditors submitted by the Oi Group.  Such notice in respect of the Brazilian RJ Proceeding was filed and published in the Official Gazette

39.    In the course of its Brazilian RJ Proceeding, the RJ Debtors filed (A) an appraisal of the Brazilian RJ Debtors' assets (the "**Appraisal**") and (B) a feasibility report analyzing the Oi Group's turnaround strategy and business plan under the RJ Plan (the "**Feasibility Report**" and, together with the Appraisal, the "**Required Plan Reports**").   The Appraisal provided an analysis of the going-concern and forced liquidation values of the Brazilian RJ Debtors' assets, and the Feasibility Report examined the Brazilian RJ Debtors' business and recovery prospects under the RJ Plan.   As detailed in the Appraisal, a forced liquidation of the Oi Group's assets would likely have resulted in a materially lower recovery for the Oi Group's creditors.

40.    The Required Plan Reports disclosed the likelihood of the Oi Group's ability to perform obligations under the RJ Plan and the Oi Group's future business prospects.   No objections directly related to the Feasibility Report or the Appraisal were lodged in the Brazilian RJ Proceeding.

41.    When the Brazilian RJ Debtors filed their RJ Plan, it was accompanied by (A) a detailed description of the means of reorganization, and a summary thereof and (B) the Required Plan Reports, each of which were filed in the court records of the Brazilian RJ Proceeding.

42.    The Judicial Administrator provided creditors with monthly reports regarding the activities of the Oi Group.   The JA's reports included important detailed information and analyses concerning the status of the Brazilian RJ Proceeding, the cash flow and operating results for the Oi Group, the status of the RJ Plan, and other information.

43.    Additional disclosures were made throughout the course of the Brazilian RJ Proceeding, which included: (i) notices sent by the BNYM to Bondholders informing them of approval of the RJ Plan and necessary required action to recover under the RJ Plan, (ii) a written presentations regarding the Company's recent revisions to its long term business plan and capital

expenditure program on October 10, 2017, (iii) a written summary on the Company's mobile and broadband investment strategy; and (iv) a written summary of the Company's working capital needs.

**F.      Voting Rights, Approval and Confirmation of the Final RJ Plan**

a.      <u>Determination of Voting Rights</u>

44.     On October 4, 2016, the Brazilian RJ Court rendered a decision (the "**Indenture Trustee Voting Decision**") recognizing that while bondholders had a right to individualize their claims and to vote individually in the GCM, the indenture trustees of each of the U.S. Notes and the U.K. Notes (respectively and in their capacities as such, the Bank of New York Mellon ("**BNYM**") and Citicorp Trustee Company Limited ("**Citicorp**") and, together, the "**Indenture Trustees**") had the right to represent and cast votes on behalf of absent bondholders who did not individualize their claims.  The Indenture Trustee Voting Decision was appealed by the Brazilian RJ Debtors[9] and later confirmed by the Brazilian Court of Appeals on October 31, 2017.

45.     On October 20, 2017, the Brazilian RJ Court held that the Dutch insolvency trustees appointed in the Netherlands with respect to the Dutch bankruptcy estates of Coop and PTIF (the "**Dutch Trustees**") would neither be heard nor permitted to participate in the restructuring plan process on behalf of, respectively, Coop and PTIF.  On November 6, 2017, the Dutch Trustees jointly appealed that decision.[10]

46.     On November 9, 2017, the Brazilian Court of Appeals rendered a decision granting the provisional relief requested, but on December 1, 2017 this decision was revoked by the Brazilian Court of Appeals, ultimately denying the relief requested by the Dutch Trustees

---

[9]    Interlocutory Appeal 0058493-09.2016.8.19.0000, filed by the Brazilian RJ Debtors.

[10]   Interlocutory Appeal 0063586-16.2017.8.19.0000, filed by Jasper Reinier Berkenbosch and Jean Leon Marcel Groenewegen.

(stating that the Dutch Trustees could not vote nor represent Coop and PTIF in the GCM because the Dutch Bankruptcy Proceedings (as discussed below) had not been recognized by the Brazilian Superior Court of Justice, and thus would not produce any effects in Brazil, and provisions of article 43 of the Brazilian Bankruptcy Law entail voting restrictions to affiliated companies). [11]

b.    Quorum for Vote at the General Meeting of Creditors

47.    Attendance at the GCM is illustrated below:

|           | Attending, by Value of Claims |
|-----------|-------------------------------|
| Class I   | 92.28%                        |
| Class II  | 100%                          |
| Class III | 98.57%                        |
| Class IV  | 59.04%                        |

Brazilian Confirmation Order 5-6.

c.    Voting Mechanics at the GCM

48.    Creditors in attendance or represented at the GCM could vote for, against, or abstain from voting on, the RJ Plan.  To administer and collect all votes, the Judicial Administrator used an electronic system that collected inputs made to digital devices available at the GCM.

d.    Voting on Consolidation

49.    Prior to the vote on the RJ Plan itself, creditors voted on whether or not they wanted the RJ Plan to proceed on the terms of a consolidation of the RJ Debtors. Because the Oi Group is economically interconnected by virtue of related intercompany agreements, guarantees, and obligations and because its managerial, administrative, and financial decisions are made at

---

[11]    Interlocutory Appeal 0063586-16.2017.8.19.0000.

the direction of Oi for the benefit of the Oi Group, the RJ Plan is premised on the consolidation of the assets and liabilities of all seven Brazilian RJ Debtors.  Consolidation was for voting and distribution purposes only; the RJ Plan does not cause the corporate consolidation or merger of the Brazilian RJ Debtors.

50.    On August 21, 2017, the Brazilian RJ Court granted consolidation of the Brazilian RJ Debtors in the Brazilian RJ Proceeding (the "**Consolidation Decision**").  The Consolidation Decision was appealed by a number of creditors[12] and by the Dutch Trustees.[13]  On September 20, 2017, the Brazilian Court of Appeals rendered preliminary decisions staying the effects of the Consolidation Decision and: (i) ordering the Brazilian RJ Debtors to present segregated lists of creditors for each debtor and to provide any information needed to adequately assess each of the Brazilian RJ Debtors, indebtedness independently, and (ii) decreeing that creditors present at the GCM would vote on the issue of consolidation separately from other matters.

51.    Pursuant to the decision of the Brazilian RJ Court, voting on consolidation was conducted at the GCM prior to the voting of the RJ Plan, separately from any other matter, and in accordance with the guidelines established under the interlocutory appeals filed against the Consolidation Decision.[14]  Consolidation of the RJ Plan was overwhelmingly approved by the creditors of the Brazilian RJ Debtors at the GCM, as follows:

---

[12]    Interlocutory Appeal 0052171-36.2017.8.19.0000, filed by Capricorn, Syzygy, and others; and Interlocutory Appeal 0052769-87.2017.8.19.0000, filed by Goldentree Distressed Fund 2014 LP and others.

[13]    Interlocutory Appeal 0048011-65.2017.8.19.0000, filed by Jasper Reinier Berkenbosch and Jean Leon Marcel Groenewegen.

[14]    Interlocutory Appeal 0052171-36.2017.8.19.0000, filed by Capricorn, Syzygy, and others.

|  | Approval, by Value of Claims |
|---|---|
| Oi | 99.5% |
| Móvel | 96.87% |
| Telemar | 99.88% |
| Coop | 97.68% |
| PTIF | 99.09% |
| Copart 4 | 100% |
| Copart 5 | 100% |

52.     See *Minutes of the General Meeting of Creditors of Oi, Telemar, Móvel, Copart*

*4, Copart 5, PTIF, and Coop – Under Judicial Reorganization* ("**GCM Minutes**")[15] at 5-6.

e.     Approval of the RJ Plan at the General Meeting of Creditors

53.     Following the vote approving consolidation, the creditors of the Brazilian RJ

Debtors then voted on the RJ Plan on a consolidated basis.

54.      Only bondholders who individualized their claims per the legal procedure set

forth by the Brazilian RJ Court were permitted to vote.  Although the Indenture Trustee Voting

Decision permitted the Indenture Trustees to represent and vote on behalf of absent bondholders

who had not individualized their claims, both Indenture Trustees abstained from so voting.  The

RJ Plan was voted and approved in every class in a GCM attended by a record number of

creditors.  Brazilian Confirmation Order 6.  Per-class voting numbers were as follows:

|  | Approval Percentage by Number of Claims voted at GCM | Approval Percentage by Value of Claims voted at GCM |
|---|---|---|
| Class I | 100% | N/A |
| Class II | 100% | 100% |
| Class III | 99.56% | 72.17% |
| Class IV | 99.8% | N/A |

Brazilian Confirmation Order 5-6.  The lower approval percentage by value in Class III is due to

the negative vote of ANATEL, which held approximately 25.59% of all Class III voting claims.

---

[15]     A copy of the GCM Minutes and an English translation thereof is attached to hereto as Exhibit F.

Voting Report, Attachment 39 to Minutes of GCM ("**Voting Report**"),[16] at 132.   Absent

ANATEL's vote, 99.57% in number and 97% in value of the unsecured claims voted in favor of

the RJ Plan, including all major bondholders, and in particular the members of the IBC.   See

Voting Report 184, 783.

f.   Confirmation of the RJ Plan

55.   On January 3, 2018, the Public Prosecution Office of the State of Rio de Janeiro

issued an opinion (the "**Public Prosecutor Opinion**")[17] in support of confirmation of that the RJ

Plan, with the reservation of certain exceptional matters later addressed by the Brazilian RJ

Court in its order confirming the RJ Plan and discussed next.

56.   On January 8, 2018, the Brazilian RJ Court entered its order (the "**Brazilian**

**Confirmation Order**")[18] ratifying and confirming the RJ Plan, but modifying certain provisions

regarding the reimbursement of creditors' advisor fees and the eligibility of bondholders to

participate as backstop investors under the Backstop Agreement (as explained below).   Brazilian

Confirmation Order 9.   On February 5, 2018, (the "**Confirmation Date**"), the Brazilian

Confirmation Order was published in the Official Gazette.

57.   Several motions for clarification and several interlocutory appeals have been filed

against the Brazilian Confirmation Order.   Although subject to several of these pending appeals,

the Brazilian Confirmation Order and RJ Plan have not been stayed, fully or partially, and

therefore remain in full force and effect, according to their terms, as of the date of this Motion.

58.   As noted, the Brazilian Confirmation Order and subsequent orders of the

Brazilian RJ Court altered certain features of the RJ Plan, namely the process by which creditors

---

[16]   A copy of the relevant portion of the Voting Report is attached to the Supporting Factual Declaration as Exhibit G.
[17]   The Public Prosecutor Opinion, along with an English translation thereof, is attached hereto as Exhibit B.
[18]   A copy of the Brazilian Confirmation Order from the electronic judicial files of the Brazilian RJ Court and a certified translation from Portuguese to English thereof are attached to hereto as Exhibit C.

may choose from various payment options under the RJ Plan, and creditor eligibility to participate in the Backstop Agreement and capital increase contemplated. Specifically, on February 26, 2018, the Brazilian RJ Court extended the deadline for individual bondholders to elect a payment option from February 26, 2018 to March 8, 2018. On February 16, 2018, the Debtors and certain members of the Ad Hoc Group and IBC filed a motion for clarification regarding which bondholders were eligible to participate as backstop investors for the capital increase contemplated in the RJ Plan. On March 5, 2018, the Brazilian RJ Court held that only those creditors who had committed on or before December 19, 2017—the date the GCM was convened—were eligible to participate as backstop investors, and further that such investors' advisor fees and expenses, which pursuant to the Backstop Agreement were to be reimbursed, must be submitted to and approved by the Brazilian RJ Court, with further consideration to follow in a confidential ancillary proceeding.

59. On April 2, 2018, the Brazilian RJ Court rejected certain creditors' concerns over different treatment under the RJ Plan, stating that different treatment does not mean that creditors of the same class will be treated unequally.

60. The Brazilian Confirmation Order, according to its terms, is binding on all parties as long as its effects are not stayed, which they currently are not. The confirmed RJ Plan will reduce gross debt by over BRL $35 billion, and provide BRL $4 billion in new working capital through a post-restructuring equity rights offering.

### G. Key Terms of the RJ Plan[19]

61.     This summary of key terms of the RJ Plan is qualified in its entirety by the RJ

Plan.  Additionally, further details describing certain key terms and provisions of the RJ Plan are

included the Information Statement (defined below), and such details are incorporated herein by

reference.  While this summary largely focuses on the treatment of unsecured creditors under the

RJ Plan, and more specifically the treatment of bondholders, a more exhaustive review of the RJ

Plan in its entirety can be found in the Information Statement (defined below) exhibited hereto as

Exhibit D.

a.     <u>Treatment of Bondholder Claims</u>

62.     Holders of unsecured credits evidenced by bonds ("**Bondholder Credits**,"[20] and

each such holder a "**Bondholder**") will receive one of two possible recoveries under the RJ Plan:

an elected recovery, or a default recovery.  In order to be eligible to make a recovery election, a

Bondholder must individualize its claim and submit its recovery election pursuant to the

procedures set forth in the RJ Plan (and described in detail below) and the Information and

Election Solicitation Statement dated February 6, 2018 and amended on February 14, 2018

(together with the Exhibits attached thereto, the "**Information Statement**"[21]).

63.     The RJ Plan provides that every Bondholder that individualized its Bondholder

Credits before the Brazilian RJ Court or held Bondholder Credits of BRL $50,000 or more (each,

an "**Eligible Bondholder**") was entitled to select the payment option that they wished to receive

within 20 days following the Confirmation Date (each, a "**Recovery Election**").  Bondholders

---

[19]    All capitalized terms used but not defined in this Section G shall have the meaning ascribed to them in the English
        Translation of the RJ Plan attached hereto as Exhibit A.
[20]    "**Credits**" indicates a claim held by a creditor pursuant to the RJ Plan.  "Credits" and "claims" are interchangeable for
        purposes of this Motion.
[21]    A copy of the Information Statement is attached hereto as Exhibit D.

with Bondholder Credits over BRL $50,000 that had not individualized their Bondholder Credits prior to the GCM were permitted to do so during the pendency of the Recovery Elections in a process operated by the Judicial Administrator under the supervision of the Brazilian RJ Court, by petitioning to the Brazilian RJ Court and presenting proofs of holdings of their bonds along with other documents. In addition, at the request of the Judicial Administrator, Oi recognized as Eligible Bondholders all Bondholders that had participated in the Small Creditors Program (described below). As noted, the 20-day period following the Confirmation Date to make a Recovery Election expired on February 26, 2017, but by order of the Brazilian RJ Court on February 26, 2018, this period was extended until March 8, 2018 at 11:59 (Brasilia Time) ("**Election Deadline**").[22]

64. Eligible Bondholders were permitted to make a Recovery Election in respect of their Bondholder Credits. Any Bondholder that held Bondholder Credits of over BRL $50,000 that did not individualize its claim before the Brazilian RJ Court and had not participated in the Small Creditors Program was not considered an Eligible Bondholder and was not entitled to make a Recovery Election and will receive the "Default Recovery" (described below). Further, any Eligible Bondholder who failed to make a timely and valid Recovery Election by the Election Deadline will receive the Default Recovery. RJ Plan § 4.5.5. The payment options for Eligible Bondholders are as follows:

(i)  *Non-Qualified Bondholders Elected Recovery*

65. Eligible Bondholders with Bondholder Credits equal to or less than USD $750,000.00 ("**Non-Qualified Bondholders**") were entitled to elect to recover 50% of the

---

[22]  This deadline was extended by the Brazilian RJ Court in its February 26 decision to March 8, based on the Brazilian RJ Court's finding that the Indenture Trustees did not provide sufficient support to individual Bondholders seeking representation in the recovery election process. The decision also provided that the Indenture Trustees could elect a payment option for Bondholders that did not individualize.

amount of their claims in which the principal will be paid in cash in 12 semi-annual installments following a six-year principal grace period (the "**Non-Qualified Recovery**").[23]   RJ Plan § 4.3.3.1.

(ii)    *Qualified Bondholders Elected Recovery*

66.    Eligible Bondholders with Bondholder Credits greater than USD $750,000.00 ("**Qualified Bondholders**") were entitled to elect to have their Bondholder Credits satisfied through the distribution to such Eligible Bondholder of a combination of:

  i.    New notes, issued by Oi and guaranteed by all other Brazilian RJ Debtors (the "**New Notes**");

  ii.    Newly issued common shares of Oi, distributed in the form of American Depository Shares (the "**New Shares**");

  iii.    Bonus de Subscrição (**"Warrants"**) to acquire newly issued common shares of Oi (the "**Warrant Shares**"), which Warrants will be distributed in the form of American Depository Warrants ("**ADWs**"); and

  iv.    common shares of Oi, currently held by PTIF, to be distributed in the form of ADSs (the "**PTIF-Held Shares**"; and together with the New Notes, the New Shares and the Warrants, the "**Qualified Recovery**" or the "**RJ Plan Securities**")

RJ Plan § 4.3.3.2.

67.    Oi will issue (up to) 1,756,054,163 New Shares in a capital increase (the "**Capital Increase**") of value between BRL $11,765,562,892.10 and BRL $12,292,379,141.00, paid for by conversion of the Bondholder Credits of Qualified Bondholders into New Shares.  The New Shares issued in the Capital Increase will be offered to all current Oi shareholders.  The New Notes will be governed by a New York law indenture (the "**New Notes Indenture**"), payable in

---

[23]    Interest will accrue at the rate of 6% per year and will be capitalized during the first six years; beginning at the end of the 78th month, interest will be paid semi-annually in arrears together with payments of principal.

USD, and issued at a global issuance price of USD $ 145,262.00, the sum of the face value of the New Notes (USD $130,000) and the premium (USD $15,262).

68.     The Warrants grant to holders an option to exchange each Warrant for one common share in Oi (each common share that is issued upon exercise of a warrant, a "**Warrant Share**") issued and delivered by Oi in the form of ADSs.  The Warrants are exercisable for a period of 90 days, beginning on the date one year after their issuance (or beginning on an earlier date if certain conditions occur).

69.     If the recovery election is oversubscribed and the caps described above are reached, both the PTIF-Held Shares and the New Notes shall be distributed to the Qualified Bondholders making such election in proportion to their respective Bondholder Credits so elected.

(iii)     *Default Recovery*

70.     Bondholders who are not eligible to make or otherwise do not make a recovery election will receive payment under the Default Recovery, as will elected Claims in excess of the caps described above.  RJ Plan § 4.3.6.  The Default Recovery consists of a debt instrument (the "**Default Recovery Note**") with a 20-year principal grace period beginning on the Confirmation Date and either (i) for claims denominated in Brazilian Reais, an interest rate equal to the Brazilian treasury rate ("*TR*"), or (ii) for claims denominated in USD or euros, no interest accrual.  The Brazilian RJ Debtors may at any time pre-pay the amounts due by paying 15% of the outstanding balance.  The total amount to be paid under the Default Recovery is limited to BRL $70 billion minus the amounts which will be paid per the other options available, and if this limit is reached, each unsecured credit entitled to payment under the Default Recovery shall be

26

reduced pro rata based on the size of its claim as against the pool of total claims entitled to default recovery.

        b.      <u>Unsecured Credits Other Than Bondholder Credits</u>

71.    Other unsecured creditors eligible to make elections under the RJ Plan include non-bondholders with Class III Credits and those holding Class IV small business credits (the "**ME/EPP Credits**")[24] (such holders, excluding regulatory agencies and strategic suppliers, the "**General Unsecured Creditors**").

72.    Depending on their respective classification under the RJ Plan, General Unsecured Creditors can choose among three different payment options, with oversubscriptions beyond established caps or non-elections receiving payment under the Default Recovery described above.

73.    First, under a "linear" payment option, General Unsecured Creditors with credits equal to or less than BRL $1,000 can opt to receive 100% recovery of their respective credits in a single installment. General Unsecured Creditors with claims greater than BRL $1,000 may opt to accept BRL $1,000 as full payment of their unsecured credit. Otherwise, General Unsecured Creditors, regardless of their claim amount, may opt to have their credits restructured according to Restructuring Option I or Restructuring Option II (as described below) subject to the conditions and restrictions set forth by the RJ Plan. Such creditors had 20 days from the Confirmation Date to select which payment option they prefer on a website made available by Oi or by mail. Creditors who declined to select an option will receive payment in the form of the Default Recovery. RJ Plan §§ 4.5.

---

[24]    ME/EPP credits are defined in accordance with Brazilian law.

74.    Under Restructuring Option I, General Unsecured Creditors will recover their claims in entitlements paid over time.  Principal payments under Restructuring Option I will be made beginning 60 months after the Confirmation Date and in 24 semi-annual and successive installments.[25]

75.    Under Restructuring Option II, General Unsecured Creditors will recover their claims through payments made over time, with principal payments beginning 60 months following the Confirmation Date and will be made in 24 semi-annual and successive installments.[26]

c.    Small Creditors Program

76.    In order to address the very large number of small claims pending against the Brazilian RJ Debtors, the Brazilian RJ Debtors commenced mediation procedures (the "**Small Creditors Program**") designed to quickly and efficiently address over 30,000 small claims subject to the Brazilian RJ Proceeding, thus rendering negotiations, communications with creditors, and ultimately voting a far more manageable process.  See RJ Plan § 4.4.  The Small Creditors Program invited participation by any creditor (including bondholders) to register for the Small Creditors Program prior to the GCM.  Creditors that accepted the terms and conditions of the Small Creditors Program were entitled to receive payment of up to BRL $50,000 for their claims (or the full amount of their claims if less than BRL $50,000) in two instalments with 90% of such amount paid upon execution of settlement documents and the remaining 10% of the balance paid up to 10 business days after the publication of the Confirmation Order in the

---

[25]    Claims originally denominated in BRL will accrue interest at an annual rate of 80% of the CDI (the average rate at which the Brazilian banks are willing to borrow/lend to each other for one day, similar to the federal funds rate), and claims originally denominated in USD will accrue interest at 1.75% per year.

[26]    Interest will accrue at 1.25% per year, with 10% of the interest accrued for the first 5 years paid biannually, and the remainder of the interest accrued paid 60 months after the Confirmation Date.  From the 66th month onwards, interest will be paid together with principal.

28

Official Gazette. The Small Creditors Program was open to creditors from August 29, 2017

through December 8, 2017, see RJ Plan § 4.4, and was successfully completed on December 8,

2017, with over 34,000 creditors holding over BRL $360,000,000 of claims participating,

including certain holders of PTIF Notes residing in Portugal. As of the date hereof and in

accordance with the RJ Plan, most participating creditors have received payment for the amount

of their prepetition credits that was subject to the Small Creditors Program.[27]

### d. Rights Offering

77.    Independent of and subsequent to the issuance of New Shares as part of the

Qualified Recovery under the RJ Plan, the RJ Plan also provides for the Oi Group to raise

additional funding to continue investing in capital expenditures and implement its business plan.

RJ Plan § 6. Specifically, Oi will conduct a BRL $4,000,000,000 equity rights offering (the

"**Rights Offering**") to all shareholders of the Company on a pro rata basis following

implementation of the Qualified Recovery. Subject to the satisfaction of certain conditions

precedent, the Rights Offering will take place as soon as possible after the Qualified Recovery

and in no event later than February 28, 2019.

78.    The Rights Offering is governed by the RJ Plan and supported by a backstop

agreement dated December 19, 2017 (the "**Backstop Agreement**")[28] between the Brazilian RJ

Debtors and certain Bondholders (the "**Initial Backstop Investors**").[29]    Under the Backstop

---

[27]    There are few cases in which payment is still pending, and the Company is reviewing such cases.

[28]    A copy of the Backstop Agreement is attached as Exhibit E to the Supporting Factual Declaration and as Exhibit 6.1 to the RJ Plan.

[29]    The Initial Backstop Investors party to the Backstop Agreement were: (i) Benefit Street Partners LLC, (ii) PF Fund Limited Partnership, (iii) Brookfield (represented by Brookfield Asset Management Private Institutional Capital Adviser (Credit), LLC), (iv) GoldenTree Asset Management LP (representing other managed funds and accounts), (v) Charcoal Crux 4, L.L.C., (vi) Redwood Capital Master Fund, LTD and Redwood Drawdown Master Fund L.P. (represented by Redwood Capital Management LLC), (vii) Syzygy, (viii) Bennett Restructuring Fund, L.P., (ix) Bennett Offshore Restructuring Fund, Inc., (x) Canyon Capital Advisors LLC, (xi) CVI EMCVF Lux Securities Trading S.a.r.l., (xii) EOC Lux Securities S.a.r.l., (xiii) Citadel Equity Fund LTD., (xiv) Knighthead Master Fund, L.P., Knighthead (NY) Fund, L.P., and Knighthead Annuity & Life Assurance Company (represented by Knighthead Capital Management LLC), (xv) York Capital

Agreement, Oi agreed, subject to any limitations imposed by the Brazilian Confirmation Order and subsequent decisions: (A) to conduct the Rights Offering subject to the terms contemplated under the RJ Plan and the Backstop Agreement, and to offer each Backstop Investor the right to subscribe to its pro rata portion (based on its share of the commitments (the "**Equity Commitments**")) of any shares that are not subscribed in the Rights Offering, and (B) to pay the related fees and expenses of each Backstop Investor. Each Backstop Investor agreed, on a several and non-joint basis with the other Backstop Investors and subject to certain conditions, to backstop the Rights Offering by subscribing to its pro rata share of any unsubscribed shares. The Backstop Agreement further provides that as additional consideration for its Equity Commitment, each Backstop Investor will receive a commitment fee of either (1) cash or (2) common shares of Oi (the "**Commitment Fee**").[30]

79.     On March 7, 2018 and April 2, 2018, the Brazilian RJ Court clarified that, in addition to the Backstop Investors party to the Backstop Agreement, bondholders who expressed a commitment to participate in the Rights Offering prior to the GCM were also eligible to participate as additional backstop investors,[31] and if they participate, they are bound by the terms of the Backstop Agreement. Additionally, such backstop investors will have their related advisor fees and expenses submitted to the Brazilian RJ Court for approval for reimbursement pursuant to the Backstop Agreement and the Brazilian Confirmation Order. Pursuant to a subsequent

---

Management Global Advisors LLC (representing other managed funds and accounts), (xvi) Trinity Investments Designated Activity Company, (xvii) JH Credit, L.L.C., and (xviii) Solus Alternative Asset Management LP (representing other managed funds).

[30]    Each Backstop Investor is provided the option to choose which form of payment they wish to receive for the Commitment Fee (cash or common shares), unless the trading price of such common shares during the 30 consecutive days prior to the date of the Rights Offering is BRL $10.00 or more, in which case the Company may choose the form of payment.

[31]    Due to the Brazilian RJ Court's ruling, Marble Ridge and Burlington Loan Management will become additional Backstop Investors to the Backstop Agreement, which is subject to appeals.

decision of the Brazilian RJ Court rendered April 2, 108, the reimbursement of related advisor fees and expenses will be decided in a confidential ancillary proceeding.

e.      Novation of Pre-Petition Claims and Releases

80.     The RJ Plan provides that holders of Pre-Petition Credits are entitled to receive the recoveries set forth in the RJ Plan and that such Pre-Petition Credits (subject to certain exceptions) are novated by entitlements provided by the RJ Plan and discharged under Brazilian law. Id. § 11.2.

81.     Pursuant to sections 11.12 and 11.4 of the RJ Plan, upon approval of the RJ Plan: (a) all of the Brazilian RJ Debtors, their affiliates, controlled companies, subsidiary companies, associated companies, associated entities, and other companies in the same group, and their respective shareholders, directors, counselors, investors, employees, attorneys, advisors, agents, attorneys in fact, and representatives, including their predecessors and successors (collectively, the "**Released Oi Group Parties**") will be released from their obligations and liabilities with respect to certain actions (or inactions, as applicable) prior to the Approval of the RJ Plan (such releases, the "**Oi Group Releases**"), id. § 11.2.1; and (b) each of the Brazilian RJ Debtors and their successors, and their creditors, expressly release the Backstop Investors and entities controlled by them, their subsidiaries and affiliates and other companies in the same corporate and economic group, their officers, directors, minority shareholders, partners, employees and advisors and successors (collectively, the "**Released Related Parties**" and, together with the Released Oi Group Parties, the "**Released Parties**"), from any and all liability for certain actions (or inactions, as applicable) prior to the approval of the RJ Plan, including with respect to the execution of the Backstop Agreement, the Judicial Reorganization and the restructuring provided

31

for under the RJ Plan (such releases, the "**Related Party Releases**" and, together with the Oi Group Releases, the "**Releases**"), id. § 11.12.1.2.

      f.    Conditions Subsequent

82.    The RJ Plan sets forth the following conditions subsequent: (1) the restructuring of certain Bondholder Credits under Section 4.3.3.2 of the RJ Plan, pursuant to which Qualified Bondholders that made a valid Qualified Recovery Election are eligible to have their Bondholder Credits satisfied in accordance with the terms and subject to the conditions thereof, by July 31, 2018; (2) the Capital Increase shall occur no later than July 31, 2018, and (3) the Rights Offering shall occur no later than February 28, 2019.  Id. § 12.1.

83.    The RJ Plan provides that the relevant creditors may, by resolution of the holder of a simple majority of claims present and voting at the meeting called for the purpose of waiving or modifying the condition(s) subsequent described above, approve a waiver or modification of a condition precedent.  Id. § 12.2.  Absent a waiver by the procedure set forth in the RJ Plan, failure of any condition subsequent that is not waived may result in the termination of the RJ Plan, at the discretion of the Brazilian RJ Court following consultation with the JA and public prosecutors.

      g.    Recognition

84.    Recognizing that the Oi Group restructuring is a global one and that its consummation will require the cooperation of foreign courts, the RJ Plan authorizes the Petitioner, on behalf of each of the Chapter 15 Debtors, to seek entry of an order from this Court giving full force and effect to the RJ Plan and the Brazilian Confirmation Order in the United States and granting all other appropriate and necessary measures in order to implement the RJ Plan (i.e., the Requested Relief).  See RJ Plan § 11.1.1.

### H. Bondholder Recovery Election and Distribution

85.     As discussed, the RJ Plan entitles Eligible Bondholders (those who have individualized their claims or participated in the Small Creditor Program) to a Recovery Election.  Under the RJ Plan, each Bondholder is entitled to receive a particular form of recovery depending on (1) whether such bondholder is an Eligible Bondholder, (2) whether such Bondholder makes a valid Recovery Election in accordance with the terms of the RJ Plan and the procedures described in the Information Statement (defined below), and (3) whether such Bondholder is a Qualified Bondholder or a Non-Qualified Bondholder.

86.     As discussed above, Qualified Bondholders are entitled to the Qualified Recovery, and Non-Qualified Bondholders are entitled to the Non-Qualified Recovery (the Qualified Recovery and Non-Qualified Recovery together, the "**Bondholder Recoveries**"), which will be evidenced by their receiving a participation interest under a credit agreement to be entered into between the Brazilian RJ Debtors and an administrative agent (the "**Non-Qualified Credit Agreement**").

#### a.     Disclosure of Procedures and Required Bondholder Action

87.     The RJ Debtors took measures to ensure that the Bondholders received sufficient information to, if desired, individualize their claims and make a Recovery Election.

88.     In addition to the disclosures provided prior to the GCM, the Brazilian RJ Debtors provided made available information following the creditors' vote (the "**Post-Voting Notices**") to all Bondholders regarding relevant developments in the restructuring process, including the ratification of the RJ Plan by the Brazilian RJ Court.  Following confirmation of the RJ Plan, the Post-Voting Notices further informed Bondholders that had not previously individualized their Bondholder Credits of the steps necessary to individualize their Bondholder Credits and the

deadlines by which Bondholders must do so in order to make valid Recovery Elections under the RJ Plan. To further inform recipients, Oi provided a Q&A regarding the procedures by which Bondholders could individualize their Bondholder Credits and make a Recovery Election.

89.     On February 6, 2018, the Brazilian RJ Debtors announced solicitations of Recovery Elections (the "**Recovery Election Solicitations**") in an information and election solicitation statement describing the recoveries under the RJ Plan. The statement was distributed to Bondholders and made available on both the website (the "**Election Website**")[32] maintained by D.F. King in its capacity as tabulation agent (the "**Election Tabulation Agent**") and the website set up specifically for the Brazilian RJ Debtors in the court of their RJ process[33] (the "**Brazilian RJ Website**"). The terms and conditions of the Recovery Election Solicitations were amended on February 14, 2018 at the request of the Judicial Administrator to provide that Bondholders that had participated in the Small Creditors Program, but had not individualized their Bondholder Credits before the Brazilian RJ Court, were Eligible Bondholders and thus would be entitled to make valid Recovery Elections.

90.     The final terms and conditions of the Recovery Election Solicitations are described in the Information Statement, which was distributed to Bondholders and made available on the Election Website and the Brazilian RJ Website on February 14, 2018. The Information Statement described certain terms, procedures and deadlines with respect to the Recovery Elections (such procedures, collectively, the "**Bondholder Recovery Election Procedures**"), including, without limitation, the procedures to be followed for a Bondholder to

---

[32]    The Election Website was accessible at https://www.dfkingltdevents.com.
[33]    The Brazilian RJ Website is accessible at https://www.recjud.com.br.

make a Recovery Election, and relevant background information regarding the Company, the RJ Plan and the restructuring process.

91.     Shortly after the Brazilian Confirmation Order was issued, the Brazilian RJ Debtors distributed to Bondholders the Information Statement describing the recoveries under the RJ Plan through the Recovery Election Solicitations, which was also made available on the Election Website.  The final terms and conditions of the Recovery Election Solicitations, which are described in the Information Statement, was also distributed to Bondholders and made available on the Election website.   The Information Statement described the Bondholder Recovery Election Procedures and contained background information regarding the Company, the RJ Plan and the restructuring process.

### b.     Summary of Bondholder Recovery Election Procedures[34]

92.     The Bondholder Recovery Election Procedures include certain terms, procedures and deadlines relating to (a) exchange or settlement of Bondholder Credits, (b) Bondholders participation in the Qualified Recovery Settlement Procedure or the Non-Qualified Recovery Settlement Procedure, and (c) distributions and/or issuances of debt and equity securities and/or other forms of recovery to which the Bondholders are entitled, each of which the Oi Group will formalize in further documentation to be distributed by the Oi Group, in each case in accordance with the terms and conditions set forth in the Information Statement and pursuant to its explicit authority to establish such procedures under Section 11.1.1 of the RJ Plan.

93.     Procedures for making a valid Recovery Election depended on whether an Eligible Bondholder was a "Verified Bondholder" or a "Small Bondholder" according to criteria

---

[34]    The following paragraphs provide a summary of certain of the Bondholder Recovery Election Procedures and are qualified in its entirety by reference to the full text of the Information Statement.

set forth in the Information Statement.   A "**Verified Bondholder**" is a Bondholder holding Bondholder Credits of more than BRL $50,000 and has either individualized its Bondholder Credits before the Brazilian RJ Court or has participated in the Small Creditors Program.[35]   A "**Small Bondholder**" is a Bondholder holding Bondholder Credits of BRL $50,000 or less.

94.     As set forth in the Information Statement and the Election Website, for a Verified Bondholder wishing to make a valid Recovery Election was required, by March 5, 2018 (later extended to March 15, 2018 by order of the Brazilian RJ Court, (1) to register on the Election Website and (2) to upload onto the Election Website (x) a payment option notice in the form attached to the Information Statement as Exhibit F by the Election Deadline, and (y) a proof of holdings evidencing the principal amount of each series of Bonds beneficially owned by such Verified Bondholder as of the Election Deadline.

95.     For a Small Bondholder to make a valid Recovery Election, it was required to deliver directly to Oi by the Election Deadline: (1) a payment option notice in the form attached to the Information Statement as Exhibit E; and (2) a proof of holdings evidencing the principal amount of each series of Bonds beneficially owned by such Small Bondholder as of the date of its payment option notice.

96.     Based on the information submitted by Bondholders by the applicable deadlines, (i) the Election Tabulation Agent will tabulate lists in respect of Verified Bondholders that have made a valid Qualified Recovery Election (the "**Qualified Election List**") or a valid Non-Qualified Recovery Election (the "**Non-Qualified Election List**"), and (ii) Oi will tabulate a list in respect of the Small Bondholders that have made a valid Recovery Election (the "**Small**

---

[35]    In other words, a "Verified Bondholder" is an Eligible Bondholder that is not a Small Bondholder.  A "Verified Bondholder" therefore includes both "Qualified Bondholders" and "Non-Qualified Bondholders."  A Verified Bondholder that was a Qualified Bondholder was entitled to elect to receive the Qualified Recovery and a Verified Bondholder that was a Non-Qualified Bondholder was entitled to elect to receive the Non-Qualified Recovery.

**Bondholder Election List**"). Only Bondholders that appear on the Qualified Election List as of the commencement of the Qualified Recovery Settlement Procedure (as defined below) will be eligible to have Bonds accepted in the Qualified Recovery Settlement Procedures through which distribution of the Qualified Recovery under the RJ Plan will be settled (as explained below). Only Bondholders that appear on the Non-Qualified Election List and the Small Bondholder Election List as of the commencement of the Non-Qualified Recovery Settlement Procedure (as defined below) will be eligible to have Bonds accepted in the subsequent Non-Qualified Recovery Settlement Procedure through which distribution of the Non-Qualified Recovery under the RJ Plan will be settled (as explained below).[36]

97.    Through the procedures described above, the Brazilian RJ Debtors successfully solicited recovery elections from thousands of Bondholders around the world with respect to thirteen series of New York and English law-governed bonds representing over USD $10 billion of debt, including BRL $8.5 billion in credits from Qualified Bondholers.

      c.    <u>Settlement Procedures</u>

98.    The Information Statement provided an overview of the settlement procedures expected to be undertaken following the conclusion of the Bondholder Recovery Election Procedures, which will include (a) the surrender of Bonds representing Bondholder Credits through the participation of Bondholders that appear on the Qualified Election List, Non-Qualified Election List or the "Small Bondholder" Election List in the Qualified Recovery Settlement Procedure or the Non-Qualified Recovery Settlement Procedure, as applicable, and

---

[36]    Persons that acquire beneficial interests in any Bonds after the Election Deadline will not be entitled to make a Recovery Election with respect to the acquired Bonds, but will only be entitled to receive the Default Recovery with respect to those Bonds, unless the transferor of the Bonds is included on the Qualified Election List or the Non-Qualified Election List and the transferor and transferee of the Bonds have complied with the procedures for assignment of Recovery Elections with respect to such Bonds described in the Information Statement. Small Bondholders will not be permitted to assign their valid Recovery Elections.

(b) the delivery of the Qualified Recovery or Non-Qualified Recovery to such Bondholders, as applicable, in each case in accordance with the terms and conditions set forth in the Information Statement, further information statements related to the Qualified Recovery Settlement Procedure and the Non-Qualified Recovery Settlement Procedure which the Oi Group will distribute to Bondholders in due course, and any other similar documentation distributed by the Oi Group to Bondholders in due course, and pursuant to its explicit authority to establish such procedures under Section 11.1.1 of the RJ Plan.

99.     Prior to the commencement of the Qualified Recovery Settlement Procedure and the Non-Qualified Recovery Settlement Procedure, the Brazilian RJ Debtors must satisfy certain conditions precedent (together, the "**Settlement Conditions**") by obtaining relief outside of Brazil necessary to implement the RJ Plan, including but not limited to court orders (the "**Required Foreign Orders**") entered:  (A) in these Chapter 15 Proceedings, giving full force and effect to the RJ Plan and Brazilian Confirmation Order in the United States, granting the Requested Exemption Relief (as defined below) and other necessary and appropriate relief to implement the RJ Plan, and (B) in the Dutch Bankruptcy Proceedings, confirming composition plans for Coop and PTIF, which mirror and are consistent in all material respects with the RJ Plan and fully terminate the Dutch Bankruptcy Proceedings and any other proceedings or actions initiated by the Dutch Trustee of Coop.[37] See RJ Plan § 13.2.1; Exhibit D at 25.

100.    As soon as practicable following the last to occur of the Settlement Conditions and the satisfaction or waiver of the conditions precedent set forth in Exhibit 4.3.3.5(c) to the RJ Plan, Oi will commence (1) a procedure to settle the Qualified Recovery to which Qualified

---

[37]   The Required Foreign Orders may also include relief granted in the English Proceedings and Portuguese Proceedings (both described below) by the appropriate foreign court or through consent of the appropriate parties.

Bondholders that have made valid Recovery Elections are entitled (the "**Qualified Recovery Settlement Procedure**"), and (2) a procedure to settle the Non-Qualified Recovery pursuant to which Non-Qualified Bondholders that have made valid Recovery Elections are entitled (the "**Non-Qualified Recovery Settlement Procedure**" and, together with the Qualified Recovery Settlement Procedure, the "**Settlement Procedures**"). The Qualified Recovery Settlement Procedure is expected to expire on the 20th U.S. business day following its commencement (such date and time, the "**Qualified Recovery Expiration Time**").   The Non-Qualified Recovery Settlement Procedure is expected to expire on the 20th U.S. business day following its commencement (such date and time, the "**Non-Qualified Recovery Expiration Time**").

101.    Oi expects to commence the Qualified Recovery Settlement Procedure by (1) publishing a press release announcing the commencement of the Qualified Recovery Settlement Procedure, and (2) distributing an information statement regarding the Qualified Recovery settlement (the "**Qualified Information Statement**") describing the Company, the Qualified Recovery, and the procedures through which Bondholders appearing on the Qualified Election List may participate in the Qualified Recovery Settlement Procedure, which will include procedures for:

    (i)    such Bondholders to surrender their Bonds to an agent appointed by Oi (the "**Qualified Exchange Agent**");

    (ii)    the Qualified Exchange Agent to confirm, following the Qualified Recovery Expiration Time, that the Bonds so surrendered have been surrendered by Bondholders appearing on the Qualified Election List in principal amounts not in excess of the amounts appearing on the Qualified Election List with respect to a particular

Bondholder;

(iii)    the Qualified Exchange Agent to return Bonds surrendered by Bondholders that do not appear on the Qualified Election List or principal amounts in excess of the amounts appearing on the Qualified Election List with respect to a particular Bondholder;

(iv)    Oi, following the Qualified Recovery Expiration Time, to accept cancellation Bonds surrendered by Bondholders appearing on the Qualified Election List in principal amounts not in excess of the amounts appearing on the Qualified Election List with respect to a particular Bondholder;

(v)    a separate agent appointed by Oi (the "**Settlement Agent**") to distribute the Qualified Recovery to the accounts of Bondholders whose Bonds have been accepted for cancellation by Oi;[38] and

(vi)    the Indenture Trustees to cancel the Bonds that have been accepted for cancellation by Oi.

102.    The procedures for Qualified Bondholders to participate in the Qualified Recovery Settlement Procedure will vary depending on whether the Bonds held by such Qualified Bondholder are held through the Depositary Trust Company ("**DTC**") or a common depositary for Euroclear Bank S.A./N.V. ("**Euroclear**") and Clearstream Banking, *société anonyme* ("**Clearstream**" and, together with Euroclear, the "**European Clearing Systems**"). To participate in the Qualified Recovery Settlement Procedure, Qualified Bondholders holding

---

[38]    As promptly as practicable following the acceptance of Bonds for cancellation, Oi will arrange for the distribution through the DTC and the European Clearing Systems (as defined below) of the Qualified Recovery to Bondholders whose Bonds have been accepted for cancellation.

Bonds to be surrendered through DTC will be required to surrender their Bond and complete, sign and date a letter of transmittal and deliver such letter of transmittal (the "**Letter of Transmittal**"), together with any other required documents, to the Qualified Exchange Agent. The Qualified Exchange Agent will confirm that the information provided in such Letter of Transmittal conforms to certain of the information set forth on the Qualified Election List.

103.    Similarly, Qualified Bondholders holding Bonds to be surrendered through the European Clearing Systems will be required to submit a valid participating and blocking instruction (a "**Clearing System Instruction**") in a form to be approved by the European Clearing Systems, together with any other documents required by the Clearing System Instruction, to the Qualified Exchange Agent. The Qualified Exchange Agent will confirm that the information provided in such Clearing System Instruction conforms to certain of the information set forth on the Qualified Election List.

104.    Oi expects to commence the Non-Qualified Recovery Settlement Procedure by (1) publishing a press release announcing the commencement of the Non-Qualified Recovery Settlement Procedure, and (2) distributing a Non-Qualified Recovery Settlement Information Statement (the "**Non-Qualified Information Statement**") describing the Company, the Non-Qualified Recovery, and the procedures through which Bondholders appearing on the Non-Qualified Election List may participate in the Non-Qualified Recovery Settlement Procedure, which will include procedures for:

       (i)     such Bondholders to surrender their Bonds to an agent appointed by Oi (the "**Non-Qualified Exchange Agent**");

      (ii)     the Non-Qualified Exchange Agent to confirm, following the Non-Qualified Recovery Expiration Time, that the Bonds surrendered

have been surrendered by Bondholders appearing on the Non-Qualified Election List in principal amounts not in excess of the amounts appearing on the Non-Qualified Election List with respect to a particular Bondholder;

(iii)    the Non-Qualified Exchange Agent to return Bonds surrendered by Bondholders that do not appear on the Non-Qualified Election List or principal amounts in excess of the amounts appearing on the Non-Qualified Election List with respect to a particular Bondholder;

(iv)    Oi, following the Non-Qualified Recovery Expiration Time, to accept for cancellation Bonds surrendered by Bondholders appearing on the Non-Qualified Election List in principal amounts not in excess of the amounts appearing on the Non-Qualified Election List with respect to a particular Bondholder;

(v)    Oi to enter into the Non-Qualified Credit Agreement with an administrative agent and to deliver to such administrative agent a schedule of the participants in the Non-Qualified Credit Agreement (consisting of the Bondholders appearing on the Non-Qualified Election List whose surrendered Bonds have been accepted for cancellation) and the principal amounts of their respective participations in the Non-Qualified Credit Agreement (which shall be equal to the amounts of the respective Non-Qualified Recoveries to which such participants are entitled); and

42

(vi)      the Indenture Trustees to cancel the Bonds have been accepted for

cancellation by Oi.

105.     Bondholders entitled to payment under the Default Recovery will receive an

unsecured right to payment of their Qualified Bondholder Credits, payable in five equal annual

installments commencing with a grace period of 20 years, counted from the Confirmation Date

or the date on which the grace period begins to run after confirmation of the plan in the relevant

jurisdiction, as applicable.

## I.   Substitution of the Foreign Representative

106.     On May 12, 2017 and following conversion of the Dutch SoPs into the Dutch

Bankruptcy Proceedings, the Brazilian RJ Court issued an order confirming, among other things,

that for purposes of Brazilian law: (i) the Brazilian statutory administrators  of Coop and PTIF

maintain their regular management powers, regardless of orders of Dutch Courts, and (ii) the

foreign representative maintains his powers, and each of Coop and PTIF maintain their powers to

appoint a new Foreign Representative of their Brazilian RJ Proceeding, and for Coop, specific

reference to the appointment of a representative for purposes of these Chapter 15 Proceedings

(the "**May 12 Brazilian Order**").

107.     Consistent with the May 12 Brazilian Order, on July 18, 2017, pursuant to a

resolution of the board of directors of each of the Chapter 15 Debtors, each of the Chapter 15

Debtors simultaneously (i) revoked the appointment of Mr. Shah as foreign representative of its

Brazilian RJ Proceeding in the United States and his power-of-attorney to act as such, and (ii)

appointed the Petitioner as foreign representative of its Brazilian RJ Proceeding in the United

States and granted him a power-of-attorney to act as such.  On July 18, 2017, the Petitioner

replaced Mr. Shah as the foreign representative of the Brazilian RJ Proceeding for each of the Chapter 15 Debtors, including PTIF and Coop.

### J.    Ancillary and other Foreign Proceedings

108.    In addition to the Brazilian RJ Proceeding, certain of the RJ Debtors are subject to ancillary and/or other plenary restructuring proceedings outside of Brazil.  The Oi Group has endeavored to coordinate these proceedings, in support of a unified, global solution to its restructuring—one which depends significantly on the relief requested in the FFE Motion.  The following reviews the foreign restructuring proceedings of (and foreign court orders related to) the Brazilian RJ Debtors.

### a.    The Dutch Restructuring Proceedings

109.    Both prior to and following commencement of the Brazilian RJ Proceeding, creditors initiated actions against Coop and PTIF in the Netherlands, including by filing involuntary Dutch bankruptcy petitions against these entities.  On August 22, 2016, Citicorp, in its capacity as the Trustee of the PTIF Notes, filed an involuntary petition at the direction of certain holders of PTIF Notes against PTIF in the Netherlands.

110.    Coop filed its petition for SoP on August 9, 2016, while PTIF filed its petition for SoP on September 30, 2016.  On August 9, 2016, the Dutch Bankruptcy Court granted Coop's SoP and appointed J.R. Berkenbosch ("**Mr. Berkenbosch**") of Jones Day as the administrator (*bewindvoerder*) of Coop.  On October 3, 2016, the Dutch Bankruptcy Court also granted PTIF's SoP petition and appointed J.L.M. Groenewegen ("**Mr. Groenewegen**") of the law firm CMS Derks Star Busman N.V. as the administrator of PTIF.

111.    On December 1, 2016, Mr. Berkenbosch and Mr. Groenewegen filed petitions with the Dutch Bankruptcy Court seeking conversion of the Dutch SoPs of Coop and PTIF,

respectively, into Dutch bankruptcy proceedings (proceedings which give the Dutch trustee more control over the debtor and are generally aimed at liquidation rather than reorganization of the debtor).  On December 23, 2016, members of the IBC and Citicorp Trustee Limited – indenture trustee of the notes issued by PTIF-filed a similar petition for Coop.  Subsequently, on January 4, 2017, Citicorp filed a petition with the Dutch Bankruptcy Court requesting that the SoP of PTIF be converted into a bankruptcy.  On February 2, 2017, the Dutch Bankruptcy Court rejected these conversion applications (the "**Dutch Bankruptcy Court Rejection Decision**"), and although Mr. Berkenbosch and Mr. Groenewegen chose not to appeal, members of the IBC and Citicorp appealed the Dutch Bankruptcy Court Rejection Decision.

112.    On April 19, 2017, the Dutch Bankruptcy Court of Appeals granted the appeals of members of the IBC and Citicorp, and converted Coop's and PTIF's Dutch SoPs to Dutch bankruptcy proceedings (each a "**Dutch Bankruptcy Proceeding**" and together, the "**Dutch Bankruptcy Proceedings**").  The Dutch Court of Appeals appointed Mr. Berkenbosch as Coop's Dutch Trustee in the Netherlands, and Mr. Groenewegen as PTIF's Trustee in the Netherlands.

113.    Approval of the RJ Plan, and the preliminary vote regarding consolidation, included approval by the vast majority of the PTIF and Coop Bondholders.  Following entry of the Brazilian Confirmation Order, Coop and PTIF on April 10, 2018 offered composition plans to their unsecured creditors as part of their Dutch Bankruptcy Proceedings (the "**Dutch Composition Plans**").  The voting deadline for the Coop Dutch Composition Plan is May 15, 2018, and the voting deadline for the PTIF Dutch Composition Plan is April 30, 2018.  The Dutch Composition Plans mirror (and are consistent in all material respects with) the terms of the RJ Plan already approved by stakeholders.  The Dutch Composition Plans will in principle be

45

approved if (i) a majority of all unsecured creditors with admitted claims in number present or are represented at the verification meeting and (ii) creditors whose claims representing at least 50% of the admitted claims in amount, vote in favor of each of the Dutch Composition Plans. The Dutch Court is then required to ratify each of the Dutch Composition Plans at a further hearing, which will take place between eight and fourteen days following verification meetings.

> b.    The English Recognition Proceedings

114.    On June 23, 2017, the High Court of England and Wales issued orders in relation to each of Oi, Móvel, and Telemar (each, an "**English Recognition Order**," and together, the "**English Recognition Orders**") recognizing the Brazilian RJ Proceeding as a "foreign main proceeding" in proceedings (the "**English Proceedings**") opened under the Cross-Border Insolvency Regulations 2006, which implements the Model Law in Great Britain.

115.    Each of the English Recognition Orders:

> (i)    stayed the commencement or continuation of individual actions or individual proceedings concerning the relevant debtors' assets, rights, obligations or liabilities;

> (ii)    stayed execution against the relevant debtors' assets; and

> (iii)    suspended the rights of the relevant debtors to transfer, encumber or otherwise dispose of their assets.

116.    On July 28, 2016, the English Recognition Order granted in respect of Móvel was partially modified to lift the suspension on its rights to transfer, encumber or otherwise dispose of its assets so that Móvel could continue operating its business.

> c.    The Portuguese Recognition Order

46

117.    To safeguard certain of the Brazilian RJ Debtors' rights, Oi, Telemar and, later, Móvel also sought ancillary relief in Portugal.    On November 18, 2016, Oi and Telemar petitioned the Judicial Court of the Region of Lisbon (the "**Portuguese Court**") to recognize the Brazilian RJ Proceeding in relation to Oi and Telemar; subsequently on July 11, 2017, the request was extended to Móvel as well.    The Portuguese Court granted the petitions with respect to Oi and Telemar on March 6, 2017, and with respect to Móvel on August 11, 2017 (the "**Portuguese Recognition Orders**").

### K.    Additional Orders of the RJ Court

118.    On January 9, 2018, Oi shareholder Pharol, SGPS S.A. ("**Pharol**") and Pharol subsidiary Bratel S.À.R.L ("**Bratel**"), issued a statement informing that it was requesting a "partial reconsideration" of the Brazilian Confirmation Order (the "**Partial Reconsideration Request**") and calling for an extraordinary shareholders meeting (the "**Extraordinary Meeting**") to be held on February 7, 2018 to deliberate the terms of the RJ Plan among other issues.    The Brazilian RJ Court rejected the Partial Reconsideration Request, including the request calling for the Extraordinary Meeting.    Nonetheless, the Extraordinary Meeting was held and attended by a number of shareholders, including Pharol, Bratel, Société Mondiale, Petrorio, and Aurélio Valporto, among others.    In response to the Extraordinary Meeting, the state public prosecutor ("the **Prosecutor**") filed a request with the Brazilian RJ Court on February 13, 2018 to suspend the rights of all shareholders who attended and signed the minutes of the Extraordinary Meeting and that those shareholders be removed from their positions for at least two years starting from the granting of the judicial reorganization.

119.    On March 7, 2018, the Brazilian RJ Court granted the Prosecutor's request and issued a decision, suspending the "political rights" of those shareholders who voted at the

Extraordinary Meeting (the "**March 7 RJ Court Decision**") and removing the members of the Board who were appointed by such shareholders, until the new equity contemplated under the RJ Plan has been issued to creditors.

I, Antonio Reinaldo Rabelo Filho, declare under penalty of perjury pursuant to 28 USC 1746, that the foregoing is true and correct to the best of my information and belief.

Dated:  April 13, 2018

Respectfully submitted,

Antonio Reinaldo Rabelo Filho

STATE OF FLORIDA       )
                         )SS:
COUNTY OF MIAMI-DADE   )

Sworn to and subscribed before me this 13th day of April, 2018, by Antonio Reinaldo Rabelo Filho, who is personally known to me.

My Commission Expires: June 10, 2018

_____
NOTARY PUBLIC

AILEEN VENES
Notary Public - State of Florida
My Comm. Expires Jun 10, 2018
Commission # FF 156978