**<u>EXHIBIT A</u>**
**RJ Plan and Certified English Translation**

## Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

...ESP nº 787
...88-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

...º 7952                    Livro nº 166                    Página nº 392

I, Cristina Gonzales, certified public translator, duly admitted and sworn by the Commercial Registry of the State of São Paulo, Brazil, hereby certify that a *copy* of a document written in PORTUGUESE was submitted to me, the translation of which is as follows:

### CONSOLIDATED JUDICIAL REORGANIZATION PLAN OF

OI S.A. – UNDER JUDICIAL REORGANIZATION

TELEMAR NORTE LESTE S.A. – UNDER JUDICIAL REORGANIZATION

OI MÓVEL S.A. – UNDER JUDICIAL REORGANIZATION

COPART 4 PARTICIPAÇÕES S.A. – UNDER JUDICIAL REORGANIZATION

COPART 5 PARTICIPAÇÕES S.A. – UNDER JUDICIAL REORGANIZATION

PORTUGAL TELECOM INTERNATIONAL FINANCE BV – UNDER JUDICIAL REORGANIZATION

OI BRASIL HOLDINGS COÖPERATIEF UA – UNDER JUDICIAL REORGANIZATION

December 20, 2017

**OI S.A. – Under Judicial Reorganization** ("Oi"), a publicly held corporation, registered with the CNPJ/MF under No. 76.535.764/0001-43, with a registered office and a principal place of business at Rua do Lavradio nº 71, Centro, Rio de Janeiro - RJ, CEP 20230-070; **TELEMAR NORTE LESTE S.A. – Under Judicial Reorganization** ("TELEMAR"), a closely held corporation, registered with the CNPJ/MF under No. 33.000.118/0001-79, with a registered office and a principal place of business at Rua do Lavradio nº 71, Centro, Rio de Janeiro - RJ, CEP 20230-070; **OI MÓVEL S.A. – Under Judicial Reorganization** ("OI MÓVEL"), a closely held corporation, registered with the CNPJ/MF under No. 05.423.963/0001-11, with a registered office and a principal place of business at Setor Comercial Norte, Quadra 3, Bloco A, Edifício Estação Telefônica, térreo (parte 2), Brasília - DF, at Setor Comercial Norte, Quadra 3, Bloco A, Edifício Estação Telefônica, térreo (parte 2), CEP 70.713-900; **COPART 4 PARTICIPAÇÕES S.A. – Under Judicial Reorganization** ("COPART 4"), a closely held corporation, registered with the CNPJ/MF under No. 12.253.691/0001-14, with a registered office and a principal place of business at Rua General Polidoro, 99, 4º andar, parte, Botafogo, Rio de Janeiro-RJ, CEP 22280-004; **COPART 5 PARTICIPAÇÕES S.A. – Under Judicial Reorganization** ("COPART 5"), a closely held corporation, registered with the CNPJ/MF under No. 12.278.083/0001-64, with a registered office and a principal place of business at Rua General Polidoro, 99, 5º andar, parte, Botafogo, Rio de Janeiro-RJ, CEP 22280-004; **PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. – Under Judicial Reorganization** ("PTIF"), a private legal entity organized and existing under the Laws of the Netherlands, with a registered office in Amsterdam, Naritaweg 165, 1043 BW, and principal place of business in this city of Rio de Janeiro; and **OI BRASIL HOLDINGS COÖPERATIEF U.A. – Under Judicial Reorganization** ("OI COOP"), a private legal entity organized and existing under the Laws of the Netherlands, registered with the CNPJ/MF under No. 16.770.090/0001-30, with a registered office in Amsterdam, Schiphol Boulevard 231,B tower, 5th floor, 1118 BH Schiphol, and principal place of business in this city of Rio de Janeiro (OI, TELEMAR, OI MÓVEL, COPART 4, COPART 5, PTIF, and OI COOP are hereinafter collectively

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 393*

referred to as "Oi Group" or "Debtors"), present, in the records of Judicial reorganization proceeding No. 0203711-65.2016.8.19.0001, pending at the 7th Commercial Court of the District of the Capital-RJ ("Judicial Reorganization"), in compliance with the provisions of art. 53 of Law 11.101/2005 ("LFR"), the present joint judicial reorganization plan ("Plan" or "PRJ"), in accordance with the following terms and conditions:

### 1.    Definitions and Interpretation Rules

**1.1.    Definitions.**    The terms and expressions printed in uppercase in this Plan will have the meanings attributed to them in **Exhibit 1.1.**

### 1.2.    Interpretation Rules.

**1.2.1.**    The Plan must be read and interpreted in accordance with the rules provided for in this **Section 1.2** and its exhibits.

**1.2.2.**    Whenever required by the context, the definitions contained in this Plan will apply both in the singular and in the plural forms, and the masculine gender will include the feminine gender and vice-versa.

**1.2.3.**    The headers and titles of the clauses in this Plan should only serve as reference information and will not limit or affect the meaning of the clauses, paragraphs, or items to which they apply.

**1.2.4.**    Unless otherwise expressly provided for in this Plan, the exhibits and documents referred to in this Plan form an integral part or the Plan for all legal purposes and its content is binding. References to any documents or other instruments include all their amendments, replacements, and consolidations, as well as the respective complementation, unless otherwise expressly provided for in this Plan.

**1.2.5.**    Unless otherwise expressly provided for in this Plan, references to chapters, clauses, items, or exhibits will apply to chapters, clauses, items, and exhibits to this Plan.

**1.2.6.**    Under the terms of the applicable legislation, unless otherwise expressly provided for in this Plan, all references to the Debtors must be interpreted so as to include the legal entities to succeed them in their obligations, by reason of the corporate reorganization provided for in this Plan.

**1.2.7.**    The use of the terms "included" and "including", among other similar terms in this Plan, followed by any statement, notice, or general subject cannot be interpreted so as to limit this statement, notice, or general subject to the items or specific subjects immediately included after the referred word — as well as similar items or subjects —, and must, on the contrary, be considered as a reference to all other items or subjects that could reasonable be included in the widest possible scope of such statement, notice, or subject, and these terms will always be interpreted as though they were accompanied with the term "for example purposes".

**1.2.8.**    References to legal provisions and Laws must be interpreted as references to such legal provisions and Laws as they were in effect on the date of this Plan or on the date specifically determined by the context.

**1.2.9.**    All terms provided for in this Plan will be counted as provided for in art. 132 of the Civil Code, excluding the start date and including the expiration date, and, if the final term falls on a day

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 394*

rather than a Business Day, it will be automatically extended to the immediately subsequent Business Day.

**1.2.10**. Unless otherwise expressly provided for in this Plan: (*a*) in case of conflict between the clauses in this Plan, the clause that contains specific provisions will prevail over that which contains generic provisions; (*b*) in case of conflict between the provisions of the exhibits and/or documents referred to in this Plan and the provisions of this Plan, the Plan will prevail; and (*c*) in case of conflict between the provisions of this Plan and the obligations provided for in any agreements signed by the Debtors and/or their Affiliates prior to the Request Date, the Plan will prevail.

**2.    Miscellaneous**

**2.1.    Oi Group and its Operations.** Oi Group started its operations with the provision of fixed telephony services, but, throughout the years, by keeping up with the technological cycles and the market demand, it expanded its operation also to mobile telephony, Internet, and pay television areas, among others.

Currently, the Debtors provide telecommunication services in an integrated manner and under the same brand – "Oi" –, offering a variety of converging products, for both fixed and mobile telephony. Today, Oi Group is the largest fixed telephony service provider in Brazil (and one of the largest in Latin America), with 13.4 million lines in operation, which represents a market share of 34.1% of the total market of the country, servicing homes, companies, and telephony for public use. In addition, it is one of the largest conglomerates in the segment of mobile telephony, with a market share of 17.4% in this sector.

Oi Group's operations also cover fixed and mobile broadband services, Wi-Fi, TV, and public telephony, considering that its supply of converging and integrated services has shown to be successful and necessary, as it helps increase user loyalty.

Oi Group also provides data communication and telephony services on an exclusive basis to 100% of the army sites located in Brazil's dry border, in addition to operating Comandante Ferraz station's telecommunications system, in the Antarctic, in partnership with the Ministry of Navy.

The social relevance of Oi Group is reflected in the expressive figures associated with tax revenue and the generation of employment; between 2013 and 2016 alone, Oi Group paid approximately BRL 34 billion to the public treasure in taxes, and currently relies on more than 131.3 thousand direct and indirect job slots in Brazil. Also, Oi Group *(i)* is engaging in social projects and initiatives, such as "Oi Futuro", a social responsibility institute created in 2001 that includes projects in the segments of education, sustainability, sports, and culture, as well as *(ii)* participates in the conduction of public policies, such as the National Broadband Plan and Broadband in Schools.

In addition, Oi Group enables the electronic counting of votes in local and state elections occurred in the country, and thus makes possible the integration between the information obtained from 2,113 electoral districts and 12,244 electoral sections of the Regional Electoral Courts, which enables the transmission of this information to the Superior Electoral Court.

Oi Group's operations are concentrated in Regions I, II, and III of the General Plan of Concessions (described in the initial petition of the Judicial Reorganization), and all telecommunication services provided depend on the prior concession of ANATEL, whether by means of grants, authorizations, licenses, or registrations.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

## Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 395*

In brief, Oi Group is one of the largest corporate conglomerates in the country, and is present in all 5,570 Brazilian cities, servicing more than 63 million clients. Within this context, the importance of Oi Group is unquestionable, not only to the Brazilian telecommunications system, but also and especially to the nationwide population, and therefore its uplift and recovery are crucial.

**2.2.    Oi Group's Structure.** The corporate structure of Oi Group is represented in the organizational chart below:



As highlighted in the initial petition of the Judicial Reorganization, the activities of Oi Group are developed in a coordinated manner and under the corporate, operational, financial, administrative, and managerial single control of OI, which acts as a holding entity (in addition to being the holder of the concession of the "Commuted Fixed Telephone Service" – STFC [*Serviço Telefônico Fixo Comutado*] in Region II) of the group and whose shares are listed in the B3 and in the NYSE (in the latter case, with negotiation in the ADR format).

OI MÓVEL and COPART 4 are subsidiaries wholly owned by TELEMAR, which in turn is a subsidiary wholly owned by the controller OI, as well as PTIF, OI COOP, and COPART 5.

Fixed telephony operations are performed by TELEMAR, the concessionaire of the public service in point, while the provision of the cable TV services is the responsibility of OI MÓVEL, which is also the holder of the authorization to operate mobile telephony services.

PTIF, OI COOP, COPART 4, and COPART 5 are Oi Group's investment companies. The first two entities, existing and organized under the Laws of the Netherlands, are mere financial vehicles of Oi Group, organized to obtain funds in the international market, which are intended, through loans, for the funding of activities in Oi Group's operating companies in Brazil, considering that this structure is regularly used by several Brazilian conglomerates. Whereas the latter two are the owners of some of the main properties leased for Oi Group in the State of Rio de Janeiro.

**2.3.    Reasons for the Crisis.** The current financial situation of Oi Group is a result of several factors. The retention of a large amount of funds in court deposits arising from discussions within the regulatory, labor, tax, and civil scope, with immediate impact on the liquidity of Oi Group, as well as with the imposition of high administrative fines, particularly by ANATEL, has contributed to the worsening of Oi Group's financial situation.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 396*

The change in the standards of consumption of telecommunication services, due to the technological evolution, worsened this scenario of financial difficulties even more. With the mass supply of mobile telephony, cable TV and Internet services, the attractiveness of fixed telephony services was reduced, which resulted in a decrease in the base of subscribers of Oi Group in this segment.

Notwithstanding the foregoing, the level of the objectives and goals associated with the obligations of universalization of fixed telephony services (consolidated in the General Plan of Universalization Goals, as provided for in the General Telecommunications Law) has remained stable since 1998, the year on which the concession agreements in effect were signed. Therefore, within the context of the referred obligations of universalization, Oi Group finds itself forced to make heavy investments in certain regions and remote locations, with low demographic density and a low-income population, obtaining, as a compensation, a small financial return as compared with the regulatory requirement of these investments.

Numbers regarding public telephones (popularly known as "*orelhões*", "big ears", in English) are an example of this lack of proportion between the obligations imposed to the Debtors within the scope of the universalization requirements *vis-à-vis* its financial compensation: currently, Oi Group operates approximately six hundred and forty-one thousand (641,000) public telephones across Brazil (with the exception of São Paulo), at an annual cost of approximately one hundred eighty million Reais (BRL 180,000,000.00), while the annual revenue generated by these public telephones is only two million seven hundred thousand Reais (BRL 2,700,000.00) in 2016 (considering that a reduction of more than 90% was verified between 2009 and 2016).

In addition, the costs to obtain funds incurred by Oi Group – taking into account the high interest rates adopted nationwide, as well as the need for and cost of foreign exchange protection for funds obtained abroad – are higher than the costs to obtain funds incurred by its direct competitors, who are international players, which also contributed to the deterioration of Oi Group's financial situation.

On the other hand, it is notable that the Country's economic scenario has been deteriorating over the past years, thus directly impacting the operations performed by Oi Group and negatively affecting its liquidity. Moreover, the profile of the market covered by fixed telephony concessionaires competing with the Debtors is more homogeneous and the economic power of their users is materially higher than that of those covered by Oi Group in its area of activity (larger and more heterogeneous than the area of activity of its competitors).

The combination of these factors prevented compliance with several obligations, primarily those assumed by reason of operations involving financial loans and fund raising through the issuance of bonds and debentures, which balances represent the majority of Oi Group's current indebtedness, which gave rise to the request for Judicial Reorganization.

**2.4    Previous Measures Adopted**. Since the first signs of deterioration of its financial health, Oi Group has been collaborating with external financial and legal advisors, in Brazil and abroad, to help it in the negotiation process with creditors and in the assessment of feasible alternatives for its reorganization.

Over the past quarters, Oi Group has been implementing an internal restructuring project – referred to as "Transformation Plan" – comprising more than three hundred and seventy (370) initiatives, considering that the great majority of them have already been executed or are in the process of execution, which, in general terms, intends to increase its competitiveness in the market, improve

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 397*

productivity, and reduce costs and expenses, increase operational efficiency, and improve the quality of the services.

As a result, we could highlight the following in this period: (i) the launchings of innovative plans, such as Oi Livre in mobile telephony and Oi Total Play in the residential segment; (ii) the significant improvement of operational indicators, such as, for instance, the thirty-three point three percent (33.3%) reduction in the average time to solve defects and the thirty-one point three percent (31.3%) reduction in the average time to install services, both during the second quarter of 2017, in relation to the second quarter of 2016; (iii) the reduction of BRL one billion and two hundred million Reais (BRL 1,200,000,000.00) in costs and expenses in the first six months of 2017 in relation to the same period in 2016 and (iv) the improvement in several quality indicators, such as the twenty-eight point six percent (28.6%) reduction in incoming complaints at ANATEL, the twenty-one point six percent (21.6%) reduction in incoming complaints at Procon, and the fifty-eight point seven percent (58.7%) reduction in the filing of complaint actions in the Special Civil Court (JEC - *Juizado Especial Cível*), all in the second quarter of 2017 in relation to the second quarter of 2016.

**2.5.    Reasons for the Joint Plan**. Oi Group consists of companies that, under Oi's common control, have a relevant economic and operational interconnection resulting especially from the interdependence and complementariness of the activities and services they provide, in addition to the management of the companies' funds to the benefit of the common interest.

Oi Group's managerial, administrative, and financial decisions are made by the controlling company, OI. On the other hand, Oi Group's internal and corporate processes and organization are also integrated and fully unified.

In addition to this single and consolidated direction of the converging and integrated activities, and to the direct operational and commercial bond, the Debtors have a strict economic and financial relationship strongly interconnected among themselves, by virtue of agreements, guarantees, and obligations that bind them and make them financially dependent on one another.

The Debtors are parties to several intercompany loan agreements executed due to the management of Oi Group's funds for the sake of the common interest. Furthermore, there are several debt agreements executed by Oi, Telemar, and Oi Móvel with financial institutions, in addition to several guarantees granted by one of the group's companies in favor of the other. Among the transactions that demonstrate the Debtors' economic and financial connection, we highlight: (i) the issuance of bonds in the international market by PTIF and Oi Coop, and Oi appears as full guarantor in such transactions, as well as the issuance of bonds, by Oi, in the international market, with Telemar appearing as guarantor of some series of such bonds; and (ii) the issuance of real estate Credit Bills, by COPART 4 and COPART 5, backed by the receivables corresponding to the rent amounts of real estates leased to Oi and Telemar, with Oi appearing as debtor and Telemar as guarantor in the agreement executed by COPART 5.

Furthermore, the operation center where the remote monitoring of the entire network of Oi Group is made is located in properties owned by COPART 4 and COPART 5, and leased to Oi Group.

From a commercial and operational point of view, Oi, Telemar, and Oi Móvel share the same physical and logistic infrastructure, and use "multi-service" networks through which communications and data related to different concessions of Oi Group travel (fixed and mobile telephony, Internet, and TV signal). This business model – which consists of a consolidated practice in the telecommunications sector – enables Oi Group to offer and sell several integrated package plans that

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                     *Livro nº 166*                     *Página nº 398*

include converging services under the single "Oi" brand, which encourages the loyalty of users, reduces the rate of discontinuation of consumers with respect to each one of the services contracted, and enables competition between Oi Group and the other operators of telecommunication services. Therefore, a significant part of the operating assets is intended for the provision of varied services, which would render unfeasible an eventual separation according to the owning company.

Therefore, considering the business model adopted by Oi Group, with integration and convergence in the provision of telecommunication services, the many cross guarantees and the consolidation of the corporate, operational, financial, administrative, and managerial control at Oi, the solution of the economic and financial crisis must occur in a joint and consolidated manner, under penalty of risking Oi Group's restructuring process, which plays a crucial social role, to the evident detriment of the Creditors and other holders of interest (including those of social nature) that surround them, all interested in the resolution of the present situation (government, investors, financial institutions, employees, suppliers, consumers, etc.).

Assuming that some of the entities in Oi Group could not be the subject matter of reorganization, while others are under reorganization, implies ignoring the damaging consequence that would oppose to the remaining activity, in light of the legal and practical complexities that the lack of success of one of the companies could create, as the uplift of an entity in Oi Group depends on the reorganization of the entire group in conjunction, as provided for in this Plan and in the initial petition of the Judicial Reorganization.

**2.6.    Economic, Financial, and Operational Feasibility of Oi Group**. Notwithstanding the difficulties and factors that affect Oi Group, giving rise to the request for Judicial Reorganization, the current financial situation is temporary and transitory, considering that Oi Group is in a position to revert it, taking into account its economic magnitude.

The activities performed by the Debtors are profitable and feasible, and generate for Oi Group, in 2016, a gross revenue in the amount of forty-five billion Reais (BRL 45,000,000,000.00) and a net revenue of approximately twenty-six billion Reais (BRL 26,000,000,000.00). In addition, recent events reinforce the conclusion drawn with respect to the profitability of the activities of the Debtors and the feasibility of Oi Group. With the launching of the new "Oi" brand, to date, it was possible to verify (*i*) an increase in the sale of new "Oi Total" plans; (*ii*) a significant increase in the so-called RGU (revenue generating unit, equivalent to each service contracted); (*iii*) an increase in the operational efficiency; and (*iv*) a reduction in the service discontinuity rate.

Moreover, it is known that discussions between ANATEL and the Ministry of Communications are in an advanced stage with regard to changes in the regulatory environment, which can result in the transformation of the concessions into authorizations, as well as in the change in the legal system of the reversible assets, releasing the concessionaires from many of their obligations and making them more competitive in relation to their competitors operating under an authorization system. In fact, there are Legislative Bills in an advanced stage that are intended exactly to increase security in the change in the model, which will benefit all concessionaires, rather than only those linked to Oi Group. These changes will positively impact the Debtors' situation, and therefore, they are also considered very important for the effective uplift of Oi Group, with the preservation of their corporate activities and, consequently, the maintenance of the source of production and employment, encouraging the company's social function and stimulating economic activity, which are objectives expressly stated in the LFR and expressed in indelible clauses of the Brazilian Constitution.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 399*

The feasibility of the Plan and the measures provided for therein for the reorganization of Oi Group is attested and confirmed by the Reports, under the terms of art. 53, items II and III, of the LFR, which are included in **Exhibit 2.6** of this Plan.

## 3.    Primary means of Reorganization

**3.1.    Overview.** Oi Group proposes the adoption of the measures listed below as a means to overcome its current and temporary economic and financial crisis, which are detailed in the specific sections of this Plan, under the terms of the LFR and other applicable Laws:

**3.1.1.    Credits Restructuring**: Oi Group will restructure and equalize its liabilities associated with Pre-Petition Credits and, at the discretion of Oi Group, with Post-Petition Credits whose holders wish to be subject to the effects of this Plan, under the terms of **Section 4** of this Plan. Pre-Petition Creditors will remain creditors of Debtor that was its original debtor, except any changes arising from corporate reorganizations made pursuant this Plan or specific provision in a different sense in this Plan, and observing in any case the provision of **Section 3.1.1.2** of this Plan.

**3.1.1.1.** Debtors shall employ their best efforts to cancel the respective bonds issued and currently existing, in compliance with the provisions of the applicable legislation to each jurisdiction of Debtors, and may take all applicable and required measures in any and every applicable jurisdiction, including Brazil, United States of the America and United Kingdom, in order to comply with the respective applicable legislations and implement the measures set forth in this Plan, and they may, in such cases, consult third parties in relation to bonds issued abroad, such as, for instance, depositary institutions, in order to ensure that the measures to be implemented are in compliance with the legislations of the respective jurisdictions, except the provision of **Section 11.4**.

**3.1.1.2.** Due to the consolidated nature of this Plan, Debtors shall be jointly liable for the fulfillment of all obligations set forth in this Plan.

**3.1.2.    Mediation/Conciliation/Agreement:** Oi Group can file Mediation/Conciliation/Agreement procedures with its Creditors contained in the Creditors' List of the Bankruptcy Trustee during the Judicial Reorganization, under the terms of **Section 4.4.**, as per the judicial decisions rendered on the topic.

**3.1.3.    Disposal of Permanent Assets**: as a manner of obtaining funds, Oi Group can dispose of the assets included in the permanent (noncurrent) assets of the Debtors listed in Exhibit **3.1.3**, as well as other movable or immovable assets included in its permanent assets, as per **Section 5.1** and art. 66 of the LFR., provided that possible requirements, authorizations or limitations that may be necessary are complied with, notably in regard to ANATEL.

**3.1.4.    Capital Increase – New Funds:** Oi Group shall, pursuant to **Section 6** of this Plan and observing the provision of the Backstop Agreement, increase the capital in four billion Reais (BRL4,000,000,000.00), in order to ensure the minimum funds to make the necessary CAPEX investments and modernization of its infrastructure aiming at the implementation of the business plan contemplated in this Plan.

**3.1.5.    New Funds**: Oi Group can also prospect and adopt measures, including during the Judicial Reorganization, with the purpose of obtaining new funds under the terms of **Section 5.3**, through the implementation of eventual capital increases or other manners of raising funds in the capital market, to be approved on the terms of this Plan and of the respective bylaws of the companies of Oi Group,

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                *Livro nº 166*                *Página nº 400*

provided that it is in accordance with the provisions of this Plan and of arts. 67, 84, and 149 of the LFR. Any new funds raised in the capital market will be of a post-petition nature for the purposes of the provisions of the LFR, except regarding any capital increase, as they do not represent payment obligations.

**3.1.6. Corporate Reorganization:** Oi Group can make the Corporate Reorganization, under the terms of **Section 7** of this Plan, with the purpose of obtaining a more efficient structure that is appropriate to the implementation of the proposals provided for in this Plan and to the continuity of its activities, or any other corporate reorganization to be timely defined by the Debtors, provided that it does not cause a Material Adverse Effect on the companies included in Oi Group.

**3.1.7. Transitional Amendments to the Governance:** In order to guarantee the execution of the measures provided for in this Plan and taking into consideration the several interests involved in the scope of the Judicial Reorganization, this Plan has transitional rules of corporate governance related to the creation of a Transitional Board of Directors and the formation of a New Board of Directors, so as to ensure the institutional stability of Oi Group and the implementation of this Plan.

**3.1.8. Court Deposits:** After the Judicial Ratification of the Plan, Oi Group can immediately withdraw the full amount of the Court Deposits that have not been used for payment, as provided for in this Plan.

4.     **Credit Restructuring:**

**4.1.      Labor Credits.** In accordance with **Sections 4.1.2** and **4.1.3** below, Labor Credits, as per the amounts indicated in the Creditors' List of the Bankruptcy Trustee, will be paid in national currency, after the end of the grace period of one hundred and eighty (180) days as of the Judicial Ratification of the Plan, in five (5) equal and successive monthly installments, considering that the first installment will mature on the last Business Day of the grace period abovementioned, and the other installments on the same day in the subsequent months, upon Court Deposit in the case records of the Proceedings in which the Labor Creditor is a party or if the Labor Creditor is not a party of the Court Proceedings, observing the provisions in **Section 13.4**.

**4.1.1.** Labor Credits not yet acknowledged on the date expected for the first payment as set forth in **Section 4.1** above, will be paid as follows, after being acknowledged:

(a)     if held by Labor Creditors not in the Court Deposits Labor Creditor category, their payment will be made with a judicial deposit, in the case records of the Proceedings, after the final decision rendered in court that closes the Proceeding and ratifies the amount owed without the possibility of objection by Oi Group, in accordance with **Section 4.1**, starting the term of one hundred and eighty (180) days of the grace period, on the date on which the referred decision is rendered in court, considering that the first installment will mature on the last Business Day of the grace period abovementioned, and the other installments on the same day in the subsequent months; or

(b)     if owned by Court Deposits Labor Creditors (or those which eventually meet this category, if any Court Deposit is made by Oi Group in the respective Proceeding dealing with the Labor Credit in point after the presentation of this Plan to the Judicial Reorganization Court, their payment will be made in accordance with **Section 4.1.2** below.

**4.1.2. Court Deposits Labor Creditors.** Labor Credits held by Court Deposits Labor Creditors will be paid through the withdrawal of the amount of the Court Deposit by the respective Court

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 401*

Deposits Labor Creditor, after the Judicial Ratification of the Plan, up to the limit of the amount of the referred Labor Credit contained in the Creditors' List of the Bankruptcy Trustee.

**4.1.2.1.** In the event that the Court Deposit referred to in **Section 4.1.2** above is greater than the amount of the respective Labor Credit contained in the Creditors' List of the Bankruptcy Trustee, the exceeding amount will be withdrawn by Oi Group.

**4.1.2.2.** In the event that the Court Deposit referred to in **Section 4.1.2** above is evidently less than the amount of the respective Labor Credit contained in the Creditors' List of the Bankruptcy Trustee, the remaining balance of the respective Labor Credit will be paid with a judicial deposit, in the case records of the Proceedings, in national currency, after the decision rendered by the Labor Court that ratifies the amount owed and after the end of the grace period of one hundred and eighty (180) days as of the Judicial Ratification of the Plan, in five (5) equal and successive monthly installments, considering that the first installment will mature on the last Business Day of the grace period abovementioned, and the other installments will mature on the same day in the subsequent month, always with a judicial deposit, in the case records of the Proceedings.

**4.1.2.3.** In accordance with **Section 4.1.2.1** above, the amount of the Labor Credit held by the Court Deposits Labor Creditor will be paid for purposes of indemnity, comprising any and all fees of the respective Labor Attorneys or other professionals, as well as court expenses and costs incurred by the Court Deposits Labor Creditor in point.

**4.1.3.** **Fundação Atlântico Labor Credit.** The Fundação Atlântico Labor Credit will be paid under the following conditions, in accordance with the amount contained in the Creditors' List of the Bankruptcy Trustee:

**4.1.3.1.** **Grace Period:** grace period of amortization of the principal of five (5) years, as of the date of the Judicial Ratification of the Plan.

**4.1.3.2.** **Installments:** amortization of the principal in six (6) annual and successive installments, with the first installment maturing on the last Business Day of the grace period referred to in **Section 4.1.3.1** above.

**4.1.3.3.** **Interest/inflation adjustment:** INPC + five point five percent (5.5%) per year, incurred as of the Judicial Ratification of the Plan, considering that (*i*) the interest and inflation adjustment incurred throughout the first five (5) years as of the Judicial Ratification of the Plan will not be paid during this period, and will be capitalized to the amount of the principal on a yearly basis; and (*ii*) the interest incurred on the new amount of the principal will be paid annually as of the last Business Day of the month in which the term referred in item (*i*) above ends, in conjunction with the installments regarding the amortization of the principal.

**4.2.** **Secured Credits.** Secured Credits will be grouped and paid as follows:

**4.2.1.** **Grace Period:** grace period of amortization of the principal of seventy-two (72) months, from the date of the Judicial Ratification of the Plan.

**4.2.2.** **Principal:** the amount of the principal will be paid in one hundred eight (180) monthly and successive installments, with the first installment maturing on the fifteenth (15th) day of the seventy-third (73rd) month from the Judicial Ratification of the Plan, and the others on the same day, every

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                             CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                     RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                      *Livro nº 166*                      *Página nº 402*

subsequent month, as of the first payment, as per the percentages of the amount of the principal described in the following progressive table:

| Months | Percentage of the amount to be amortized per month |
|---|---|
| 0 to 72nd | 0.0% |
| 73rd to 132nd | 0.33% |
| 133rd to 179th | 1.67% |
| 180th | 1.71% |

**4.2.3    Interest:** Long-Term Interest Rate (TJLP), disclosed by the Central Bank, added by 2.946372%, considering that:

(*i*)    interest incurred throughout the first four (4) years from the Judicial Ratification of the Plan will not be paid during this period, and will be capitalized on a yearly basis to the amount of the principal, so that the balance of the principal at the end of each year is the initial balance of the period added to the interest capitalized during the period in point, as per the following formula:

**final balance of the period = initial balance of the period x $(1+t)^{DC/360}$**,

where *t* represents the inflation adjustment and interest rate originally contracted and DC represents consecutive days; and

(*ii*)    as of the fifteenth (15th) day of the forty-ninth (49th) month from the Judicial Ratification of the Plan, the interest incurred on the new amount of the principal will be paid on a monthly basis, in national currency, until the full payment of the principal under the terms of this Plan.

**4.2.4    Other contractual conditions:** the Debtors undertake to comply, until the full payment of the Secured Credits, the terms and conditions described in **Exhibit 4.2.4.**

**4.3    Unsecured Credits.**

**4.3.1    Payment and Restructuring of Unsecured Credits:** Unless otherwise provided for in this Plan, each Unsecured Creditor may opt, at its discretion, to have the entirety of its respective Unsecured Credits paid in the manner set forth in **Section 4.3.1.1** or restructured by means of the options set forth in Sections **4.3.1.2 and 4.3.1.3** below, without possibility of voluntary division of the amount of credit among the referred to options and observing the respective Unsecured Credits limits.

**4.3.1.1  Linear Payment of Unsecured Credits:** Except if set forth otherwise in this Plan:

(i)    Unsecured Creditors holding ME/EPP Credits or Class III Credits in an amount equal to or less than one thousand Reais (BRL 1,000.00): The Unsecured Creditors that opt for the credit payment form set forth in this **Section 4.3.1.1** will receive their respective Credits in one single installment by the twentieth (20th) Business Day as of the Judicial Ratification of the Plan or the Acknowledgment of the Plan in the Creditor's Jurisdiction, as applicable, limited to the amount of the Creditors' List of the Bankruptcy Trustee.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 403*

(ii)    Unsecured Creditors holding ME/EPP Credits or Class III Credits in an amount superior to one thousand Reais (BRL 1,000.00): The Unsecured Creditors may opt, through the electronic platform made available by Oi at the electronic address www.recjud.com.br, for receipt under the terms of this **Section 4.3.1.1**, provided that they agree to receive only the amount of one thousand Reais (BRL 1,000.00) as full payment of their respective Unsecured Credit, as applicable, which comprises, when applicable, any and all attorney's or other professional fees, as well as court expenses and costs incurred by the Unsecured Creditor in point. Within this context, the payment will be made by the twentieth (20th) Business Day from the end of the term for the choice of credits payment to be made by the respective Unsecured Creditor through the electronic platform made available by Oi at the electronic address www.recjud.com.br, and neither the ME/EPP or Class III Creditor, nor its attorneys will be eligible to receive any amounts in addition to that indicated in this **Section 4.3.1.1**.

**4.3.1.2 Restructuring Option I:** Unsecured Creditors holding ME/EPP or Unsecured Credits or Class III Credits may opt for Restructuring Option I, by which their respective Unsecured Credits shall be restructured, up to six (6) months from the date of the Judicial Ratification of the Plan, under **Section 4.3.1.2.1** and in observance of the limit set forth in items (a) and (b) below for Unsecured Credits in Reais and United States Dollars, respectively.

**(a)**    A part of the Unsecured ME/EPP Credits or Class III Credits will be represented in Reais by the amount of the Unsecured Credits in Reais which choose Restructuring Option I, up to the maximum limit of ten billion Reais (BRL 10,000,000,000.00), and each Unsecured Creditor may choose one of the following payment options: (i) restructuring of the Unsecured Credit in Reals, as per the terms and conditions provided for in **Exhibit 4.3.1.2(a1)**; (ii) private debentures as per the terms and conditions provided for in **Exhibit 4.3.1.2(a2)**; or (iii) public debentures, in the same terms and conditions of the private debentures; and

**(b)**    A part of the Unsecured ME/EPP Credits or Class III Credits will be represented in United States Dollars by the amount of the Unsecured Credits in United States Dollars which choose Restructuring Option I, in accordance with the provisions of art. 50, paragraph 2, of the LFR, up to the maximum limit of one billion one hundred and fifty million United States Dollars (USD 1,150,000,000.00) and paid under the terms and conditions provided for in **Exhibit 4.3.1.2(b)**, assuming Debtors the liens related to the taxes that may be levied in Brazil, including, but not limited to, the lien of the withholding income tax (gross up). In the event the choices of Unsecured Creditors of the payment option provided for in **Section 4.3.1.3** do not reach the limit set forth in **Section 4.3.1.3**, an occasional remaining balance shall be automatically added to the limit established in this **Section 4.3.1.2(b)**.

**4.3.1.2.1**    In observance of the proportional allocation of the Unsecured Credits subject to Restructuring Option I in view of the entirety of ME/EPP or Class I Unsecured Credits payable within the limits set forth in items (a) and (b) of **Section 4.3.1.2**, as applicable, the ME/EPP or Class III Credits in point will be restructured as follows:

**(a)**    **Grace Period:** grace period of amortization of the principal of sixty (60) months, from the Judicial Ratification of the Plan;

**(b)**    **Principal**: the amount of the principal will be amortized in twenty-four (24) semi-annual and successive installments, with the first installment maturing on the twenty-fifth (25th) day of the sixty-sixth (66th) month from the Judicial Ratification of the Plan, and the others on the same day,

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 404*

every six (6) months, as of the first payment, as per the percentages of the amount of the principal plus the capitalized interest (as per item (c) below), pursuant to the following progressive table:

| Semesters | Percentage of the amount to be amortized per semester |
|---|---|
| 0 to 10th | 0% |
| 11th to 20th | 2.0% |
| 21st to 33rd | 5.7% |
| 34th | 5.9% |

**(c)** **Interest:** (*A*) ME/EPP or Class III Credits originally denominated in Reais will incur interest corresponding to the annual rate of eighty percent (80%) of the CDI; and (*B*) ME/EPP or Class III Credits originally denominated in United States Dollars, interest of one point seventy-five percent (1.75%) per year, considering that the interest shall be annually capitalized by the amount of principal and paid on a semi-annual basis as of the twenty-fifth (25th) day of the sixty-sixth (66th) month counted as from the date of the Judicial Homologation of the Plan.

**(d)** **Assignment of Rights**: The contractual instruments that may be entered into with such ME/EPP Unsecured Creditors or Class III, as the case may be, and any claims within the scope of such contractual instruments and any legal, equitable rights or any other economic interests provided for in such contractual instruments or arising therefrom, may only be transferred, assigned, contributed, made available or in other way disposed of (in whole or in part), upon notification to Debtors pursuant to Article 290 of the Civil Code and as long as the following are observed (i) the Code of Ethics of Group Oi available on this date at the address http://ri.oi.com.br and (ii) that the respective assignment does not involve individuals or legal entities indicated in the list of the Office of Foreign Assets Control (OFAC), of the Treasury Department of the United States of America.

**4.3.1.2.2** Once the limit established in item **(a)** of **Section 4.3.1.2** above for Unsecured Credits to be restructured in Reais or the limit set forth in item **(b)** of Section **4.3.1.2** above for Unsecured Credits to be restructured in United States Dollars is reached, the Creditors holding ME/EPP Credits or Class III Credits that have chosen the Restructuring Option I shall have part of their Unsecured Credits paid according to the option chosen, proportionally and limited to the amount of the respective Unsecured Credit presented in the List of Creditors of the Bankruptcy Trustee. The remaining balances shall be automatically allocated to be paid according to **Section 4.3.6** below.

**4.3.1.3 Restructuring Option II:** The Unsecured Creditors holding ME/EPP Unsecured Credits or Class III Credits may choose the Restructuring Option II, according to which the respective Unsecured Creditors shall be restructured by the amount of the Unsecured Credits in United States Dollars that choose the Restructuring Option II, within up to six (06) months from the date of Judicial Ratification of the Plan, pursuant to **Section 4.3.1.3.1** and observing the maximum limit of eight hundred fifty million United States Dollars (USD 850.000.000,00) for Unsecured Credits.

**4.3.1.3.1** Complying with the proportional allocation of the Unsecured Credits that choose the Restructuring Option II regarding the total amount of ME/EPP or Class III Credits to be paid within the limit set forth in **Section 4.3.1.3.**, the ME/EPP or Class III Credits in question shall be restructured as follows:

**(a)** **Grace Period:** grace period of amortization of principal of sixty (60) months, counted from the Judicial Ratification of the Plan.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP n° 787
CCM n° 9.743.188-5 (São Paulo, SP)

CPF/MF n° 108.911.608-09
RG n° 14.873.251 SSP/SP

*Tradução n° 7952*              *Livro n° 166*                     *Página n° 405*

**(b)    Principal:** the amount of principal shall be amortized in twenty-four (24) successive installments on a semi-annual basis, and the first one shall be due on the twenty-fifth (25th) day of the sixty-sixth (66th) month counted from the Judicial Ratification of the Plan, and the other installments shall be due on the same day every six (06) months as of the first payment, according to percentages of the amount of principal, plus capitalized interest (according to item (c) below), described in the progressive table below:

| Semesters | Percentage of the amount to be amortized per semester |
|---|---|
| 0 to 10th | 0% |
| 11th to 20th | 2.0% |
| $21^{rd}$ to 33rd | 5.7% |
| 34th | 5.9% |

**(c)    Interest:** interest of one-point twenty-five percent (1.25%) per year, considering that the interest shall be capitalized on an annual basis by the amount of principal and paid on a semi-annual basis from the twenty-fifth (25th) day of the sixty-sixth (66th) month counted from the date of Judicial Ratification of the Plan, taking into consideration that:

(i)    Ten percent (10%) of the interest incurred during the sixty (60) first months as of the Judicial Ratification of the Plan will be paid every six months, in cash, on the twenty-fifth (25th) day of the interest period;

(ii)    Ninety percent (90%) of the remaining interest and inflation adjustment incurred during the first sixty (60) months from the Judicial Ratification of the Plan, will not be paid during this period, and will be capitalized on a yearly basis to the amount of the principal, so that the balance of the amount of the principal at the end of each year is the initial balance of the period added to the interest capitalized during the period; and

(iii)    as of the sixty-sixth (66th) month counted from the Judicial Ratification of the Plan, one hundred percent (100%) of the interest and inflation adjustment incurred on the new principal will be paid every semester, on the twenty-fifth (25th) day of each interest period.

**4.3.1.3.2    Assignment of Rights:** The contractual instruments to be entered into with such ME/EPP or Class III Unsecured Creditors, as applicable, and any claims thereunder and any legal, equitable or other economic interest set forth therein shall not be transferred, assigned, contributed, conveyed, or otherwise alienated (in whole or in part), including but not limited to by way of sub-participation or discounting of any of such contractual instruments in a manner that would alter the ultimate beneficiary thereof without the prior consent in writing from the Debtors and all ME/EPP or Class III Unsecured Creditors that choose the Restructuring Option II. In addition, no encumbrance or lien on, or right in, any such contractual instruments may be granted or conveyed by any ME/EPP or Class III Unsecured Creditors that choose the Restructuring Option II without the prior consent in writing from the Debtors and all ME/EPP or Class III Unsecured Creditors, as applicable, that choose the Restructuring Option II.

**4.3.1.3.3.**    Once the limit set forth in **Section 4.3.1.3** above for Unsecured Credits is reached, Creditors holding ME/EPP or Class III Credits that have opted for Restructuring Option II shall have part of their Unsecured Credits paid pursuant to the chosen option, in a pro rata manner and limited to the amount of the respective Unsecured Credit included in the Creditors' List of the Bankruptcy Trustee. The outstanding balances shall be automatically paid under **Section 4.3.6** below.

Rua Pereira Estéfano, n° 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                           CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                   RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                  *Livro nº 166*                  *Página nº 406*

**4.3.1.3.4.** If the choices of Unsecured Creditors of this payment option do not reach the limit set forth in Section **4.3.1.3** above, an occasional remaining balance shall be automatically added to the limit set forth in Section **4.3.1.2(b)**. Accordingly, if the choices of the Unsecured Creditors of the payment option set forth in **Section 4.3.1.2(b)** do not reach the limit established in **Section 4.3.1.2(b)**, any remaining balance shall be automatically added to the limit established in **Section 4.3.1.3**.

**4.3.1.3.5. Other contractual conditions:** The other conditions applicable to the payment of the Unsecured Credits as set forth in **Section 4.3.1.3** are described in **Exhibit 4.3.1.5**, assuming Debtors the liens related the liens related to the taxes that may be levied in Brazil, including, but not limited to, the lien of the withholding income tax (gross up).

**4.3.2. Court Deposits for the Payment of Unsecured Credits:** Unless otherwise provided for in this Plan, ME/EPP Credits held by Court Deposits ME/EPP Strategic Unsecured Creditors and Class III Credits held by Court Deposits Class III Strategic Unsecured Creditors contained in the Creditors' List of the Bankruptcy Trustee and acknowledged by the Debtors, in the latter case in accordance with the terms of **Section 4.3.2.2**, will be paid based upon withdrawal of the amount of the Court Deposit by the respective Court Deposits Strategic Unsecured Creditor, after the Judicial Ratification of the Plan, until the limit of the amount of the referred Unsecured Credit, as applicable, contained in the Creditors' List of the Bankruptcy Trustee, and acknowledged by the Debtors, in the latter case, in accordance with the terms of **Section 4.3.2.2**.

**4.3.2.1.** Notwithstanding the provisions of **Section 4.3.2** above, the payment of Class III Credits held by Court Deposits Class III Strategic Unsecured Creditors shall be made pursuant to the following discount percentages of the amount of the referred Class III Credit contained in the Creditors' List of the Bankruptcy Trustee and acknowledged by the Debtors, in the latter case in accordance with the terms of **Section 4.3.2.2**, as described in the progressive table below:

| Credit Amount Interval | % of Deduction |
|---|---|
| Up to BRL 1,000.00 | 0.0% |
| BRL 1,000.01 to BRL 5,000.00; | 15.0% |
| BRL 5,000.01 to BRL 10,000.00 | 20.0% |
| BRL 10,000.01 to BRL 150,000.00 | 30% |
| Above BRL 150,000.00 | 50% |

**4.3.2.2.** As applicable, Unsecured Credits not yet acknowledged on the date expected for the choice made by the respective Unsecured Creditor through the electronic platform made available by Oi at the electronic address www.recjud.com.br, and that, after being acknowledged, are held by ME/EPP or Class III Unsecured Creditors who are Court Deposit ME/EPP Strategic Unsecured Creditors or Court Deposit Class III Strategic Unsecured Creditors, as applicable, shall be paid under **Section 4.3.2** above, and, as applicable, in accordance with the provisions of **Section 4.3.2.1** above. In such case, the respective Court Deposits Strategic Unsecured Creditor (*i*) cannot file an objection or question in any other way the amount indicated in the Creditors' List of the Bankruptcy Trustee or in an equivalent document, or (*ii*) if Oi Group files an objection regarding the amount indicated in the Creditors' List of the Bankruptcy Trustee or in an equivalent document, it must agree to the amount indicated in the respective objection filed by Oi Group.

**4.3.2.3.** In the event that, after presentation of this Plan to the Judicial Reorganization Court, any Court Deposit is made by Oi Group in the respective Proceedings in which the Unsecured Credit in point is discussed and the respective Unsecured Creditor accepts the conditions provided for in

Rua Pereira Estêfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 407*

**Sections 4.3.2** and **4.3.2.1**, as applicable, so that its Unsecured Credit is framed within the concept set forth in **Section 4.3.2.2** above, such Unsecured Credits may also be paid under **Section 4.3.2** above, and, as applicable, also in accordance with the provisions of **Section 4.3.2.1** above. In such case, the respective Court Deposits Strategic Unsecured Creditor (*i*) cannot file an objection or question in any other way the amount indicated in the Creditors' List of the Bankruptcy Trustee or in an equivalent document, or (*ii*) if Oi Group files an objection regarding the amount indicated in the Creditors' List of the Bankruptcy Trustee or in an equivalent document, it must agree to the amount indicated in the respective objection filed by Oi Group.

**4.3.2.4.** In the event that the Court Deposit referred to in **Section 4.3.2** above is greater than the amount of the respective ME/EPP or Class III Credit (in the latter case, obtained after the deduction of the discount indicated in **Section 4.3.2.1**) contained in the Creditors' List of the Bankruptcy Trustee, and acknowledged by the Debtors, in the latter case in accordance with the terms of **Section 4.3.2.2**, the exceeding amount will be withdrawn by Oi Group.

**4.3.2.5.** In the event that the Court Deposit referred to in **Section 4.3.2** above is demonstrably less than the amount of the respective ME/EPP or Class III Credit (in the latter case, obtained after the deduction of the discount indicated in **Section 4.3.2.1**) contained in the Creditors' List of the Bankruptcy Trustee and acknowledged by the Debtors, in the latter case in accordance with the terms of Section **4.3.2.2**, the remaining balance of the respective Court Deposits Strategic Unsecured Creditor, as applicable, will be paid in national currency, after the rendering of the decision by the relevant Court that ratifies the amount owed, in accordance with **Section 4.3.6** below.

**4.3.2.6.** For purposes of the provisions of **Sections 4.3.2** and **4.3.2.4** above, within twenty (20) Business Days from the end of the term for the choice of credits payment to be made by the respective Unsecured Creditor through the electronic platform made available by Oi at the electronic address www.recjud.com.br, the Court Deposits Strategic Unsecured Creditor in point, in conjunction with all its attorneys of record, including those eligible to costs of loss of suit, and the Debtors must present an ME/EPP or Class III Joint Petition, as applicable, directing the relevant Court (*i*) to issue the respective court permits for the withdrawal of the Court Deposit, as described in **Sections 4.3.2** and **4.3.2.4** above, as applicable, and (*ii*) the dismissal, recording of the filing, and definitive shelving of the Proceeding. The Court Deposit can only be withdrawn, in any event, after the ratification by the relevant Court of the amount owed, under the terms of the ME/EPP or Class III Joint Petition, as applicable.

**4.3.2.7.** In accordance with the provisions of **Section 4.3.2.4** above, the amount of the ME/EPP or Class III Credit held by the Court Deposits Strategic Unsecured Creditor, as applicable, will be considered as comprising any and all attorney's fees (provided that the attorney's fees are not already in Class I in the Creditors' List of the Bankruptcy Trustee) or other professional fees, as well as court expenses and costs incurred by the Court Deposits Strategic Unsecured Creditor in point. Within this context, neither the respective Court Deposits Strategic Unsecured Creditor, nor its attorneys will be eligible to receive any amount in addition to that contained in the Creditors' List of the Bankruptcy Trustee and acknowledged by the Debtors, in the latter case in accordance with the terms of **Section 4.3.2.2** (and, as applicable, in accordance with the provisions of **Section 4.3.2.1**), for the respective ME/EPP or Class III Credit.

**4.3.3.   Bond Restructuring**: Given the nature of its Unsecured Credits, represented by bonds issued and negotiated abroad and governed by foreign laws, as well as by the laws and other rules applicable in the jurisdictions where such bonds are negotiated and, also, given the procedural complexity to implement the restructuring of its Unsecured Credits in comparison to the other

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

## Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                *Livro nº 166*                *Página nº 408*

Unsecured Creditors, the Bondholder Unsecured Creditors shall have their Bondholder Unsecured Credits restructured exclusively in accordance with the provisions of this **Section 4.3.3**. Depending on the issue and amount of their respective Bondholders' Unsecured Credits, the Bondholder Unsecured Creditors must expressly communicate their option for the restructuring of their Bondholder Unsecured Credits in one of the forms provided for in **Sections 4.3.3.1** or **Section 4.3.3.2** below, observing the procedure of **Section 4.5.5** of this Plan:

**4.3.3.1. Non-qualified Bondholders' Unsecured Credits Option**: The Non-qualified Bondholder Unsecured Creditors who, at the moment of their option through the sending of the Payment Option Notice, state and prove that hold Bondholders' Unsecured Credits with a maximum value of up to seven hundred and fifty thousand United States Dollars (USD 750,000.00) (or the equivalent in Reais, converted by the Conversion Exchange Rate) shall their respective Credits restructured under this **Section 4.3.3.1** and sub-clauses below:

**(a) Non-qualified Bondholders' Unsecured Credits Limit:** The maximum total amount of the Non-qualified Bondholders' Unsecured Credits to be restructured under this **Section 4.3.3.1** shall be limited to five hundred million United States Dollars (USD 500,000,000.00).

**(b)     Discount**: The Non-qualified Bondholders' Unsecured Credits restructuring provided for in **Section 4.3.3.1** shall imply the reduction of the respective Non-qualified Bondholders' Unsecured Credit in fifty percent (50%). For all purposes, the discount shall be applicable, in the first place, to the interest and, afterwards, to the installment of principal that composes the Bondholders' Unsecured Credits subject to **Section 4.3.3.1**.

**(c)     Grace Period**: The Grace Period of amortization of principal shall be of six (6) years, counted as from the date of Judicial Ratification of the Plan.

**(d)     Principal:** The amount of principal shall be equal to fifty percent (50%) of the Non-qualified Bondholders' Unsecured Credits, limited to the amount of two hundred and fifty million United States Dollars (USD 250,000,000.00), and shall be amortized in twelve (12) successive installments on a semi-annual basis, and the first one shall be due on the fifteenth (15th) day of the seventy-eighth (78th) month counted from the Judicial Ratification of the Plan and the other installments shall be due on the same day every six (6) months counted from the first payment, according to percentages of the amount of principal, added by the capitalized item (as per sub-clause (d) below), described in the progressive table below:

| Semesters | Percentage of the amount to be amortized per semester |
|---|---|
| 0 to 12th | 0% |
| 13th to 18th | 4.0% |
| 19th to 23rd | 12.66% |
| 24th | 12.70% |

**(e)     Interest:** Levy of interest of six percent (6%) per year in United State Dollars, as of the date of Ratification of the Plan, being capitalized on an annual basis by the amount of principal and annually paid as of the fifteenth (15th) day of the seventy-eighth (78th) month counted from the date of Judicial Ratification of the Plan.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                *Livro nº 166*                *Página nº 409*

---

(f)    **Other contractual conditions:** the other conditions applicable to the restructuring of Non-qualified Bondholders' Unsecured Credits as provided for in **Section 4.3.3.1** are described in **Exhibit 4.3.3.1(f)**.

**4.3.3.1.1.**    If the Non-qualified Bondholder Unsecured Creditor (x) fails to timely express its option to receive the payment of its respective Non-qualified Bondholders' Unsecured Credit as per Section 4.3.3.1; and/or (y) does not prove the compliance with the condition established under the terms of Section 4.3.3.1, such Non-qualified Bondholder Unsecured Creditor shall have the totality of its Non-qualified Bondholders' Unsecured Credit fully allocated to be paid pursuant to Section 4.3.6.

**4.3.3.1.2.**    If the limit set forth in **Section 4.3.3.1.(a)** above is reached, the Non-qualified Bondholders' Unsecured Creditors holding Non-qualified Bondholders' Unsecured Credits whose credits are restructured as provided for in this **Section 4.3.3.1** shall have part of their Non-qualified Bondholders' Unsecured Credits paid according to the option chosen, in a pro rata manner and limited to the respective amount of Non-qualified Bondholder's Unsecured Credit. The remaining balances shall be automatically allocated to be paid pursuant to **Section 4.3.6** below.

**4.3.3.2. Qualified Bondholders' Unsecured Credits Option:** Complying with the Conditions Precedent indicated in **Exhibit 4.3.3.5(c)**, the Qualified Bondholder Unsecured Creditors holding Qualified Bondholders' Unsecured Credits in an amount above seven hundred and fifty thousand United States Dollars (USD 750,000.00) (or the equivalent in Reais converted by the Conversion Exchange Rate) that expressly and timely elect the payment option established in this **Section 4.3.3.2** by sending the Payment Option Notice shall have their respective Qualified Bondholders' Unsecured Credits restructured and paid by means of delivery of package comprised of New Notes, PTIF Shares, New Common Shares – I and Subscription Bonus under **Sections 4.3.3.3, 4.3.3.4, 4.3.3.5 and 4.3.3.6** below:

(i)    common shares issued by Oi and held by PTIF, as ADRs;

(ii)    a package with (a) New Notes, (b) New Common Shares – I as ADRs, and (c) Subscription Bonus, to be issued by Oi;

it being certain that the difference between the total amount of Qualified Bondholders' Unsecured Credits and the global price of shares issued by Oi and held by PTIF, New Notes, New Common Shares I and Subscription Bonus shall be used for offset of losses to shareholders account, under the terms of article 64, paragraph 3 of Decree-Law 1,598 of 1977 and of the Normative Opinion CST No. 04 of 1981. The difference that may not be offset this way shall be considered as having been the object of remission, as the first step in the implementation of this **Section 4.3.3.2**, and shall have been first applied to interested and only subsequently to the installment of the principal composing the Qualified Bondholders' Unsecured Credits.

**4.3.3.2.1. Reasons for Exchange:** For each six hundred sixty-four thousand five hundred and seventy-three United States Dollars and ninety-eight United States cents (USD 664,573.98) in Qualified Bondholders' Unsecured Credits, converted by the Conversion Exchange Rate, the respective Qualified Bondholders' Unsecured Credit shall receive, cumulatively:

**(i)**    nine thousand one hundred and thirty-seven (9,137) common shares issued by Oi and held by PTIF, as ADRs, currently kept by Oi in treasury;

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                *Livro nº 166*                *Página nº 410*

**(ii)**  a package with:

**(a)**  New Notes issued at the global issuance price of one hundred forty-five thousand two hundred sixty-two United States Dollars (USD 145,262.00), which comprises the face value of one hundred thirty thousand United States Dollars (USD 130,000.00), and a premium in the issue of fifteen thousand two hundred and sixty-two United States Dollars (USD 15,262.00) justified by the attractiveness, pursuant to **Section 4.3.3.3;**

**(b)**  one hundred nineteen thousand and seventeen (119,017) New Common Shares – I as ADRs as a result of the Capital Increase Capitalization of Credits after the Judicial Ratification of the Plan, pursuant to **Section 4.3.3.5**; and

**(c)**  nine thousand one hundred fifty-five (9,155) Subscription Bonuses issued by Oi as additional advantage to the result of Capital Increase Capitalization of Credits after the Judicial Ratification of the Plan pursuant to **Section 4.3.3.6.**

**4.3.3.2.1.1.** The reasons for exchange set forth in Section **4.3.3.2.1** assume that the quantity of common and preferred shares issued by Oi on the date of this Plan is 825,760,902. In case of any increase in the number of shares issued by Oi, the quantities of shares received by the Qualified Bondholders' Unsecured Creditors resulting from the reasons for exchange shall be proportionally adjusted.

**4.3.3.3.** **New Notes.** The New Notes shall be issued by OI or a wholly-owned subsidiary of Oi and, as guarantors and joint Debtors, by the other Debtors, until July 31, 2018. The New Notes shall be issued in multiples of one thousand United States Dollars (USD 1,000.00) and the amounts in credits that fall short of the referred minimum amount of one thousand United States Dollars (USD 1,000.00) will not be taken into account for the purposes of this **Section 4.3.3.3**, without fractioning or proportional receipt. For clarification purposes, presumably, if a Qualified Bondholder Unsecured Creditor has a credit to receive New Notes in the amount of one hundred thirty-one thousand five hundred United States Dollars (USD 131,500.00), it will only receive New Notes with face value equivalent to one hundred thirty-one thousand United States Dollars (USD 131,000.00), and for the purposes of this **Section 4.3.3.3**, the residual amount of five hundred United States Dollars (USD 500.00) will not be taken into account. The issuance of New Notes will abide by the following terms and conditions:

**(a)**  **Limit amount of the issuance**: The New Notes shall be issued as per Section **4.3.3.3**, in United State Dollars, and shall have the maximum face value of six billion and three hundred million Reais (BRL 6,300,000,000.00), converted by the Conversion Exchange Rate, which is equivalent to the maximum face value of one billion, nine hundred and eighteen million, one hundred thousand, one hundred and sixty United States Dollars and forty-five cents of United States Dollars (USD 1,918,100,167.45).

**(b)**  **Maturity**: The Maturity Dates of New Notes is the seventh (7th) year after the Issuance Date of the Notes.

**(c)**  **Principal:** The amount of the principal of New Notes will be paid in a single installment, its maturity date being on the fifth (5th) day of the eighty-fourth (84th) month after the Issuance Date of the Notes.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 411*

**(d)     Interest:** Interest accrual and payment may occur by means of one of the manners provided for in items (i) and (ii) below, at Oi's exclusive discretion:

**(i)**     Ten percent (10%) per year in United States Dollars on the amount of the principal, as of the Ratification of the Plan, to be paid semiannually in cash on the 5th (fifth) day of the 6th (sixth) month counted from the Date of Issuance of the Notes and the other payments every six (6) months counted from the first payment of interest; or

**(ii)**     During the first three (3) years counted as from the date of Judicial Ratification of the Plan, and the accrual and payment of the interest shall occur pursuant to item (x) below and as of the fourth (4th) year counted as of the date of Judicial Ratification of the Plan, and the accrual and payment of the interest shall occur pursuant to item (y) below:

(x) Up to the third (3rd) year counted as from the date of Judicial Ratification of the Plan, accrual of interest of twelve percent (12%) per year in United States Dollars on the amount of the principal, paid on a semiannual basis pursuant to items "a" and "b" below;

**a.**     eight percent (8%) of the annual interest paid in cash on the fifth (5th) day of the sixth (6th) month counted from the Issuance of the Notes, other payments occurring every six (6) months counted from the first payment of interest; and

**b.**     The remaining four percent (4%) semiannually capitalized to the amount of the principal, the first capitalization occurring on the fifth (5th) day of the sixth (6th) month counted from the Note Issuance Date, and paid on the fifth (5th) day of the thirty-sixth (36th) month after the Issuance Date of the Notes, so the balance of the principal in the end of the third (3rd) year is the initial balance plus the capitalized interest of the period.

(y) As of the fourth (4th) year counted from the date of Judicial Ratification of the Plan, accrual of interest of ten percent (10%) per year in United States Dollars on the amount of principal, which shall be semiannually paid in cash, on the fifth (5th) day month of each period of interest.

**(e)**     The Qualified Bondholder Unsecured Creditors' right to receive New Notes will always be limited to the percentage its respective Qualified Bondholder Unsecured Credit represents in the total sum of Qualified Bondholders' Unsecured Credits that may timely elect the option pursuant to Section **4.3.3.2.**

**(f)     Other contractual conditions:** the New Notes shall be issued under the legislation of New York for free negotiation in the international market, Debtors assuming the liens related to the taxes that may be levied in Brazil, including, but not limited to, the lien of the withholding income tax (gross up), observing and without prejudice to the conditions applicable to the New Notes described in **Exhibit 4.3.3.3.(f).**

**4.3.3.4. PTIF Shares**: PTIF shares shall be distributed to the Qualified Bondholder Unsecured Creditors at the proportion of the respective Qualified Bondholders' Unsecured Credits until July 31, 2018, conditioned to the approval of a composition plan to be offered by any of Debtors before the Dutch justice.

**4.3.3.5. Capital Increase – Capitalization of Credits:** The New Ordinary Shares - I shall be issued by Oi in a capital increase by private subscription, upon the capitalization of part of the Qualified Bondholders Unsecured Credits that have timely elected the option of **Section 4.3.3.2** as per this Plan, observing the applicable regulatory rules, and shall grant the same rights granted by the other

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 412*

common shares issued by in circulation. The issuance of New Common Share – I shall be in observance of the provision of article 171, paragraph 2 of Law 6,404, of December 15, 1976, and of the following terms and conditions:

**(a)      Limit amount of the issuance:** Up to one billion seven hundred fifty-six million fifty-four thousand one hundred and sixty-three (1,756,054,163) New Ordinary Shares - I shall be issued, with a unitary issuance price between six Reais and seventy centavos (BRL 6.70) and seven Reais (BRL 7.00), so that the total sum of the Capital Increase – Capitalization of Credits shall be between eleven billion seven hundred sixty-five million five hundred sixty-two thousand eight hundred and ninety-two Reais and ten centavos (BRL 11,765,562,892.10) and twelve billion two hundred ninety-two million three hundred seventy-nine thousand one hundred and forty-one Reais (BRL 12,292,379,141.00), paid up by means of capitalization of part of the Qualified Bondholders Unsecured Credits and subject to the preemptive right of the current shareholders of Oi as set forth below.

**(b)      Preemptive Right**: The issuance of New Common Shares - I must abide by, as applicable, the preemptive right provided for in art. 171 and its paragraphs 2 and 3 of the Corporation Law, dated December 15, 1976. Within this context, if the preemptive right is exercised by the current shareholders of Oi, the amounts paid by them will be delivered to the Qualified Bondholders Unsecured Creditors holders of the Qualified Bondholders Unsecured Credits to be capitalized.

**(c)      Conditions Precedent – Capital Increase Capitalization of Credits:** The Capital Increase Capitalization of Creditors shall occur as soon as possible, until July 31, 2018, but provided that the Conditions Precedents for the Capital Increase – Capitalization of Credits established in **Exhibit 4.3.3.5(c)** are verified or expressly and formally waived by the Qualified Bondholders Unsecured Creditors in a Creditors' Meeting set forth in **Section 8.1**, as established in **Exhibit 8.1**.

**4.3.3.6. Subscription Bonus issued by Oi**: The Subscription Bonuses shall be issued by Oi, as an additional advantage to the issuance of the New Ordinary Shares - I resulted of the Capital Increase Capitalization of Credits provided for in **Section 4.3.3.5.**, with the observance of the applicable rules and under the following terms and conditions:

**(a)      Period for Exercise**: The Subscription Bonuses shall be exercised at any moment from one (1) year of the date of its issue, for a period of ninety (90) days. The beginning of the period for exercise shall be advanced in the following situations: (i) disclosure of Material Fact on the execution of the Capital Increase New Funds set forth in **Section 6** and in the Backstop Agreement; or (ii) in case of execution of any transaction that implies in the change of Control of Oi, whichever comes first. For the purpose of item (i), Oi shall inform the market, through Material Fact, at least fifteen (15) Business Days before the shareholders' general meeting or the Board of Directors' meeting to resolve on the Capital Increase New Funds so that their holders may have enough time to exercise the Subscription Bonuses and the preemptive right in the subscription of the Capital Increase New Funds be ensured thereto.

**(b)      Right to Receive Common Shares:** The subscription bonuses shall be assigned without cost as an additional advantage to the subscribers of the shares issued according to **Section 4.3.3.5** and shall grant to their holders the right to receive common shares issued by Oi, upon the payment of an amount in Reais not greater than one cent of United States Dollar (USD 0.01) per New Common Share – I for the exercise of the Subscription Bonus, at the proportion of one (1) common share for each Subscription Bonus.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 413*

**(c)      Number of Subscription Bonuses:** Up to one hundred thirty-five million eighty-one thousand and eighty-nine (135,081,089) Subscription Bonuses shall be issued.

**4.3.3.7.** Oi Group undertakes to deliver to the Bonds' Trustee the New Common Shares – I as ADRs, as the case may be, in payment to the Qualified Bondholders' Unsecured Creditors that elected the option for the restructuring of their respective Qualified Bondholders' Unsecured Credits as per **Section 4.3.3.2**, pursuant to the Bonds Issue Deeds or other procedure that may be agreed upon between the Oi Group, the Bonds' Trustee and approves by the Qualified Bondholders' Unsecured Credits in Creditors' Meeting called for that end, in order to make possible the delivery of the New Common Shares – I or of the ADRs to the Bonds' Trustee for its future transfer to the Qualified Bondholders' Unsecured Creditors, being the specific costs related to the services set forth in this clause borne by Oi Group. The future transfer of the New Common Shares – I or of the ADRs, of the New Notes and the Subscription Bonuses to the respective Qualified Bondholders' Unsecured Creditors, as the case may be, free and clear of any lien or encumbrance, shall imply the cancellation of the Bonds Issue Deeds.

**4.3.3.8.** The effective delivery of the PTIF Shares, New Notes, New Common Shares - I and Subscription Bonuses to the respective Qualified Bondholders' Unsecured Creditors, as set forth in **Section 4.3.3.2**, free and clear of any lien, shall represent payment of the of the Qualified Bondholders' Unsecured Credits, with the consequent Settlement, as per **Section 11.10** of this Plan, without prejudice to **Section 11.4**.

**4.3.3.9.** The approval of the Plan followed by the Judicial Ratification of the Plan will give powers to Oi, through its Transitional Officers, to take all measures necessary to the implementation of the Plan, including, from the corporate point of view, to sign the subscription lists and represent in shareholders' general meeting, in behalf and to the benefit of the Qualified Bondholders' Unsecured Creditors that restructure their Qualified Bondholders' Unsecured Credits as set forth in **Section 4.3.3.2**, related to the New Common Shares – I to be issued and delivered by Oi as ADRs as payment of such Qualified Bondholders' Unsecured Credits, without prejudice to **Section 11.4**.

**4.3.3.10.**      The approval of the Plan followed by the Judicial Ratification of the Plan represents the express agreement of the Qualified Bondholders' Unsecured Creditors with the measures necessary to the implementation of the Plan, especially in relation to the Capital Increase New Funds, therefore all holders of the New Common Shares – I hereby agree and undertake in an irrevocable and irreversible manner to attend and vote in favor of the Capital Increase – New Funds, under the terms and conditions established in **Section 6** of this Plan, in the shareholders' general meeting called for that end, if necessary, hereby granting to Oi's Transitional Officers all powers necessary to represent them in shareholder's general meeting, on behalf and to the benefit of the Qualified Bondholders' Unsecured Creditors and/or any third party holder of the New Common Shares – I at the time of said shareholders' general meeting, without prejudice to **Section 11.4**.

**4.3.3.11.**      The Qualified Bondholders' Unsecured Creditors that (i) do not timely express their option for the restructuring of their respective Qualified Bondholders' Unsecured Credits pursuant to Section **4.3.3.2**, or (ii) are not Qualified Bondholder according to this Plan, shall have their respective Bondholders' Unsecured Credits fully allocated to be paid pursuant to **Section 4.3.6**.

**4.3.3.12.**      **Delivery in Depositary Receipts**: In the implementation of the Capital Increase Capitalization of Credits, Oi shall deliver (i) the PTIF Shares, (ii) the New Common Shares – I and (iii) Subscription Bonuses to the Qualified Bondholders' Unsecured Creditors, which may be freely negotiated at the maximum extent permitted by the applicable legislation. The PTIF Shares and the

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

## Cristina Gonzales
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 414*

New Common Shares – I shall be issued as ADRs, through the DRs Program of common shares sponsored by Oi and registered before the U.S. Securities & Exchange Commission. The common shares issued upon the exercise of Subscription Bonuses shall be issued as ADRs, through the DRs Program of common shares sponsored by Oi and registered before the U.S. Securities & Exchange Commission and may be freely negotiated at the maximum extent permitted by the applicable legislation. Oi shall be liable for: (i) obtaining at its expenses all registrations or release of registration required by the securities legislation of the United States of America; (ii) perform all necessary records, foreign exchange transactions and registrations before the Brazilian authorities; and (iii) bear all and any taxes or expenses resulting from the deposit of the shares in the custody of the DRs Program and the corresponding issue of the ADRs.

**4.3.4. Regulatory Agencies Pre-Petition Credits.** The liquidated Regulatory Agencies Pre-Petition Credits shall be novated by operation of this Plan and settled in two hundred forty (240) monthly installments, from June 30, 2018, as follows: (i) from the 1st to the 60th installment: zero point one hundred and sixty percent (0.160%); (ii) from the 61st to the 120th installment: zero point three hundred and thirty percent (0.330%); (iii) from the 121st to the 180th installment: zero point five hundred percent (0.500%); (iv) from the 181st to the 239th installment: zero point six hundred and sixty percent (0.660%); and (v) 240th installment: outstanding balance. The first installments shall be fully paid by means of conversion into income of the cash sums deposited in court, to secure said credits. In the month in which the amount of the court deposits is not sufficient to fully pay an installment, such payment shall be complemented in Brazilian currency. As of the subsequent month, Oi shall pay the other installments in Brazilian currency. As of the second installment, the monthly installments shall be adjusted pursuant to the SELIC variation, and shall always be paid on the last Business Day of each month. The following discounts shall be applicable to the liquidated Regulatory Agencies Pre-Petition Credits: (i) fifty percent (50%) of interest; and (ii) twenty-five percent (25%) of late charge.

**4.3.4.1.** The Non-liquidated Regulatory Agencies Pre-Petition Credits, if and when settled by a final and unappealable decision, shall be paid as per Section **4.3.6** of this Plan.

**4.3.4.2.** In case of occurrence of a legal rule that regulates an alternative manner for the settlement of the Liquidated or Non-liquidated Regulatory Agencies Pre-Petition Credits, Debtors may adopt the new regime, observing the terms and conditions set forth in Oi's bylaws.

**4.3.5    Payment of Credits of Strategic Supplier Creditors.** Considering the importance of maintaining the supply of goods and services to Oi Group, all Strategic Supplier Creditors that choose the payment option of their respective ME/EPP or Class III Unsecured Credits rather than those arising from loans or funding granted to Oi Group set forth in this Section through the electronic platform made available by Oi at the electronic address www.recjud.com.br shall be paid as described below, except for the provisions in Section **4.3.5.3** below:

**4.3.5.1** Up to the limit of one hundred and fifty thousand Reais (BRL 150,000.00) (or the equivalent amount in United Stated Dollars or Euros), and always within the limit of the respective amounts of the ME/EPP or Class III Credits to said ME/EPP or Class III Unsecured Creditors, ME/EPP or Class III Credits held by the Strategic Supplier Creditors will be paid in one single installment on the twentieth (20th) Business Day after the end of the term for the choice of the credits payment option to be made by the respective Unsecured Creditor through the electronic platform made available by Oi at the electronic address www.recjud.com.br.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

Matrícula na JUCESP nº 787                                                                                    CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                                                       RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                                    *Livro nº 166*                                    *Página nº 415*

**4.3.5.2.** The balance of the ME/EPP or Class III Credits held by Strategic Supplier Creditors that remains after the payment made under the terms of **Section 4.3.5.1** above, will be paid with a discount of ten percent (10%) in four (4) equal and successive annual installments added by (*i*) TR plus zero point five percent (0.5%) per year, in case the ME/EPP or Class III Credits held by Strategic Supplier Creditors are in Reais; and (*ii*) zero point five percent (0.5%) per year, in case the ME/EPP or Class III Credits held by Strategic Supplier Creditors are in United States Dollars or Euro, in any case accruing over the net sum of outstanding tax and from the Judicial Ratification of the Plan or the Acknowledgment of the Plan in the Creditor's Jurisdiction, as applicable, considering that the first installment matures on the last Business Day of the first year after the end of the term for the choice of the credits payment option to be made by the respective Unsecured Creditor through the electronic platform made available by Oi at the electronic address www.recjud.com.br, and the other installments mature on the same day and month in the subsequent years.

**4.3.5.3** The following will be paid as per **Section 4.3.6** below (i) the Strategic Supplier Creditor who, once requested by any of the Debtors, refuses to supply goods and/or services under the same terms and conditions practiced until the Request Date by the respective Strategic Supplier Creditor for the Debtors and (ii) credits held by ME/EPP or Class III Unsecured Creditors that do not derive from the supply of goods or services to Oi Group.

**4.3.6     General Payment Method.** The Unsecured Credits (or the respective and eventual remaining balances) indicated in **Section 4.3.6.1** below will be paid as described below:

**(a)     Main Amount:** The total main amount of the Credits to be restructured pursuant to this Section **4.3.6** shall be limited to seventy billion Reais (BRL 70,000,000,000.00), deducted the amount of the Pre-Petition Credits that were restructured in another manner pursuant to this Plan, in Reais or converted to Reais as per the Conversion Exchange Rate.

**(b)     Grace period:** grace period of amortization of the principal of twenty (20) years, from the dated of the Judicial Ratification of the Plan or the Acknowledgment of the Plan in the Creditor's Jurisdiction, as applicable.

**(c)     Installments**: amortization of the principal in five (5) annual, equal and successive installments, with the first installment maturing on the last Business Day of the grace period referred to in item (a) of this **Section 4.3.6**, and the others on the same day in the subsequent years

**(d)     Interest/inflation adjustment:**

**a.**     TR per year, if the holder of Unsecured Credits opts for receiving the payment of its respective credits in Reais (or the respective and eventual remaining balances); incurred as of the Judicial Ratification of the Plan or the Acknowledgment of the Plan in the Creditor's Jurisdiction, as applicable, considering that the total amount of interest/inflation adjustment accumulated over the period will only be paid, collectively, with the last installment referred to in item (c) of this Section **4.3.6**. In the case of Pre-Petition Creditors directed to this Section **4.3.6**, the payment of its credits shall be carried out in its original currencies.

**b.**     without accrual of interest, if the holder of Unsecured Credits opts for receiving the payment of its respective credits in United States Dollars or in Euros (or respective and occasional remaining balances);

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzáles**

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                         *Livro nº 166*                         *Página nº 416*

(e)     **Prepayment Option**: Oi shall have the option of, at its exclusive criteria, at any time, settle in advance the amounts due pursuant to **Section 4.3.6**, by means of the payment of fifteen percent (15%) of the amount of principal and capitalized interest up to the date of exercise of the option.

(f)     **Limit of Payments**: If the amount of the Unsecured Credits that are restructured pursuant this **Section 4.3.6**, each Unsecured Credit shall be proportionally (pro rata) reduced in relation to the Unsecured Credits that are entitled to the payments set forth in this **Section 4.3.6**, so that the total amount to be paid by Debtors will never exceed the limit established in **Section 4.3.6(a)**. The residual amount of the Unsecured Credits that exceed the amount established in **Section 4.3.6(a)** shall be considered redeemed, pursuant to Article 385 of the Civil Code.

4.3.6.1     Unless otherwise provided for in this Plan, the general payment method provided for in **Section 4.3.6** applies to Unsecured Creditors, which Unsecured Credits cannot be paid through any of the other methods provided for in this Plan, notably if (*i*) the limits provided for the payment options set forth in Sections **4.3.1.2 and 4.3.1.3** above is reached, and if there still are remaining Unsecured Credit balances; (*ii*) an Unsecured Creditor does not timely indicate the option to pay its Unsecured Credit, as per Section 4.5 below; (*iii*) the Unsecured Creditor is not eligible for any of the payment options provided for in Sections **4.3.1.2, 4.3.1.3** and **4.3.3**; (*iv*) the Bondholder Unsecured Creditor is not a Qualified Bondholder as set forth in this Plan; (*v*) Non-liquidated Credits are materialized under the terms of **Section 4.7** below; (*vi*) Late Credits are qualified, under **Section 4.9**; (*vii*) Credits are increased under the terms of **Section 4.10** below; (*viii*) Credits are reclassified as per **Section 4.11**; (*ix*) there is a remaining Court Deposit Unsecured Credit balance after the withdrawal of the respective Court Deposits; or (*x*) the Strategic Creditor, in relation to the portion of its credit that does not fall into the form of payment of **Section 4.3.5** above.

**4.4     Mediation/Conciliation/Agreement with Creditors:** As authorized by the Judicial Reorganization Court, the Debtors have offered to all Pre-Petition Creditors the option to adhere to the plan of Mediation/Conciliation/Agreement with Oi Group before the Creditors' General Meeting. In accordance with the plan of Mediation/Conciliation/Agreement, the Debtors undertook to advance up to fifty thousand Reais (BRL 50,000.00) of their Credits, with the payment of two (2) installments as follows: (i) ninety percent (90%) of the total amount of the installment of the respective Credit to be paid within ten (10) Business Days after the signing of the agreement term within the scope of the Mediation/Conciliation/Agreement; and (ii) a remaining ten percent (10%) of the total amount of the installment regarding the respective Credit to be paid within ten (10) days after the Judicial Ratification of the Plan or the Acknowledgment of the Plan in the Creditor's Jurisdiction, as applicable.

**4.4.1.** For Pre-Petition Creditors who have chosen to adhere to the plan of Mediation/Conciliation/Agreement with Oi Group, the Debtors will comply with the terms set forth in **Section 4.4** above, and they shall deposit, in the account indicated by the respective Creditor, the total amount of the second installment, in the amount corresponding to ten percent (10%) of the sum of up to fifty thousand Reais (BRL 50,000.00), within ten days after the Judicial Ratification of the Plan, or the Acknowledgment of the Plan in the Creditor's Jurisdiction, as applicable.

**4.4.2** If the Pre-Petition Creditor who has decided to adhere to the plan of Mediation/Conciliation/Agreement with Oi Group holds a Pre-Petition Credit that exceeds fifty thousand Reais (BRL 50,000.00), the Debtors will pay the outstanding balance of the respective Pre-Petition Credit in accordance with the conditions applicable to the respective class of creditors and with the option chosen by the Pre-Petition Creditor, if applicable.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                  *Livro nº 166*                  *Página nº 417*

**4.5    Payment Option Choice.** For the purposes of the provisions of **Section 4**, Pre-Petition Creditors must, within twenty (20) calendar days from the Judicial Ratification of the Plan, choose among the payment options of their respective credits referred to in this Plan, through the electronic platform made available by Oi at the electronic address www.recjud.com.br, as well as inform the details of the bank account to which the payment must be made, as applicable, and the Debtors will not be held liable for any noncompliance with the choice and information supplied through the electronic platform made available by Oi at the electronic address www.recjud.com.br, or by the untimely choice, in which case the Debtors will be released from the obligation of making the respective payment and the provisions of Section **13.4.1** below will be applied.

**4.5.1.** Unless otherwise provided for in this Plan, specially the provisions of Section **4.5.1.1.** below, taking into consideration the alternative nature of the payment options set forth in **Section 4** above, the choice of each Pre-Petition Creditor must necessarily be restricted to only one of the referred options, with exception of Financial Creditors that hold credit instrument of different natures.

**4.5.1.1.** The agents representing more than one Pre-Petition Creditor may choose different payment options applicable to those represented by them, it being certain that each represented Pre-Petition Creditor may not voluntarily receive the payment of their respective Pre-Petition Credits by means of more than one payment option, with exception of the provision of **Section 4.5.1.**

**4.5.2.** The choice expressed by the respective Pre-Petition Creditor in the electronic platform made available by Oi at the electronic address www.recjud.com.br will be irrevocable and irreversible, and cannot be subsequently changed for any reason, except as expressly agreed to by the Debtors.

**4.5.3.** A Pre-Petition Creditor who is unable to or who cannot choose the payment option of their respective credits by means of the electronic platform made available by Oi at the electronic address www.recjud.com.br may send the choice regarding the payment option by mail to Oi's P.O. box No. 532, CEP 20.010-974, Rio de Janeiro-RJ, and the details of the bank account in which the payment of the respective Credit shall be made must be informed.

**4.5.4.** The Pre-Petition Creditor who fails to choose the payment option of their respective credits within the term and in the manner set forth in this Plan will receive its respective Pre-Petition Credit as provided for in **Section 4.3.6** above.

**4.5.5.** The provisions of **Sections 4.5.3** and **4.5.4** shall not be applicable to (i) Qualified Bondholders Unsecured Creditors and (ii) Non-qualified Bondholders Unsecured Creditors with credits in an amount greater than fifty thousand Reais (BRL 50,000.00), the choices of which between the payment options for the purpose of this **Section 4.5** shall only be considered valid if (x) the respective Qualified Bondholders Unsecured Creditor or Non-qualified Bondholders Unsecured Creditor has, before the Reorganization Court, individualized the respective Qualified Bondholders Unsecured Credits or Non-qualified Bondholders Unsecured Credits, as per the procedure established by the Bondholder Decision; and, cumulatively, (y) Oi Group receives the (i) Payment Option Notice, as per the template set forth in **Exhibit 4.5.5**; and (ii) copy of the documents the prove the ownership and amount of the bonds held by the respective Qualified Bondholders Unsecured Creditor or Qualified Bondholders Unsecured Creditor [sic], as individualized before the Reorganization Court in compliance with the Bondholder Decision. The Bondholders that have already formalized their right of voice, vote and petition pursuant to the Bondholder Decision and therefore have been authorized to vote in the Creditors' Meeting, are discharged from sending the documentation described in item (x) and (y) above, without prejudice to the sending of the Payment Option Notice, provided that they represent to Oi Group that there has not been any change in the

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                          CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                  RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 418*

---

amount of their respective bonds or, in case of any change, they send copy of the Screen Shot necessary to prove the updated amount of the respective Bonds.

**4.6    Intercompany Credits:**

**4.6.1    Intercompany Credits in Reais:** The Debtors may agree on an alternative form to settle the Intercompany Credits in Reais, moreover, in accordance with their original terms and conditions, but not limited to the offsetting provided for by the law, in up to sixty (60) days counted from the Ratification of the Plan. Remaining Intercompany Credits in Reais will be settled as of twenty (20) years after the end of the payment of the Credits set forth in **Section 4.3.6**, as follows:

**(a)    Installments**: amortization of the principal in five (5) annual, equal and successive installments, the first becoming due on the last Business Day of the end of the term set forth in **Section 4.6.1**, and the others on the same day of the following years.

**(b)    Interest/inflation adjustment:** TR per year incurring as of the Judicial Ratification of the Plan; and the total amount of interest and inflation adjustment accrued in the period will only be paid jointly with the last installment mentioned in item (a) of this **Section 4.6.1.**

**(c)**    Intercompany Credits restructured in accordance with Section **4.6.1** may be settled, at Oi's discretion, with alternative settlement and/or payment forms, including the offsetting, as provided for by the law or change of the payment conditions set forth in this **Section 4.6.1** in order to adjust the cash flow of Debtors for compliance with the obligations assumed in this Plan.

**4.6.2.    Intercompany Credits in United States Dollars or Euros:** The Debtors will settle the Intercompany Credits in United States Dollars or Euros as of twenty (20) years after the end of the payment of the Credits set forth in **Section 4.3.6**, as follows:

**(a) Installments**: amortization of the principal in five (5) annual, equal and successive installments, the first becoming due on the last Business Day of the end of the term set forth in **Section 4.6.2**, and the others on the same day of the following years.

**(b) Interest/inflation adjustment:** no interest accrual.

**(c)** Intercompany Credits restructured in accordance with **Section 4.6.2** may be settled, at Oi's discretion, with alternative settlement and/or payment forms, including but not limited to the offsetting, as provided for by the law or change of the payment conditions set forth in this **Section 4.6.2** in order to adjust the cash flow of Debtors for compliance with the obligations assumed in this Plan.

**4.7.    Non-liquidated Credits**. Non-liquidated Credits are fully subject to the terms and conditions of this Plan and to the effects of the Judicial Reorganization. Once the Non-liquidated Credits are materialized and acknowledged as liquidated by a final and unappealable judicial or arbitration decision, or upon agreement between the parties, even as a result of a Mediation, provided that it is based on criteria established by the case law from the Superior Court of Justice or from the Federal Supreme Court, the Non-liquidated Credits shall be paid as set forth in **Section 4.3.6**, unless otherwise set forth in this Plan.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 419*

**4.8.**    Oi may perform, after the Judicial Ratification of the Plan, Mediation procedure, to be implemented with the specific purpose of executing arrangements to make liquid Credits that are current non-liquidated.

**4.9.**    **Late Credits**. In case the Credits are acknowledged by final and unappealable judicial or arbitration decision, or upon agreement between the parties, after the date of presentation of this Plan to the Judicial Reorganization Court, they will be considered Late Credits and shall be paid in accordance with the classification and criteria set forth in this Plan regarding the class in which the Late Credits must be proved and included, provided that if Late Credits involve Unsecured Credits, their respective payment must be made in accordance with **Section 4.3.6**.

**4.10**    **Changes in the Credits Amount**. In case of changes in the amount of any of the Credits already acknowledged and included in the Creditors' List of the Bankruptcy Trustee by a final and unappealable judicial or arbitration decision, or upon agreement between the parties, the amount changed of the respective Credit must be paid under the terms set forth in this Plan, provided that, if a certain Unsecured Credit has been increased, the increased installment of the relevant Unsecured Credit shall be paid pursuant to **Section 4.3.6**.

**4.11.**    **Credits Reclassification**. If, by final and unappealable a judicial or arbitration decision, or upon agreement between the parties, the reclassification of any of the Credits to Unsecured Credits is determined, the reclassified Credits shall be paid in accordance to the terms and conditions set forth in **Section 4.3.6**.

## 5.    FUNDS FOR THE PAYMENT OF CREDITORS

**5.1**    Disposal of Assets. After the Approval of the Plan, with the purpose of raising funds, Oi Group will be allowed to, regardless of a new approval by the Pre-Petition Creditors, dispose of the assets included in the permanent (noncurrent) assets of the Debtors listed in **Exhibit 3.1.3** of this Plan of the Non-Material Assets, provided that approved by the Transitional Board of Directors or by the New Board of Directors, according to the moment, and of the Material Assets, provided that approved by the Transitional Board of Directors or by the New Board of Directors, according to the moment, and approved by the Judicial Reorganization Court.

**5.1.1.**    With the purpose of generating liquidity and improving their cash flow, the Debtors will use their best effort with the purpose of benefiting themselves from opportunities to participate of a consolidation phase of the Brazilian telecommunication market and of assets disposal, including those arising from eventual changes in the regulatory model, always in accordance with the provisions of **Section 5.1** and pursuant to the interest of the Debtors themselves, regardless of compliance with obligations still pending towards creditors, which is the subject matter of the Judicial Reorganization Plan.

**5.2.**    **Generation of Cash Sweep**. During the first five (5) fiscal years counted as from the date of Judicial Ratification of the Plan, GROUP OI shall apply the amount equivalent to 100% of the Net Revenue from the Sale of Assets exceeding two hundred million United States Dollars (USD200,000,000.00) to investments in its activities. As of the sixth (6th) fiscal year as of the date of the Judicial Ratification of the Plan, Oi Group will allocate to its Unsecured Creditors and Secured Creditors an amount equivalent to seventy percent (70%) of the Cash Balance that exceeds the Minimum Cash Balance.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                    CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                           RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 420*

**5.2.1. Distribution of Cash Sweep funds**. The distribution of the amounts regarding the Cash Sweep described in **Section 5.2** above will occur proportionally (pro rata) to the payments provided for in Sections **4.2, 4.3.1.2** and **4.3.1.3**, as applicable, and as a consequence there will be a proportional reduction of the balance of the respective credits, and limited to the amount of the credit of each Secured Creditor and Unsecured Creditor, as provided for in the Creditors' List of the Bankruptcy Trustee. The remaining balance of Secured Credits and Unsecured Credits after the payment arising from the Cash Sweep will be calculated and adjusted under the terms of this Plan and its payment shall observe the provisions set forth in **Section 4.2, Section 4.3** and their subsections, as applicable.

## 5.3 Additional Financing Manners

**5.3.1.** In addition to the funds obtained with the Capital Increase – New Funds, the Company may seek, if needed, within up to two (2) years from the date of the Judicial Ratification of the Plan, new funds in the capital market, at a total amount of up to two billion and five hundred million Reais (BRL 2,500,000,000.00).

**5.3.1.1.** Such fundraising shall be carried out under attractive conditions to enable the capitalization of funds necessary to carry out Oi Group's activities, which may be carried out, amongst other manners, by means of the public issuance of common shares or new debt instruments, including debts with guarantee.

**5.3.2.** Upon approval of the Plan and adjustment of its capital structure, Debtors shall use their best efforts for the opening of new credit facilities for import of equipment in the potential amount of two billion Reais (BRL 2,000,000,000.00), including regarding the preliminary indication received from financial advisor of Export Credit Agencies.

## 6. CAPITAL INCREASE – NEW FUNDS

**6.1. Capital Increase**. Due to the needs of new funds to resume investments in CAPEX and implementation of its business plan, Oi Group undertake to perform, as per this Plan, the Backstop Agreement and observing the applicable legislation, as soon as possible after the conclusion of the Capital Increase – Capitalization of Credits set forth in **Section 4.3.3** and in any case until February 28, 2019, the Capital Increase – New Funds, observing the following:

**(a) Structure of the Capital Increase**. The Capital Increase – New Funds shall be made through the private issue of New Common Shares – II issued by Oi;

**(b) Amount of the Capital Increase**: The total amount of the Capital Increase shall be four billion Reais (**BRL 4,000,000,000.00**), as established in this Plan and in the Backstop Agreement;

**(c) Issue Price.** The issue price of the New Common Shares – II in the Capital Increase – New Funds shall be calculated by the division of the amount of three billion Reais (**BRL 3,000,000,000.00**) by the number of Oi's shares outstanding in the Business Day immediately before the Capital Increase New Funds, with the exception of any adjustments in the issue price of as set forth in the Backstop Agreement;

**(d) Registration of the Capital Increase – New Fund:** Oi shall register the New Common Shares – II issued as a result of the implementation of the Capital Increase – New Fund before the U.S. Securities & Exchange Commission, so that the shareholders residing abroad may participate in said

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP n° 787                                                    CPF/MF n° 108.911.608-09
CCM n° 9.743.188-5 (São Paulo, SP)                                           RG n° 14.873.251 SSP/SP

*Tradução n° 7952*                      *Livro n° 166*                        *Página n° 421*

Capital Increase – New Fund, freely negotiate their subscription rights and acquire New Common Shares – II as ADRs, through the DRs Program of common shares sponsored by Oi and registered before the U.S. Securities & Exchange Commission. Oi shall be liable for: (i) obtaining at its expenses all registrations or release of registration required by the securities legislation of the United States of America; (ii) perform all necessary records, foreign exchange transactions and registrations before the Brazilian authorities; and (iii) bear all and any taxes or expenses resulting from the deposit of the shares in the custody of the DRs Program and the corresponding issue of the ADRs.

**(e) Preemptive Right**. Pursuant to Article 171, paragraph 2 of Law 6,404/76, Oi's shareholders, at the time of the Capital Increase – New Fund, shall have preemptive right regarding the subscription of the shares issued; and

**(f) Conditions Precedent - Capital Increase – New Fund:** The Capital Increase – New Fund shall take place as soon as possible, until at most February 28, 2019, but provided that the Conditions Precedents for the Capital Increase – New Funds, as established in the Backstop Agreement, are verified or expressly and formally waived by the Backstopper Investors.

**6.1.1.1.** After the expiry of the period of the preemptive right of the Capital Increase – New Funds, any remaining shares shall be divided between the shareholders that expressed interest in the reserve of remaining shares in the respective list of subscription. The Shareholder that desires to subscribe remaining shares may also, at the moment of the subscription of the remaining shares to which it is entitled, request an additional number of non-subscribed remaining shares, subject to the availability of remaining shares. If the total shares object of requests of additional remaining shares exceed the amount of the remaining shares available, the division will be made between the Shareholders that have requested the additional remaining shares, in the proportion set forth in the Backstop Agreement. The full placement of the remaining shares shall be ensured by the Backstoppers Investors, pursuant to the Backstop Agreement.

**6.1.1.2. Approval and Conditions to the Capital Increase Upon New Funds:** Until January 15, 2019, Oi Group shall call a shareholders' general meeting and/or meeting of the Board of Directors, as the case may be, to approve the issue of New Common Shares – II, for the purpose of compliance with this Plan and the Backstop Agreement. If there is any hindrance to such approval, it may be compensated by a decision of the Judicial Reorganization Court, without prejudice to the rights and measures of the Backstoppers Investors for specific performance of the obligations related to the Capital Increase – New Funds contracted in this Plan and in the Backstop Agreement.

**6.1.1.3. Commitment Premium**: Due to the solid commitment made by the Backstopper Investors to guarantee the subscription of the totality of the Capital Increase - New Funds under the terms of the Backstop Agreement, Oi undertakes to pay the Backstoppers Investors, under the conditions set forth in the Backstop Agreement, proportionally to the amount of the respective commitment, the commitment premium contracted pursuant to the Backstop Agreement corresponding to (i) eight percent (8%) of the amount ensured by the Backstopper Investors, due and payable in United State Dollars; or (ii) ten percent (10%) of the amount ensured by the Backstopper Investors, due and payable in new common shares issued by Oi, at the discretion of the Backstopper Investors, observing the provision of **Sections 6.1.1.3.1 and 6.1.1.3.2** below and the Backstop Agreement, except that the amounts of the commitment premium may be increased, under the terms and conditions of the Backstop Agreement, if Oi Group exercises the option of extension of the validity period of the Backstop commitment.

Rua Pereira Estéfano, n° 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787                                              CPF/MF nº 108.911.608-09
CCM nº 9.743.188-5 (São Paulo, SP)                                      RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 422*

**6.1.1.3.1.** If the weighted average price per volume of common shares issued by Oi on the thirty (30) days previous to the Capital Increase New Funds is above ten Reais **(BRL 10.00)** per share, the choice of the payment method of the Commitment Premium shall be upon Oi; if it is below this amount, the choice shall be individually made by each of the Backstoppers Investors, as established in the Backstop Agreement.

**6.1.1.3.2.** In case of grouping of shares, the amount of ten Reais **(BRL 10.00)** per share shall be multiplied by the quantity of shares that are grouped in each new share. Likewise, in case of share split, the amount of ten Reais **(BRL 10.00)** per share shall be divided by the quantity of shares object of split for each old share of Oi.

**6.1.1.3.3.** For the purpose of payment of the Commitment Premium in shares, the amount of the shares to be delivered to the Backstoppers Investors shall be its issue price in the Capital Increase - New Funds, as established in the Backstop Agreement.

**6.1.1.3.4. Payment of the Commitment Premium**: Debtors represent and acknowledge for the legal purposes that the Commitment Premium is due by Debtors pursuant to the Backstop Agreement. Debtors undertake by this Plan, in an irrevocable and irreversible manner, to pay the Commitment Premium on the date of conclusion of the Capital Increase - New Funds or in any case of non-compliance with the Backstop Agreement by Debtors, as established in the Backstop Agreement.

## 7.    CORPORATE REORGANIZATION

**7.1.** In addition to the corporate reorganization transactions described in **Exhibit 7.1**, the Debtors will be authorized to perform corporate reorganization transactions, such as spin-off, consolidation, merger of one or more companies, transformation, dissolution, or winding up between the Debtors themselves and/or any of their Affiliates, always with the purpose of optimizing their operations and improving their results, thus contributing to the fulfillment of the obligations set forth in this Plan, provided that approved by the Transitional Board of Directors or the New Board of Directors, according to the moment and the governance rules of **Section 9**.

## 8.    MEETING OF CREDITORS

**8.1.    Meeting of Creditors.** Given the specificities of the Qualified Bondholders Unsecured Creditors, certain subjects that affect only the rights of the Qualified Bondholders Unsecured Creditors, as established in this Plan, shall be decided by them in Meeting of Creditors, observing the terms of **Exhibit 8.1**.

## 9.    OI GOVERNANCE DURING JUDICIAL REORGANIZATION

**9.1.    Corporate Governance.** The management of Oi Group shall comply with, in the performance of its activities, the best corporate governance practices, in addition to all terms, conditions and limitations included in this Plan and other instruments related to the Judicial Reorganization.

**9.1.1. Special Transition Rules.** As from Approval of the Plan, the following special transition rules of governance of Debtors shall be applicable, prevailing on the provisions of their respective Bylaws, in order to give institutional stability to their corporate bodies and administrators for the purpose of complying with this Plan, as follows:

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 423*

(i) **Executive Office – Stabilization:** During the Transitional Period (i) the Transitional Officers (x) shall remain in the same offices they hold and with the roles they perform on this date, with the maintenance and renewal of the current contractual commitments, including, but not limited to, the currently existing contractual indemnities, and its removal from and alteration to the functions of the Transitional Officers are forbidden, (y) shall be exclusively responsible for the execution and implementation of the Plan up to the conclusion of the Judicial Reorganization, observing the provision of item (iii) below; and (ii) the Directors Officers shall exercise their respective roles with the operational assignments to be fixed at an Oi Executive Board meeting, and said Officers must refrain from interfering, directly or indirectly, in any way, in issues related to the Judicial Reorganization, including and specially in relation to the implementation of the Plan, being subject to dismissal at any time by the Transitional Board of Directors or by the New Board of Directors, as the case may be.

(ii) **Executive Office – Operations**: Debtors will engage within up to sixty (60) Business Days after the Approval of the Plan the Operational Officer, who will be liable for preparing Oi at its new phase of transformation and for the integrated action of the commercial and operating areas of Debtors. The Operational Officer may not be dismissed or replaced during the Transitional Period.

a. **Selection Process of the Operational Officer**: Debtors shall engage a HR Consultancy within fifteen (15) Business Days from the Approval of the Plan. The HR Consultancy shall present to the Transitional Board of Directors, within thirty (30) Business Days from its engagement, a list of potential candidates to the position of Operational Officer. The Transitional Board of Directors shall present to the current CEO, within ten (10) Business Days, a list with three potential candidates to the position of Operational Officer. The CEO shall select the Operational Officer within five (5) Business Days and Debtors shall immediately hire the Operational Officer.

(iii) **New Executive Office**: After the Transitional Period, the Transitional Board of Directors or the New Board of Directors, as the case may be, may freely decide on the composition of the Executive Office of Debtors, observing that the current CEO and Finance and Investor Relations Officer shall be reinstated to, and maintained in, until the closing of the Judicial Reorganization, the positions of Legal Counsel and Officer without a specific designation with administrative and financial functions, with the same current assignments and competences, administrative structure, levels of decision and maintaining and renewing the current contractual commitments, including, but not limited to, the contractually provided indemnities. In case of removal of the Legal Counsel and Officer without a specific designation with administrative and financial functions by the Transitional Board of Directors or New Board of Directors, as the case may be, before the conclusion of the Judicial Reorganization, Debtors undertake by this Plan to fully comply with the compensation packages currently in force.

**9.2. Transitional Board of Directors**. In order to ensure effective compliance with Debtors' corporate purpose and the measures provided for in this Plan and subject to the applicable regulatory approval , as of the Approval of the Plan, and up to the future investiture of the members of the New Board of Directors, as per this Plan, duly approved by the competent regulatory authorities, Debtors shall have a Transitional Board of Directors comprised of a total of nine (9) full members, without deputies, identified in **Exhibit 9.2.,** as follows:

- Six (6) members of the current Board of Directors;

- Three (3) new members, which shall be invested in office by operation of this Plan, pursuant to Article 50, IV, of LRF.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP n° 787
CCM n° 9.743.188-5 (São Paulo, SP)

CPF/MF n° 108.911.608-09
RG n° 14.873.251 SSP/SP

*Tradução n° 7952*                        *Livro n° 166*                        *Página n° 424*

**9.2.1.** The resolutions of the Transitional Board of Directors shall comply with the provision of Article 30 of Oi's Bylaws, and all resolutions shall be taken by simple majority of those present. In the event of any deadlock in the Resolutions of the Transitional Board of Directors, the Chairman of the Transitional Board of Directors shall have the casting vote, according to article 30 of Oi Bylaws.

**9.2.2.** All functions of the other members of the current Board of Directors, which are not designated members of the Transitional Board of Directors pursuant to **Section 9.2** above, whether holders or alternates, shall be suspended, including in Advising Committees for Oi administration, and they may not participate of any meeting of the Transitional Board of Directors and (a) shall be formally replaced by operation of this Plan, pursuant to Article 50, IV, of LRF, after the investiture of the New Board of Directors, as per this Plan, or (b) shall have their term in office expiry by lapse of time, whichever occurs first.

**9.2.3.** Oi shall use its best efforts to obtain the regulatory approvals necessary to the effective investiture of the members of the Transitional Board of Directors who does not comprise the current Board of Directors.

**9.2.4.** The members of the Transitional Board of Directors cannot be replaced until the investiture of the members of the New Board of Directors.

**9.3.** **New Board of Directors.** Within forty-five (45) Business Days from the conclusion of the Capital Increase Capitalization of Credits, by operation of this Plan, as per Article 50, IV, of LRF, Debtors shall have a New Board of Directors, comprised by eleven (11) full members, without alternates, included in the Consensual Slate, with a term of office of two (2) years, the election of which shall be ratified by a Shareholders' General Meeting called for that end, as per the Corporation Law and Oi's Bylaws, in compliance with this Plan.

**9.3.1.** **Formation of the Consensual Slate**. The Consensual Slate for the New Board of Directors shall be comprised exclusively by independent directors, according to definition in Oi Bylaws, observing that one (1) of the Independent Directors shall be Mr. Eleazar de Carvalho Filho. The other independent directors and their alternates shall be chosen by the vote of the simple majority of the Transitional Board of Directors. The HR Consultancy shall submit to the Transitional Board of Directors, within ninety (90) Business Days from the approval of the Plan, a list with at least twenty-two (22) candidates to be member of the New Board of Administration, for selection of the ten (10) independent directors and formation of the Consensual Slate.

**9.3.2** **Election of the New Board of Directors**. Immediately after and in any case within five (5) Business Days from the conclusion of the Capital Increase – Capitalization of Credits, the Transitional Board of Directors shall call a Shareholders' General Meeting for the election and investiture of the New Board of Directors and their respective directors as per the Consensual Slate.

**9.4.** The resolutions of the New Board of Directors shall comply with the provisions of Article 30 of Oi's Bylaws, being taken by simple majority of those present. In case of hindrance in the Resolutions of the New Board of Directors, the Chairman of the New Board of Directors shall have the casting vote, in accordance with Article 30 of Oi's Bylaws.

**9.5.** The members of the New Board of Directors may not be dismissed, except due to gross mistake, willful misconduct, gross negligence, abuse of term of office or violation of the respective fiduciary duties, as per the applicable legislation.

Rua Pereira Estéfano, n° 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 425*

**9.6.**   In case of vacancy, the provision of Article 150 of the Corporation Law shall be observed.

**9.7.**   **Board of Directors**. After the expiry of the term of office of the New Board of Directors as per this Plan, a new Shareholders' General Meeting may be called for the resolution and election of new members for Oi's Board of Directors, the reinstatement authorized, observing the provisions in Oi's Bylaws and in the Corporation Law.

**9.8. Ordinary course of activities.** Debtors and its administration undertake to conduct Oi Group businesses in accordance with the ordinary course of their operations and with the provisions of this Plan until the investiture of the New Board of Directors.

**9.9.**   **Affirmative and Negative Covenant**: During the Transitional Period, Debtors and their management, including the current Executive Office and the Transitional Board of Directors undertake to do and not to do the provisions in **Exhibit Error! Reference source not found..** [*sic*]

## 10.   ADDITIONAL OBLIGATIONS

**10.1.**   **Restriction to the Payment of Dividends**.

**10.1.1.** Until the sixth (6th) year of the date of Judicial Ratification of the Plan, Debtors shall not declare or pay any dividend, return on capital, or make any other payment or distribution on (or related to) the shares issued by themselves (including any payment related to merger or consolidation involving any Debtor).

**10.1.1.1.**   The declaration of, or the following payments are excepted for the restrictions described in **Section 10.1.1** above:

**(a)**   Dividends, return on capital or other distributions exclusively of one Debtor payable to another Debtors;
**(b)**   Payments by any Debtor to dissident shareholders according to the applicable legislation carried out after the date of Judicial Ratification of the Plan; or
**(c)**   Any payment of dividends carried out according to this Plan.

**10.1.2.** After the sixth (6th) anniversary of the date of Judicial Ratification of the Plan, as applicable, the Debtors will be authorized to declare or pay any dividend, return on capital or make any other payment or distribution on (or related to) the shares issued thereby (including any payment in relation to any type of consolidation or merger involving Debtors) only if the quotient of the consolidated net debt of Oi (that is, Financial Credits, deducted from Cash, plus the Anatel credits) / EBITDA of the fiscal year ended immediately before the declaration or of the payment, is equal or lower than two (2). After the Capital Increase with Capitalization of Credits and the Capital Increase New Funds, the payments of dividends, return on capital or any other payment or distribution on (or related to) the shares issued thereby (including any payment in relation to any consolidation or merger involving any Debtor), shall be authorized if the consolidate net financial debt ration of Oi (that is, Financial Credits, deducted from Cash) / EBITDA of the fiscal year ended immediately before the declaration or of the payment, is equal or lower than two (2), being certain that there shall not be any restriction to the distribution of dividends after the full payment of the Financial Credits.

**10.1.2.1.**   The declaration of, or the following payments are excepted for the restrictions described in **Section 10.1.2** above:

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 426*

**(a)**      dividends, return on capital or other distributions exclusively of one Debtor payable to another Debtors;

**(b)**      payments by any Debtor to dissident shareholders according to the applicable legislation carried out after the date of Judicial Ratification of the Plan; or

**(c)**      Any payment of dividends carried out according to this Plan or determined by the applicable legislation, including the mandatory dividend.

**10.2.    Suspension of Obligations**. Beginning on the day of an Event of Suspension of Obligations and ending on a Date of Reversal (as defined below) (for the purposes of this clause, such period being referred to as "Suspension Period"), Oi Group: (i) shall not be bound to make an early annual redemption with Generation of Cash Sweep, as per **Section 5.2**; and (ii) may pay dividends free of any restriction provided for in **Section 10.1** of this Plan (for the purposes of this clause, "Suspended Obligations")

**10.2.1.** In any period of time, if two (2) among the following Rating Agencies (Standard and Poors, Moodys or Fitch Ratings) classify Oi with an investment grade and no default occurs, the obligations listed in **Section 10.2** will be suspended (for the purposes of this clause, "Event of Suspension of Obligations"). If on any subsequent date (for the purposes of this Section, "Date of Reversal") one (1) or both Rating Agencies cancel the investment grade or reduce the investment ratings of Oi below the investment grade, the suspended obligations will be applicable again.

**10.3.    Authorized Capital Increase.** As a manner to enable the approval of share issuances and subscription bonus set forth in this Plan, regardless of a statutory reform, Oi undertakes to call, as soon as possible after the Judicial Ratification of the Plan, a general meeting of shareholders to resolve on the increase of the limit of its authorized capital, in quantity sufficient to withstand such issuances, if necessary. If there is any hindrance to such approval, it may be compensated by a decision of the Judicial Reorganization Court.

**10.4.    Positive Covenants**. By means of this Plan, the Debtors undertake to, during the course of the Judicial Reorganization, (a) to conduct the Oi Group's business according to the regular course of its transactions; (b) comply with all terms, conditions and limitations set forth herein; and (c) comply with all obligations undertaken herein.

**11.      EFFECTS OF THE PLAN**

**11.1.    The Binding Nature of the Plan.** As of the Judicial Ratification of the Plan, the provisions of this Plan bind the Debtors, their shareholders and partners, the Pre-Petition Creditors and their relevant successors and assignees, under the terms of art. 59 of the LFR.

**11.1.1.** Observing the provision of **Section 11.4**, the Approval of the Plan constitutes authorization and binding consent granted by Pre-Petition Creditors to enable the Debtors to, within the limits of the Law and the terms of this Plan, take any and all appropriate and required action to implement the measures provided for in this Plan, including (*i*) the obtainment of judicial, extrajudicial or administrative measure (whether according to any insolvency law or under the scope of any principal or incidental procedure) pending or to be initiated by the Debtors, any of the representatives of the Debtors or any representative of the Judicial Reorganization, in any jurisdiction that is not Brazil with the purpose of giving force, validity and effect to the Plan and its implementation and (*ii*) the

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 427*

establishment of procedures for (*ii.a*) Creditors who are non-residents of Brazil to express their choice with respect to the option for the payment of their respective Pre-Petition Credits, notwithstanding the provisions of Sections **4.5, 4.5.1, 4.5.2, 4.5.3, 4.5.4 and 4.5.5**, (*ii.b*) the payment of the Credits held by the referred Creditors who are non-residents in Brazil, in the appropriate manner, as provided for in this Plan; and (*ii.c*) to guarantee equal treatment of the Creditors, deduct the amounts of the Credits to be paid by the Debtors, under this Plan, to the Creditors, whether or not these Creditors are residents of Brazil, indicated in the Creditors' List of the Bankruptcy Trustee, any and all amounts received by these creditors of the Debtors and/or resulting from any disposal, liquidation or foreclosure of their assets in other jurisdictions, as applicable.

**11.1.1.1.**        In the light of the foregoing, within the limits of the Law and the terms of this Plan, Creditors who approve the Plan expressly state that they undertake to approve any other instruments regarding a composition between creditors and any of the Debtors in another jurisdiction, to be submitted for approval by the creditors in any jurisdiction, including, but not limited to, a composition plan to be offered by any of the Debtors before the Dutch Courts, as well as to sign any and all instruments required to put said composition of creditors into effect, except the provision of **Section 11.4**.

**11.2.    Novation**. Unless otherwise provided in Section **11.2.1** below and specifically agreed to by the Secured Creditor and Oi Group, and in accordance with the provisions of **Section 4.2.4**, the Judicial Ratification of the Plan will imply the novation of all Pre-Petition Credits, under the terms of art. 59 of the LFR, which will be paid as set forth in this Plan. Due to the novation, all obligations, contractual covenants, financial indexes, events of early termination, as well as other obligations and guarantees of any nature assumed or provided by the Debtors are terminated, and will be replaced, in all their terms (except as otherwise provided for in this Plan), by the provisions of this Plan.

**11.2.1.** Considering the relevance of the guarantees in force provided by Oi Group's companies in order to maintain the permits for the use of radiofrequency, as required by Governmental Authorities, as well as to maintain assets and rights required for the provision of services in the scope of said permits, it is hereby expressly excepted that such guarantees will not be affected by the novation provided for in **Section 11.2**, above.

**11.3.    Termination of Claims.** Observing the provision of **Section 11.4**, as of the Judicial Ratification of the Plan, while this Plan is being complied, and in accordance with the provisions of Sections **4.1.2** and **4.3.2**, the Pre-Petition Creditors, except Labor Creditors, can no longer (*i*) file or proceed with any and all judicial actions or Proceedings of any nature against the Debtors associated with any Pre-Petition Credit, except with regard to the provisions of art. 6, paragraph 1, of the LFR in relation to Proceedings regarding Non-liquidated Credits; (*ii*) execute any judgment, judicial decision, or arbitration award against the Debtors associated with any Pre-Petition Credit; (iii) pledge or encumber any of Oi Group's assets to satisfy their respective Pre-Petition Credits or practice any other constrictive acts against the assets of the Debtors; (iv) create, improve, or execute any collateral on the assets and rights of the Debtors to ensure the payment of the Pre-Petition Credit; (v) claim any right for the settlement of their respective Pre-Petition Credit against any credit owed to the Debtors; (vi) seek to meet their Pre-Petition Credit through any other means rather than those provided for in this Plan. With the Judicial Ratification of the Plan, all executions, among other remedies in course against Oi Group and regarding Pre-Petition Credits, will be terminated, and the judicial constrictions and pledges will be released, considering that the balance of the Court Deposits that have not been used in the payment of Creditors under the terms of **Sections 4.1.2 and 4.3.2** above will also be released.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                *Livro nº 166*                *Página nº 428*

**11.4.**   The provisions of **Sections 3.1.1.1, 4.3.3.8, 4.3.3.10, 11.1.1, 11.1.1.1, 11.3, 11.10, 11.11, 11.12, 11.12.1, 11.12.1.1, 11.12.1.2, 13.2.1, 13.10.1 and 13.10.2** above do not apply to the Current Litigants, as well as does not affect any current or future litigation, or causes of litigation of the Current Litigants, in any jurisdiction, being maintained their rights to adopt any action that understand necessary in relation to the Plan, the Financing DIP, any agreement, instrument or other document created or executed in relation to this Plan or to the Financing DIP, including, without limitation, the right to terminate such agreements or to file actions in any jurisdiction for the protection and efficiency of the rights of this Plan or of the Financing DIP, or to demand those rights, actions or causes of action connected to, arising from or related to the non-compliance with any term and condition by Debtor, included in this Plan, in the Financing DIP or in any other agreement, instrument or other document created or executed and related to this Plan, or to the Financing DIP, to which such party is bound.

**11.4.1.** Until the date of the Judicial Ratification of the Plan or January 15, 2018, whichever occurs first (for the purposes of this section, the "Period of Suspension Litigations"), each of the Debtors and the Current Litigants must refrain from pursuing in any jurisdiction (including in Brazil, United States of America, Netherlands, Portugal or United Kingdom) any dispute, actions or causes of action against Debtors or any of the Current Litigants or the Protected Parties.

**11.4.2.** During the Period of Suspension Litigations, Debtors and the Current Litigants must coordinate their efforts to take any measure necessary or appropriate to suspend the Pending Actions and must not perform any adjustment in their actions, requests, appeals, motion for reconsideration or similar action, except if necessary to maintain the Pending Action or avoid statute of limitation. Specifically, the parties must require: (i) the suspension, during the Period of Suspension Litigation, of the court actions of which they are parties in the United States of America, Netherlands and Cayman Island, as the case may be; (ii) to Mr. Jasper Berkenbosch, designated trustee in the bankruptcy proceedings of Coop in course in Netherlands, to request, during the Period of Suspension Litigation, the suspension of the avoidance proceeding filed thereby; and (iii) to the District Court of Amsterdam where the avoidance proceeding is in course, the suspension of that action during the Period of Suspension Litigations.

**11.4.3.** Nothing in this Plan prevent the Current Litigants from pursuing or continuing to pursue motions of reconsideration, change, vacatur, appeals or any other similar measure or an appeal of written memorandum of decision of the North American Bankruptcy Court dated of December 4, 2017, file number 17-11888, registration number 130, or any other order related to such decision.

**11.4.4.** Debtors and the Current Litigants may adopt applicable legal measures strictly necessary to protect their rights, appeals or right to appeal, provided that Debtors and the Current Litigants adopt the measures strictly necessary for the protection of right.

**11.4.5.** Any statute of limitation, period of suspension or preemptive period, or any other time appeal, including mutual waivers, dismissals or abdications, set forth in law, statute, agreement, by equity or any other means, which may be argued by Debtors or by the Current Litigant, are interrupted until the occurrence of: (i) the conclusion of the negotiation for the closing of the Pending Actions, the transactions set forth in this Plan for the restructuring of the credits or (ii) ninety (90) days after the end of the period of suspension of the Pending Actions set forth in **Section 11.4.4** above; whichever comes first.

**11.4.6.** Nothing in this Plan shall limit or restrict the rights of the Current Litigants, being certain that, except for the obligation to suspend actions set forth in this clause, any Current Litigant shall

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP n° 787
CCM n° 9.743.188-5 (São Paulo, SP)

CPF/MF n° 108.911.608-09
RG n° 14.873.251 SSP/SP

*Tradução n° 7952*              *Livro n° 166*              *Página n° 429*

have protected its right of taking any action that it understands necessary related to the Plan, the Financial DIP, any agreement, instrument or other document created or executed in relation to this Plan or to the Financing DIP, including, without limitation, the right to terminate such agreements or to file actions in any jurisdiction for the protection and efficiency of the rights of this Plan or of the Financing DIP or to demand those rights, actions or causes of actions connected to, arising from or related to the non-compliance with any term and condition by Debtors, included in this Plan, in the Financing DIP or in any other agreement, instrument or other document created or executed in relation to this Plan, or to the Financing DIP, of which such part is bound.

**11.4.7.** Debtors and Current Litigants shall use their best efforts in a commercially reasonable manner to negotiate in good faith the closing of the Pending Actions in mutually acceptable terms in the United States of America, Netherlands and Cayman Islands, as the case may be. Nothing in this Plan shall be construed as an obligation of Debtors or of the Current Litigants to close such Pending Actions.

**11.4.8.** The Approval of the Plan does not prevent the Pre-Petition Creditors and/or Debtors from pursuing in any jurisdiction (including in Brazil, United States of America, Netherlands, Portugal or United Kingdom) any dispute, actions or causes of action against the Current Litigants, nor does it imply waiver to the rights or remedies that the Pre-Petition Creditors and/or Debtors have against the Current Litigants.

**11.5.    Reconstitution of Rights**. Verified the occurrence of any of the Conditions Subsequent set forth in **Section 12** and provided that Oi Group has not obtained the waivers necessary pursuant **Section 12.2** and/or situation of conversion from the Judicial Reorganization into bankruptcy during the term established in Article 61 of LFR, the Pre-Petition Creditors shall have all their rights and guarantees fully restored to the conditions originally contracted, as if the Plan had not been approved, being reestablished all actions and claims against Oi Group, and ensuring the right to file or resume any judicial or extrajudicial action against Oi Group, deducting the amounts that may have been paid as per this Plan and in the course of the Judicial Reorganization and excepted the acts validly executed within the scope of the Judicial Reorganization and this Plan, observing the provision of Articles 61, paragraph 2, and 74, of LFR.

**11.6.    Formalization of Documents, among Other Measures.** Oi Group, the purchasers of any assets owned by any of the Debtors and the Creditors and their representatives and attorneys must practice all acts and sign all agreements, among other documents, which, in form and substance, are required or appropriate for compliance with and the implementation of the provisions of this Plan.

**11.7.    Modification of the Plan**. Addenda, amendments or modifications in the Plan may be proposed at any time after the Judicial Ratification of the Plan, provided that such addenda, amendments or modifications are (i) submitted to voting in the Creditors' Meeting, observing the quorum required by Articles 45 and 58, main section and paragraph 1, of LFR.

**11.7.1. Biding Effect of the Modifications of the Plan**. The addenda, amendments or modifications in the Plan shall bind Oi Group, its Pre-Petition Creditors and their respective assignees and successors, from its approval by the Creditors' Meeting as per Articles 45 or 58 of LFR.

**11.8.    Maintenance of the Right of Petition and Voice and Vote in Creditors' Meeting.** For the purposes of this Plan, and while the closing of the Judicial Reorganization does not occur, the Creditors -- including the Qualified Bondholders Unsecured Creditors that may convert part of their Qualified Bondholders Unsecured Credits into Oi's capital as per the Capital Increase --

Rua Pereira Estéfano, n° 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 430*

Capitalization of Credits -- shall maintain the amount and quantity of their Pre-Petition Credits for the purpose of right of petition, voice and vote in each and every Creditors' Meeting after the Judicial Ratification of the Plan, regardless of the conversion of the Qualified Bondholders Unsecured Credits into New Common Shares I – and respective settlement.

**11.9.   Economic equivalence in the fulfillment of the Plan**. In the event that any of the transactions provided for in the Plan, which do not involve payments in cash to the Pre-Petition Creditors, could not be implemented by the Debtors due to the end of the deadline applicable to the implementation of such transactions or due to regulatory reasons, the Debtors will adopt the required measures in order to assure an equivalent economic result to the Pre-Petition Creditors.

**11.10.   Settlement.** Payments made as set forth in this Plan will automatically discharge, proportionally to the amount effectively received and regardless of any additional formalities, the full, complete, irrevocable, and irreversible settlement of any and all Pre-Petition Credits against the Debtors, due to a primary or personal obligation, including with respect to the Financial Charges, so that the Pre-Petition Creditors can no longer file any claims against the Debtors, relatively to the Pre-Petition Credits, at any time, whether in court or out of court.

**11.11.   Ratification of Acts.** The Approval of the Plan by the Creditors' General Meeting will imply the approval and ratification of all regular management acts practiced and measures taken by the Debtors in the course of the Judicial Reorganization, including, without limitations to, the acts required for restructuring in the manner proposed by this Plan, the execution of the Backstop Agreement, as well as all other acts and actions required for the full implementation and completion of this Plan and the Judicial Reorganization, which are expressly authorized, validated, and ratified for all legal purposes, including and especially articles 66, 74, and 131 of the LFR.

**11.12.   Disclaimer and Waiver of Liability.**

**11.12.1.       Disclaimer and Waiver of Liability of the Exempted Parties.** As a result of the Approval of the Plan, Creditors expressly hold the Exempted Parties harmless from and against any and all liability for the regular management acts practiced and obligations assumed before or after the Request Date until the date of the Approval of the Plan, including with respect to the restructuring provided for in this Plan, granting to the Exempted Parties comprehensive, public, general, irrevocable and irreversible settlement of all property, penal, and moral rights and intentions eventually arising from the referred acts, on any account, observing the provision of **Section 11.4**.

**11.12.1.1.**       Approval of the Plan equally represents express and irrevocable waiver by Creditors to the rights on which any claims, actions, or rights to file, promote, proceed to or claim, whether in court or out of court, on any account and without exceptions or reservations, in any jurisdiction, the reparation of damages and/or other actions or measures promoted against the Exempted Parties with respect to the acts practiced and obligations assumed by the Exempted Parties, including by virtue and/or in the course of the Judicial Reorganization, are founded. The Creditors, as applicable, shall take the appropriate measures so that the trustees appointed in the Dutch bankruptcy proceedings of Oi Coop and PTIF close all litigations against the Exempted Parties or cause such litigations to be closed, observing the provision of **Section 11.4**.

**11.12.1.2.       Disclaimer and Waiver of Liability of the Backstoppers Investors.** As a result of the Approval of the Plan, each of the companies part of Oi Group and their successors, and the Creditors, expressly hold the Exempted Parties Backstoppers Investors harmless from and against any and all liability for the acts practiced, including the execution of the Backstop Agreement, and

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 431*

obligations assumed before or after the Request Date until the date of the Approval of the Plan, including with respect to the restructuring provided for in this Plan and in the Backstop Agreement, granting to the Exempted Parties Backstoppers Investors comprehensive, public, general, irrevocable and irreversible settlement of all property, penal, and moral rights and intentions eventually arising from the referred acts, on any account.

## 12.    CONDITIONS SUBSEQUENT OF THE PLAN

**12.1.    Conditions Subsequent.** The following are conditions subsequent of the Plan, the occurrence of which shall result in the automatic termination of the Plan and its provisions, with the consequent maintenance and/or reconstitution of the rights and guarantees of the Creditors under the conditions originally contracted, as if the Plan had not been approved, pursuant to this **Section 12.1:**

(i)    non-occurrence of the restructuring of the Qualified Bondholders Unsecured Creditors as per **Section 4.3.3.2** until July 31, 2018;

(ii)    non-occurrence of the Capital Increase Capitalization of Credits as established in **Section 4.3.3.5** until July 31, 2018; and

(iii)    non-occurrence of the Capital Increase New Funds as established in **Section 6** until February 28, 2019.

**12.2.    Waiver of Conditions Subsequent.** The Creditors may, in resolution of the holders of the simple majority of the Credits present at the Creditors' Meeting called for that purpose, approve the total or partial waiver or modification of the condition(s) subsequent described in Section 12.1 above.

**12.3.    Termination of the Plan**. If the Plan is terminated, it will be incumbent upon the Creditors' Meeting to resolve (i) on the approval of modification to the Plan, observing the quorum for approval of Plan established in Articles 45 and 58, paragraph 1, of LFR, or (ii) for the adjudication of bankruptcy by the Reorganization Court.

## 13.    Miscellaneous

**13.1.    Conditions precedent.** The effectiveness of this Plan is conditioned to (*i*) the Approval of the Plan; and (*ii*) the Judicial Ratification of the Plan, and the effectiveness of the implementation of the measures set forth in this Plan is conditioned to the compliance of the applicable legal, regulatory and statutory requirements and conditions.

**13.2.    Positive and Negative Covenants**. Through this Plan, the Debtors undertake to, during the Judicial Reorganization, (a) conduct the businesses of Oi Group according to the regular course of its operations; (b) observe all terms, conditions and limitations set forth herein; and (c) fulfill all obligations undertaken in this Plan.

**13.2.1.** Without prejudice to the provisions of **Section 13.2** above, the Debtors undertake to adopt the measures that are within their reach and are necessary for this Plan to be acknowledged as effective, enforceable and binding in the applicable foreign jurisdictions, to the extent that such acknowledgment is necessary for the implementation of the measures set forth in this Plan regarding the respective Creditors, observing the provision of **Section 11.4.**

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzales**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*          *Livro nº 166*          *Página nº 432*

**13.3.   Closing of the Judicial Reorganization.** The Judicial Reorganization shall be terminated upon the verification of the compliance of all obligations set forth in the Plan that expire within two (2) years as of the Judicial Ratification of the Plan.

**13.4.   Payment Methods.** Except for Labor Creditors that are parties to Proceedings, who will always be paid upon judicial deposit in the case records of the respective Proceedings, except if there is a provision to the contrary in the Plan, the amounts owed to the Pre-Petition Creditors shall be paid through (*a*) the direct transfer of funds to the bank account of the respective Pre-Petition Creditor, through a credit order document (DOC) or electronic transfer of available funds (TED), (*b*) a Payment Order to be directly withdrawn from the teller of the financial institution by the respective Pre-Petition Creditor, as the case may be; the proof of said financial transaction can be used as proof of settlement of the respective payment; or even (*c*) other means necessary for the payment of Regulatory Agencies Pre-Petition Credits.

**13.4.1.** The payments set forth in this Plan shall be carried out only after the availability and remittance by the Pre-Petition Creditors, with the exception of Labor Creditors that are parties in Proceedings, of their updated registration data and bank account information in the electronic platform that will be made available by Oi at the electronic address www.recjud.com.br. If the Pre-Petition Creditor does not make available and send said information in a timely manner so that the Debtors may make said payment, on the dates and within the terms set forth in this Plan, such non-performance will not be considered a non-compliance with the Plan. No fine, monetary adjustment or default charges shall be levied regarding the payments that are not made on the dates and within the terms set forth in the Plan due to the Pre-Petition Creditors not having made available and sent said information in a timely manner.

**13.5.   Payment Dates.** In case any payment or obligation set forth in this Plan should be performed or satisfied on a day other than a Business Day, said payment or obligation may be performed or satisfied, as the case may base, on the immediately subsequent Business Day, without this characterizing lack of punctuality of the Debtors or implying the assessment of Financial Charges. Similarly, regarding any payment obligations depending on acts that have not yet been performed, the Debtors shall exert all efforts to carry out the payments as soon as possible, according to the structure of this Plan.

**13.6.   Communications.** All notifications, requirements, requests and other communications to Oi Group, requested or permitted by this Plan, in order to be effective, shall be performed in writing and shall be considered performed when (i) sent by registered letter, return receipt requested, or by courier, and effectively delivered; or (ii) sent by e-mail with evidence of delivery, observing the following contact information:

Oi S.A.
Rua Humberto de Campos, 425
Protocolo – Recuperação Judicial
Leblon
Rio de Janeiro – RJ
CEP 22430-190
E-mail: rjoi@oi.net.br

**13.7.   Severability of the Plan.** In the event of any term or provision of the Plan is considered invalid, void or ineffective by the Judicial Reorganization Court, the validity and effectiveness of the

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

**Cristina Gonzáles**
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 433*

remaining provisions shall not be affected, and the Debtors shall propose new provisions to substitute those declared invalid, void or ineffective, so as to maintain the purpose set forth in this Plan.

**13.8.    Assignment of Credits.** Except if provided otherwise in this Plan, the Creditors may assign their Pre-Petition Credits to other Creditors or to third parties, and the assignment shall only have effects provided that (i) the Debtors, the Bankruptcy Trustee and the Judicial Reorganization Court are informed; and (ii) the assignees sign a written statement attesting to the receipt of a copy of the Plan and acknowledging that the Pre-Petition Credit will be subject to the provisions of the Plan. The provisions of items "i" and "ii" above do not apply to the Qualified Bondholders Unsecured Credits nor to the New Notes, which may be freely assigned, regardless of previous notice and/or agreement of Debtors.

**13.9.    Amendments Previous to Approval of the Plan.** Debtors reserve the right, pursuant to Law, to amend this Plan up to the date of Approval of the Plan, including complementing the protocol with additional documents and translations of related documents.

**13.10.   Powers of Oi Group to implement the Plan**

**13.10.1.**          The Approval of the Plan followed by the Judicial Ratification of the Plan shall give Oi, through its legal representatives, powers to take all measures necessary to the implementation of the Plan, including, from the corporate point of view, to sign the subscription lists, on behalf and to the benefit of the Bondholders Unsecured Creditors that restructure their Credits as set forth in **Section 4.3.3.1.1** related to the shares to be issued and delivered by Oi as ADRs in payment for such Credits, observing the provision of **Section 11.4**.

**13.10.2.**          After the Judicial Ratification of the Plan, Oi Group is hereby authorized to adopt all measures necessary for (i) submitting the Approval of the Plan to the insolvency proceedings in course before the Bankruptcy Court of the Southern District of New York (Chapter 15), with the purpose of granting effects to the Plan in the North-American territory, binding the Creditors domiciled and established therein, as well as (ii) starting and/or continuing other judicial, extrajudicial or administrative proceedings, whether insolvency procedures or of any other nature, in other jurisdictions other than the Federative Republic of Brazil, including in the North-American and Dutch territory, as the case may be, for the implementation of this Plan, including, but not limited to, the insolvency proceedings or proceedings necessary to the implementation of the provisions of this Plan, notably pursuant to the applicable legislation of the United States of America, British Virgin Islands and Netherlands. The accessory proceedings abroad cannot change the terms and conditions of this Plan, observing the provision of **Section 11.4**.

**13.11.  Applicable Law.** The rights, duties and obligations arising herefrom shall be governed, interpreted and signed under the laws in force in the Federative Republic of Brazil, even if the Credits are governed by the laws of another jurisdiction and without the application of any rules or principles of private international law.

**13.12.  Dispute Resolution and Jurisdiction.** All controversies or disputes that arise or are related to this Plan, including Creditors' claims related to the amount of their respective Pre-Petition Credits, may be previously submitted to the Mediation procedure, pursuant to the rules of the Chamber of Mediation and Arbitration of Fundação Getulio Vargas/RJ or alternatively of the Permanent Center of Consensual Methods for Litigation Resolution of the Higher Courts of the State of Rio de Janeiro [*Núcleo Permanente de Métodos Consensuais de Solução de Litígios do Tribunal de Justiça do Estado do Rio de Janeiro*]. If such controversies or disputes are not solved in Mediation, such

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP n° 787
CCM n° 9.743.188-5 (São Paulo, SP)

CPF/MF n° 108.911.608-09
RG n° 14.873.251 SSP/SP

*Tradução n° 7952*          *Livro n° 166*          *Página n° 434*

controversies or disputes shall be solved (*i*) by the Judicial Reorganization Court, until the end of the Judicial Reorganization proceedings with the ratification decision made final and unappealable; and (*ii*) by any corporate court of the Central Courts of the City of Rio de Janeiro, after the end of the Judicial Reorganization proceedings with the ratification decision made final and unappealable.

The Plan is signed by Oi Group's duly appointed legal representatives.

Rio de Janeiro, December 20, 2017.

[*signatures*]
**Oi S.A. – under judicial reorganization**

[*signatures*]
**Telemar Norte Leste S.A. – under judicial reorganization**

[*signatures*]
**Oi Móvel S.A. – under judicial reorganization**

[*signatures*]
**Copart 4 Participações S.A. – under judicial reorganization**

[*signature*]
**Copart 5 Participações S.A. – under judicial reorganization**

[*signature*]
**Portugal Telecom International Finance B.V. – under judicial reorganization**

[*signature*]
**Oi Brasil Holdings Coöperatief U.A. – under judicial reorganization**

---

## Exhibit 1.1
## Definitions

"**Shareholders**" means the direct or indirect shareholders of OI, including the individuals that are, directly or indirectly, controlling shareholders of OI and their successors in any manner.

"**Pending Actions**" means any pending judicial and extrajudicial measures on the date of the Plan or on a previous date in the United States of America, Holland and Cayman Island, the parties of which are any of the Debtors and the Current Litigants.

"**PTIF Shares**" means the 134,819,390 common shares issued by Oi held by PTIF, as ADRs, currently held by Oi in treasury.

"**Shareholders' Agreements**" means the agreements entered between the Shareholders on the purchase and sale of shares issued by the Debtors, right of first refusal, exercise of the right to vote or the control power, which shall be observed by the company when filed in its principal place of business, pursuant to the terms of Article 118 of the Brazilian Corporations Law.

Rua Pereira Estéfano, n° 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 / +55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                *Livro nº 166*                *Página nº 435*

"**Bankruptcy Trustee**" means Escritório de Advocacia Arnold Wald, with a registered office at Av. Pres. Juscelino Kubitschek, 510, 8º andar, São Paulo- SP, CEP 04543-906, as appointed by the Judicial Reorganization Court, under the terms of the decision rendered on July 22, 2016.

"**ADR**" means American Depositary Receipts, a method through which OI's shares are traded on the NYSE.

"**Labor Attorneys**" means the respective attorneys of the Court Deposits Labor Creditors constituted in the records, including those holding defeated party's fees.

"**Affiliates**" means, with respect to any Person, any Person that directly or indirectly Controls, is Controlled by, or is under common Control of this Person.

"**Disposal of Assets**" means the transactions of disposal of assets pursuant to Section 5.1.

"**ANATEL**" means the National Telecommunications Agency [*Agência Nacional de Telecomunicações*], created by Law No. 9,472, dated July 16, 1997.

"**Approval of the Plan**" means the approval of this Plan by the Pre-Petition Creditors in the Creditors' General Meeting, as per art. 45 or 58, paragraph 1 of the LFR. For the purposes of this Plan, the Approval of the Plan is considered to occur on the date of the Creditors' General Meeting that approves the Plan. In case of approval under the terms of art. 58, paragraph 1 of the LFR, the Approval of the Plan is considered to occur on the date of the decision granting the Judicial Reorganization.

"**Creditors' General Meeting**" means any general meeting of creditors under the terms of Chapter II, Section IV of the LFR.

"**Non-Material Asset**" means property or assets of any Debtor with Fair Market Value that does not exceed five percent (5%) of the item "Assets" of the consolidated annual financial statements of Oi for the previous fiscal year.

"**Material Asset**" means property or assets of any Debtor with Fair Market Value that does exceed five percent (5%) of the item "Assets" of the consolidated annual financial statements of Oi for the previous fiscal year.

"**Capital Increase Capitalization of Credit**" means a capital increase of Oi, subscribed by the Qualified Bondholders Unsecured Creditors, paid up upon capitalization of the Qualified Bondholders Unsecured Credits, as per Article 171, paragraph 2, of the Corporation Law and other applicable legal provisions, in accordance with the conditions set forth in **Section 4.3.3.5**.

"**Capital Increase New Funds**" means a capital increase of Oi, subscribed by the Backstopper Investors, pursuant to the Backstop Agreement, paid up upon private issuance (i.e., without registration before CVM) of new common shares, as per Article 170, paragraph 1, of the Corporation Law and other applicable legal provisions, in accordance with the conditions provided for in **Section 6**.

"**Governmental Authorities**" means the government of the Federative Republic of Brazil or of any other jurisdiction or a political subdivision of it, including any federal, state, or local institution, agency, division, department, or body of this government, or a political subdivision of it, including

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 / +55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 436*

the Public Prosecutor's Office, the Federal Police, the Federal Revenue Office of Brazil, the National Institute of Social Security, the Central Bank of Brazil, the Securities and Exchange Commission, ANATEL, the Federal Accounting Court, any judicial, administrative or arbitration court or tribunal, any regulatory or self-regulatory entity.

**"Broadband in Schools"** means the program launched by the Federal Government through Decree 6,424/2008, which allows fixed telephony service companies to exchange the obligations of installing telephone service stations (PST, *postos de serviços telefônicos*) in the cities by installing a network infrastructure to support high-speed connection to the Internet in all Brazilian cities and the connection of all urban public schools with services provided at no cost until 2025.

**"B3"** means B3 S.A. - Bolsa, Brasil, Balcão.

**"BNDES"** means the Brazilian Economic and Social Development Bank [*Banco Nacional de Desenvolvimento Econômico e Social*].

**"Bondholder"** means the holder of a Bondholder Unsecured Credit.

**"Non-qualified Bondholder"** means, exclusively for the purpose of this Plan, those individual investors holding Bondholders Unsecured Credits in an amount of up to seven hundred thousand United States Dollars (USD750,000.00)

**"Qualified Bondholder"** means, exclusively for the purpose of this Plan, those individual or legal entity investors holding Bondholders Unsecured Credits in an amount of up to seven hundred thousand United States Dollars (USD750,000.00) and that, if resident in the European Union, prove the compliance with the applicable legal requirements, especially the condition of qualified investor, pursuant to the Prospectus Directive of the European Economic Area (EEA).

**"Subscription Bonus"** means the securities described in **Section 4.3.3.6**.

**"Brasil Telecom"** means Brasil Telecom S.A., created from the privatization of the former state company Telecomunicações Brasileiras S.A., and which originated the current Oi Group.

**"CAPEX"** means the investments carried out to acquire physical assets or services that will expand Oi's capacity (consolidating its controlled companies) to generate profit. It means capital expenditure.

**"Consensual Slate"** means the consensual slate of eleven (11) full members and respective alternates that will compose the New Board of Directors and will be constituted in accordance with the procedure set forth in **Section 9.3** of this Plan.

**"Civil Code"** means Law No. 10,406, dated January 10, 2002.

**"Transitional Board of Directors"** means Oi Board of Directors to be composed pursuant to **Section 9.3**.

**"HR Consultancy"** means Spencer Stuart or other first-class Human Resource consultancy acceptable to the Backstopper Investors.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 437*

"**Eligible 4373 Accounts**": Are investment accounts held by foreign investors as per Resolution 4,373, issued by the Brazilian Central Bank on September 29, 2014, opened or that may be opened by Unsecured Creditors, in accordance with the legislation in force, before financial institutions that may be informed by Oi Group in due time in a communication or specific invitation to bid in order to enable the subscription of Convertible Debentures / subscription bonus, in due time and manner, as applicable. Eligible 4373 Accounts are and will be 4373 Accounts whose custodians determine that the Convertible Debentures / subscription bonus are qualified as an investment provided for by Resolution 4373, with zero tax rate of the Tax on Financial Operations (IOF) on effective or simultaneous exchange operations for funds to enter the Country, in compliance with the applicable regulations.

"**Backstop Agreement**" means the agreement entered into on December 19, 2017 between the Debtors and the Backstopper Investors, through which the Debtors and the Backstopper Investors assumed obligations within the scope of the Capital Increase New Funds, which is part of **Exhibit 6.1**.

"**Control**" means, under the terms of art. 116 of Law 6,404/76, (i) the ownership of partner rights that ensure to its holder, on a permanent basis, the majority of the votes in the social deliberations and the power to elect the majority of the company managers; and (ii) the effective use of this power to direct social activities and guide the operation of the company's bodies. The expressions and terms "Controller", "Controlled by", "under common Control", and "Controlled Company" have the meanings logically arising from the definition of "Control".

"**Copart 4**" means COPART 4 Participações S.A. – under judicial reorganization, a closely held corporation, registered with the CNPJ/MF under No. 12.253.691/0001-14, with a registered office and a principal place of business at Rua General Polidoro, 99, 4º andar, parte, Botafogo, Rio de Janeiro-RJ, CEP 22280-004.

"**Copart 5**" means COPART 5 Participações S.A. – under judicial reorganization, a closely held corporation, registered with the CNPJ/MF under No. 12.278.083/0001-64, with a registered office and a principal place of business at Rua General Polidoro, 99, 5º andar, parte, Botafogo, Rio de Janeiro-RJ, CEP 22280-004.

"**Credits**" means the Pre-Petition Credits and the Post-Petition Credits.

"**Secured Credits**" means the Pre-Petition Credits guaranteed by in rem rights, under the terms of art. 41, item II of the LFR.

"**Class III Credits**" means the Pre-Petition Credits provided for in arts. 41, item III, and 83, item VI of the LFR against the Debtors, held by Persons who are not any of the Debtors themselves.

"**Pre-Petition Credits**" means the credits and permanent injunctions subject to the effects of this Plan, whether matured or maturing, which respective agreements, obligations and/or triggering events occurred prior to the Request Date, regardless of whether or not they are included in the Creditors' List of the Bankruptcy Trustee. Pre-Petition Credits are all Credits referred to in this Plan, regardless of their nature, with the exception of Post-Petition Credits.

"**Regulatory Agencies Pre-Petition Credits**" means non-tax Pre-Petition Credits held by regulatory agencies or arising out of obligations imposed due to the resolution of regulatory agencies, including ANATEL. Occasional administrative fines already deemed as overdue by decision rendered within

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*          *Livro nº 166*          *Página nº 438*

the scope of the Superior Court of Justice are not included in the Regulatory Agencies Pre-Petition Credits.

"**Liquidated Regulatory Agencies Pre-Petition Credits**" means the Regulatory Agencies Pre-Petition Credits registered as overdue federal tax liability.

"**Non-liquidated Regulatory Agencies Pre-Petition Credits**" means the Regulatory Agencies Pre-Petition Credits not registered as overdue federal tax liability.

"**Post-Petition Credits**" means the credits held against the Debtors that are not subject to the effects of this Plan due to the fact that (a) their triggering event occurred after the Request Date, or (ii) they meet art. 49, paragraphs 3 and 4 of the LFR, or any other legal standard that excludes them from the effects of this Plan.

"**Financial Credits**" means the Pre-Petition Credits arising from transactions executed within the scope of the National Financial System with financial institutions.

"**Non-liquidated Credits**" means Pre-Petition Credits *(i)* under any judicial or arbitration proceeding, whether initiated or not, derived from any legal relationships and agreements existing on the Request Date; or *(ii)* in relation to which there is a pending matter for the resolution of a controversy or dispute; or *(iii)* those that, even if not falling into items (*i*) and (*ii*) above, are not included in the Creditors' List of the Bankruptcy Trustee, for any reason.

"**Intercompany Credits**" means the Debtors' credits derived from loans made among them as a way of managing cash and transfer of funds among the different companies that form Oi Group, including funds derived from transactions carried out in the international market by the Debtors.

"**ME/EPP Credits**" Means the Pre-Petition Credits held by micro and small businesses, defined in accordance with Complementary Law No. 123/2006, under the terms of art. 41, item IV of the LFR.

"**Unsecured Credits**" means the ME/EPP Credits, the Class III Credits and the Regulatory Agencies Pre-Petition Credits.

"**Court Deposit Unsecured Credits**" means the Court Deposit ME/EPP Credits and the Court Deposit Class III Credits.

"**Bondholders' Unsecured Credits**" means the Unsecured Credits pertaining to bonds pertaining to debt issuances by PTIF and Oi Coop, guaranteed by Oi and issued by Oi and guaranteed by Telemar listed as follows, issued and traded abroad and regulated by foreign laws, as well as subject to laws and other applicable rules in the jurisdictions where such bonds are traded: (i) 9.75% Senior Notes issued by Oi, (ii) 5.125% Senior Notes 2017 issued by Oi and guaranteed by Telemar, (iii) 9.500% Senior Notes 2019 issued by Oi and guaranteed by Telemar, (iv) 5.500% Senior Notes 2020 issued by Oi and guaranteed by Telemar, (v) 5.625% Senior Notes 2021 issued by Coop and guaranteed by Oi, (vi) 5.750% Senior Notes 2022, issued by Coop and guaranteed by Oi, (vii) 6.250% Notes 2016 issued by PTIF and guaranteed by Oi, (viii) 5.242% Notes 2017 issued by PTIF and guaranteed by Oi, (ix) 4.375% Notes 2017 issued by PTIF and guaranteed by Oi, (x) 5.875% Notes 2018 issued by PTIF and guaranteed by Oi, (xi) 5.000% Note 2019 issued by PTIF and guaranteed by Oi, (xii) 4.625% Notes 2020 issued by PTIF and guaranteed by Oi, and (xiii) 4.500% Notes 2025 issued by PTIF and guaranteed by Oi.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*            *Livro nº 166*            *Página nº 439*

"**Non-qualified Bondholders' Unsecured Credits**" means the Bondholders' Unsecured Credits held by Non-qualified Bondholders.

"**Qualified Bondholders' Unsecured Credits**" means the Bondholders' Unsecured Credits held by Qualified Bondholders.

"**Late Credits**" means those Pre-Petition Credits qualified after the publication of the Creditors' List of the Bankruptcy Trustee on the official press as provided by article 7, paragraph 2 of the LFR.

"**Labor Credits**" means the Pre-Petition Credits arising from the labor legislation or resulting from a work accident, under the terms of art. 41, item I of the LFR.

"**Fundação Atlântico Labor Credit**" means the Labor Credit owned by Fundação Atlântico de Seguridade Social, private pension entity linked to Oi Group.

"**Creditors**" means all creditors referred to in this Plan.

"**Secured Creditors**" means the holders of Secured Credits.

"**Pre-Petition Creditors**" means the holders of Pre-Petition Credits.

"**Post-Petition Creditors**" means the holders of Post-Petition Credits.

"**Strategic Supplier Creditors**" means those Class III and/or ME/EPP Unsecured Creditors that maintain the goods and/or services supply to the Debtors, as applicable, without any unreasonable change in the terms and conditions practiced until the Request Date by the respective Class III Creditors with regard to the Debtors and that do not have any kind of on-going litigation against any of the Debtors, except for any incident related to the Judicial Reorganization Proceeding.

"**Unsecured Creditors**" means the ME/EPP Unsecured Creditors and the Class III Unsecured Creditors.

"**Bondholder Unsecured Creditors**" means the holders of Bondholder Unsecured Credits.

"**Class III Unsecured Creditors**" means holders of Class III Credits.

"**ME/EPP Unsecured Creditors**" means holders of ME/EPP Credits.

"**Court Deposits Strategic Unsecured Creditors**" means the holders of Class III or ME/EPP Credits who, being aware that the existence of litigation against the Debtors incurs in spending funds and compromises the liquidity of Oi Group, expressly agree with the amounts of the respective Class III or ME/EPP Credits, as applicable, acknowledged by the Debtors, including those indicated in the List of the Bankruptcy Trustee, which in the latter case such Class III or ME/EPP Credit eventually becomes a Court Deposits Strategic Unsecured Creditor in accordance with **Section Erro! Fonte de referência não encontrada.**, and waive the right to offer, propose, or proceed with credit actions, qualifications, divergences, objections, or any other measure (including appeals) which aim at increasing the amounts of their respective Class III or ME/EPP Credits, as applicable and as acknowledged by the Debtors, including those indicated in the List of the Bankruptcy Trustee, in the latter case, when said Class III or ME/EPP Credit eventually becomes a Court Deposits Strategic

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 440*

Unsecured Creditor in accordance with **Section** Erro! Fonte de referência não encontrada., and that they meet the provisions of **Section 4.3.2.**

"**Late Creditors**" means the holders of Late Credits.

"**Labor Creditors**" means the holders of Labor Credits.

"**Court Deposits Labor Creditors**" means the Labor Creditors who are parties to lawsuits involving the Debtors, in whose case records the Court Deposits have been made

"**Issuance Date of Notes**" means the date of issuance of New Notes.

"**Request Date**" means the date of the filing of the request for judicial reorganization, namely: June 20, 2016

"**Bondholders Decision**" means the decision rendered by the Judicial Reorganization Court on the procedure and respective documentation to be submitted by the Bondholders for the individualization of the Bonds held thereby for the purposes of individualized exercise of the right of petition, voice and vote.

"**Court Deposit**" means the court deposits made by Oi Group within the scope of judicial actions of any nature, which will be used in the payment of particular credits, as set forth in this Plan**.**

"**Consolidated Financial Expense**" means, in any period, without duplicity, the sum of the consolidated expense with interest of Oi for the period of four quarters on any of their debts acquired through loans payable in cash (paid or capitalized) to the extent that such expense was deducted (and not added again) from the calculation of the consolidated operational result.

"**Business Day**" means any and every day rather than a Saturday, Sunday, or holiday in the city of Rio de Janeiro, State of Rio de Janeiro.

"**Directors Officers**" means Oi's statutory officers without specific designation that were nominated and invested in office after August 2017.

"**Transitional Officers**" means Oi's statutory officers who were exercising their activities before August 2017 and the current CEO.

"**United States Dollars**" or "**USD**" means the currency of the United States of America.

"**EBITDA**" means, for the last four (4) and consecutive fiscal quarters of Oi, each an "accounting period", the sum (without any duplicity) (i) of the result before the taxes on the consolidated profit for a certain accounting period (adjusted by the extraordinary profits or losses); (ii) of the following factors deducted for the purposes of determining the result before taxes on profit: (1) consolidated depreciation and amortization occurred in that same accounting period; (2) Consolidated Financial Expenses deducted from the consolidated financial revenues. It represents the routine EBITDA, as presented in the management report included in the consolidated financial statements of Oi.

"**Material Adverse Effect**" means, regarding any of the companies forming Oi Group, any change or effect that, both individually or jointly with other factors, have a material adverse effect on the financial situation and on the transactions made by the companies included in Oi Group as a whole,

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 / +55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 441*

or a material adverse effect on the capacity of the companies included in Oi Group to implement, complete, and/or comply with any of the obligations under the terms of this Plan provided, however, that for the purposes of this definition, no change, effect, event or incident arises or results from any of the following situations, solely or combined, constitute or are taken into consideration in the determination that they have been or could be a Material Adverse Effect: (i) general changes, developments or conditions in any national, regional or global economy or in the industries in which the companies included in Oi Group operate, except as the companies included in Oi Group are disproportionally affected by such changes, developments or conditions; and (ii) financial conditions or other political or market condition in the country where the companies included in Oi Group operate.

"**Financial Charges**" means any inflation adjustment, interest, fine, penalty, indemnity, inflation, losses and damages, and/or late payment interest, among other charges of a similar nature.

"**Bylaws**" means the bylaws or a similar organizational document of OI, TELEMAR, OI MÓVEL, COPART 4, COPART 5, PTIF, and OI COOP and their Affiliates.

"**Euro**" or "**EUR**" means the currency of the European Union.

"**Oi Group**" means OI, TELEMAR, OI MÓVEL, COPART 4, COPART 5, OI COOP, and PTIF.

"**Judicial Ratification of the Plan**" means the judicial decision rendered by the Judicial Reorganization Court that granted the Judicial Reorganization, under the terms of art. 58, main paragraph or paragraph 1 of the LFR. For the purposes of this Plan, the Judicial Ratification of the Plan is considered to occur on the date of publication, on the official gazette, of the trial court decision granting the Judicial Reorganization, against which, after the expiration of the terms for the filing of the applicable appeals, no appeals with suspensive effect are pending judgment. In the event that the Plan is rejected in the trial court or in the appellate court, the Judicial Ratification of the Plan will be considered effective, respectively, on the date on which the eventual appellate court's decision, or that of a higher court, is made available on the official gazette, whether of a trial court or the full appellate court – whichever occurs first – as deliberated, against which, after the expiration of the terms to file the applicable appeals, no appeals with suspensive effect are pending judgment.

"**INSS**" means the National Institute of Social Security, linked to the Ministry of Labor and Social Security.

"**Backstopper Investors**" means the investors identified in the Backstop Agreement, which undertook to immediate provide or obtain solid commitments of guarantee of the full subscription of the Capital Increase New Funds.

"**IPCA**" means the Consumer Price Index, measured on a monthly basis by the IBGE (Brazilian Institute of Geography and Statistics).

"**Judicial Reorganization Court**" means the court of the 7th Commercial Court of the District of the Capital – RJ.

"**Reports**" means Oi Group's economic and financial, and asset and property assessment reports, prepared under the terms of article 53, items II and III of the LFR.

"**Law**": means any law, regulation, order, award, or decree issued by any Governmental Authority.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 / +55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales
### Tradutora Pública e Intérprete Comercial
### Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 442*

---

"**Brazilian Corporations Law**" means Law No. 6,404, dated December 15, 1976.

"**General Telecommunications Law**" means Law No. 9,472, dated July 16, 1997.

"**LFR**": means Law No. 11,101, dated February 9, 2005.

"**LIBOR**" means the London Interbank Offered Rate for United States Dollars and Euros, published by Reuters (or a different commercially available source providing these rates), of six (6) months.

"**Current Litigants**" means the Pre-Petition Litigants that, on the date of this Plan, are in a litigation against any of the Debtors, their Affiliates and/or their current or former Officers, in the United States of America, Netherlands (Holland) or in the Cayman Islands and the creditors, as defined in the credit agreement related to Mr. J.R, Berkenbosh as trustee in the bankruptcy proceedings of Oi Brasil Holdings Cooperatief U.A., dated of July 4, 2017, against the assets in liquidation due to bankruptcy of COOP (the "Financing DIP")

"**Mediation/Conciliation/Agreement**" means any proceeding to be filed under the terms of Law No. 13,140, dated June 26, 2015.

"**Ministry of Communications**" means the body of the Brazilian Executive Power created by Decree-Law No. 200, dated February 25, 1967, which regulates the telecommunication, postal, and broadcasting services.

"**Payment Option Notice**" means the notice to be sent by the Bondholders Unsecured Creditors, with exception of the Non-qualified Bondholders holding Bondholders' Unsecured Credits up to fifty thousand Reais (BRL50,000.00), within fifty (15) calendar days from the Judicial Ratification of the Plan, as per **Exhibit 4.5.5** and pursuant to **Section 4.5.5**, to express their interests in adhering to one of the Payment Options of the Bondholders Unsecured Creditors defined in **Section 4.3.3**.

"**New Notes**" means the Notes to be issued pursuant to **Section 4.3.3.3.**

"**New Board of Directors**" means Oi Board of Directors to be composed pursuant to **Section 9.4.**

"**NYSE**" means the New York Stock Exchange.

"**OI**" means OI S.A. – under judicial reorganization, a publicly held corporation, registered with the CNPJ/MF under No. 76.535.764/0001-43, with its registered office and principal place of business at Rua do Lavradio nº 71, Centro, Rio de Janeiro - RJ, CEP 20230-070.

"**Oi Coop**" means OI BRASIL HOLDINGS COÖPERATIEF U.A. – UNDER JUDICIAL REORGANIZATION, a private legal entity organized and existing under the Laws of the Netherlands, registered with the CNPJ/MF under No. 16.770.090/0001-30, with a registered office in Amsterdam, Schiphol Boulevard 231, B tower, 5º andar, 1118 BH Schiphol, and principal place of business in the city of Rio de Janeiro - RJ.

"**Oi Móvel**" means Oi Móvel S.A. – under judicial reorganization, a closely held corporation, registered with the CNPJ/MF under No. 05.423.963/0001-11, with a registered office at Setor Comercial Norte, Quadra 3, Bloco A, Edifício Estação Telefônica, térreo (parte 2), Brasília - DF, at

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 443*

Setor Comercial Norte, Quadra 3, Bloco A, Edifício Estação Telefônica, térreo (parte 2), CEP 70.713-900.

"**OPEX**" means the result of the continuous costs that a company has to keep running. It means operational expenditure.

"**Exempted Parties**" means the Debtors, their Affiliates, controlled companies, subsidiary companies, associated companies, associated entities, and other companies in the same group, and their respective shareholders, directors, counselors, investors, employees, attorneys, advisors, agents, attorneys in fact, and representatives, including their predecessors and successors.

"**Exempted Parties Backstopper Investors**" means the Backstopper Investors and the entities controlled thereby, subsidiaries and affiliates, and other companies in the same corporate and economic group, their officers, directors, minority shareholders, partners, employees and advisors and successors.

"**Protected Parties**" means, in relation to the Current Litigants, their companies, subsidiaries, controlled companies, associates, controlling companies, former and new companies, current or previous, as well as attorneys-in-fact, officers, administrators, managers, founding partners, partners, members, employees, agents, representatives, members of the advisory council, financial advisors, attorneys, accountants, consultants, investment banks and other professionals, in the capacity of advisors of the parties involved, and in relation to the Debtors, its subsidiaries, controlled companies, associates, controlling companies, former and new companies, current or previous, as well as attorneys-in-fact, officers, administrators, managers, founding partners, members, employees, agents, representatives, financial advisors, attorneys, accountants, consultants, investment banks and other professionals, in the capacity of advisors of the parties involved.

"**Person**" means any individual, firm, corporation, company, unincorporated association, partnership, trust, or other legal entity or responsible for administrative decision that is not the subject matter of questioning by the Judiciary Power.

"**Class III or ME/EPP Joint Petition**" means the joint petition to be presented under the terms of **Section** Erro! Fonte de referência não encontrada., in a form and with contents to be disclosed by the Debtors fifteen (15) days in advance of the date of the Creditors' General Meeting convened to deliberate upon this Plan.

"**Transitional Period**" means the period between the date of Approval of the Plan, the occurrence and conclusion of the Capital Increase Capitalization of Credits, twelve (12) months from the Ratification of the Plan or February 28, 2019, whichever comes first.

"**Plan or PRJ**" means this joint judicial reorganization plan, including all amendments, modifications, changes and complements, as well as all exhibits and documents referred to in the clauses of this Plan.

"**General Plan of Universalization Goals**" means the plans that provide for the universalization obligations, which are regularly reviewed through the issuance of decrees by the Federal Government (currently, PGMU III, approved by Decree No. 7,512, of June 30, 2011, is in effect and includes goals for the period between 2011 and 2016).

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 / +55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*        *Livro nº 166*        *Página nº 444*

"**General Plan of Concessions**" means the plan that defined the regions and sectors for the concessions and authorizations of the Fixed Commuted Telephone Service instituted by Decree No. 6,654, of November 20, 2008.

"**National Broadband Plan**" means an initiative of the Federal Government created by Decree No. 7,175, of May 12, 2010, which main objective is to make the access to broadband Internet popular in the country, especially in areas lacking technology.

"**Portugal Telecom**" means Portugal Telecom, a Portuguese telecommunications company.

"**Proceedings**" means any and all litigations, at a judicial, administrative, or arbitration sphere (in any phase, including the execution/satisfaction of the judgment) in course on the Request Date involving a discussion associated with any of the Pre-Petition Credits before the Judiciary Power or the Arbitration Court, as applicable, including labor claims.

"**DR Program**" means the depositary receipts program issued abroad by a depositary institution.

"**PTIF**" means Portugal Telecom International Finance B.V. – under judicial reorganization, a private legal entity organized and existing under the Laws of the Netherlands, with its registered office in Amsterdam, Naritaweg 165, 1043 BW, and principal place of business in the city of Rio de Janeiro - RJ.

"**Real**": means the local currency in the Federative Republic of Brazil.

"**Net Revenue from the Sale of Assets**" means the funds with the disposal of net assets of the direct costs related to such transaction (including costs with legal, accounting and financial consultancy, commission and sales) and any relocation of debts incurred and taxes and fees paid or to be paid as a result of the respective disposal of assets

"**Acknowledgement of the Plan in the Creditor's Jurisdiction**" means any judicial decision or court order required for the Plan to produce its regular effects in the jurisdiction applicable to the Creditor in point.

"**Judicial Reorganization**" means this judicial reorganization proceeding, under No. 0203711-65.2016.8.19.0001, pending in the Judicial Reorganization Court.

"**Debtors**" means Oi, Telemar, Oi Móvel, Copart 4, Copart 5, Oi Coop, and PTIF.

"**Regions I, II, and III**" means the regions of the Brazilian territory divided by the General Plan of Concessions for concessions and authorizations of the Fixed Commuted Telephone Service, considering that Region I comprises 16 states located in regions North, Northeast, and Southeast of Brazil, Region II comprises the Federal District and nine states located in regions North, Midwest, and South, and Region III comprises the State of São Paulo.

"**Creditors' List of the Bankruptcy Trustee**" means the list of creditors prepared by the Bankruptcy Trustee in accordance with article 7, paragraph 2 of the LFR.

"**Corporate Reorganization**" means the corporate reorganization to be made under the terms of **Section** 7 of this Plan.

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 445*

"**Creditors' Meeting**" means the meeting of Eligible Creditors for resolution of subjects set forth in this Plan, the call, instatement and resolution of which shall observe **Section 8.1**.

"**Cash Balance**" means the sum of the following accounts of the consolidated balance sheet: 1.01.01 Cash and Cash Equivalents; 1.01.02 Financial Investments, calculated in the consolidated Standardized Financial Statements – Oi's DFPs.

"**Minimum Cash Balance**" in relation to any fiscal year, means the greatest between: (i) 25% of the OPEX + CAPEX of the respective fiscal year, calculated annually based on the consolidated annual financial statements of Oi for the respective fiscal year or (ii) five billion Reais (BRL 5,000,000,000.00). Additionally, during the next five (5) fiscal years following the year in which the Capital Increase – New Funds is concluded, any funds derived from Capital Increases – New Funds will be added to the calculation of the Minimum Cash Balance; and (ii) the next four (4) fiscal years following the year in which a capital increase of Oi is concluded, any funds derived from the respective capital increase will be added to the calculation of the Minimum Cash Balance.

"**SELIC**" means the adjusted average rate of daily financings assessed in the Settlement and Custody Special System for federal bonds, the application of which complies with Law 10,522, of July 19, 2002.

"**Exchange Rate**" means, for any event (except in the cases of Conversion Exchange Rate and Voting Exchange Rate), the closing rate for sale of United States Dollars/Real and Euro/Real, as applicable, published by the Brazilian Central bank on its website, on the section Quotations and Bulletins, option "Closing Quotations of All Currencies on one Date", or any other rate that may replace it, and the sale closing rate for sale of Euro/United States Dollars, published on Bloomberg's information system.

"**Conversion Exchange Rate**" means the closing rate for sale on December 11, 2017, of United States Dollars/Real and Euro/Real, as applicable, published by the Brazilian Central Bank on its website, on the section Quotations and Bulletins, option "Closing Quotations of All Currencies on one Date", or any other rate that may replace it, and the sale closing rate for sale on t December 11, 2017, of Euro/United States Dollars, published on Bloomberg's information system.

"**Voting Exchange Rate**" means the closing rate for sale on the Business Day immediately before the Creditors' General Meeting that deliberates on the Approval of the Plan, of United States Dollars/Real and Euro/Real, as applicable, published by the Brazilian Central Bank on its website, on the section Quotations and Bulletins, option "Closing Quotations of All Currencies on one Date", or any other rate that may replace it.

"**Telemar**" means Telemar Norte Leste S.A. – under judicial reorganization, a closely held corporation, registered with the CNPJ/MF under No. 33.000.118/0001-79, with its registered office and principal place of business at Rua do Lavradio nº 71, Centro, Rio de Janeiro - RJ, CEP 20230-070.

"**TR**" means the reference rate instituted by Law No. 8,177/91, as calculated and disclosed by the Central Bank of Brazil, which the product will be accrued to the balance of the face value of the Credit for purposes of the calculation of the pecuniary amount of the obligations provided for in this Plan, and which will be owed on the payment dates set forth herein. In case of temporary unavailability of the TR, the last index-number disclosed, calculated on a *pro rata temporis* basis for Business Days, will be used to replace it, considering that no financial compensations will be

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*              *Livro nº 166*              *Página nº 446*

applicable upon the disclosure of the appropriate index-number. In the absence of the calculation and/or disclosure of the index-number for a period longer than five (5) Business Days after the date expected for its disclosure, or even in case of its termination by legal requirement or court order, the TR must be replaced by a substitute legally determined for such.

"**Bonds' Trustee**" means The Bank of New York Mellon and Citicorp Trustee Company Ltd., fiduciary agents pursuant to the Bonds Issue Deeds, as the case may be, as well as the companies that are directly or indirectly controlled thereby, their officers, administrators and employees, or other agent that may be indicated in replacement of The Bank of New York Mellon and/or Citicorp Trustee Company Ltd. pursuant to the Bonds Issue Deeds.

"**UPI**" means the isolated production sites to be disposed of under the terms of article 60 of the LFR.

"**Fair Market Value**" means, regarding any asset, the price (which, for clarification, shall consider any liability associated with the related asset) that would be paid by a willing buyer to a willing seller not affiliated in a commercial transaction that does not involve the arrest of assets or coercion from any part, determined in good faith the Board of Directors of Oi.

## EXHIBIT 2.6
### REPORTS

## EXHIBIT 3.1.3
### Assets

Direct or indirect disposal of the following assets:

**UNITEL S.A.**, an Angolan company with tax identification number 5410003144, registered before the Commercial Registry of Luanda under number 44/199, headquartered in Talatona, Sector 22, via C3, Edifício UNITEL, Luanda Sul, Angola.

**BRASIL TELECOM CALL CENTER S.A.**, a corporation enrolled in the CNPJ/MF under No. 04.014.081/0001-30, registered before the Commercial Registry of the State of Goiás under NIRE 53 3 0000758-6, headquartered at Rodovia BR 153, Km 06, S/N, Bloco 03, Vila Redenção, in the City of Goiânia, State of Goiás, CEP 74.845-090;

**TIMOR TELECOM, S.A.**, corporation, collective entity No. 1014630, registered with the National Administration of Domestic Trade under No. 01847/MTCI/XI/2012, with its principal place of business at Rua Presidente Nicolau Lobato, Timor Plaza, 4º andar, in Dili, Timor Leste.

The formalization of the disposal of assets located at the addresses listed below is subject to prior verification regarding the lack of impediment or prohibition of an administrative or judicial nature:

•       BR 101 KM 205 (Barreiros/Almoxarifado), in the State of Santa Catarina and registered under enrollment No. 40564;
•       Av Madre Benvenuta, in the State of Santa Catarina and registered under enrollment No. 48391;
•       Rua Cel Genuino, in the State of Rio Grande do Sul and registered under enrollment Nos. 8.247, 24.697, 24.698, 24.699, 11.046, 11.047;

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales
### Tradutora Pública e Intérprete Comercial
### Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 447*

- Av. Joaquim de Oliveira, in the State of Rio Grande do Sul and registered under enrollment No. 114.947;
- Avenida Lauro Sodre nº 3290, in the State of Rondônia and registered under enrollment No. 24743;
- Rua Gabriel de Lara, in the State of Paraná and registered under enrollment No. 16059;
- Rua Neo Alves Martins nº 2263, in the State of Paraná and registered under enrollment No. 58948;
- Travessa Teixeira de Freitas nº 75 (Complexo Merces F), in the State of Paraná and registered under enrollment Nos. 36731, 36732, 36733, 36734, 36735, 36736, 36737, 36738, 36739, 36740 and 36741;
- Avenida Teixeira de Freitas nº 141 (Complexo Merces G), in the State of Paraná and registered under enrollment No. 15049;
- Rua Visconde Nacar nº 234 (Complexo Merces B), in the State of Paraná and registered under enrollment No. 26912;
- Rua Visconde do Rio Branco nº 397 (Complexo Merces A), in the State of Paraná and registered under enrollment No. 13940;
- Avenida Goias, in the State of Goiás and registered under enrollment Nos. 42.041 and 42.042;
- Avenida Getulio Vargas S/N, in the State of Roraima and registered under enrollment Nos. 46.241, 46.242, 46.243 and 46.244;
- Rua Sabino Vieira / Rua Chaves De Faria nº 85/ R.S.L. Gonzaga nº 275, in the State of Rio de Janeiro and registered under enrollment No. 55316;
- Rua Dr. Miguel Vieira Ferreira (Rua Uranos 1139), in the State of Rio de Janeiro and registered under enrollment No. 51186;
- Estr. Pau da Fome nº 2716, in the State of Rio de Janeiro and registered under enrollment No. 105885;
- Avenida Nossa Senhora de Copacabana nº 462 A, lj e, s/lj, in the State of Rio de Janeiro and registered under enrollment No. 67704;
- Rua dos Limoeiros nº 200, in the State of Rio de Janeiro and registered under enrollment No. 10409;
- Camaragibe - Estrada de Aldeia - Km-125, in the State of Pernambuco and registered under enrollment No. 2503;
- Rua do Principe nº 156 e nº 120, in the State of Pernambuco and registered under enrollment No. 24857;
- Rua Itambe nº 200, in the State of Minas Gerais and registered under enrollment No. 38227;
- Rua Vitorio Nunes Da Motta nº 220, Enseada do Suá in the State of Espírito Santo and registered under enrollment No. 52265;
- Rua Silveira Martins, Cabula, nº 355, in the State of Bahia and registered under enrollment No. 76908;
- Rua Prof. Anfrisia Santiago nº 212, in the State of Bahia and registered under enrollment No. 12798;
- Avenida Getulio Vargas - BL. A, nº 950, in the State of Amazonas and registered under enrollment No. 14610;
- Rua Goias, S/N, Farol, in the State of Alagoas and registered under enrollment No. 75071.
- Rua Zacarias da Silva, Lote 2, Barra da Tijuca (Alvorada), in the City and State of Rio de Janeiro and registered under enrollment No. 381171;
- Rua Senador Pompeu, nº 119 - 5º andar, Centro, in the City and State of Rio de Janeiro and registered under enrollment No. 106766;

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales
### Tradutora Pública e Intérprete Comercial
### Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                    *Livro nº 166*                    *Página nº 448*

- Rua Alexandre Mackenzie, nº 75, Centro, in the City and State of Rio de Janeiro and registered under enrollment Nos. 274011, 274012, 274013, 274014, 274015, 274039, 274040, 274041, 274042;
- Rua do Lavradio, nº 71, Centro (Arcos), in the City and State of Rio de Janeiro and registered under enrollment No. 70149;
- Rua Araribóia, nº 140, São Francisco, in the City of Niterói, State of Rio de Janeiro, and registered under enrollment No. 10770;
- Rua Assai, s/n, Jardim Pindorama, in the City of São Félix do Araguaia, State of Mato Grosso, and registered under enrollment No. 3825;
- Rua Sena Madureira, nº 1070, in the City of Fortaleza, State of Ceará, and registered under enrollment No. 1409;
- Rua Manoel P. da Silva (Cap. Pereirinha, S/N), in the City of Corumbá, State of Mato Grosso do Sul, and registered under enrollment Nos. 24.969, 24.970, 24.971, 24.972 and 24.973;
- Av Nicanor de Carvalho, nº 10, in the City of Corumbá, State of Mato Grosso do Sul, and registered under enrollment No. 12295;
- Pq. Triunfo de Cotegipe, S/N – João Dantas, in the City of Alagoinhas, State of Bahia, and registered under enrollment No. 775;
- Estrada Velha do Amparo, KM 4, in the City of Friburgo, State of Rio de Janeiro, and registered under enrollment No. 5283;
- Av. Prudente de Morais, nº 757 B, Bairro Tirol, in the City of Natal, State of Rio Grande do Norte, and registered under enrollment No. 28639;
- Av. Afonso Pena, nº 583, in the City of Manaus, State of Amazonas, and registered under enrollment No. 7496;
- Rua Leitão da Silva, nº 2.159, Itararé (CONJED), in the City of Vitória, State of Espírito Santo, and registered under enrollment Nos. 46.977 and 46.978;
- BLOCO C, QUADRA 02, SETOR COMERCIAL CENTRAL, Planaltina, in the City of Brasília, Distrito Federal, and registered under enrollment No. 801;
- Rua Padre Pedro Pinto nº1460, Venda Nova (ISFAP), in the City of Belo Horizonte, State of Minas Gerais, and registered under enrollment No. 4187;
- Rua 2 De Setembro, nº 733, Campo De Futebol, in the City of Blumenau, State of Santa Catarina, and registered under enrollment No. 598;
- BR 116, KM 159, Rua Cel Antônio Cordeiro, 3950, Altamira, in the City of Russas, State of Ceará, and registered under enrollment No. 180;
- Rua Correa Vasques,69, Cidade Nova, in the City and State of Rio de Janeiro and registered under enrollment Nos. 40962, 40963, 40964, 40965, 40966, 40967, 40968, 40969, 40970, 40971, 40972, 41190;
- Rua Walter Ianni, Anel Rodoviário, KM 23,5 - Bairro Aarão Reis/São Gabriel (PUC MINAS), in the City of Belo Horizonte, State of Minas Gerais, and registered under enrollment No. 27601;

---

## EXHIBIT 4.2.4
## SECURED CREDITS

---

## EXHIBIT 4.3.1.2(A1)
## RESTRUCTURING OPTION I – CREDITS IN REAIS

---

## EXHIBIT 4.3.1.2(A2)

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 / +55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*          *Livro nº 166*          *Página nº 449*

---

**RESTRUCTURING OPTION I – CREDITS IN REAIS**

---

**EXHIBIT 4.3.1.2(B)**
**RESTRUCTURING OPTION I – CREDITS IN UNITED STATES DOLLARS**

---

**EXHIBIT 4.3.3.1(F)**
**INSTRUMENT OF NON-QUALIFIED BONDHOLDERS' UNSECURED CREDITS**

---

**EXHIBIT 4.3.3.3.(F)**
**QUALIFIED BONDHOLDERS' UNSECURED CREDITS – NEW NOTES**

---

**EXHIBIT 4.3.3.5(c)**
**CONDITIONS PRECEDENT**

The following Conditions Precedent are conditions precedent for the Capital Increase – Capitalization of Credits as set forth in Section **4.3.3.5(c)** of the Plan, which shall be verified or formally and expressly waived by the Qualified Bondholders Unsecured Creditors in Creditors' Meeting, as set forth in **Exhibit 8.1**:

*(i)*      approval of the Plan by the Creditors' General Meeting, as per Article 45 of LFR;

*(ii)*      Judicial Ratification of the Plan without any exception, modification or restrict that directly or indirectly affects any right of the Qualified Bondholders Unsecured Creditors as per the Plan, individually or jointly considered, provided that

*(ii.a)* no appeal is filed against the decision of Judicial Ratification of the Plan (Article 58 of LFR) which has received staying effects or, if staying effects are given to the appeal, the decision that granted staying effects has been reconsidered or revoked by another lower court or panel decision; or

*(ii.b)* no judicial or administrative action has been requested and granted where an injunction, interim relief and/or any measure or similar writ of mandamus that has the effect of staying or making unfeasible the Judicial Ratification of the Plan and/or the implementation, in the whole or in part, of this Plan, or, if said injunction, interim relief and/or any measure or similar writ of mandamus is granted, this granting is reconsidered or revoked by the competent authority.

*(iii)*      absence of violation of any obligation assumed by Oi Group pursuant to or as consequence of this Plan;

*(iv)*

*(iv.a)* ANATEL, represented by the Office of the General Counsel for the Federal Government, did not submit new answers or appeals in court nor has insisted on answers or appeals in court existing on the date of the Approval of the Plan in relation to this Plan or to the restructuring object of this Plan, including the novation and/or restructuring of the Pre-Petition Credits Regulatory Agencies, as per **Section 4.3.4**; or

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 / +55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales
Tradutora Pública e Intérprete Comercial
Inglês - Português

Matricula na JUCESP n° 787
CCM n° 9.743.188-5 (São Paulo, SP)

CPF/MF n° 108.911.608-09
RG n° 14.873.251 SSP/SP

*Tradução n° 7952*                    *Livro n° 166*                    *Página n° 450*

*(iv.b)* ANATEL has not rendered in administrative proceedings a decision determining the intervention or similar acts that affect the granting and/or authorizations operated by Oi Group or that may result in a Material Adverse Effect;

*(v)* novation and restructuring of the Pre-Petition Credits Regulatory Agencies pursuant to this Plan;

*(vi)* granting of all regulatory and legal authorizations necessary for the implementation of the Capital Increase – Capitalization of Credits, including, but not limited to, ANATEL's authorizations and, if applicable, CADE's;

*(vii)* absence of labor, social security, tax, civil and/or environmental, administrative actions, adverse decisions or contingences and/or of any other nature, including, but not limited to, anticorruption investigations or similar actions against Oi Group, which make Debtor liable for the payment of any amount greater than ten (10) billion Reais, individually considered, and/or that result or may result in a Material Adverse Effect.

## EXHIBIT 7.1
### Corporate Reorganizations

- Merger of Oi Internet S.A into Oi or Telemar or Oi Móvel;
- Merger of Oi Móvel S.A. into Telemar or Oi;
- Merger of Telemar into Oi.
- Merger of Paggo Administradora Ltda. into Oi Móvel;
- Merger of Brasil Telecom Comunicação Multimídia Ltda. into Telemar or Oi;
- Merger of Copart 4 into Telemar;
- Merger of Copart 5 into Oi;
- Merger or transfer of assets of SEREDE – Serviços de Rede S.A. in one or more Debtors;
- Merger or transfer of assets of Rede Conecta Serviços de Rede S.A. in one or more Debtors;
- Any reorganization that does not cause a Material Adverse Effect on the companies included in Oi Group and that does not materially change the nature of the businesses of the companies included in Oi Group;

## EXHIBIT 8.1.
### CREDITOR'S MEETING

**1.1. Creditors' Representation.** Within fifteen (15) days from the Ratification of the Plan, the Qualified Bondholders Unsecured Creditors shall sent notify Oi Group, pursuant to **Section 13.6** of the Plan, to indicate the attorneys-in-fact qualified to represent them in the Creditors' Meeting that may be called pursuant to the Plan, with the following information: (i) full identification; (ii) phone number; (iii) electronic address (email); and (iv) address.

**1.2.** Oi Group is released from calling for the Creditors' Meeting the Qualified Bondholders Unsecured Creditors that do not comply with the term establish above, and this lack of call of such Creditors is not non-compliance by Oi Group with the obligations assumed in this Section.

Rua Pereira Estéfano, n° 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 /+55 (11) 99153-0636
cristina@aliancatraducoes.com.br

## Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*                      *Livro nº 166*                      *Página nº 451*

---

**1.2.1.**   Any change in the information sent by the Qualified Bondholders Unsecured Creditors to Oi Group shall be immediately informed to Oi Group, upon new notice pursuant to **Section 13.6** of the Plan. The impossibility of calling the Qualified Bondholders Unsecured Creditor due to the lack of such notice shall be construed as non-compliance by Oi Group with its obligation of calling the Qualified Bondholders Unsecured Creditors for the Creditors' Meeting.

**1.3.**   **Rules of Call, Instatement and Resolution.** The rules of call, instatement and resolution are the following:

(i) the call will be made at least eight (8) days in advance for the first call and five (5) for the second call;

(ii) the Creditors' Meeting shall be instated, in first call, with the presence of Qualified Bondholders Unsecured Creditors holding more than fifty percent (50%) of the Qualified Bondholders Unsecured Credits, or, in second call, with any quorum;

(iii) the vote of each Qualified Bondholders Unsecured Creditor shall be proportional to the amount of its respective Credit. The Credits in foreign currency shall be converted by the Conversion Exchange Rate;

(iv) except if otherwise set forth in this Plan, the resolutions shall be taken by the Qualified Bondholders Unsecured Creditors that represent more than half (50% + BRL 1.00) of the total amount of the Qualified Bondholders Unsecured Credits present to the Creditors' Meeting;

(v) the Creditors' Meeting shall take place always in the City of Rio de Janeiro, State of Rio de Janeiro, in the Federative Republic of Brazil, in a location to be timely defined by Oi Group;

(vi) the call of the Qualified Bondholders Unsecured Creditors shall be made by Oi Group, by its own initiative or at the request of the Qualified Bondholders Unsecured Creditors representing at least twenty percent (20%) of the Qualified Bondholders Unsecured Credits, through notice sent by email to any of the attorneys-in-fact indicated by the Qualified Bondholders Unsecured Creditor for that purpose, pursuant to **Section 13.6** of the Plan. If Oi Group, at the request of the Qualified Bondholders Unsecured Creditors, representing at least twenty percent (20%) of the Qualified Bondholders Unsecured Credits, does not call the Creditors' Meeting within five (5) Business Days from the respective request, such Qualified Bondholders Unsecured Creditors may call a Creditors' Meeting in their own name, and they shall be refunded by Oi Group for the costs incurred; and

(vii) the rules set forth in LFR for instatement and resolution in Creditors' General Meeting shall be applied to what is not expressly provided in this Exhibit.

---

## EXHIBIT 9.2
### MEMBERS OF THE TRANSITIONAL BOARD OF DIRECTORS

1. José Mauro Mettrau Carneiro da Cunha, CPF (Individual Taxpayers' Register) No. 299.637.297-20 – Chairman

2. Ricardo Reisen de Pinho, CPF No. 855.027.907-20 – Vice-Chairman

3. Marcos Duarte Santos, CPF No. 014.066.837-36

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 / +55 (11) 99153-0636
cristina@aliancatraducoes.com.br

# Cristina Gonzales

Tradutora Pública e Intérprete Comercial
Inglês - Português

Matrícula na JUCESP nº 787
CCM nº 9.743.188-5 (São Paulo, SP)

CPF/MF nº 108.911.608-09
RG nº 14.873.251 SSP/SP

*Tradução nº 7952*          *Livro nº 166*          *Página nº 452*

---

5. Pedro Zañartu Gubert Morais Leitão, Portuguese Passport No. M655076

6. Helio Calixto da Costa, CPF No. 047.629.916-00

7. Marcos Rocha, CPF 801.239.967-91

8. Eleazar de Carvalho Filho, CPF 382.478.107-78

9. Marcos Grodetzky, CPF 425.552.057-72

In the absences or temporary hindrance of the Chairman of the Transitional Board of Directors, he shall be replaced by the Vice-Chairman of the Transitional Board of Directors, regarding his functions and prerogatives.

IN WITNESS WHEREOF, I hereunto set my hand and seal.

São Paulo, December 27, 2017

CRISTINA GONZALES

Rec. No.: 4392
Talão No.: 037
Emol.: R$14.867,77

Rua Pereira Estéfano, nº 114 - conjunto 809
04144-070 São Paulo, SP
+55 (11) 3384-8550 / +55 (11) 99153-0636
cristina@aliancatraducoes.com.br

---

PLANO DE RECUPERAÇÃO JUDICIAL CONSOLIDADO DE

OI S.A. – EM RECUPERAÇÃO JUDICIAL

TELEMAR NORTE LESTE S.A. – EM RECUPERAÇÃO JUDICIAL

OI MÓVEL S.A. – EM RECUPERAÇÃO JUDICIAL

COPART 4 PARTICIPAÇÕES S.A. – EM RECUPERAÇÃO JUDICIAL

COPART 5 PARTICIPAÇÕES S.A. – EM RECUPERAÇÃO JUDICIAL

PORTUGAL TELECOM INTERNATIONAL FINANCE BV – EM RECUPERAÇÃO JUDICIAL

OI BRASIL HOLDINGS COÖPERATIEF UA – EM RECUPERAÇÃO JUDICIAL

20 de Dezembro de 2017

---

**OI S.A. – Em Recuperação Judicial** ("OI"), sociedade anônima de capital aberto, inscrita no CNPJ/MF sob o nº 76.535.764/0001-43, com sede e principal estabelecimento na Rua do Lavradio nº 71, Centro, Rio de Janeiro - RJ, CEP 20230-070; **TELEMAR NORTE LESTE S.A. – Em Recuperação Judicial** ("TELEMAR"), sociedade anônima de capital fechado, inscrita no CNPJ/MF sob o nº 33.000.118/0001-79, com sede e principal estabelecimento na Rua do Lavradio nº 71, Centro, Rio de Janeiro - RJ, CEP 20230-070; **OI MÓVEL S.A. – Em Recuperação Judicial** ("OI MÓVEL"), sociedade anônima de capital fechado, inscrita no CNPJ/MF sob o nº 05.423.963/0001-11, com sede e principal estabelecimento no Setor Comercial Norte, Quadra 3, Bloco A, Edifício Estação Telefônica, térreo (parte 2), Brasília - DF, no Setor Comercial Norte, Quadra 3, Bloco A, Edifício Estação Telefônica, térreo (parte 2), CEP 70.713-900; **COPART 4 PARTICIPAÇÕES S.A. – Em Recuperação Judicial** ("COPART 4"), sociedade anônima de capital fechado, inscrita no CNPJ/MF sob o nº 12.253.691/0001-14, com sede e principal estabelecimento na Rua General Polidoro, 99, 4º andar, parte, Botafogo, Rio de Janeiro-RJ, CEP 22280-004; **COPART 5 PARTICIPAÇÕES S.A. – Em Recuperação Judicial** ("COPART 5"), sociedade anônima de capital fechado, inscrita no CNPJ/MF sob o nº 12.278.083/0001-64, com sede e principal estabelecimento na Rua General Polidoro, 99, 5º andar, parte, Botafogo, Rio de Janeiro-RJ, CEP 22280-004; **PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. – Em Recuperação Judicial** ("PTIF"), pessoa jurídica de direito privado constituída de acordo com as Leis da Holanda, com sede em Amsterdam, Naritaweg 165, 1043 BW, e principal estabelecimento nesta cidade do Rio de Janeiro; e **OI BRASIL HOLDINGS COÖPERATIEF U.A. – Em Recuperação Judicial** ("OI COOP"), pessoa jurídica de direito privado constituída de acordo com as Leis da Holanda, inscrita no CNPJ/MF sob o nº 16.770.090/0001-30, com sede em Amsterdam, Schiphol Boulevard 231,B tower, 5th floor, 1118 BH Schiphol, e principal estabelecimento nesta cidade do Rio de Janeiro (sendo OI, TELEMAR, OI MÓVEL, COPART 4, COPART 5, PTIF e OI COOP em conjunto doravante denominadas como "GRUPO OI" ou "RECUPERANDAS"), apresentam, nos autos do processo de recuperação judicial nº 0203711-65.2016.8.19.0001, em curso perante a 7ª Vara Empresarial da Comarca da Capital-RJ ("Recuperação Judicial"), em cumprimento ao disposto no art. 53 da Lei nº 11.101/2005 ("LFR"), o presente plano de recuperação judicial conjunto ("Plano" ou "PRJ"), nos termos e condições dispostos a seguir:

2

1.    DEFINIÇÕES E REGRAS DE INTERPRETAÇÃO

1.1.    **Definições.**    Os termos e expressões utilizados neste Plano em letras maiúsculas terão os significados a eles atribuídos no **Anexo 1.1**.

1.2.    **Regras de Interpretação**.

1.2.1.    O Plano deve ser lido e interpretado conforme as regras dispostas nesta **Cláusula 1.2** e seus anexos.

1.2.2.    Sempre que exigido pelo contexto, as definições contidas neste Plano serão aplicadas tanto no singular quanto no plural e o gênero masculino incluirá o feminino e vice-versa.

1.2.3.    Os cabeçalhos e títulos das cláusulas deste Plano servem apenas a título informativo de referência e não limitarão ou afetarão o significado das cláusulas, parágrafos ou itens aos quais se aplicam.

1.2.4.    Exceto quando disposto expressamente de forma diversa neste Plano, os anexos e documentos mencionados neste Plano são partes integrantes do Plano para todos os fins de direito e seu conteúdo é vinculativo. Referências a quaisquer documentos ou outros instrumentos incluem todas as suas alterações, substituições e consolidações e respectivas complementações, salvo se expressamente disposto de forma diversa neste Plano.

1.2.5.    Exceto quando disposto expressamente de forma diversa neste Plano, referências a capítulos, cláusulas, itens ou anexos aplicam-se a capítulos, cláusulas, itens e anexos deste Plano.

1.2.6.    Nos termos da legislação aplicável, exceto se disposto expressamente de forma diversa neste Plano, todas as referências às RECUPERANDAS devem ser interpretadas de forma a incluir as pessoas jurídicas que as sucederem em suas obrigações, em razão de reorganização societária prevista neste Plano.

3

**1.2.7.** A utilização dos termos "inclusive", "incluindo" e outros termos semelhantes no presente Plano seguidos de qualquer declaração, termo ou matéria genérica não poderá ser interpretada de forma a limitar tal declaração, termo ou matéria aos itens ou matérias específicos inseridos imediatamente após tal palavra — bem como a itens ou matérias similares —, devendo, ao contrário, ser considerada como sendo referência a todos os outros itens ou matérias que poderiam, razoavelmente, ser inseridos no escopo mais amplo possível de tal declaração, termo ou matéria, e tais termos serão sempre interpretados como se estivessem acompanhados do termo "exemplificativamente".

**1.2.8.** As referências a disposições legais e a Leis devem ser interpretadas como referências a tais disposições legais e Leis tais como vigentes na data deste Plano ou na data especificamente determinada pelo contexto.

**1.2.9.** Todos os prazos previstos neste Plano serão contados na forma prevista no art. 132 do Código Civil, excluindo-se o dia do começo e incluindo-se o dia do vencimento, e, se o termo final cair em dia que não seja Dia Útil, será prorrogado, automaticamente, para o Dia Útil imediatamente posterior.

**1.2.10.** Exceto quando disposto expressamente de forma diversa neste Plano: *(a)* na hipótese de haver conflito entre cláusulas deste Plano, a cláusula que contiver disposição específica prevalecerá sobre a que contiver disposições genéricas; *(b)* na hipótese de conflito entre as disposições dos anexos e/ou dos documentos mencionados neste Plano e as disposições deste Plano, o Plano prevalecerá; e *(c)* na hipótese de haver conflito entre as disposições deste Plano e as obrigações previstas em quaisquer contratos celebrados pelas Recuperandas e/ou suas Afiliadas antes da Data do Pedido, o Plano prevalecerá.

**2.    Considerações Gerais**

**2.1.    Grupo Oi e suas Operações.** O Grupo Oi iniciou suas atividades com a prestação de serviços de telefonia fixa, mas ao longo dos anos, acompanhando os ciclos

4

tecnológicos e a demanda do mercado, expandiu sua atuação também para as áreas de telefonia móvel, *internet* e TV por assinatura, dentre outros.

Atualmente, as RECUPERANDAS prestam serviço de telecomunicações de forma integrada sob uma só marca – "Oi" –, oferecendo uma variedade de produtos convergentes, tanto para telefonia fixa quanto para móvel. O GRUPO OI é hoje o maior prestador de serviço de telefonia fixa no Brasil (e um dos maiores da América Latina), com 13,4 milhões de linhas em operação, representativa de *market share* de 34,1% do total do país, atendendo a residências, empresas e telefonia de uso público. Além disto, é um dos maiores conglomerados no segmento de telefonia móvel, com um *market share* de 17,4% nesse setor.

As operações do GRUPO OI abrangem, ainda, serviços de banda larga fixa e móvel, *Wi-Fi*, TV e telefonia pública, sendo que sua estratégia de oferta de serviços convergentes e de forma integrada vem se mostrando exitosa e necessária, tendo em vista que ajuda na fidelização dos usuários.

O GRUPO OI também presta, com exclusividade, serviços de telefonia e comunicação de dados a 100% das unidades do exército localizadas na fronteira seca do Brasil, além de operar o sistema de telecomunicações da estação Comandante Ferraz, na Antártica, em convênio com o Ministério da Marinha.

A relevância social do GRUPO OI é refletida nos expressivos números relacionados à arrecadação tributária e geração de empregos; somente no período de 2013 a 2016, o GRUPO OI recolheu, aproximadamente, R$34 bilhões aos cofres públicos em tributos, contando hoje com mais de 131,3 mil postos de trabalho diretos e indiretos no Brasil. Ainda, o GRUPO OI *(i)* está engajado em iniciativas e projetos sociais, tais como "Oi Futuro", instituto de responsabilidade social criado em 2001, com projetos nas áreas de educação, sustentabilidade, esporte e cultura, bem como *(ii)* participa da condução de políticas públicas, como o Plano Nacional de Banda Larga e Banda Larga nas Escolas.

Adicionalmente, o GRUPO OI viabiliza a apuração eletrônica de votos nas eleições municipais e estaduais realizadas no país, proporcionando a integração entre as informações provenientes das 2.113 distritos eleitorais e 12.244 seções eleitorais dos

Tribunais Regionais Eleitorais, o que possibilita a transmissão de tais informações ao
Tribunal Superior Eleitoral.

As operações do GRUPO OI estão concentradas nas Regiões I, II e III do Plano Geral de
Outorgas (descritas na petição inicial da Recuperação Judicial), e todos os serviços de
telecomunicações prestados dependem de prévia outorga da ANATEL, seja por meio de
concessões, autorizações, licenças ou registros.

Em suma, o GRUPO OI é um dos maiores conglomerados empresariais do país, presente
em todos os 5.570 municípios brasileiros e atende a mais de 63 milhões de clientes.
Nesse contexto, é inquestionável a importância do GRUPO OI não apenas para o sistema
de telecomunicações brasileiro, mas também e especialmente para a população no
âmbito nacional, sendo fundamental o seu soerguimento e preservação.

**2.2.** __Estrutura do GRUPO OI.__ A estrutura societária do GRUPO OI está representada no
organograma abaixo:



Conforme destacado na petição inicial da Recuperação Judicial, as atividades do GRUPO
OI são desenvolvidas de forma coordenada e sob o controle societário, operacional,
financeiro, administrativo e gerencial único da OI, que atua como entidade *holding*
(além de ser titular de concessão de "Serviço Telefônico Fixo Comutado" – STFC na
Região II) do grupo e cujas ações são listadas na B3 e na NYSE (neste último caso, com
negociação no formato de ADR).

A OI MÓVEL e COPART 4 são subsidiárias integrais da TELEMAR, que, por sua vez, é subsidiária integral da controladora OI, assim como PTIF, OI COOP e COPART 5.

As operações de telefonia fixa são desempenhadas pela TELEMAR, concessionária do serviço público em questão, enquanto a prestação dos serviços de TV a cabo está a cargo da OI MÓVEL, que é também detentora da autorização para a exploração dos serviços de telefonia móvel.

A PTIF, OI COOP, COPART 4 e COPART 5 são sociedades de investimento do GRUPO OI. As duas primeiras entidades, constituídas de acordo com as Leis da Holanda, são veículos financeiros do GRUPO OI, constituídos para captação de recursos no mercado internacional, os quais são vertidos, por meio de empréstimos, para financiamento das atividades das sociedades operacionais do GRUPO OI no Brasil, sendo esta estrutura comumente utilizada por diversos conglomerados brasileiros. Já as duas últimas são proprietárias de alguns dos principais imóveis locados para o GRUPO OI no Estado do Rio de Janeiro.

**2.3.**    **Razões da Crise.** A atual situação financeira do GRUPO OI decorre de uma série de fatores. Contribuíram para o agravamento da situação financeira do GRUPO OI a retenção de vultosa soma de recursos em depósitos judiciais decorrentes de discussões nos âmbitos regulatório, trabalhista, fiscal e cível, com impacto imediato na liquidez do GRUPO OI, bem como a imposição de elevadas multas administrativas, particularmente pela ANATEL.

A alteração nos padrões de consumo de serviços de telecomunicações, devido à evolução tecnológica, agravou ainda mais este cenário de dificuldade financeira. Com a oferta massificada de serviços de telefonia móvel, TV a cabo e *internet*, a atratividade do serviço de telefonia fixa entrou em declínio, resultando na queda da base de assinantes do GRUPO OI nesse segmento.

Não obstante, o nível dos objetivos e metas relativas às obrigações de universalização do serviço de telefonia fixa (consolidadas no Plano Geral de Metas de Universalização, conforme previsto na Lei Geral de Telecomunicações) permanece estabilizado desde

7

1998, ano em que foram assinados os contratos de concessão em vigor. Em razão disso, no contexto das referidas obrigações de universalização, o GRUPO OI encontra-se obrigado a realizar pesados investimentos em determinadas regiões e locais remotos, com baixa densidade demográfica e população de baixo poder aquisitivo, auferindo, em contrapartida, retorno financeiro pequeno quando comparado com a exigência regulatória de tais investimentos.

Como exemplo dessa desproporção entre as obrigações impostas às RECUPERANDAS no âmbito das exigências de universalização vis-à-vis sua contrapartida financeira, destacam-se os números relativos aos telefones de uso público (popularmente conhecidos como "orelhões"): o GRUPO OI opera atualmente cerca de 641.000 (seiscentos e quarenta e um mil) telefones públicos em todo o Brasil (exceto São Paulo), a um custo anual de aproximadamente R$ 180.000.000,00 (cento e oitenta milhões de Reais), ao passo que a receita anual gerada por tais telefones públicos é de apenas R$ 2.700.000,00 (dois milhões e setecentos mil Reais) em 2016 (tendo-se observado ainda uma queda de mais de 90% entre 2009 e 2016).

Some-se a isso o fato de que os custos para captação de recursos pelo GRUPO OI – dadas as altas taxas de juros praticadas nacionalmente, bem como a necessidade e custo de proteção cambial para captações no exterior – são mais elevados do que os custos de captação de seus competidores diretos, que são *players* internacionais, o que também contribuiu para a deterioração da situação financeira do GRUPO OI.

Por outro lado, é notório que o cenário econômico do País vem se deteriorando nos últimos anos, impactando diretamente as operações desempenhadas pelo GRUPO OI e afetando negativamente sua liquidez. Além disso, o perfil do mercado atendido pelas concessionárias de telefonia fixa que são concorrentes das RECUPERANDAS é mais homogêneo e o poder econômico dos seus usuários é materialmente maior do que aqueles atendidos pelo GRUPO OI na sua área de atuação (maior e mais heterogênea que a área de atuação de suas concorrentes).

A conjunção desses fatores impossibilitou o cumprimento de diversas obrigações, mormente aquelas assumidas em razão de operações de empréstimos financeiros e captações de recursos por meio da emissão de *bonds* e debêntures, cujos saldos

representam a maior parte do atual endividamento do GRUPO OI, culminando com o pedido de Recuperação Judicial.

**2.4.   Medidas Prévias Adotadas.** Desde os primeiros sinais de deterioração de sua saúde financeira, o GRUPO OI vem trabalhando em conjunto com assessores financeiros e jurídicos externos, no Brasil e no exterior, para auxiliá-lo no processo de negociação com credores e de avaliação de alternativas viáveis à sua recuperação.

Nos últimos trimestres, o GRUPO OI vem implementando um projeto de reestruturação interna – denominado "Plano de Transformação" – que compreende mais de 370 (trezentas e setenta) iniciativas, a grande maioria já executada ou em fase de execução, que, em linhas gerais, têm por objetivo o aumento da sua competitividade no mercado, o aumento de produtividade, a redução de custos e despesas, o aumento da eficiência operacional e a melhoria da qualidade dos serviços.

Como resultado, podemos destacar neste período: (i) o lançamentos de planos inovadores, como o Oi Livre na telefonia móvel e o Oi Total Play no segmento residencial; (ii) a melhoria substancial dos indicadores operacionais, como, por exemplo, a redução de 33,3% (trinta e três vírgula três por cento) do tempo médio para resolução de defeitos e a redução de 31,3% (trinta e um vírgula três por cento) do tempo médio para a instalação de serviço, ambos no segundo trimestre de 2017 em relação ao segundo trimestre de 2016; (iii) a redução de R$ 1.200.000.000,00 (um bilhão e duzentos milhões de Reais) de custos e despesas no primeiros seis meses de 2017 em relação ao mesmo período de 2016 e (iv) a melhoria em diversos indicadores de qualidade, como redução de 28,6% (vinte e oito vírgula seis por cento) na entrada de reclamações na ANATEL, redução de 21,6% (vinte e um vírgula seis por cento) na entrada de reclamações no Procon e a redução de 58,7% (cinquenta e oito vírgula sete por cento) na entrada de ações por reclamação no Juizado Especial Cível (JEC), todos no segundo trimestre de 2017 em relação ao segundo trimestre de 2016.

**2.5.   Razões para o Plano Conjunto.** O GRUPO OI é composto de sociedades sob o controle comum da Oi com relevante interligação econômica e operacional que decorre, em especial, da interdependência e complementaridade das atividades e dos serviços que prestam e de gestão dos recursos das sociedades em prol do interesse comum.

9

As decisões gerenciais, administrativas e financeiras do GRUPO OI emanam da controladora, a OI. Por outro lado, a organização e os processos internos e corporativos do GRUPO OI são também integrados e plenamente unificados.

Adicionalmente, a essa direção única e consolidada das atividades convergentes e integradas, e do vínculo direto operacional e comercial, as RECUPERANDAS possuem estreita relação econômica e financeira fortemente interligada entre si, em virtude de contratos, garantias e obrigações que as vinculam e as tornam dependentes financeiramente entre si.

As RECUPERANDAS possuem diversos contratos de mútuo *intercompany* celebrados em razão da gestão dos recursos do GRUPO OI em prol do interesse comum. Além disso, há diversos contratos de dívida firmados entre OI, TELEMAR e OI MÓVEL junto a instituições financeiras, havendo ainda inúmeras garantias outorgadas por uma sociedade do grupo em favor da outra. Dentre outras operações que demonstram a vinculação econômica e financeira entre as RECUPERANDAS merecem destaque: *(i)* a emissão no mercado internacional de *bonds* (títulos de dívida) pela PTIF e OI COOP, tendo a OI comparecido como garantidora integral em tais operações, bem como a emissão no mercado internacional de *bonds* pela OI, tendo a TELEMAR comparecido como garantidora de algumas das séries dos referidos *bonds*; e a *(ii)* emissão pela COPART 4 e COPART 5 de Cédulas de Crédito Imobiliário com lastro nos recebíveis correspondentes aos aluguéis dos imóveis locados para a OI e a TELEMAR, sendo que a OI figura como devedora e a TELEMAR como garantidora no contrato firmado pela COPART 5.

Ademais, o centro de operações de onde é feito o monitoramento remoto de toda a rede do GRUPO OI está localizado em imóveis de propriedade da COPART 4 e COPART 5 e locados ao GRUPO OI.

Sob a perspectiva comercial e operacional, a OI, TELEMAR e OI MÓVEL compartilham da mesma infraestrutura física e logística, utilizando-se de redes "multisserviço" por onde trafegam comunicações e dados relativos a diferentes outorgas do GRUPO OI (telefonia fixa, móvel, *internet* e sinal de TV). Esse modelo de negócios – que consiste em prática consolidada no setor de telecomunicações – possibilita ao GRUPO OI oferecer e

comercializar diversos planos de pacotes integrados que incluem serviços convergentes sob a marca única "Oi", o que estimula a fidelização dos usuários, reduz a taxa de desligamento dos consumidores em relação a cada um dos serviços contratados e possibilita a competição do GRUPO OI com as demais operadoras de serviços de telecomunicações. Logo, grande parte dos ativos operacionais é dedicada ao provimento de serviços variados, o que tornaria inviável uma eventual separação de acordo com a empresa proprietária.

Considerando, portanto, o modelo de negócios adotado pelo GRUPO OI, com integração e convergência na prestação de serviços de telecomunicações, as inúmeras garantias cruzadas e a consolidação do controle societário, operacional, financeiro, administrativo e gerencial na OI, a solução da crise econômico-financeira deve-se dar de forma conjunta e consolidada, sob pena de colocar em risco a reestruturação do GRUPO OI, que exerce importantíssima função social, em evidente prejuízo aos Credores e demais titulares de interesses (inclusive sociais) que as cercam, todos interessados na resolução da presente situação (governo, investidores, instituições financeiras, empregados, fornecedores, consumidores, etc).

Pressupor que alguma das entidades do GRUPO OI poderá não ser objeto de recuperação enquanto outras se recuperam implica ignorar a consequência danosa que se oporia à atividade remanescente, à luz das complexidades jurídicas e práticas que o insucesso de uma das empresas poderia criar, visto que o soerguimento de uma entidade do GRUPO OI depende da recuperação de todo o grupo conjuntamente, conforme exposto neste Plano e na petição inicial da Recuperação Judicial.

**2.6.    Viabilidade Econômico-Financeira e Operacional do GRUPO OI.** Não obstante as dificuldades e fatores que acometem o GRUPO OI, culminando com o pedido de Recuperação Judicial, a atual situação financeira é temporária e passageira, possuindo o GRUPO OI todas as condições para revertê-la, diante de sua magnitude econômica.

As atividades desempenhadas pelas RECUPERANDAS são rentáveis e viáveis, gerando em 2016 para o GRUPO OI receita bruta de R$ 45.000.000.000,00 (quarenta e cinco bilhões de Reais) e líquida de cerca de R$ 26.000.000.000,00 (vinte e seis bilhões de Reais). Além disso, eventos recentes reforçam a conclusão quanto à rentabilidade das atividades das

11

RECUPERANDAS e viabilidade do GRUPO OI. Com o lançamento da nova marca "Oi", observou-se até o momento *(i)* o crescimento na venda dos novos planos "Oi Total", *(ii)* o aumento significativo do denominado RGU (unidade geradora de receita, equivalente a cada serviço contratado), *(iii)* incremento na eficiência operacional, e *(iv)* a diminuição da taxa de desligamento de serviços.

Ademais, é público que se encontram em estágio avançado discussões entre ANATEL e Ministério das Comunicações para mudanças no ambiente regulatório, que poderão resultar na transformação das concessões em autorizações, bem como na alteração do regime jurídico dos bens reversíveis, desonerando as concessionárias de muitas de suas obrigações e tornando-as mais competitivas em relação às concorrentes que operam sob o regime de autorização. Há, inclusive, Projetos de Lei em tramitação avançada, voltados, justamente, a conferir maior segurança à mudança de modelo, que beneficiará todas as concessionárias e não apenas aquelas vinculadas ao GRUPO OI. Tais mudanças impactarão positivamente a situação das RECUPERANDAS e, portanto, são também consideradas como importantes para o efetivo soerguimento do GRUPO OI, com a preservação de suas atividades empresariais e, consequentemente, a manutenção da fonte produtora e de postos de trabalho, promovendo a função social da empresa e o estímulo à atividade econômica, objetivos expressamente declarados na LFR e expressos em cláusulas pétreas da Constituição da República.

A viabilidade do Plano e das medidas nele previstas para a recuperação do GRUPO OI é atestada e confirmada pelos Laudos, nos termos do art. 53, incisos II e III, da LFR, os quais constam do **Anexo 2.6** a este Plano.

3.    **PRINCIPAIS MEIOS DE RECUPERAÇÃO**

**3.1.    Visão Geral.** O GRUPO OI propõe a adoção das medidas elencadas abaixo como forma de superar a sua atual e momentânea crise econômico-financeira, as quais estão detalhadas nas seções específicas do presente Plano, nos termos da LFR e demais Leis aplicáveis:

    **3.1.1.    Reestruturação dos Créditos:** o GRUPO OI realizará uma reestruturação e equalização de seu passivo relativo a Créditos Concursais e, a critério do

GRUPO OI, a Créditos Extraconcursais cujos titulares desejem se submeter aos efeitos deste Plano, nos termos da **Cláusula 4** deste Plano. Os Credores Concursais continuarão a ser credores da RECUPERANDA que era a sua respectiva devedora original, ressalvadas eventuais alterações derivadas de reorganizações societárias realizadas nos termos deste Plano ou disposição específica em sentido diverso neste Plano, e observado em qualquer caso o disposto na **Cláusula 3.1.1.2** deste Plano.

 **3.1.1.1.** As RECUPERANDAS envidarão seus melhores esforços para cancelar os respectivos títulos emitidos e existentes atualmente, observado o disposto nas legislações aplicáveis a cada uma das jurisdições das RECUPERANDAS, e poderão tomar todas as providências cabíveis e necessárias em toda e qualquer jurisdição aplicável, incluindo Brasil, Estados Unidos da América e Reino Unido, a fim de cumprir com as respectivas legislações aplicáveis e implementar as medidas previstas no presente Plano, podendo, nestes casos, consultar terceiros relacionados aos títulos de dívida emitidos no exterior, como, por exemplo, instituições depositárias, de forma a assegurar que as medidas a serem implementadas estão em conformidade com as legislações das respectivas jurisdições, ressalvado o disposto na **Cláusula 11.4.**

 **3.1.1.2.** Em decorrência da natureza consolidada deste Plano, as RECUPERANDAS serão solidariamente responsáveis pelo cumprimento de todas as obrigações estabelecidas neste Plano.

**3.1.2.** **Mediação/Conciliação/Acordo**: o GRUPO OI poderá instaurar procedimentos de Mediação/Conciliação/Acordo com seus Credores constantes da Relação de Credores do Administrador Judicial durante a Recuperação Judicial, nos termos da **Cláusula 4.4**, na forma das decisões judiciais proferidas sobre o tema.

**3.1.3.** **Alienação de Bens do Ativo Permanente:** como forma de levantamento de recursos, o GRUPO OI poderá promover a alienação dos bens que integram o ativo permanente (não circulante) das RECUPERANDAS que se

encontram listados no **Anexo 3.1.3**, bem como de outros bens, móveis ou imóveis, integrantes do seu ativo permanente, na forma da **Cláusula 5.1** e do art. 66 da LFR, desde que observadas eventuais exigências, autorizações ou limitações regulatórias necessárias, notadamente no que diz respeito à ANATEL.

3.1.4. **Aumento de Capital – Novos Recursos:** o GRUPO OI realizará na forma da **Cláusula 6** deste Plano e observado o disposto no Contrato de Backstop um aumento de capital de R$ 4.000.000.000,00 (quatro bilhões de reais), de forma a assegurar os recursos mínimos necessários para fazer os investimentos necessários de CAPEX e modernização de sua infraestrutura visando a implementação do plano de negócios contemplado neste Plano.

3.1.5. **Novos Recursos:** o GRUPO OI também poderá prospectar e adotar medidas, inclusive durante a Recuperação Judicial visando à obtenção de novos recursos nos termos da **Cláusula 5.3**, mediante a implementação de eventuais aumentos de capital ou outras formas de captação no mercado de capitais, a serem aprovados nos termos deste Plano e dos respectivos estatutos sociais das sociedades do GRUPO OI e desde que observado o disposto neste Plano e nos arts. 67, 84 e 149 da LFR. Eventuais novos recursos captados no mercado de capitais terão natureza extraconcursal para fins do disposto na LFR, exceto no que diz respeito a eventuais aumentos de capital, uma vez que não representam obrigações de pagamento.

3.1.6. **Reorganização Societária:** o GRUPO OI poderá realizar Reorganização Societária, nos termos da **Cláusula 7** deste Plano, visando à obtenção de uma estrutura mais eficiente e adequada à implementação das propostas previstas neste Plano e à continuidade de suas atividades, ou qualquer outra reorganização societária que venha a ser oportunamente definida pelas RECUPERANDAS, desde que não cause um Efeito Adverso Relevante nas sociedades integrantes do GRUPO OI.

14

3.1.7. **Alterações Transitórias na Governança**: De modo a garantir a execução das medidas previstas neste Plano e considerando os diversos interesses envolvidos no âmbito da Recuperação Judicial, este Plano contém regras transitórias de governança corporativa relativas à criação de um Conselho de Administração Transitório e formação de um Novo Conselho de Administração, para assegurar a estabilidade institucional do Grupo Oi e a implementação deste Plano.

3.1.8. **Depósitos Judiciais:** Após a Homologação Judicial do Plano, o GRUPO OI poderá efetuar o imediato levantamento do valor integral dos Depósitos Judiciais que não tenham sido utilizados para pagamento, nas formas previstas neste Plano.

4. REESTRUTURAÇÃO DOS CRÉDITOS

4.1. **Créditos Trabalhistas.** Observado o disposto nas **Cláusulas 4.1.2** e **4.1.3** abaixo, os Créditos Trabalhistas, conforme valores indicados na Relação de Credores do Administrador Judicial, serão pagos em moeda corrente nacional, após o decurso do prazo de carência de 180 (cento e oitenta) dias a contar da Homologação Judicial do Plano, em 5 (cinco) parcelas mensais, iguais e sucessivas, vencendo-se a primeira no último Dia Útil do prazo de carência referido acima, e as demais no mesmo dia dos meses subsequentes, mediante Depósito Judicial nos autos do Processo em que seja parte o Credor Trabalhista ou caso o Credor Trabalhista não seja parte em Processo judicial, observado o disposto na **Cláusula 13.4**.

4.1.1. Os Créditos Trabalhistas ainda não reconhecidos na data prevista para a realização do primeiro pagamento estabelecida na **Cláusula 4.1** acima serão pagos da seguinte forma, após serem reconhecidos:

(a) se de titularidade de Credores Trabalhistas que não sejam da categoria de Credor Trabalhista Depósito Judicial, seu pagamento será efetuado, mediante depósito judicial nos autos do respectivo Processo, após o trânsito em julgado da decisão que encerrar o Processo e homologar o valor devido sem restar margem para impugnação pelo GRUPO OI, na forma da **Cláusula 4.1**, iniciando-se o

15

prazo de 180 (cento e oitenta) dias de carência na data em que a referida decisão transitar em julgado, vencendo-se a primeira parcela no último Dia Útil do prazo de carência referido acima e as demais no mesmo dia dos meses subsequentes; ou

(b) se de titularidade de Credores Trabalhistas Depósito Judicial (ou que venham a se enquadrar, caso algum Depósito Judicial seja efetuado pelo GRUPO OI no respectivo Processo em que se discuta o Crédito Trabalhista em questão após a apresentação deste Plano ao Juízo da Recuperação Judicial), seu pagamento será efetuado na forma da **Cláusula 4.1.2** abaixo.

4.1.2. **Credores Trabalhistas Depósito Judicial**. Os Créditos Trabalhistas de titularidade dos Credores Trabalhistas Depósito Judicial serão pagos mediante o levantamento do valor do Depósito Judicial pelo respectivo Credor Trabalhista Depósito Judicial, após a Homologação Judicial do Plano, até o limite do valor do referido Crédito Trabalhista constante da Relação de Credores do Administrador Judicial.

4.1.2.1. Na hipótese de o Depósito Judicial referido na **Cláusula 4.1.2** acima ser superior ao valor do respectivo Crédito Trabalhista constante da Relação de Credores do Administrador Judicial, o valor excedente será levantado pelo GRUPO OI.

4.1.2.2. Na hipótese de o Depósito Judicial referido na **Cláusula 4.1.2** acima ser comprovadamente inferior ao valor do respectivo Crédito Trabalhista constante da Relação de Credores do Administrador Judicial, o saldo remanescente do respectivo Crédito Trabalhista será pago mediante depósito judicial nos autos do respectivo Processo, em moeda corrente nacional, após a decisão do Juízo Trabalhista que homologar o valor devido e depois do decurso do prazo de carência de 180 (cento e oitenta) dias a contar da Homologação Judicial do Plano, em 5 (cinco) parcelas mensais, iguais e sucessivas, vencendo-se a primeira no último Dia Útil do prazo de carência referido acima, e as demais

16

no mesmo dia dos meses subsequentes, sempre mediante depósito judicial nos autos do respectivo Processo.

**4.1.2.3.** Observado o disposto na **Cláusula 4.1.2.1** acima, o valor do Crédito Trabalhista de titularidade do Credor Trabalhista Depósito Judicial será pago a título de verba indenizatória, compreendendo todos e quaisquer honorários dos respectivos Advogados Trabalhistas ou de outros profissionais, bem como custas e despesas processuais incorridas pelo Credor Trabalhista Depósito Judicial em questão.

**4.1.3.** **Crédito Trabalhista Fundação Atlântico.** Observado o valor constante da Relação de Credores do Administrador Judicial, o Crédito Trabalhista Fundação Atlântico será pago nas seguintes condições:

**4.1.3.1.** **Carência:** período de carência de amortização de principal de 5 (cinco) anos, contados a partir da data da Homologação Judicial do Plano.

**4.1.3.2.** **Parcelas:** amortização do principal em 6 (seis) parcelas anuais e sucessivas, vencendo-se a primeira no último Dia Útil do prazo de carência referido na **Cláusula 4.1.3.1** acima.

**4.1.3.3.** **Juros/atualização monetária:** INPC + 5,5% (cinco e meio por cento) ao ano, incidentes a partir da Homologação Judicial do Plano, sendo que *(i)* os juros/atualização monetária incidentes ao longo dos 5 (cinco) primeiros anos a partir da Homologação Judicial do Plano não serão pagos neste período, sendo capitalizados ao valor do principal anualmente; e *(ii)* os juros incidentes sobre o novo valor do principal serão pagos anualmente a partir do último Dia Útil do mês em que se completar o decurso do prazo referido no item (i) acima, juntamente com as parcelas de amortização do valor principal.

17

**4.2.**   **Créditos com Garantia Real.** Os Créditos com Garantia Real serão agrupados e pagos da seguinte forma:

**4.2.1.**   **Carência**: período de carência de amortização de principal de 72 (setenta e dois) meses, contados a partir da data da Homologação Judicial do Plano.

**4.2.2.**   **Principal:** o valor do principal será pago em 108 (cento e oito) parcelas mensais e sucessivas, vencendo-se a primeira no 15º (décimo quinto) dia do 73º (septuagésimo terceiro) mês contado da Homologação Judicial do Plano, e as demais no mesmo dia a cada mês subsequente, a partir do primeiro pagamento, conforme percentuais do valor principal descritos na tabela progressiva abaixo:

| Meses | Percentual do valor a ser amortizado por mês |
|---|---|
| 0 a 72º | 0,0% |
| 73º a 132º | 0,33% |
| 133º a 179º | 1,67% |
| 180º | 1,71% |

**4.2.3.**   **Juros:** TJLP - Taxa de Juros de Longo Prazo, divulgada pelo Banco Central, acrescido de 2,946372%, sendo que:

*(i)*   os juros incidentes ao longo dos 4 (quatro) primeiros anos a partir da Homologação Judicial do Plano não serão pagos neste período, sendo capitalizados anualmente ao valor do principal, de modo que o saldo do principal ao final de cada ano seja o saldo inicial do período somado dos juros capitalizados no período em questão, de acordo com a seguinte fórmula:

**saldo final do período = saldo inicial do período x $(1+t)^{DC/360}$**,

em que *t* representa a taxa de juros/atualização monetária contratadas originalmente e *DC* representa dias corridos; e

*(ii)* a partir do 15º (décimo quinto) dia do 49º (quadragésimo novo) mês contado da Homologação Judicial do Plano, os juros incidentes sobre o novo valor do principal serão pagos mensalmente, em moeda corrente nacional, até o pagamento total do principal nos termos deste Plano.

**4.2.4.** **Demais condições contratuais:** as Recuperandas obrigam-se a cumprir, até o pagamento integral dos Créditos com Garantia Real, os termos e condições descritos no **Anexo 4.2.4**.

**4.3.** **Créditos Quirografários.**

**4.3.1.** **Pagamento e Reestruturação dos Créditos Quirografários:** Exceto se disposto de forma contrária neste Plano, cada Credor Quirografário poderá optar, à sua discricionariedade, por ter a totalidade de seus respectivos Créditos Quirografários pagos na forma prevista na **Cláusula 4.3.1.1** ou reestruturados através das opções previstas nas **Cláusulas 4.3.1.2 e 4.3.1.3** abaixo, sem possibilidade de divisão voluntária do valor do crédito entre as referidas opções e observados os respectivos limites de Créditos Quirografários.

**4.3.1.1.** **Pagamento Linear de Créditos Quirografários:** Exceto se disposto de forma contrária neste Plano:

(i) Credores Quirografários titulares de Créditos ME/EPP ou Créditos Classe III no valor igual ou inferior a R$1.000,00 (mil Reais): Os Credores Quirografários que escolherem a forma de pagamento de créditos prevista nesta **Cláusula 4.3.1.1** terão seus respectivos Créditos pagos em uma única parcela até o 20º (vigésimo) Dia Útil a contar da Homologação Judicial do Plano ou do Reconhecimento do Plano na Jurisdição do Credor, conforme aplicável, limitado ao valor do respectivo Crédito constante da Relação de Credores do Administrador Judicial;

19

(ii)   Credores Quirografários titulares de Créditos ME/EPP ou Créditos Classe III em valor superior a R$1.000,00 (mil Reais): Os Credores Quirografários poderão optar, através de plataforma eletrônica a ser disponibilizada pela Oi no endereço eletrônico www.recjud.com.br, pelo recebimento nos termos desta **Cláusula 4.3.1.1** desde que concordem em receber apenas o valor de R$ 1.000,00 (mil Reais) como pagamento integral do seu respectivo Crédito Quirografário, conforme aplicável, compreendendo, quando for o caso, todos e quaisquer honorários advocatícios ou de outros profissionais, bem como custas e despesas processuais incorridas pelo Credor Quirografário em questão. Nesse contexto, o pagamento será feito até o 20º (vigésimo) Dia Útil contado do término do prazo para a escolha da opção de pagamento de créditos a ser realizada pelo respectivo Credor Quirografário através da plataforma eletrônica a ser disponibilizada pela Oi no endereço eletrônico www.recjud.com.br, e nem o Credor ME/EPP ou Classe III, conforme aplicável, nem seus advogados farão jus ao recebimento de qualquer valor adicional àquele indicado nesta **Cláusula 4.3.1.1.**

4.3.1.2.   **Opção de Reestruturação I:** Os Credores Quirografários titulares de Créditos Quirografários ME/EPP ou Créditos Classe III poderão optar pela Opção de Reestruturação I, pela qual seus respectivos Créditos Quirografários serão reestruturados em até 6 (seis) meses contados da data da Homologação Judicial do Plano, conforme os termos da **Cláusula 4.3.1.2.1** e observados os limites previstos nos itens (a) e (b) abaixo para Créditos Quirografários em Reais e Dólares Norte-Americanos, respectivamente:

(a)   Parte dos Créditos Quirografários ME/EPP ou Créditos Classe III será representada em Reais pelo valor dos Créditos Quirografários em Reais que optarem pela Opção de

Reestruturação I, até o limite máximo de R$ 10.000.000.000,00 (dez bilhões de Reais), sendo que cada Credor Quirografário poderá escolher uma das seguintes opções de pagamento: (i) reestruturação do Crédito Quirografário em Reais, conforme os termos e condições previstos no **Anexo 4.3.1.2(a1);** (ii) debêntures privadas, conforme termos e condições previstos no **Anexo 4.3.1.2(a2)**; ou (iii) debêntures públicas, nos mesmos termos e condições das debêntures privadas; e

(b)  Parte dos Créditos Quirografários ME/EPP ou Créditos Classe III será representada em Dólares Norte-Americanos pelo valor dos Créditos Quirografários em Dólares Norte-Americanos que optarem pela Opção de Reestruturação I, observado o disposto no art. 50, § 2º, da LFR, até o limite máximo de USD1.150.000.000,00 (um bilhão, cento e cinquenta milhões de Dólares Norte-Americanos) e paga nos termos e condições previstos no **Anexo 4.3.1.2(b),** com assunção, pelas Recuperandas, dos ônus relativos aos tributos porventura incidentes no Brasil incluindo, mas não se limitando, ao ônus do imposto de renda retido na fonte (*gross up*). Caso as escolhas dos Credores Quirografários da opção de pagamento prevista na **Cláusula 4.3.1.3** não atinjam o limite estabelecido na **Cláusula 4.3.1.3**, eventual saldo remanescente será automaticamente será acrescido ao limite estabelecido nesta **Cláusula 4.3.1.2(b)**.

4.3.1.2.1.  Obedecida a alocação proporcional dos Créditos Quirografários que escolham a Opção de Reestruturação I frente à totalidade dos Créditos ME/EPP ou Classe III a serem pagos dentro dos limites estabelecidos nos itens (a) e (b) da **Cláusula 4.3.1.2**, conforme o caso, os Créditos ME/EPP ou Classe III em questão serão reestruturados da seguinte forma:

(a)  **Carência:** período de carência de amortização de principal de 60 (sessenta) meses, contados a partir da Homologação Judicial do Plano.

(b)  **Principal:** o valor do principal será amortizado em 24 (vinte e quatro) parcelas semestrais e sucessivas, vencendo-se a primeira no 25º (vigésimo quinto) dia do 66º (sexagésimo sexto) mês contado da Homologação Judicial do Plano e as demais no mesmo dia a cada 6 (seis) meses a contar do primeiro pagamento, conforme percentuais do valor do principal, acrescido dos juros capitalizados (conforme item (c) abaixo), descritos na tabela progressiva abaixo:

| Semestres | Percentual do valor a ser amortizado por semestre |
|-----------|---------------------------------------------------|
| 0 a 10º | 0% |
| 11º a 20º | 2,0% |
| 21º a 33º | 5,7% |
| 34º | 5,9% |

(c)  **Juros:** *(A)* para os Créditos ME/EPP ou Classe III denominados originalmente em Reais, incidirão juros correspondentes à taxa anual de 80% (oitenta por cento) do CDI; e *(B)* para os Créditos ME/EPP ou Classe III denominados originalmente em Dólares Norte-Americanos, juros de 1,75% (um vírgula setenta e cinco por cento) ao ano, sendo que os juros serão capitalizados anualmente ao valor do principal e pagos semestralmente a partir do 25º (vigésimo quinto) dia do 66º (sexagésimo sexto) mês contado da data da Homologação Judicial do Plano.

(d)  **Cessão de Direitos**: Os instrumentos contratuais que vierem a ser celebrados com tais Credores Quirografários

ME/EPP ou Classe III, conforme o caso, e quaisquer reinvindicações no âmbito de tais instrumentos contratuais e quaisquer direitos legais, equitativos ou quaisquer outros interesses econômicos previstos em tais instrumentos contratuais ou deles decorrentes, somente poderão ser transferidos, cedidos, contribuídos, disponibilizados ou de outra forma alienados (no todo ou em parte), mediante notificação às RECUPERANDAS, nos termos do artigo 290 do Código Civil, e desde que observados (i) o Código de Ética do Grupo Oi disponível nesta data no endereço http://ri.oi.com.br e (ii) que a respectiva cessão não envolva pessoas físicas ou jurídicas indicadas na lista do *Office of Foreign Assets Control (OFAC)*, do Departamento de Tesouro dos Estados Unidos da América.

4.3.1.2.2.    Uma vez atingido o limite estabelecido no item **(a)** da **Cláusula 4.3.1.2** acima para Créditos Quirografários a serem reestruturados em Reais ou o limite estabelecido no item **(b)** da **Cláusula 4.3.1.2** acima para Créditos Quirografários a serem reestruturados em Dólares Norte-Americanos, os Credores titulares de Créditos ME/EPP ou Créditos Classe III que tenham escolhido a Opção de Reestruturação I terão parte de seus Créditos Quirografários pagos conforme a opção escolhida, de forma *pro rata* e limitado ao valor do respectivo Crédito Quirografário constante da Relação de Credores do Administrador Judicial. Os saldos remanescentes serão automaticamente alocados para serem pagos na forma da **Cláusula 4.3.6** abaixo.

4.3.1.3.    **Opção de Reestruturação II**: Os Credores Quirografários titulares de Créditos Quirografários ME/EPP ou Créditos Classe III poderão optar pela Opção de Reestruturação II, pela qual seus respectivos Créditos Quirografários serão reestruturados pelo valor dos Créditos Quirografários em Dólares Norte-Americanos

23

que optarem pela Opção de Reestruturação II, em até 6 (seis) meses contados da data da Homologação Judicial do Plano, conforme os termos da **Cláusula 4.3.1.3.1** e observados o limite máximo de USD 850.000.000,00 (oitocentos e cinquenta milhões de Dólares Norte-Americanos) para Créditos Quirografários.

4.3.1.3.1.    Obedecida a alocação proporcional dos Créditos Quirografários que escolham a Opção de Reestruturação II frente à totalidade dos Créditos ME/EPP ou Classe III a serem pagos dentro do limite estabelecido na **Cláusula 4.3.1.3**, os Créditos ME/EPP ou Classe III em questão serão reestruturados da seguinte forma:

(a)    **Carência:** período de carência de amortização de principal de 60 (sessenta) meses, contados a partir da Homologação Judicial do Plano.

(b)    **Principal:** o valor do principal será amortizado em 24 (vinte e quatro) parcelas semestrais e sucessivas, vencendo-se a primeira no 25º (vigésimo quinto) dia do 66º (sexagésimo sexto) mês contado da Homologação Judicial do Plano e as demais no mesmo dia a cada 6 (seis) meses a contar do primeiro pagamento, conforme percentuais do valor do principal, acrescido dos juros capitalizados (conforme item (c) abaixo), descritos na tabela progressiva abaixo:

| Semestres | Percentual do valor a ser amortizado por semestre |
|---|---|
| 0 a 10º | 0% |
| 11º a 20º | 2,0% |
| 21º a 33º | 5,7% |
| 34º | 5,9% |

(c)    **Juros:** juros de 1,25% (um vírgula vinte e cinco por cento) ao ano, sendo que os juros serão capitalizados anualmente

24

ao valor do principal e pagos semestralmente a partir do 25º (vigésimo quinto) dia do 66º (sexagésimo sexto) mês contado da data da Homologação Judicial do Plano, sendo que:

(i) 10% (dez por cento) dos juros incidentes ao longo dos 60 (sessenta) primeiros meses a partir da Homologação Judicial do Plano serão pagos semestralmente em dinheiro no 25º (vigésimo-quinto) dia do mês de cada período de juros;

(ii) os 90% (noventa por cento) restantes dos juros/atualização monetária incidentes ao longo dos 60 (sessenta) primeiros meses a partir da Homologação Judicial do Plano não serão pagos neste período, sendo capitalizados anualmente ao valor do principal, de modo que o saldo do valor do principal a cada final de ano seja o saldo inicial do período somado dos juros capitalizados no período; e

(iii) a partir do 66º (sexagésimo sexto) mês contado da Homologação Judicial do Plano, 100% (cem por cento) dos juros/atualização monetária incidentes sobre o novo valor do principal serão pagos semestralmente, no 25º (vigésimo-quinto) dia do mês de cada período de juros.

4.3.1.3.2. **Cessão de Direitos**: Os instrumentos contratuais que vierem a ser celebrados com tais Credores Quirografários ME/EPP ou Classe III, conforme o caso, e quaisquer reinvindicações no âmbito de tais instrumentos contratuais e quaisquer direitos legais, equitativos ou quaisquer outros interesses econômicos previstos em tais instrumentos contratuais ou deles decorrentes, não poderão ser transferidos, cedidos, contribuídos, disponibilizados ou de outra forma alienados (no todo ou em parte), incluindo, mas não se limitando, a título de sub-

25

participação ou desconto de quaisquer de tais instrumentos contratuais, de forma a alterar seu beneficiário final, sem o prévio consentimento por escrito das RECUPERANDAS e de todos os Credores Quirografários ME/EPP ou Classe III, conforme o caso, que tenham escolhido a Opção de Reestruturação II. Adicionalmente, nenhum ônus ou gravame, ou qualquer outro direito previsto, em tais instrumentos contratuais poderá ser concedido ou transferido por quaisquer dos Credores Quirografários ME/EPP ou Classe III, conforme o caso, que tenham escolhido a Opção de Reestruturação II, sem o prévio consentimento por escrito das RECUPERANDAS e de todos os Credores Quirografários ME/EPP ou Classe III, conforme o caso, que tenham escolhido a Opção de Reestruturação II.

4.3.1.3.3.   Uma vez atingido o limite estabelecido na **Cláusula 4.3.1.3** acima para Créditos Quirografários, os Credores titulares de Créditos ME/EPP ou Créditos Classe III que tenham escolhido a Opção de Reestruturação II terão parte de seus Créditos Quirografários pagos conforme a opção escolhida, de forma *pro rata* e limitado ao valor do respectivo Crédito Quirografário constante da Relação de Credores do Administrador Judicial. Os saldos remanescentes serão automaticamente alocados para serem pagos na forma da **Cláusula 4.3.6** abaixo.

4.3.1.3.4.   Caso as escolhas dos Credores Quirografários desta opção de pagamento não atinjam o limite estabelecido na **Cláusula 4.3.1.3** acima, eventual saldo remanescente automaticamente será acrescido ao limite estabelecido na **Cláusula 4.3.1.2(b)**. Da mesma forma, caso as escolhas dos Credores Quirografários da opção de pagamento prevista na **Cláusula 4.3.1.2(b)** não atinjam o limite estabelecido na **Cláusula 4.3.1.2(b)**, eventual saldo remanescente será automaticamente acrescido ao limite estabelecido na **Cláusula 4.3.1.3**.

4.3.1.3.5. **Demais condições contratuais:** As demais condições aplicáveis ao pagamento dos Créditos Quirografários na forma prevista na **Cláusula 4.3.1.3** estão descritas no **Anexo 4.3.1.3.5,** com assunção, pelas Recuperandas, dos ônus relativos aos tributos porventura incidentes no Brasil incluindo, mas não se limitando, ao ônus do imposto de renda retido na fonte (*gross up*).

4.3.2. **Pagamento de Créditos Quirografários Depósitos Judiciais:** Exceto se disposto de forma contrária neste Plano, os Créditos ME/EPP de titularidade dos Credores Quirografários Parceiros ME/EPP Depósitos Judiciais e os Créditos Classe III de titularidade dos Credores Quirografários Parceiros Classe III Depósitos Judiciais constantes da Relação de Credores do Administrador Judicial e reconhecidos pelas RECUPERANDAS, neste último caso observados os termos da **Cláusula 4.3.2.2,** serão pagos mediante o levantamento do valor do Depósito Judicial pelo respectivo Credor Quirografário Parceiro Depósito Judicial, após a Homologação Judicial do Plano, até o limite do valor do referido Crédito Quirografário, conforme o caso, constante da Relação de Credores do Administrador Judicial e reconhecido pelas RECUPERANDAS, neste último caso observados os termos da **Cláusula 4.3.2.2**.

4.3.2.1. Sem prejuízo do disposto na **Cláusula 4.3.2** acima, o pagamento dos Créditos Classe III de titularidade dos Credores Quirografários Parceiros Classe III Depósitos Judiciais será feito de acordo com os seguintes percentuais de deságio do valor do referido Crédito Classe III constante da Relação de Credores do Administrador Judicial e reconhecido pelas RECUPERANDAS, neste último caso observados os termos da **Cláusula 4.3.2.2,** conforme descrito na tabela progressiva abaixo**:**

| Intervalo de Valor de Crédito | % de Deságio |
|---|---|
| Até R$ 1.000,00 | 0,0% |
| R$ 1.000,01 a R$ 5.000,00; | 15,0% |

| R$ 5.000,01 a R$ 10.000,00 | 20,0% |
|---|---|
| R$ 10.000,01 a R$ 150.000,00 | 30% |
| Acima de R$ 150.000,00 | 50% |

**4.3.2.2.** Os Créditos Quirografários, conforme aplicável, ainda não reconhecidos na data prevista para a realização da escolha pelo respectivo Credor Quirografário através da plataforma eletrônica a ser disponibilizada pela Oi no endereço eletrônico www.recjud.com.br, e que, após serem reconhecidos, sejam de titularidade de Credores Quirografários ME/EPP ou Classe III que sejam Credores Quirografários Parceiros ME/EPP Depósito Judicial ou Credores Quirografários Parceiros Classe III Depósito Judicial, conforme aplicável, serão pagos na forma da **Cláusula 4.3.2** acima e, conforme aplicável, também observado o disposto na **Cláusula 4.3.2.1** acima. Nesta hipótese, o Credor Quirografário Parceiro Depósito Judicial em questão *(i)* não poderá apresentar impugnação ou questionar de qualquer outra forma o valor indicado na Relação de Credores do Administrador Judicial ou documento equivalente ou, *(ii)* caso o Grupo Oi apresente impugnação ao valor indicado na Relação de Credores do Administrador Judicial ou documento equivalente, deverá concordar com o valor indicado na respectiva impugnação do Grupo Oi.

**4.3.2.3.** Caso, após a apresentação deste Plano ao Juízo da Recuperação Judicial, algum Depósito Judicial seja efetuado pelo Grupo Oi no respectivo Processo em que se discuta o Crédito Quirografário em questão, e o Credor Quirografário em questão aceite as condições previstas nas **Cláusulas 4.3.2 e 4.3.2.1**, conforme aplicável, de modo que seu Crédito Quirografário se enquadre no conceito previsto na **Cláusula 4.3.2.2** acima, tais Créditos Quirografários também poderão ser pagos na forma da **Cláusula 4.3.2** acima e, conforme aplicável, também observado o disposto na **Cláusula 4.3.2.1** acima. Nesta hipótese, o Credor Quirografário Parceiro Depósito Judicial em questão *(i)* não

poderá apresentar impugnação ou questionar de qualquer outra forma o valor indicado na Relação de Credores do Administrador Judicial ou documento equivalente ou, *(ii)* caso o GRUPO OI apresente impugnação ao valor indicado na Relação de Credores do Administrador Judicial ou documento equivalente, deverá concordar com o valor indicado na respectiva impugnação do GRUPO OI.

4.3.2.4. Na hipótese de o Depósito Judicial referido na **Cláusula 4.3.2** acima ser superior ao valor do respectivo Crédito ME/EPP ou Classe III (neste último caso apurado após a dedução do deságio indicado **Cláusula 4.3.2.1)** constante da Relação de Credores do Administrador Judicial e reconhecido pelas RECUPERANDAS, neste último caso observados os termos da **Cláusula 4.3.2.2**, o valor excedente será levantado pelo GRUPO OI.

4.3.2.5. Na hipótese de o Depósito Judicial referido na **Cláusula 4.3.2** acima ser comprovadamente inferior ao valor do respectivo Crédito ME/EPP ou Classe III (neste último caso apurado após a dedução do deságio indicado **Cláusula 4.3.2.1**) constante da Relação de Credores do Administrador Judicial e reconhecido pelas RECUPERANDAS, neste último caso observados os termos da **Cláusula 4.3.2.2**, o saldo remanescente do respectivo Credor Quirografário Parceiro Depósito Judicial, conforme o caso, será pago em moeda corrente nacional, após a decisão do Juízo competente que homologar o valor devido, na forma da **Cláusula 4.3.6** abaixo.

4.3.2.6. Para fins do disposto nas **Cláusulas 4.3.2** e **4.3.2.4** acima, em até 20 (vinte) Dias Úteis dias a contar do término do prazo para a escolha da opção de pagamento de créditos a ser realizada pelo respectivo Credor Quirografário através da plataforma eletrônica a ser disponibilizada pela Oi no endereço eletrônico [www.recjud.com.br](www.recjud.com.br), o Credor Quirografário Parceiro Depósito Judicial em questão, juntamente com todos os seus advogados

constituídos nos autos, inclusive aqueles titulares de honorários de sucumbência, e a RECUPERANDA deverão apresentar Petição Conjunta ME/EPP ou Classe III, conforme o caso, requerendo ao Juízo competente *(i)* a expedição dos respectivos alvarás judiciais para levantamento do Depósito Judicial, na forma descrita nas **Cláusulas 4.3.2** e **4.3.2.4** acima, conforme aplicável, e *(ii)* a extinção, baixa da distribuição e arquivamento definitivo do Processo. O levantamento do Depósito Judicial, em qualquer circunstância, somente poderá ocorrer após a homologação pelo Juízo competente do valor devido, nos termos da Petição Conjunta ME/EPP ou Classe III, conforme aplicável.

4.3.2.7.  Observado o disposto na **Cláusula 4.3.2.4** acima, o valor do Crédito ME/EPP ou Classe III de titularidade do Credor Quirografário Parceiro Depósito Judicial, conforme aplicável, será considerado como compreendendo todos e quaisquer honorários advocatícios (desde que os honorários advocatícios não estejam já constando na Classe I na Relação de Credores do Administrador Judicial) ou de outros profissionais, bem como custas e despesas processuais incorridas pelo Credor Quirografário Parceiro Depósito Judicial em questão. Nesse contexto, nem o respectivo Credor Quirografário Parceiro Depósito Judicial, nem seus advogados farão jus ao recebimento de qualquer valor adicional àquele constante da Relação de Credores do Administrador Judicial e reconhecido pelas RECUPERANDAS, neste último caso observados os termos da **Cláusula 4.3.2.2** (e, conforme aplicável, observado o disposto na **Cláusula 4.3.2.1**), para o respectivo Crédito ME/EPP ou Classe III.

4.3.3.  <u>**Reestruturação de Bonds**</u>: Dada a natureza dos seus Créditos Quirografários, representados por títulos emitidos e negociados no exterior e regulados por leis estrangeiras, bem como sujeitos às leis e demais normas aplicáveis nas jurisdições onde tais títulos são negociados, e ainda, dada a complexidade procedimental para implementar a

reestruturação dos seus Créditos Quirografários em comparação aos demais Credores Quirografários, os Credores Quirografários Bondholders terão os seus Créditos Quirografários dos Bondholders reestruturados exclusivamente de acordo com o disposto nesta **Cláusula 4.3.3**. A depender da emissão e do valor dos seus respectivos Créditos Quirografários dos Bondholders, os Credores Quirografários Bondholders deverão manifestar expressamente a opção pela reestruturação de seus Créditos Quirografários dos Bondholders em uma das formas previstas nas **Cláusulas 4.3.3.1** ou **Cláusula 4.3.3.2** abaixo, observado o procedimento disposto na **Cláusula 4.5.5** deste Plano:

4.3.3.1. **Opção Créditos Quirografários dos Bondholders Não-Qualificados**: Os Credores Quirografários Bondholders Não-Qualificados que, no ato de sua opção por meio do envio da Notificação Opção de Pagamento, declararem e comprovarem que são titulares de Créditos Quirografários dos Bondholders com valor máximo de até USD750.000,00 (setecentos e cinquenta mil Dólares Norte-Americanos) (ou o equivalente em Reais convertidos pela Taxa de Câmbio Conversão), terão seus respectivos Créditos reestruturados nos termos desta **Cláusula 4.3.3.1** e suas subcláusulas abaixo:

(a) **Limite de Créditos Quirografários dos Bondholders Não-Qualificados**: O valor máximo e o total de Créditos Quirografários dos Bondholders Não-Qualificados a serem reestruturados nos termos desta **Cláusula 4.3.3.1** estará limitado a USD500.000.000,00 (quinhentos milhões de Dólares Norte-Americanos).

(b) **Deságio:** A reestruturação de Créditos Quirografários dos Bondholders Não-Qualificados prevista na **Cláusula 4.3.3.1** implicará na redução do respectivo Crédito Quirografário dos Bondholders Não-Qualificados no percentual de 50% (cinquenta por cento). Para todos os fins, o deságio será aplicado primeiramente aos juros, e, apenas posteriormente,

à parcela do principal que compõe os Créditos Quirografários dos Bondholders submetidos à **Cláusula 4.3.3.1**.

**(c)** <u>Carência</u>: Período de carência de amortização de principal de 6 (seis) anos, contados a partir da data da Homologação Judicial do Plano.

**(d)** <u>Principal</u>: O valor do principal será equivalente a 50% (cinquenta por cento) dos Créditos Quirografários dos Bondholders Não-Qualificados, limitado ao valor de USD250.000.000,00 (duzentos e cinquenta milhões de Dólares Norte-Americanos), e será amortizado em 12 (doze) parcelas semestrais e sucessivas, vencendo-se a primeira no 15º (décimo quinto) dia do 78º (septuagésimo oitavo) mês contado da Homologação Judicial do Plano e as demais no mesmo dia a cada 6 (seis) meses a contar do primeiro pagamento, conforme percentuais do valor do principal, acrescido dos juros capitalizados (conforme item (d) abaixo), descritos na tabela progressiva abaixo:

| Semestres | Percentual do valor a ser amortizado por semestre |
|---|---|
| 0 a 12º | 0% |
| 13º a 18º | 4,0% |
| 19º a 23º | 12,66% |
| 24º | 12,70% |

**(e)** <u>Juros</u>: Incidência de juros de 6% (seis por cento) ao ano em Dólares Norte-Americanos sobre o valor do principal, a partir da data da Homologação do Plano, sendo capitalizados anualmente ao valor do principal e pagos anualmente a partir do 15º (décimo quinto) dia do 78º (septuagésimo oitavo) mês contado da data da Homologação Judicial do Plano.

32

(f) **Demais condições contratuais:** as demais condições aplicáveis à reestruturação dos Créditos Quirografários dos Bondholders Não-Qualificados na forma prevista na **Cláusula 4.3.3.1** estão descritas no **Anexo 4.3.3.1(f)**.

4.3.3.1.1. Caso o Credor Quirografário Bondholder Não-Qualificado (x) não manifeste expressa e tempestivamente sua opção para receber o pagamento de seu respectivo Crédito Quirografário dos Bondholders Não-Qualificados na forma da **Cláusula 4.3.3.1**; e/ou (y) não comprove o atendimento da condição estabelecida nos termos da **Cláusula 4.3.3.1**, tal Credor Quirografário Bondholder Não-Qualificado terá a integralidade do seu Crédito Quirografário dos Bondholders Não-Qualificados integralmente alocados para serem pagos na forma da **Cláusula 4.3.6**.

4.3.3.1.2. Caso seja atingido o limite estabelecido na **Cláusula 4.3.3.1(a)** acima, os Credores Quirografários Bondholders Não-Qualificados titulares de Créditos Quirografários dos Bondholders Não-Qualificados cujos créditos sejam reestruturados na forma prevista nesta **Cláusula 4.3.3.1** terão parte de seus Créditos Quirografários dos Bondholders Não-Qualificados pagos conforme a opção escolhida, de forma *pro rata* e limitado ao valor do respectivo Crédito Quirografário do Bondholder Não-Qualificado. Os saldos remanescentes serão automaticamente alocados para serem pagos na forma da **Cláusula 4.3.6** abaixo.

4.3.3.2. **Opção Créditos Quirografários dos Bondholders Qualificados**: Observadas as Condições Precedentes indicadas no **Anexo 4.3.3.5(c)**, os Credores Quirografários Bondholders Qualificados titulares de Créditos Quirografários dos Bondholders Qualificados em montante acima de USD750.000,00 (setecentos e cinquenta mil Dólares Norte-Americanos) (ou o equivalente em

33

Reais convertidos pela Taxa de Câmbio Conversão) que expressa e tempestivamente elegerem opção de pagamento estabelecida nesta **Cláusula 4.3.3.2** por meio de envio da Notificação Opção de Pagamento terão seus respectivos Créditos Quirografários dos Bondholders Qualificados reestruturados e pagos mediante a entrega de pacote composto por Novas *Notes*, Ações PTIF, Novas Ações Ordinárias – I e Bônus de Subscrição, na forma das **Cláusulas 4.3.3.3, 4.3.3.4, 4.3.3.5 e 4.3.3.6** abaixo:

(i)   ações ordinárias de emissão da Oi detidas pela PTIF, sob a forma de ADRs;

(ii)  um pacote com (a) Novas *Notes*, (b) Novas Ações Ordinárias - I sob a forma de ADRs e (c) Bônus de Subscrição; a serem emitidos pela Oi;

sendo certo que a diferença entre o valor total dos Créditos Quirografários dos Bondholders Qualificados e o preço global das ações de emissão da Oi detidas pela PTIF, Novas *Notes*, Novas Ações Ordinárias - I e Bônus de Subscrição será utilizada para absorção de prejuízo à conta de acionistas, nos termos do art. 64, §3º do Decreto-Lei 1598 de 1977 e do Parecer Normativo CST nº 04 de 1981. A diferença que não puder ser absorvida dessa maneira será considerada como tendo sido objeto de remissão, como o primeiro passo na implementação da presente **Cláusula 4.3.3.2**, e terá sido aplicada primeiramente aos juros, e, apenas posteriormente, à parcela do principal que compõe os Créditos Quirografários dos Bondholders Qualificados.

4.3.3.2.1.   **Razões de Troca**: Para cada USD 664.573,98 (seiscentos e sessenta e quatro mil, quinhentos e setenta e três Dólares Norte-Americanos e noventa e oito centavos de Dólares Norte-Americanos) em Créditos Quirografários dos Bondholders Qualificados, convertidos pela Taxa de Câmbio Conversão, o

respectivo Credor Quirografário Bondholder Qualificado receberá cumulativamente:

**(i)** 9.137 (nove mil, cento e trinta e sete) ações ordinárias de emissão da Oɪ detidas pela PTIF, sob a forma de ADRs, atualmente mantidas pela Oi em tesouraria;

**(ii)** um pacote com:

(a) Novas *Notes* emitidas ao preço global de emissão USD 145.262,00 (cento e quarenta e cinco mil, duzentos e sessenta e dois Dólares Norte-Americanos), o qual compreende o valor de face de USD 130.000,00 (cento e trinta mil Dólares Norte-Americanos) e um prêmio na emissão de USD 15.262,00 (quinze mil, duzentos e sessenta e dois Dólares Norte-Americanos), justificado pela atratividade, nos termos das **Cláusulas 4.3.3.3**;

(b) 119.017 (cento e dezenove mil e dezessete) Novas Ações Ordinárias - I sob forma de ADRs, como resultado de Aumento de Capital Capitalização de Créditos após a Homologação Judicial do Plano, nos termos das **Cláusulas 4.3.3.5**; e

(c) 9.155 (nove mil, cento e cinquenta e cinco) Bônus de Subscrição de emissão da Oi como vantagem adicional ao resultado do Aumento de Capital Capitalização de Créditos após a Homologação Judicial do Plano, nos termos das **Cláusulas 4.3.3.6**.

**4.3.3.2.1.1.** As razões de troca previstas na **Cláusula 4.3.3.2.1** pressupõem que a quantidade de ações ordinárias e preferencias de emissão da Oi na data deste Plano é de 825.760.902. Na hipótese de eventual aumento de número de ações de emissão da Oi, as quantidades de ações

35

recebidas pelos Credores Quirografários Bondholders Qualificados decorrentes das razões de troca deverão ser proporcionalmente ajustadas.

4.3.3.3. <u>Novas *Notes*</u>. As Novas *Notes* serão emitidas por Oi ou uma subsidiária integral de Oi e, na qualidade de garantidoras e devedoras solidárias, pelas demais RECUPERANDAS, até 31 de julho de 2018. As Novas *Notes* serão emitidas em múltiplos de USD1.000,00 (mil Dólares Norte-Americanos) e os montantes em créditos que não atingirem o referido múltiplo de USD 1.000,00 (mil Dólares Norte-Americanos) serão desconsiderados para fins desta **Cláusula 4.3.3.3**, não havendo fracionamento ou recebimento proporcional. Para fins de esclarecimento, hipoteticamente, se um Credor Quirografário Bondholder Qualificado tiver um crédito para recebimento de Novas *Notes* equivalente a USD131.500,00 (cento e trinta e um mil e quinhentos Dólares Norte-Americanos), ele receberá somente Novas *Notes* com valor de face equivalente a USD131.000,00 (cento e trinta e um mil Dólares Norte-Americanos), sendo desconsiderado para os fins desta **Cláusula 4.3.3.3** o valor residual de USD500,00 (quinhentos Dólares Norte-Americanos). A emissão das Novas *Notes* observará os seguintes termos e condições:

(a) <u>**Valor limite da emissão:**</u> As Novas Notes serão emitidas na forma da **Cláusula 4.3.3.3,** em Dólares Norte-Americanos, e terão o valor de face máximo de R$ 6.300.000.000,00 (seis bilhões e trezentos milhões de Reais), convertido pela Taxa de Câmbio Conversão, o que equivale ao valor de face máximo de USD 1.918.100.167,45 (um bilhão, novecentos e dezoito milhões, cem mil, cento e sessenta e sete Dólares Norte-Americanos e quarenta e cinco centavos de Dólares Norte-Americanos).

**(b)** <u>Vencimento</u>: O vencimento das Novas *Notes* se dará no 7º (sétimo) ano após a Data de Emissão das Notes.

**(c)** <u>Principal</u>: O valor do principal das Novas *Notes* será pago em parcela única com vencimento no 5º (quinto) dia do 84º (octogésimo quarto) mês após a Data de Emissão das Notes.

**(d)** <u>Juros</u>: A incidência e o pagamento dos juros poderão ocorrer mediante uma das formas previstas nos itens (i) e (ii) abaixo, a exclusivo critério da Oi:

**(i)** Incidência de juros de 10% (dez por cento) ao ano em Dólares Norte-Americanos sobre o valor do principal, a partir da data da Homologação do Plano, os quais serão pagos semestralmente em dinheiro, no 5º (quinto) dia do 6º (sexto) mês contado da Data de Emissão das Notes e os demais pagamentos a cada 6 (seis) meses a contar do primeiro pagamento de juros; <u>ou</u>

**(ii)** Durante os 3 (três) primeiros anos contados da data da Homologação Judicial do Plano a incidência e o pagamento dos juros ocorrerão conforme previsto no item (*x*) abaixo e a partir do 4º (quarto) ano contado da data da Homologação Judicial do Plano, incidência e o pagamento dos juros ocorrerão conforme previsto no item (*y*) abaixo:

(*x*) Até o 3º (terceiro) ano contado da data da Homologação Judicial do Plano, incidência de juros de 12% (doze por cento) ao ano em Dólares Norte-Americanos sobre o valor do principal, pagos semestralmente na forma prevista nos itens "a" e "b" abaixo;

**a.** 8% (oito por cento) dos juros anuais pagos em dinheiro, no 5º (quinto) dia do 6º (sexto) mês contado da Data de Emissão das Notes e os demais pagamentos a cada 6 (seis) meses a contar do primeiro pagamento de juros; e

**b.** Os 4% (quatro por cento) restantes capitalizados semestralmente ao valor do principal, sendo a primeira capitalização no 5º (quinto) dia do 6º (sexto) mês contado da Data de Emissão das Notes e pagos no 5º (quinto) dia do 36º (trigésimo sexto) mês após a Data de Emissão das Notes, de modo que o saldo do valor do principal ao final do 3º (terceiro) ano seja o saldo inicial somado dos juros capitalizados no período.

(*y*) A partir do 4º (quarto) ano contado da data da Homologação Judicial do Plano, incidência de juros de 10% (dez por cento) ao ano em Dólares Norte-Americanos sobre o valor do principal, os quais serão pagos semestralmente em dinheiro, no 5º (quinto) dia mês de cada período de juros.

**(e)** O direito dos Credores Quirografários Bondholders Qualificados de receber as Novas *Notes* será sempre limitado ao percentual que seu respectivo Crédito Quirografário Bondholder Qualificado representa da soma total dos Créditos Quirografários dos Bondholders Qualificados que venham a tempestivamente eleger a opção nos termos da **Cláusula 4.3.3.2.**

**(f)** <u>**Demais condições contratuais:**</u> as Novas *Notes* serão emitidas sob legislação de Nova York para livre negociação no mercado internacional, com assunção, pelas Devedoras, dos ônus relativos aos tributos porventura incidentes no

Brasil incluindo, mas não se limitando, ao ônus do imposto de renda retido na fonte (*gross up*), observando-se e sem prejuízo às condições aplicáveis às Novas *Notes* descritas no **Anexo 4.3.3.3.(f)**.

**4.3.3.4.** **Ações PTIF:** As Ações PTIF serão distribuídas aos Credores Quirografários Bondholders Qualificados, na proporção dos respectivos Créditos Quirografários Bondholders Qualificados até 31 de julho de 2018, condicionada à aprovação de plano de composição a ser oferecido por qualquer das RECUPERANDAS perante a justiça holandesa.

**4.3.3.5.** **Aumento de Capital – Capitalização de Créditos:** As Novas Ações Ordinárias – I serão emitidas pela OI em aumento de capital por subscrição privada, mediante a capitalização de parte dos Créditos Quirografários dos Bondholders Qualificados que tiverem tempestivamente eleito a opção da **Cláusula 4.3.3.2** na forma deste Plano, observadas as normas regulamentares aplicáveis, e conferirão os mesmos direitos conferidos pelas demais ações ordinárias de emissão da OI em circulação. A emissão das Novas Ações Ordinárias – I observará o disposto no artigo nº 171, §2º da Lei n° 6.404, de 15 de dezembro de 1976, e os seguintes termos e condições:

(a)    **Valor limite da emissão:** Serão emitidas até 1.756.054.163 (um bilhão, setecentas e cinquenta e seis milhões, cinquenta e quatro mil, cento e sessenta e três) Novas Ações Ordinárias - I, com um preço unitário de emissão entre R$ 6,70 (seis Reais e setenta centavos) e R$ 7,00 (sete Reais), de modo que o montante total do Aumento de Capital – Capitalização de Créditos será entre R$ 11.765.562.892,10 (onze bilhões, setecentos e sessenta e cinco milhões, quinhentos e sessenta e dois mil, oitocentos e noventa e dois Reais e dez centavos) e R$ 12.292.379.141,00 (doze bilhões, duzentos e noventa e dois

milhões, trezentos e setenta e nove mil, cento e quarenta e um Reais), integralizado mediante a capitalização de parte dos Créditos Quirografários dos Bondholders Qualificados e sujeito ao direito de preferência dos atuais acionistas da Oi na forma prevista abaixo.

(b) **Direito de Preferência:** A emissão das Novas Ações Ordinárias – I deverá observar, conforme aplicável, o direito de preferência previsto no art. 171 e seus §§ 2º e 3º da Lei das S.A., de 15 de dezembro de 1976. Nesse contexto, se exercido o direito de preferência pelos atuais acionistas da Oi, as importâncias por eles pagas serão entregues aos Credores Quirografários Bondholders Qualificados titulares dos Créditos Quirografários dos Bondholders Qualificados a serem capitalizados.

(c) **Condições Precedentes – Aumento de Capital Capitalização de Créditos:** O Aumento de Capital Capitalização de Créditos ocorrerá tão logo quanto possível, até 31 de julho de 2018, mas desde que verificadas ou expressa e formalmente dispensadas pelos Credores Quirografários Bondholders Qualificados em Reunião de Credores prevista na **Cláusula 8.1**, conforme previsto no **Anexo 8.1**, as Condições Precedentes para o Aumento de Capital – Capitalização de Créditos estabelecidas no **Anexo 4.3.3.5(c)**

4.3.3.6. **Bônus de Subscrição de emissão da Oi:** Os Bônus de Subscrição serão emitidos pela Oi, como vantagem adicional à emissão das Novas Ações Ordinárias – I como resultado do Aumento de Capital Capitalização de Créditos capitalização de créditos prevista na **Cláusula 4.3.3.5**, observadas as normas aplicáveis e nos seguintes termos e condições:

(a) **Prazo de Exercício:** Os Bônus de Subscrição serão exercíveis a qualquer momento a partir de 1 (um) ano da data da sua

40

emissão, por um prazo de 90 (noventa) dias. O início do prazo de exercício será antecipado nas seguintes hipóteses: (i) divulgação de Fato Relevante sobre a realização do Aumento de Capital Novos Recursos previsto na **Cláusula 6** e no Contrato de Backstop; ou (ii) na hipótese de realização de qualquer operação que implique na alteração do Controle da Oi**,** o que ocorrer primeiro. Para os fins do item (i), a Oi informará o mercado, por meio de Fato Relevante, com antecedência mínima de 15 (quinze) Dias Úteis da assembleia geral de acionistas ou reunião do Conselho de Administração para deliberar sobre Aumento de Capital Novos Recursos de forma que os seus titulares possam ter um prazo suficiente para exercer os Bônus de Subscrição e ser-lhes assegurado o direito de preferência na subscrição do Aumento de Capital Novos Recursos.

(b) **Direito de Receber Ações Ordinárias:** Os bônus de subscrição serão atribuídos gratuitamente como vantagem adicional aos subscritores das ações emitidas conforme a **Cláusula 4.3.3.5** e conferirão aos seus titulares o direito de receber ações ordinárias de emissão da Oi, mediante o pagamento de um valor em Reais não superior a USD0,01 (um centavo de Dólares Norte-Americanos) por Nova Ação Ordinária – I para exercício do Bônus de Subscrição, na proporção de 1 (uma) ação ordinária para cada Bônus de Subscrição.

(c) **Número de Bônus de Subscrição:** Serão emitidos até 135.081.089 (cento e trinta e cinco milhões, oitenta e um mil, oitenta e nove) Bônus de Subscrição.

4.3.3.7. O Grupo Oi obriga-se a entregar ao Trustee dos Bonds as Novas Ações Ordinárias – I sob a forma de ADRs, conforme o caso, em pagamento aos Créditos Quirografários dos Bondholders Qualificados de titularidade dos Credores Quirografários

41

Bondholders Qualificados que elegeram a opção para reestruturação dos seus respectivos Créditos Quirografários dos Bondholders Qualificados na forma da **Clausula 4.3.3.2**, nos termos das Escrituras de Emissão dos Bonds ou outro procedimento que venha a ser acordado entre o Grupo Oi, o Trustee dos Bonds e aprovado pelos Créditos Quirografários dos Bondholders Qualificados em Reunião de Credores convocada para essa finalidade, de forma a viabilizar a entrega das Novas Ações Ordinárias – I ou dos ADRs ao Trustee dos Bonds para a sua ulterior transferência aos Credores Quirografários Bondholders Qualificados, sendo os custos específicos relativos aos serviços previstos nesta cláusula arcados pelo Grupo Oi. A ulterior transferência das Novas Ações Ordinárias - I ou dos ADRs, das Novas *Notes* e dos Bônus de Subscrição pelo Trustee dos Bonds aos respectivos Credores Quirografários Bondholders Qualificados, conforme o caso, livres e desembaraçadas de quaisquer ônus ou gravames, implicará no cancelamento das Escrituras de Emissão dos Bonds.

4.3.3.8.  A efetiva entrega das Ações PTIF, Novas *Notes*, Novas Ações Ordinárias – I e Bônus de Subscrição aos respectivos Credores Quirografários Bondholders Qualificados, nos termos previstos **Clausula 4.3.3.2**, livres e desembaraçadas de quaisquer ônus, representará pagamento dos Créditos Quirografários Bondholders Qualificados, com a consequente Quitação, na forma da **Cláusula 11.10** deste Plano, sem prejuízo da **Cláusula 11.4**.

4.3.3.9.  A Aprovação do Plano seguida da Homologação Judicial do Plano dará poderes à Oi, por meio de seus Diretores Transição, para tomar todas as medidas necessárias para a implementação do Plano, inclusive, do ponto de vista societário, para assinar os boletins de subscrição e representar em assembleia geral de acionistas, em nome e para o benefício dos Credores Quirografários Bondholders Qualificados que reestruturarem

seus Créditos Quirografários dos Bondholders Qualificados na forma prevista na **Cláusula 4.3.3.2**, relativos às Novas Ações Ordinárias – I a serem emitidas e entregues pela Oi sob a forma de ADRs em pagamento de tais Créditos Quirografários Bondholders Qualificados, sem prejuízo da **Cláusula 11.4**.

4.3.3.10. A Aprovação do Plano seguida da Homologação Judicial do Plano representa a expressa concordância dos Credores Quirografários Bondholders Qualificados com as medidas necessárias para a implementação do Plano, notadamente em relação ao Aumento de Capital Novos Recursos, de sorte que todos os titulares das Novas Ações Ordinárias – I desde já consentem e obrigam-se de maneira irrevogável e irretratável a comparecer e votar favoravelmente ao Aumento de Capital – Novos Recursos, nos termos e condições estabelecidos na **Cláusula 6** deste Plano, na assembleia geral de acionistas convocada para essa finalidade, caso seja necessária, conferindo desde já aos Diretores Transição da Oi todos os poderes necessários para representá-los em assembleia geral de acionistas, em nome e para o benefício dos Credores Quirografários Bondholders Qualificados e/ou qualquer terceiro titular das Novas Ações Ordinárias – I ao tempo da referida assembleia geral de acionistas, sem prejuízo da **Cláusula 11.4**.

4.3.3.11. Os Credores Quirografários Bondholders Qualificados que (i) não manifestarem expressa e tempestivamente sua opção pela reestruturação de seus respectivos Créditos Quirografários dos Bondholders Qualificados nos termos da **Cláusula 4.3.3.2**, ou (ii) não se enquadrem na condição de Bondholder Qualificado prevista neste Plano; terão seus respectivos Créditos Quirografários dos Bondholders integralmente alocados para serem pagos na forma da **Cláusula 4.3.6**.

4.3.3.12. **Entrega em Depositary Receipts**: Na implementação do Aumento de Capital Capitalização de Créditos, a Oi entregará (i)

as Ações PTIF, (ii) as Novas Ações Ordinárias - I e (iii) Bônus de Subscrição aos Credores Quirografários Bondholders Qualificados, os quais poderão ser livremente negociáveis na máxima extensão permitida nos termos da legislação aplicável. As Ações PTIF e as Novas Ações Ordinárias – I serão emitidas sob a forma de ADRs, por meio do Programa de DRs de ações ordinárias patrocinado pela Oi e registrado perante a *U.S. Securities & Exchange Commission*. As ações ordinárias emitidas mediante o exercício dos Bônus de Subscrição serão emitidas sob a forma de ADRs, por meio do Programa de DRs de ações ordinárias patrocinado pela Oi e registrado perante a *U.S. Securities & Exchange Commission* e poderão ser livremente negociáveis até o limite máximo permitido nos termos da legislação aplicável. A Oi será responsável por: (i) obter às suas expensas todos os eventuais registros ou dispensas de registro exigidos pela legislação de valores mobiliários dos Estados Unidos da América; (ii) realizar todos os registros, operações de câmbio e cadastramentos necessários perante as autoridades brasileiras; e (iii) arcar com todos e quaisquer tributos ou despesas decorrentes do depósito das ações na custódia do Programa DRs e da correspondente emissão do ADRs.

4.3.4.  **Pagamento de Créditos Concursais Agências Reguladoras.** Os Créditos Concursais Agências Reguladoras Líquidos serão novados por força deste Plano e quitados em 240 (duzentas e quarenta) parcelas mensais, a contar de 30 de junho de 2018, da seguinte forma: (i) da 1ª à 60ª prestação: 0,160% (cento e sessenta milésimos por cento); (ii) da 61ª à 120ª prestação: 0,330% (trezentos e trinta milésimos por cento); (iii) da 121ª à 180ª prestação: 0,500% (quinhentos milésimos por cento); (iv) da 181ª à 239ª prestação: 0,660% (seiscentos e sessenta milésimos por cento); e (v) 240ª prestação: saldo devedor remanescente. As primeiras parcelas serão integralmente pagas através da conversão em renda de valores depositados em dinheiro judicialmente para garantia desses créditos. No mês em que o valor dos depósitos judiciais não for suficiente para pagar a integralidade de uma parcela, tal pagamento será complementado em moeda corrente. A partir

do mês subsequente, a Oi pagará as demais parcelas em moeda corrente.
A partir da segunda parcela, as parcelas mensais serão corrigidas de
acordo com a variação da SELIC, e serão pagas sempre no último Dia Útil
de cada mês. Aos Créditos Concursais Agências Reguladoras Líquidos
serão aplicados os seguintes descontos: (i) 50% (cinquenta por cento) dos
juros; e (ii) 25% (vinte e cinco por cento) de multa de mora.

4.3.4.1. Os Créditos Concursais Agências Reguladoras Ilíquidos, se e
quando liquidados por decisão final transitada em julgada, serão
pagos na forma da **Cláusula 4.3.6.** deste Plano..

4.3.4.2. Na hipótese de superveniência de norma legal que regule forma
alternativa para a quitação dos Créditos Agências Reguladoras
Líquidos ou Ilíquidos, as Recuperandas poderão aderir ao novo
regime, observados os termos e condições previstos no estatuto
social da Oi.

4.3.5. **Pagamento de Créditos de Credores Fornecedores Parceiros.**
Considerando a importância de que seja mantido o fornecimento de bens e
serviços ao GRUPO OI, todos os Credores Fornecedores Parceiros que
escolham a opção de pagamento de seus respectivos Créditos
Quirografários ME/EPP ou Classe III que não decorrentes de empréstimos
ou financiamentos concedidos ao GRUPO OI prevista na presente Cláusula
através da plataforma eletrônica a ser disponibilizada pela Oi no endereço
eletrônico www.recjud.com.br, serão pagos na forma descrita abaixo,
exceto pelo disposto na **Cláusula 4.3.5.3** abaixo:

4.3.5.1. Até o limite de R$150.000,00 (cento e cinquenta mil Reais) (ou o
equivalente em Dólares Norte-Americanos ou Euros), e sempre
observado o limite dos respectivos valores dos Créditos ME/EPP
ou Classe III para os Credores Quirografários ME/EPP ou Classe
III em questão, os Créditos ME/EPP ou Classe III de titularidade
dos Credores Fornecedores Parceiros serão pagos em uma única
parcela, no 20º (vigésimo) Dia Útil após o término do prazo para
a escolha da opção de pagamento de créditos a ser realizada pelo

45

respectivo Credor Quirografário através da plataforma eletrônica a ser disponibilizada pela Oi no endereço eletrônico www.recjud.com.br.

4.3.5.2. O saldo dos Créditos ME/EPP ou Classe III de titularidade dos Credores Fornecedores Parceiros que remanescer após o pagamento realizado nos termos da **Cláusula 4.3.5.1** acima será pago com desconto de 10% (dez por cento) em 04 (quatro) parcelas anuais, iguais e sucessivas, acrescidas de (*i*) TR + 0,5% (meio por cento) ao ano, caso os Créditos ME/EPP ou Classe III de titularidade dos Credores Fornecedores Parceiros sejam em Reais; e (*ii*) 0,5% (meio por cento) ao ano, caso os Créditos ME/EPP ou Classe III de titularidade dos Credores Fornecedores Parceiros sejam em Dólares Norte-Americanos ou em Euros, em qualquer caso incidentes sobre o montante líquido de tributos do saldo remanescente e a contar da Homologação Judicial do Plano ou do Reconhecimento do Plano na Jurisdição do Credor, conforme aplicável, vencendo-se a primeira parcela no último Dia Útil do primeiro ano após o término do prazo para a escolha da opção de pagamento de créditos a ser realizada pelo respectivo Credor Quirografário através da plataforma eletrônica a ser disponibilizada pela Oi no endereço eletrônico www.recjud.com.br e as demais parcelas no mesmo dia e mês dos anos subsequentes.

4.3.5.3. Serão pagos na forma da **Cláusula 4.3.6** abaixo, (i) o Credor Fornecedor Parceiro que, uma vez solicitado por qualquer das Recuperandas, se recusar a fornecer bens e/ou serviços nos mesmos termos e condições praticados até a Data do Pedido pelo respectivo Credor Fornecedor Parceiro para as Recuperandas; e (ii) os créditos de titularidade de Credores Quirografários ME/EPP ou Classe III que não decorrentes de fornecimento de bens e serviços ao Grupo Oi.

**4.3.6.** **Modalidade de Pagamento Geral.** Os Créditos Quirografários (ou os respectivos e eventuais saldos remanescentes) indicados na **Cláusula 4.3.6.1** abaixo serão pagos conforme descrito a seguir:

(a) **Valor Principal:** O valor principal total dos Créditos a serem reestruturados nos termos desta **Cláusula 4.3.6** estará limitado a R$70.000.000.000,00 (setenta bilhões de Reais), subtraído o valor dos Créditos Concursais que forem reestruturados de outra forma nos termos deste Plano, em Reais ou convertidos para Reais conforme Taxa de Cambio Conversão.

(b) **Carência:** período de carência de amortização de principal de 20 (vinte) anos, contados a partir da data da Homologação Judicial do Plano ou do Reconhecimento do Plano na Jurisdição do Credor, conforme aplicável.

(c) **Parcelas:** amortização do principal em 5 (cinco) parcelas anuais, iguais e sucessivas, vencendo-se a primeira no último Dia Útil do prazo de carência referido no item (a) desta **Cláusula 4.3.6**, e as demais no mesmo dia dos anos subsequentes.

(d) **Juros/atualização monetária:**

a. TR ao ano, caso o titular de Créditos Quirografários opte por receber o pagamento de seus respectivos créditos em Reais (ou respectivos e eventuais saldos remanescentes); incidentes a partir da Homologação Judicial do Plano ou do Reconhecimento do Plano na Jurisdição do Credor, conforme aplicável, sendo que o valor total dos juros/atualização monetária acumulados no período será pago somente, e em conjunto, com a última parcela referida no item (c) desta **Cláusula 4.3.6**. No caso dos Credores Concursais direcionados para esta **Cláusula 4.3.6**, o pagamento de seus créditos serão realizados em suas moedas originais.

47

**b.** sem incidência de juros, caso o titular de Créditos Quirografários opte por receber o pagamento de seus respectivos créditos em Dólares Norte-Americanos ou em Euros (ou respectivos e eventuais saldos remanescentes);

**(e)** **Opção de Pré-Pagamento:** A Oi terá a opção de, a seu exclusivo critério, a qualquer tempo, quitar antecipadamente os valores devidos na forma desta **Cláusula 4.3.6**, por meio do pagamento de 15% (quinze por cento) do valor do principal e juros capitalizados até a data de exercício da opção.

**(f)** **Limite de Pagamentos**: Caso o valor total dos Créditos Quirografários que forem reestruturados nos termos desta **Cláusula 4.3.6** supere o valor estabelecido na **Cláusula 4.3.6(a)**, cada Crédito Quirografário será reduzido proporcionalmente (*pro rata*) em relação aos Créditos Quirografários que fazem jus aos pagamentos previstos nesta **Cláusula 4.3.6**, de forma que o valor total a ser pago pelas Recuperandas jamais excederá o limite estabelecido na **Cláusula 4.3.6(a)**. O valor residual dos Créditos Quirografários que excederem o valor estabelecido na **Cláusula 4.3.6(a)** será considerado remido, nos termos do artigo 385 do Código Civil.

4.3.6.1. Exceto se disposto de forma contrária neste Plano, a modalidade geral de pagamento prevista na **Cláusula 4.3.6** se aplica aos Credores Quirografários cujos Créditos Quirografários não possam ser pagos por qualquer das demais modalidades previstas neste Plano, notadamente nas hipóteses de *(i)* serem atingidos os limites previstos para as opções de pagamento estabelecidas nas **Cláusulas 4.3.1.2 e 4.3.1.3** acima e ainda remanescerem saldos de Créditos Quirografários; *(ii)* o Credor Quirografário não indicar tempestivamente a opção de pagamento de seu respectivo Crédito Quirografário, na forma da **Cláusula 4.5** abaixo; *(iii)* o Credor Quirografário não poder se enquadrar nas hipóteses de pagamento previstas nas **Cláusulas 4.3.1.2, 4.3.1.3 e 4.3.3**; *(iv)* o Credor Quirografário Bondholder não

se enquadrar na condição de Bondholder Qualificado prevista neste Plano; (*v*) haver a materialização de Créditos Ilíquidos nos termos da **Cláusula 4.7** abaixo; *(vi)* haver a habilitação de Créditos Retardatários nos termos da **Cláusula 4.9**; *(vii)* haver a majoração de Créditos nos termos da **Cláusula 4.10** abaixo; (*viii*) haver a reclassificação dos Créditos na forma da **Cláusula 4.11**; (*ix*) haver saldo remanescente de Créditos Quirografários Depósitos Judiciais após o levantamento dos respectivos Depósitos Judiciais; ou (*x*) o Credor Fornecedor Parceiro em relação à parcela do seu crédito que não se enquadre na forma de pagamento da **Cláusula 4.3.5** acima.

**4.4.** **Mediação/Conciliação/Acordo com Credores:** Conforme autorizado pelo Juízo da Recuperação Judicial, as RECUPERANDAS ofereceram a todos os Credores Concursais a opção de participar do plano de Mediação/Conciliação/Acordo com o GRUPO OI antes da instalação da Assembleia Geral de Credores. De acordo com o plano de Mediação/Conciliação/Acordo, as RECUPERANDAS se comprometeram a antecipar até R$50.000,00 (cinquenta mil Reais) dos seus Créditos, com o pagamento em 02 (duas) parcelas da seguinte forma: (i) 90% (noventa por cento) do valor total da parcela do respectivo Crédito a ser pago em até 10 (dez) Dias Úteis após a assinatura do termo de acordo no âmbito da Mediação/Conciliação/Acordo; e (ii) 10% (dez por cento) remanescentes do valor total da parcela do respectivo Crédito a ser pago em até 10 (dez) dias após a Homologação Judicial do Plano ou do Reconhecimento do Plano na Jurisdição do Credor, conforme aplicável.

**4.4.1.** Para os Credores Concursais que decidiram participar do plano de Mediação/Conciliação/Acordo com o GRUPO OI, as RECUPERANDAS cumprirão os termos previstos na **Cláusula 4.4** acima, devendo depositar na conta indicada pelo respectivo Credor o valor total da segunda parcela, no montante equivalente a 10% (dez por cento) do montante de até R$50.000,00 (cinquenta mil Reais) em até 10 (dez) dias após a Homologação Judicial do Plano ou do Reconhecimento do Plano na Jurisdição do Credor, conforme aplicável.

49

4.4.2. Caso o Credor Concursal que decidiu participar do plano de Mediação/Conciliação/Acordo com o GRUPO OI seja titular de um Crédito Concursal em montante superior a R$50.000,00 (cinquenta mil Reais), as RECUPERANDAS efetuarão o pagamento do saldo remanescente do respectivo Crédito Concursal de acordo com as condições aplicáveis à respectiva classe de credores e com a opção escolhida pelo Credor Concursal, se aplicável.

4.5. **Escolha de Opção de Pagamento.** Para fins do disposto na **Cláusula 4**, os Credores Concursais deverão, no prazo de até 20 (vinte) dias corridos contados da Homologação Judicial do Plano, escolher entre as opções de pagamento de seus respectivos créditos referidas neste Plano através da plataforma eletrônica a ser disponibilizada pela Oi no endereço eletrônico www.recjud.com.br, bem como informar os dados da conta bancária na qual deverá ser realizado o pagamento, conforme o caso, não se responsabilizando as RECUPERANDAS por qualquer desconformidade com a escolha e informações fornecidas através da plataforma eletrônica a ser disponibilizada pela Oi no endereço eletrônico www.recjud.com.br, ou pela escolha intempestiva, hipótese na qual estarão as RECUPERANDAS eximidas da obrigação de realizar o respectivo pagamento e será aplicado o disposto na **Cláusula 13.4.1** abaixo.

4.5.1. Exceto se disposto de forma contrária neste Plano, em especial o disposto na **Cláusula 4.5.1.1** abaixo, considerando o caráter alternativo das opções de pagamento estabelecidas na **Cláusula 4** acima, a escolha de cada Credor Concursal deverá necessariamente se restringir a apenas uma das referidas opções, com exceção de Credores Financeiros que detenham instrumentos de crédito de naturezas diferentes.

4.5.1.1. Os agentes, que representem mais de um Credor Concursal, poderão escolher diferentes opções de pagamento aplicáveis aos seus representados, sendo certo que cada Credor Concursal representado não poderá voluntariamente receber o pagamento de seus respectivos Créditos Concursais, através de mais de uma opção de pagamento, ressalvado o disposto na **Cláusula 4.5.1**.

**4.5.2.** A escolha manifestada pelo respectivo Credor Concursal na plataforma eletrônica a ser disponibilizada pela Oi no endereço eletrônico www.recjud.com.br será irrevogável e irretratável, não podendo ser posteriormente alterada por qualquer razão, a menos que haja expressa concordância das RECUPERANDAS.

**4.5.3.** O Credor Concursal que estiver impossibilitado ou não conseguir realizar a escolha da opção de pagamento de seus respectivos créditos através da plataforma eletrônica a ser disponibilizada pela Oi no endereço eletrônico www.recjud.com.br poderá enviar a escolha da opção de pagamento pelo correio para a caixa postal da Oi nº 532, CEP 20.010-974, Rio de Janeiro-RJ, devendo informar os dados da conta bancária na qual deverá ser realizado o pagamento de seu respectivo Crédito.

**4.5.4.** O Credor Concursal que não realizar a escolha da opção de pagamento de seus respectivos créditos no prazo e formas estabelecidos neste Plano receberá seu respectivo Crédito Concursal na forma prevista na **Cláusula 4.3.6** acima.

**4.5.5.** O disposto nas **Cláusulas 4.5.3 e 4.5.4** não se aplicará aos (i) Credores Quirografários Bondholders Qualificados e (ii) Credores Quirografários Bondholders Não-Qualificados com créditos em montante acima de R$50.000,00 (cinquenta mil Reais), cujas escolhas entre as opções de pagamento para fins desta **Cláusula 4.5** somente serão consideradas válidas caso (*x*) o respectivo Credor Quirografário Bondholder Qualificado ou Credor Quirografário Bondholder Não-Qualificado tenha procedido perante o Juízo da Recuperação ao processo de individualização dos respectivos Créditos Quirografário Bondholder Qualificado ou Créditos Quirografário Bondholder Não-Qualificado, conforme procedimento estipulado pela Decisão Bondholder; e, cumulativamente, (*y*) GRUPO OI receba a (i) Notificação Opção de Pagamento, conforme modelo previsto no **Anexo 4.5.5**; e (ii) cópia dos documentos que evidenciam a titularidade e montante dos *bonds* detidos pelo respectivo Credor Quirografário Bondholder Qualificado ou Credor Quirografário Bondholder Qualificado, conforme individualizados perante o Juízo da Recuperação em observação

à Decisão Bondholder. Os Bondholders que já tiverem formalizado seu direito de voz, voto e petição nos termos da Decisão Bondholder e foram, portanto, autorizados a votar na Assembleia de Credores, estão dispensados de enviar a documentação descrita no item (*x*) e (*y*) acima, sem prejuízo do envio da Notificação Opção de Pagamento, desde que declarem ao GRUPO OI que não houve alteração no valor dos seus respectivos *bonds* ou, tendo havido alguma alteração, enviem cópia do *Screen Shot* necessário para comprovar o valor atualizado dos respectivos Bonds.

**4.6.** **Créditos Intercompany**:

**4.6.1.** **Créditos Intercompany em Reais**: As RECUPERANDAS poderão convencionar forma alternativa de extinção dos Créditos Intercompany em Reais nos seus termos e condições originalmente contratados, inclusive, mas não se limitando, ao encontro de contas na forma da lei, em até 60 (sessenta) dias contados da Homologação Judicial do Plano. Os Créditos Intercompany em Reais remanescentes serão quitados a partir de 20 (vinte) anos após o término do pagamento dos Créditos previsto na forma da **Cláusula 4.3.6** conforme abaixo:

(a) **Parcelas:** amortização do principal em 5 (cinco) parcelas anuais, iguais e sucessivas, vencendo-se a primeira no último Dia Útil do término do prazo previsto na **Cláusula 4.6.1**, e as demais no mesmo dia dos anos subsequentes.

(b) **Juros/atualização monetária:** TR ao ano incidentes a partir da Homologação Judicial do Plano, sendo que o valor total dos juros/atualização monetária acumulados no período será pago somente, e em conjunto, com a última parcela referida no item (a) desta **Cláusula 4.6.1**.

(c) Os Créditos Intercompany reestruturados na forma da **Cláusula 4.6.1** poderão ser quitados, a critério da Oi, mediante formas alternativas de extinção e/ou pagamento, inclusive com o encontro de contas na

forma da lei ou alteração das condições de pagamento previstas nesta **Cláusula 4.6.1** a fim de ajustar o fluxo de caixa das RECUPERANDAS para cumprimento das obrigações assumidas neste Plano.

**4.6.2.** **Créditos Intercompany em Dólares Norte-Americanos ou Euros**: As RECUPERANDAS quitarão os Créditos Intercompany denominados em Dólares Norte-Americanos ou em Euros, a partir de 20 (vinte) anos após o término do pagamento dos Créditos previsto na forma da **Cláusula 4.3.6**, conforme abaixo:

**(a)** **Parcelas:** amortização do principal em 5 (cinco) parcelas anuais, iguais e sucessivas, vencendo-se a primeira no último Dia Útil do término do prazo previsto na **Cláusula 4.6.2**, e as demais no mesmo dia dos anos subsequentes.

**(b)** **Juros/atualização monetária:** sem incidência de juros.

**(c)** Os Créditos Intercompany reestruturados na forma da **Cláusula 4.6.2** poderão ser quitados, a critério da Oi, mediante formas alternativas de extinção e/ou pagamento, inclusive, mas não se limitando, ao encontro de contas na forma da lei ou alteração das condições de pagamento previstas nesta **Cláusula 4.6.2** a fim de ajustar o fluxo de caixa das RECUPERANDAS para cumprimento das obrigações assumidas neste Plano.

**4.7.** **Créditos Ilíquidos.** Os Créditos Ilíquidos se sujeitam integralmente aos termos e condições deste Plano e aos efeitos da Recuperação Judicial. Uma vez materializados e reconhecidos por decisão judicial ou arbitral que os tornem líquidos, transitada em julgado, ou por acordo entre as partes, inclusive fruto de Mediação, desde que com base em critérios estabelecidos pela jurisprudência do Superior Tribunal de Justiça ou do Supremo Tribunal Federal, os Créditos Ilíquidos serão pagos na forma prevista na **Cláusula 4.3.6**, exceto quando disposto de forma distinta neste Plano.

**4.8.**    A Oi poderá realizar, após a Homologação Judicial do Plano, procedimento de Mediação, a ser implementado com o propósito específico de realizar acordos de modo a tornar líquidos Créditos atualmente Ilíquidos.

**4.9.**    **Créditos Retardatários.** Na hipótese de reconhecimento de Créditos por decisão judicial ou arbitral, transitada em julgado, ou acordo entre as partes, posteriormente à data de apresentação deste Plano ao Juízo da Recuperação Judicial, serão eles considerados Créditos Retardatários e deverão ser pagos de acordo com a classificação e critérios estabelecidos neste Plano para a classe na qual os Créditos Retardatários em questão devam ser habilitados e incluídos, sendo certo que, na hipótese de os Créditos Retardatários envolverem Créditos Quirografários, seus respectivos pagamentos deverão ser realizados na forma prevista na **Cláusula 4.3.6**.

**4.10.**    **Modificação do Valor de Créditos.** Na hipótese de modificação do valor de qualquer dos Créditos já reconhecidos e inseridos na Relação de Credores do Administrador Judicial por decisão judicial ou arbitral, transitada em julgado, ou acordo entre as partes, o valor alterado do respectivo Crédito deverá ser pago nos termos previstos neste Plano, sendo certo que, caso determinado Crédito Quirografário tenha sido majorado, a parcela majorada do Crédito Quirografário em questão deverá ser paga nos termos da **Cláusula 4.3.6**.

**4.11.**    **Reclassificação de Créditos.** Caso, por decisão judicial ou arbitral, transitada em julgado, ou acordo entre as partes, seja determinada a reclassificação de qualquer dos Créditos para Créditos Quirografários, o Crédito reclassificado deverá ser pago nos termos e condições previstos na **Cláusula 4.3.6**.

**5.**    RECURSOS PARA PAGAMENTO DE CREDORES

**5.1.**    **Alienação de Ativos.** Após a Aprovação do Plano, como forma de levantamento de recursos, o GRUPO OI poderá promover, independentemente de nova aprovação dos Credores Concursais, a alienação dos bens do ativo permanente (não circulante) das RECUPERANDAS listados no **Anexo 3.1.3** a este Plano e dos Ativos Não Relevantes, desde que aprovada pela Conselho de Administração Transitório ou pelo Novo Conselho de Administração, conforme o momento, e dos Ativos Relevantes, desde que aprovada

pela Conselho de Administração Transitório ou pelo Novo Conselho de Administração, conforme o momento, e aprovada pelo Juízo da Recuperação Judicial.

> 5.1.1. Com o objetivo de gerar liquidez e proporcionar uma melhora em seu fluxo de caixa, as RECUPERANDAS empreenderão seus melhores esforços com o objetivo de se beneficiarem de oportunidades de participar de processos de consolidação do mercado de telecomunicações brasileiro e de alienação de ativos, inclusive decorrentes de eventuais alterações no modelo regulatório, sempre observado o disposto na **Cláusula 5.1** e o interesse das próprias RECUPERANDAS, sem prejuízo do cumprimento de obrigações ainda pendentes perante credores, objeto do Plano de Recuperação Judicial.

5.2.   **Geração de Caixa Excedente (_Cash Sweep_)**. Durante os 5 (cinco) primeiros exercícios fiscais contados da data da Homologação Judicial do Plano, o GRUPO OI destinará o montante equivalente a 100% da Receita Líquida da Venda de Ativos que exceder USD200.000.000,00 (duzentos milhões de Dólares Norte-Americanos) para investimentos em suas atividades. A partir do 6º (sexto) exercício fiscal contado da data da Homologação Judicial do Plano, o GRUPO OI destinará aos seus Credores Quirografários e Credores com Garantia Real o montante equivalente a 70% (setenta por cento) do Saldo de Caixa que exceder o Saldo do Caixa Mínimo.

> 5.2.1. **Distribuição dos recursos do Cash Sweep**. A distribuição dos valores relativos ao _Cash Sweep_ descritos na **Cláusula 5.2** acima ocorrerá de forma proporcional (_pro rata_) aos pagamentos previstos nas **Cláusulas 4.2, 4.3.1.2 e 4.3.1.3**, conforme aplicável, com a consequente redução proporcional do saldo dos respectivos créditos e limitado ao valor do crédito de cada Credor com Garantia Real e Quirografário conforme constante da Relação de Credores do Administrador Judicial. O saldo remanescente dos Créditos com Garantia Real e Quirografários após o pagamento decorrente do Cash Sweep será recalculado e ajustado nos termos do presente Plano e seu pagamento observará o disposto na **Cláusula 4.2**, **Cláusula 4.3** e suas subcláusulas, conforme o caso.

5.3.   **Formas de Financiamento Adicionais**

**5.3.1.** Além dos recursos obtidos com o Aumento de Capital – Novos Recursos, a Companhia poderá buscar, caso necessário, em até 2 (dois) anos da data da Homologação Judicial do Plano, novos recursos no mercado de capitais, no montante total de até R$ 2.500.000.000,00 (dois bilhões e quinhentos milhões de Reais).

**5.3.1.1.** Estas captações serão realizadas em condições atrativas para viabilizar a capitalização dos recursos necessários à consecução das atividades do GRUPO OI, podendo ser realizadas, entre outras formas, mediante a emissão de pública de ações ordinárias ou de novos instrumentos de dívida, incluindo dívidas com garantia.

**5.3.2.** Com a aprovação do Plano e a readequação de sua estrutura de capital, as RECUPERANDAS envidarão os seus melhores esforços para a obtenção de abertura de novas linhas de crédito para importação de equipamentos no valor potencial de R$ 2.000.000.000,00 (dois bilhões de Reais), inclusive à luz da indicação preliminar recebida de assessor financeiro de agências de crédito à exportação (*Export Credit Agencies*).

**6.    AUMENTO DE CAPITAL – NOVOS RECURSOS**

**6.1. Aumento de Capital**. Diante das necessidades de novos recursos para retomada de investimentos em CAPEX e implementação do seu plano de negócios, o Grupo Oi obriga-se a realizar na forma deste Plano, do Contrato de Backstop e observada a legislação aplicável, tão logo quanto possível após a conclusão do Aumento de Capital - Capitalização de Créditos previsto na **Cláusula 4.3.3** e em qualquer caso até 28 de fevereiro de 2019, o Aumento de Capital - Novos Recursos, observado o seguinte:

**(a) Estrutura do Aumento de Capital.** O Aumento de Capital - Novos Recursos será realizado por meio da emissão privada de Novas Ações Ordinárias – II de emissão da Oi;

**(b) <u>Montante do Aumento de Capital</u>**: O montante total do Aumento de Capital será de **R$4.000.000.000,00** (quatro bilhões de Reais), conforme estabelecido neste Plano e no Contrato de Backstop;

**(c) <u>Preço de Emissão</u>**. O preço de emissão das Novas Ações Ordinárias – II no Aumento de Capital – Novos Recursos será calculado pela divisão do valor de **R$ 3.000.000.000,00** (três bilhões de Reais) pelo número de ações da Oi em circulação no Dia Útil imediatamente anterior ao Aumento de Capital Novos Recursos, ressalvados eventuais ajustes no preço de emissão conforme previsto no Contrato de Backstop;

**(d) <u>Registro do Aumento de Capital – Novos Recursos</u>**: A Oi registrará as Novas Ações Ordinárias – II emitidas em decorrência da implementação do Aumento de Capital – Novos Recursos perante a *U.S. Securities & Exchange Commission*, de forma que os acionistas residentes fora do país possam participar do referido Aumento de Capital – Novos Recursos, livremente negociar seus direitos de subscrição e adquirir Novas Ações Ordinárias – II sob a forma de ADRs, por meio do Programa de DRs de ações ordinárias patrocinado pela Oi e registrado perante a *U.S. Securities & Exchange Commission*. A Oi será responsável por: (i) obter às suas expensas todos os eventuais registros ou dispensas de registro exigidos pela legislação de valores mobiliários dos Estados Unidos da América; (ii) realizar todos os registros, operações de câmbio e cadastramentos necessários perante as autoridades brasileiras; e (iii) arcar com todos e quaisquer tributos ou despesas decorrentes do depósito das ações na custódia do Programa DRs e da correspondente emissão do ADRs.

**(e) <u>Direito de Preferência</u>.** Nos termos do art. 171, §2º da Lei 6.404/76, os acionistas da Oi por ocasião do Aumento de Capital - Novos Recursos terão direito de preferência para a subscrição das ações emitidas; e

**(f) <u>Condições Precedentes – Aumento de Capital – Novos Recursos</u>:** O Aumento de Capital Novos Recursos ocorrerá tão logo quanto possível, até no máximo 28 de fevereiro de 2019, mas desde que verificadas ou expressa e formalmente dispensadas pelos Investidores Backstoppers, as

57

Condições Precedentes para o Aumento de Capital – Novos Recursos,
conforme estabelecidas no Contrato de Backstop.

6.1.1.1. Após o término do período de direito de preferência do
Aumento de Capital - Novos Recursos, as eventuais sobras de
ações serão rateadas entre os acionistas que manifestarem
interesse na reserva de sobras no respectivo boletim de
subscrição.  O Acionista que desejar subscrever sobras poderá,
ainda, no ato de subscrição das sobras a que fizer jus, solicitar
um número adicional de sobras de ações não subscritas, sujeito à
disponibilidade de sobras. Caso o total de ações objeto de
pedidos de sobras adicionais exceda ao montante de sobras
disponíveis, será realizado o rateio entre os Acionistas, que
tiverem solicitado reserva de sobras adicionais, na proporção
prevista no Contrato de Backstop. A colocação integral das
sobras de ações será garantida pelos Investidores Backstoppers,
nos termos do Contrato de Backstop.

6.1.1.2. **Aprovação e Condições para o Aumento de Capital Mediante
Novos Recursos:** Até 15 de janeiro de 2019, o GRUPO OI deverá
chamar assembleia geral de acionistas e/ou reunião do Conselho
de Administração, conforme o caso, para aprovação da emissão
das Novas Ações Ordinárias – II, para fins de cumprimento deste
Plano e do Contrato de Backstop. Havendo qualquer empecilho a
essa aprovação, ele poderá ser suprido por decisão do Juízo da
Recuperação Judicial, sem prejuízo aos direitos e medidas dos
Investidores Backstoppers para execução específica das
obrigações relacionadas ao Aumento de Capital – Novos
Recursos contratadas neste Plano e no Contrato de Backstop.

6.1.1.3. **Prêmio de Compromisso**: Em função do compromisso firme
prestado pelos Investidores Backstoppers de garantir a
subscrição da totalidade do Aumento de Capital Novos Recursos
nos termos do Contrato de Backstop, a Oi obriga-se a pagar aos
Investidores Backstoppers, nas condições previstas no Contrato

de Backstop, proporcionalmente ao valor do respectivo compromisso, o prêmio de compromisso contratado nos termos do Contrato de Backstop correspondente a (i) 8% (oito por cento) do montante garantido pelos Investidores Backstoppers, devido e pagável em Dólares Norte-Americanos; ou (ii) 10% (dez por cento) do montante garantido pelos Investidores Backstoppers, devido e pagável em novas ações ordinárias emitidas pela Oi, a critério dos Investidores Backstoppers, observado o disposto nas **Cláusulas 6.1.1.3.1 e 6.1.1.3.2** abaixo e o Contrato de Backstop, ressalvado que os valores do prêmio de compromisso podem ser majorados, nos termos e condições do Contrato de Backstop, caso o Grupo Oi exerça a opção de extensão do período de validade do compromisso de Backstop.

6.1.1.3.1.    Caso o preço médio ponderado por volume das ações ordinárias de emissão da Oi nos 30 (trinta) dias que antecederem o Aumento de Capital Novos Recursos seja superior a **R$10,00** (dez Reais) por ação, a escolha da forma de pagamento do Prêmio de Compromisso será da Oi; caso seja inferior, a escolha será feita individualmente por cada um dos Investidores Backstoppers, conforme estabelecido no Contrato de Backstop.

6.1.1.3.2.    Caso haja agrupamento de ações, o montante de **R$ 10,00** (dez reais) por ação deverá ser multiplicado pela quantidade de ações que forem agrupadas em cada nova ação. Da mesma maneira, caso haja desmembramento de ações, o montante de **R$ 10,00** (dez reais) por ação deverá ser dividido pela quantidade de ações objeto de desmembramento para cada ação antiga da Oi.

6.1.1.3.3.    Para fins do pagamento do Prêmio de Compromisso em ações, o valor das ações a serem entregues aos Investidores Backstoppers será o seu preço de emissão no Aumento de

Capital – Novos Recursos, conforme estabelecido no Contrato de Backstop.

**6.1.1.3.4.** **Pagamento do Prêmio de Compromisso**: As RECUPERANDAS declaram e reconhecem para os fins de direito que o Prêmio de Compromisso é devido pelas Recuperandas nos termos do Contrato de Backstop. As RECUPERANDAS obrigam-se por este Plano, em caráter irrevogável e irretratável, a pagar o Prêmio de Compromisso na data da conclusão do Aumento de Capital - Novos Recursos ou em qualquer caso de descumprimento do Contrato de Backstop pelas RECUPERANDAS, conforme estabelecido no Contrato de Backstop.

**7.** **REORGANIZAÇÃO SOCIETÁRIA**

**7.1.** Além das operações de reorganização societária descritas no **Anexo 7.1**, as RECUPERANDAS poderão realizar operações de reorganização societária, tais como cisão, fusão, incorporação de uma ou mais sociedades, transformação, dissolução ou liquidação entre as próprias RECUPERANDAS e/ou quaisquer de suas Afiliadas, sempre com o objetivo de otimizar as suas operações e incrementar os seus resultados, contribuindo assim para o cumprimento das obrigações constantes deste Plano, desde que aprovadas pelo Conselho de Administração Transitório ou o Novo Conselho de Administração, conforme o momento e as regras de governança da **Cláusula 9**.

**8.** **REUNIÃO DE CREDORES**

**8.1.** **Reunião de Credores.** Dadas as especificidades próprias dos Credores Quirografários Bondholders Qualificados, determinadas matérias que afetem apenas os direitos dos Credores Quirografários Bondholders Qualificados, conforme estabelecido neste Plano, serão deliberadas por eles em Reunião de Credores, observados os termos do **Anexo 8.1**.

**9.** **GOVERNANÇA DA OI DURANTE A RECUPERAÇÃO JUDICIAL**

**9.1.** **Governança Corporativa.** A administração do GRUPO OI deverá observar, na condução das suas atividades, as melhores práticas de governança corporativa, além de todos os termos, condições e limitações constantes deste Plano e dos demais instrumentos relacionados com a Recuperação Judicial.

**9.1.1.** **Regras Especiais de Transição**. A partir da Aprovação do Plano, serão aplicáveis as seguintes regras especiais de transição de governança das RECUPERANDAS, com prevalência sobre as disposições de seus respectivos Estatutos Sociais, de forma a conferir estabilidade institucional aos seus órgãos sociais e administradores para fins de cumprimento deste Plano, nos seguintes termos:

(i)      **Diretoria - Estabilização**: Durante o Período de Transição (i) os Diretores Transição serão (x) mantidos nos mesmos cargos e funções em que atuam nesta data, com a manutenção e renovação dos compromissos contratuais atuais, incluindo, mas sem limitar, as indenizações previstas contratualmente atualmente existentes e vedada a sua destituição e alteração das competências dos Diretores Transição, (y) exclusivamente responsáveis pela execução e implementação do Plano até o encerramento da Recuperação Judicial, observado o disposto no item (iii) abaixo; e (ii) os Diretores Conselheiros exercerão seus respectivos cargos com as atribuições operacionais a serem fixadas em reunião da Diretoria da Oi, devendo se abster de interferir, direta ou indiretamente, de qualquer modo em questões relacionadas à Recuperação Judicial, inclusive e especialmente em relação à implementação do Plano, podendo ser destituídos a qualquer tempo pelo Conselho de Administração Transitório ou Novo Conselho de Administração, conforme o caso.

(ii)      **Diretoria - Operações**: As RECUPERANDAS contratarão em até 60 (sessenta) Dias Úteis após a Aprovação do Plano o Diretor de Operações, que ficará responsável pela preparação da Oi em sua nova fase de transformação e pela ação integrada das áreas comercial e operacional das RECUPERANDAS. O Diretor de Operações não poderá ser destituído ou substituído durante o Período de Transição.

61

a. **Processo de Seleção do Diretor de Operações**: As RECUPERANDAS deverão contratar a Consultoria de RH em até 15 (quinze) Dias Úteis após a Aprovação do Plano. A Consultoria de RH deverá apresentar ao Conselho de Administração Transitório, no prazo de 30 (trinta) Dias Úteis após a sua contratação, uma lista de potenciais candidatos ao cargo de Diretor de Operações. O Conselho de Administração Transitório deverá apresentar ao atual Diretor Presidente, no prazo de 10 (dez) Dias Úteis, uma lista tríplice de potenciais candidatos ao cargo de Diretor de Operações. O Diretor Presidente selecionará o Diretor de Operações no prazo de 5 (cinco) Dias Úteis e as RECUPERANDAS contratarão imediatamente o Diretor de Operações.

(iii)    **Nova Diretoria**: Após o Período de Transição, o Conselho de Administração Transitório ou Novo Conselho de Administração, conforme o caso, poderá deliberar livremente sobre a composição da Diretoria das RECUPERANDAS, observado que o atual Diretor Presidente e Diretor de Finanças e Relações com Investidores serão reconduzidos e mantidos até o encerramento da Recuperação Judicial aos cargos de Diretor Jurídico e de Diretor sem designação específica com funções administrativo-financeiras, com as mesmas atribuições e competências atuais, estrutura administrativa, alçadas de decisão e com a manutenção e renovação dos compromissos contratuais atuais, incluindo, mas sem limitar, às indenizações previstas contratualmente. Na hipótese de destituição do Diretor Jurídico e do Diretor sem designação específica com funções administrativo-financeiras pelo Conselho de Administração Transitório ou Novo Conselho de Administração, conforme o caso, antes do encerramento da Recuperação Judicial, as RECUPERANDAS obrigam-se por este Plano a cumprir integralmente os pacotes de remuneração atualmente existentes.

9.2.    **Conselho de Administração Transitório**. De modo a assegurar o efetivo cumprimento do objeto social das RECUPERANDAS e das medidas previstas neste Plano e sujeito às aprovações regulamentares aplicáveis, a partir da Aprovação do Plano e até a

ulterior investidura dos membros do Novo Conselho de Administração,  na forma deste
Plano,  devidamente  aprovada  pelas  autoridades  regulatórias  competentes,  as
RECUPERANDAS  terão  um  Conselho  de  Administração  Transitório  composto  por  um
total de 9 (nove) membros titulares, sem suplentes, identificados no **Anexo 9.2.**, sendo:

> - 6 (seis) membros do atual Conselho de Administração;

> - 3 (três) novos membros, os quais serão empossados por força e operação
> deste Plano, nos termos do artigo 50, IV da LRF.

**9.2.1.**  As deliberações do Conselho de Administração Transitório obedecerão ao
disposto no artigo 30 do Estatuto Social da Oi, sendo todas as deliberações
tomadas  por  maioria  simples  dos  presentes.  Na  hipótese  de  qualquer
impasse nas Deliberações do Conselho de Administração Transitório, o
Presidente  do  Conselho  de  Administração  Transitório  terá  o  voto  de
qualidade, de acordo com o artigo 30 do Estatuto Social da Oi.

**9.2.2.**  Os demais membros do atual Conselho de Administração, que não sejam
nomeados como membros do Conselho de Administração Transitório nos
termos da **Clausula 9.2** acima, sejam eles titulares ou suplentes, terão
todas  as  suas  funções,  inclusive  em  Comitês  de  assessoramento  à
administração  da  OI,  suspensas,  não  podendo  participar  de  qualquer
reunião  do  Conselho  de  Administração  Transitório  e  (a)  serão
formalmente substituídos por força deste Plano, nos termos do artigo 50,
IV da LRF, após a posse do Novo Conselho de Administração, na forma
deste Plano, ou (b) terão seus mandatos encerrados por decurso do prazo,
o que ocorrer primeiro.

**9.2.3.**  A  OI  envidará  seus  melhores  esforços  para  obter  as  aprovações
regulatórias necessárias à efetiva posse dos membros do Conselho de
Administração  Transitório  que  não  compõem  o  atual  Conselho  de
Administração.

**9.2.4.** Os membros do Conselho de Administração Transitório não poderão ser destituídos até a investidura dos membros do Novo Conselho de Administração.

**9.3.** **Novo Conselho de Administração.** Em até 45 (quarenta e cinco) Dias Úteis após a conclusão do Aumento de Capital Capitalização de Créditos, por força e operação deste Plano, na forma do artigo 50, IV da LRF, as RECUPERANDAS terão um Novo Conselho de Administração, formado por 11 (onze) membros titulares, sem suplentes, constantes da Chapa Consensual, com mandato de 2 (dois) anos, cuja eleição será ratificada em sede de Assembleia Geral de Acionistas convocada para essa finalidade, na forma da Lei das S.A. e do Estatuto Social da OI, em cumprimento a este Plano.

**9.3.1.** **Formação da Chapa Consensual**. A Chapa Consensual para o Novo Conselho de Administração será formada exclusivamente por conselheiros independentes, conforme definido no Estatuto Social da OI, observado que 1 (um) dos Conselheiros Independentes será o Sr. Eleazar de Carvalho Filho. Os demais conselheiros independentes e seus suplentes serão escolhidos pelo voto da maioria simples do Conselho de Administração Transitório. A Consultoria de RH deverá apresentar ao Conselho de Administração Transitório, em até 90 (noventa) Dias Úteis após a Aprovação do Plano, lista contendo ao menos 22 (vinte e dois) candidatos a membros do Novo Conselho de Administração, para seleção dos 10 (dez) conselheiros independentes e formação da Chapa Consensual.

**9.3.2.** **Eleição do Novo Conselho de Administração**. Imediatamente após e em qualquer caso em até 5 (cinco) Dias Úteis após a conclusão do Aumento de Capital Capitalização de Créditos, o Conselho de Administração Transitório deverá convocar Assembleia Geral de Acionistas para eleição e investidura do Novo Conselho de Administração e seus respectivos conselheiros na forma da Chapa Consensual.

**9.4.** As deliberações do Novo Conselho de Administração obedecerão ao disposto no artigo 30 do Estatuto Social da OI, sendo tomadas por maioria simples dos presentes. Na hipótese de qualquer impasse nas Deliberações do Novo Conselho de

Administração, o Presidente do Novo Conselho de Administração terá o voto de qualidade, de acordo com o artigo 30 do Estatuto Social da Oi.

**9.5.**    Os membros do Novo Conselho de Administração não poderão ser destituídos, exceto por erro grosseiro, dolo, culpa grave, abuso de mandato ou violação dos respectivos deveres fiduciários, na forma da legislação aplicável.

**9.6.**    Na hipótese de vacância observar-se-á o disposto no artigo 150 da Lei das S.A.

**9.7.    Conselho de Administração**. Após o encerramento do mandato do Novo Conselho de Administração na forma deste Plano, poderá ser convocada nova Assembleia Geral de Acionistas para deliberação e eleição de novos membros para o conselho de administração da OI, autorizada a recondução, observado o disposto no Estatuto Social da Oi e na Lei das S.A.

**9.8.    Curso normal das atividades.**    As RECUPERANDAS e sua administração comprometem-se a conduzir os negócios do Grupo Oi de acordo com o curso ordinário de suas operações e com o previsto neste Plano até a investidura do Novo Conselho de Administração.

**9.9.    Obrigações de Fazer e Não-Fazer:** Durante o Período de Transição, as RECUPERANDAS e suas administrações, incluindo a Diretoria atual e o Conselho de Administração Transitório obrigam-se a fazer e a não-fazer o disposto no **Anexo** Erro! Fonte de referência não encontrada..

**10.    OBRIGAÇÕES ADICIONAIS**

**10.1.    Restrição a Pagamentos de Dividendos**.

> **10.1.1.** Até o 6º (sexto) ano da data de Homologação Judicial do Plano, as RECUPERANDAS não poderão declarar ou efetuar o pagamento de qualquer dividendo, retorno de capital ou realizar qualquer outro pagamento ou distribuição sobre (ou relacionado) às ações de suas emissões (incluindo

qualquer pagamento em relação a qualquer fusão ou consolidação envolvendo qualquer RECUPERANDA).

**10.1.1.1.** Estão exceptuados das restrições descritas na **Cláusula 10.1.1** acima, a declaração ou pagamento de:

**(a)** dividendos, retorno de capital ou outras distribuições exclusivamente de uma RECUPERANDA para outra RECUPERANDA;

**(b)** pagamentos por qualquer RECUPERANDA para acionistas dissidentes de acordo com a legislação aplicável realizados após a data da Homologação Judicial do Plano; ou

**(c)** qualquer pagamento de dividendos realizado de acordo com este Plano.

**10.1.2.** Após o 6º (sexto) aniversário da data de Homologação Judicial do Plano, conforme aplicável, as Recuperandas estarão autorizadas a declarar ou efetuar o pagamento de qualquer dividendo, retorno de capital ou realizar qualquer outro pagamento ou distribuição sobre (ou relacionado) às ações de suas emissões (incluindo qualquer pagamento em relação a qualquer fusão ou consolidação envolvendo as Recuperandas) somente se o quociente dívida líquida consolidada da Oi (isto é, Créditos Financeiros, deduzidos de Caixa, acrescido dos créditos Anatel) / EBITDA do exercício social encerrado imediatamente anterior à declaração ou do pagamento, for igual ou inferior a 2 (dois). Após a realização do Aumento de Capital com Capitalização de Créditos e do Aumento de Capital Novos Recursos, a realização de pagamentos de dividendos, retorno de capital ou qualquer outro pagamento ou distribuição sobre (ou relacionado) às ações de suas emissões (incluindo qualquer pagamento em relação a qualquer fusão ou consolidação envolvendo qualquer Recuperanda), será autorizada se o quociente dívida financeira líquida consolidada da Oi (isto é, Créditos Financeiros, deduzidos de Caixa) / EBITDA do exercício social encerrado imediatamente anterior à declaração ou pagamento for igual ou inferior a

2 (dois), sendo certo que não haverá qualquer restrição à distribuição de dividendos após o integral pagamento dos Créditos Financeiros.

> 10.1.2.1. Estão excetuados das restrições descritas na **Cláusula 10.1.2** acima, a declaração ou pagamento de:

> > **(a)** dividendos, retorno de capital ou outras distribuições exclusivamente de uma RECUPERANDA para outra RECUPERANDA;

> > **(b)** pagamentos por qualquer RECUPERANDA para acionistas dissidentes de acordo com a legislação aplicável realizados após a data da Homologação Judicial do Plano; ou

> > **(c)** qualquer pagamento de dividendos realizado de acordo com este Plano ou determinado pela legislação aplicável, incluindo o dividendo obrigatório.

**10.2.** **Suspensão de Obrigações**. Começando no dia de um Evento de Suspensão de Obrigações e terminando em uma Data de Reversão (conforme definido abaixo) (para fins desta cláusula, referido período denominado "Período de Suspensão"), o Grupo Oi: (i) estará desobrigado a realizar resgate anual antecipado com Geração de Caixa Excedente, na forma da **Cláusula 5.2**; e (ii) poderá realizar pagamento de dividendos livre de qualquer restrição prevista na **Cláusula 10.1** deste Plano (para fins desta cláusula, "Obrigações Suspensas").

> 10.2.1. Em qualquer período de tempo, caso 2 (duas) dentre as seguintes Agências de Rating (Standard and Poors, Moodys ou Fitch Ratings) classifiquem a Oi com grau de investimento e, nenhum descumprimento tenha ocorrido, as obrigações listadas na **Cláusula 10.2** estarão suspensas (para fins desta Cláusula, "Evento de Suspensão de Obrigações"). Se em qualquer data subsequente (para fins desta Cláusula, "Data de Reversão"), 1 (uma) ou ambas as Agências de Rating cancelar os ratings de grau de investimento ou reduzir os ratings da Oi abaixo de grau de investimento, as obrigações suspensas voltam a ser aplicáveis.

**10.3.    Aumento do Capital Autorizado.** Como forma de possibilitar a aprovação das emissões de ações e bônus de subscrição previstas neste Plano independentemente de reforma estatutária, a Oi se compromete a convocar, assim que possível após a Homologação Judicial do Plano, assembleia geral de acionistas para deliberar sobre o aumento do limite do seu capital autorizado em quantidade suficiente para fazer frente a tais emissões, se necessário for. Se houver qualquer empecilho a essa aprovação, ele poderá ser suprido por decisão do Juízo da Recuperação Judicial.

**10.4.    Obrigações de Fazer.** Por meio deste Plano, as RECUPERANDAS comprometem-se a, durante o curso da Recuperação Judicial, (a) conduzir os negócios do GRUPO OI de acordo com o curso ordinário de suas operações; (b) observar todos os termos, condições e limitações estabelecidos neste Plano; e (c) cumprir com todas as obrigações assumidas neste Plano.

**11.    EFEITOS DO PLANO**

**11.1.    Vinculação do Plano.** A partir da Homologação Judicial do Plano, as disposições deste Plano vinculam as RECUPERANDAS, seus acionistas e sócios, os Credores Concursais e respectivos cessionários e sucessores, nos termos do art. 59 da LFR.

> **11.1.1.** Observado o disposto na **Cláusula 11.4**, a Aprovação do Plano constitui autorização e consentimento vinculante concedidos pelos Credores Concursais para que as RECUPERANDAS possam, dentro dos limites da Lei e dos termos deste Plano, adotar todas e quaisquer providências que sejam apropriadas e necessárias para a implementação das medidas previstas neste Plano, inclusive *(i)* obtenção de medida judicial, extrajudicial ou administrativa (seja de acordo com qualquer lei de insolvência ou no âmbito de qualquer procedimento de natureza principal ou incidental) pendente ou a ser iniciado pelas RECUPERANDAS, qualquer dos representantes das RECUPERANDAS ou qualquer representante da Recuperação Judicial em qualquer jurisdição que não seja o Brasil com o propósito de conferir força, validade e efeito ao Plano e sua implementação e *(ii)* o estabelecimento de procedimentos para *(ii.a)* Credores não residentes no Brasil manifestarem sua escolha quanto à opção para pagamento de seus respectivos Créditos Concursais, sem

68

prejuízo do disposto nas **Cláusulas 4.5**, **4.5.1**, **4.5.2**, **4.5.3**, **4.5.4 e 4.5.5**; *(ii.b)* pagamento dos Créditos de titularidade dos referidos Credores não residentes no Brasil na forma aplicável, conforme prevista neste Plano; e *(ii.c)* para garantir o tratamento equitativo dos Credores, deduzir dos valores dos Créditos a serem pagos pelas RECUPERANDAS, nos termos deste Plano, aos Credores, residentes ou não no Brasil, indicados na Relação de Credores do Administrador Judicial, todo e qualquer valor recebido por tais credores das RECUPERANDAS e/ou decorrente da eventual alienação, liquidação ou excussão dos seus ativos em outras jurisdições, conforme aplicável.

11.1.1.1. Em consonância com o acima exposto, dentro dos limites da Lei e dos termos deste Plano, os Credores que aprovarem o Plano expressamente declaram que se comprometem a aprovar qualquer outro instrumento de composição entre credores e quaisquer das RECUPERANDAS em outra jurisdição, a ser submetido à aprovação de credores em qualquer jurisdição, inclusive, mas não se limitando a, um plano de composição a ser oferecido por qualquer das RECUPERANDAS perante a justiça holandesa, bem como a celebrar todo e qualquer instrumento necessário para efetivar tal composição de credores, ressalvado o disposto na **Cláusula 11.4**.

**11.2.** **Novação.** Exceto pelo disposto na **Cláusula 11.2.1** abaixo e no caso de acordo específico entre o Credor com Garantia Real e o GRUPO OI, bem como observado o disposto na **Cláusula 4.2.4**, a Homologação Judicial do Plano implicará na novação de todos os Créditos Concursais, nos termos do art. 59 da LFR, os quais serão pagos na forma estabelecida neste Plano. Por força da novação, todas as obrigações, *covenants* contratuais, índices financeiros, hipóteses de vencimento antecipado, bem como outras obrigações e garantias de quaisquer naturezas assumidas ou prestadas pelas RECUPERANDAS ficam extintas, sendo substituídas, em todos os seus termos (exceto quando disposto de forma diversa neste Plano), pelas previsões deste Plano.

11.2.1. Tendo em vista a importância das garantias vigentes constituídas pelas sociedades do GRUPO OI para manutenção de outorgas de uso de

radiofrequência, conforme exigido pelas Autoridades Governamentais, bem como manutenção de ativos e direitos necessários à prestação de serviços no âmbito das referidas outorgas, fica expressamente ressalvado que as referidas garantias não serão afetadas pela novação prevista na **Cláusula 11.2** acima.

**11.3.** <u>**Extinção das Ações.**</u> Observado o disposto na **Cláusula 11.4**, a partir da Homologação Judicial do Plano, enquanto este Plano estiver sendo cumprido, e observado o disposto nas **Cláusulas 4.1.2** e **4.3.2**, os Credores Concursais, salvo os Credores Trabalhistas, não mais poderão *(i)* ajuizar ou prosseguir em toda e qualquer ação judicial ou Processo de qualquer natureza contra as RECUPERANDAS relacionado a qualquer Crédito Concursal, excetuado o disposto no art. 6º, §1º, da LFR relativamente a Processos em que se estejam discutindo Créditos Ilíquidos; *(ii)* executar qualquer sentença, decisão judicial ou sentença arbitral contra as RECUPERANDAS relacionada a qualquer Crédito Concursal; *(iii)* penhorar ou onerar quaisquer bens do GRUPO OI para satisfazer seus respectivos Créditos Concursais ou praticar qualquer outro ato constritivo contra o patrimônio das RECUPERANDAS; *(iv)* criar, aperfeiçoar ou executar qualquer garantia real sobre os bens e direitos das RECUPERANDAS para assegurar o pagamento de Crédito Concursal; *(v)* reclamar qualquer direito de compensação de seu respectivo Crédito Concursal contra qualquer crédito devido às RECUPERANDAS; *(vi)* buscar a satisfação de seu Crédito Concursal por qualquer outro meio, que não o previsto neste Plano. Com a Homologação Judicial do Plano, todas as execuções e outras medidas judiciais em curso contra o GRUPO OI relativas aos Créditos Concursais serão extintas, e as penhoras e constrições judiciais liberados, sendo igualmente liberados em favor do GRUPO OI o saldo de Depósitos Judiciais que não tenham sido empregados no pagamento de Credores nos termos das **Cláusulas 4.1.2 e 4.3.2** acima.

**11.4.** O disposto nas **Cláusulas 3.1.1.1, 4.3.3.8, 4.3.3.10, 11.1.1, 11.1.1.1, 11.3, 11.10, 11.11, 11.12, 11.12.1, 11.12.1.1, 11.12.1.2, 13.2.1, 13.10.1 e 13.10.2** acima não se aplica aos Litigantes Atuais e não representa renúncia de direito, dispensa de obrigação ou quitação por parte dos Litigantes Atuais, bem como não afeta quaisquer litígios, atuais ou futuros, ou causas de litígio dos Litigantes Atuais, em quaisquer jurisdições, ficando preservados seus direitos de tomar qualquer ação que entender necessária relativamente ao Plano, o DIP Financing, qualquer contrato, instrumento ou outro documento criado ou firmado em relação a este Plano ou o DIP Financing, incluindo

sem limitação o direito de rescindir tais contratos ou ingressar com litígios em quaisquer jurisdições para proteção e eficácia dos direitos deste Plano ou do DIP Financing ou para exigir esses direitos, ações ou causas de ações ligadas, decorrentes ou relacionadas ao desrespeito de quaisquer termos e condições pelas Recuperandas, contidos neste Plano, no DIP Financing ou em qualquer contrato, instrumento ou outro documento criado ou firmado e relacionado a este Plano, ou ao DIP Financing, pelo qual tal parte é obrigada.

**11.4.1.** Até a data da Homologação Judicial do Plano ou 15 de janeiro de 2018, o que ocorrer primeiro (para fins desta cláusula, o "<u>Período de Suspensão Litígios</u>"), cada uma das Recuperandas e os Litigantes Atuais devem abster-se de perseguir em qualquer jurisdição (inclusive no Brasil, nos Estados Unidos da América, nos Países Baixos, em Portugal ou no Reino Unido) quaisquer disputas, ações ou causas de ação contra as Recuperandas ou quaisquer dos Litigantes Atuais ou as Partes Protegidas.

**11.4.2.** Durante o Período de Suspensão Litígios, as Recuperandas e os Litigantes Atuais devem coordenar seus esforços para tomar qualquer medida necessária ou apropriada para suspender as Ações Pendentes e não devem realizar qualquer ajuste em suas ações, pedidos, apelações, recursos para reconsideração ou ação semelhante, exceto se necessário para preservar a Ação Pendente ou evitar o decurso do prazo prescricional. Especificamente, as partes devem requerer: (i) a suspensão, durante o Período de Suspensão Litígios , das ações judiciais em que são partes nos Estados Unidos da América, na Holanda e nas Ilhas Cayman, conforme o caso; (ii) ao Sr. Jasper Berkenbosch, *trustee* nomeado no processo de falência da Coop em curso na Holanda, que requeira, durante o Período de Suspensão Litígios, a suspensão da *avoidance proceeding* por ele ajuizada; e (iii) à Corte Distrital de Amsterdam em que tem curso a *avoidance proceeding*, a suspensão desta ação durante o Período de Suspensão Litígios .

**11.4.3.** Nada neste Plano previne os Litigantes Atuais de perseguir ou continuar perseguindo pedidos de reconsideração, alteração, vacatur, recursos ou

qualquer outra medida similar ou uma apelação de memorando escrito de decisão da Corte Norte-Americana de Falência datada de 4 de dezembro de 2017, protocolo número 17-11888, registro número 130, ou qualquer outra ordem relativa a tal decisão.

**11.4.4.** As RECUPERANDAS e os Litigantes Atuais podem tomar medidas legais cabíveis estritamente necessárias para preservar seus direitos, apelações ou direito de apelação, desde que as RECUPERANDAS e os Litigantes Atuais tomem as medidas estritamente necessárias para preservação de direito.

**11.4.5.** Qualquer prazo de prescrição, de suspensão ou preemptivo, ou qualquer outro recurso temporal, incluindo renúncias, dispensas ou abdicações mútuas, previstas em lei, estatuto, contrato, por equidade ou qualquer outro meio, que podem ser arguidos pelas RECUPERANDAS ou pelo Litigante Atual ficam interrompidos até que ocorra: (i) a conclusão da negociação para o encerramento das Ações Pendentes, as operações previstas neste Plano para reestruturação dos créditos ou (ii) 90 (noventa) dias após o decurso do prazo de suspensão das Ações Pendentes previsto na **Cláusula 11.4.4** acima; o que ocorrer primeiro.

**11.4.6.** Nada neste Plano deve limitar ou restringir os direitos dos Litigantes Atuais, sendo certo que, exceto pela obrigação de suspender ações prevista nesta cláusula, qualquer Litigante Atual deve ter preservado o seu direito de tomar qualquer ação que entender necessária relativamente ao Plano, o DIP Financing, qualquer contrato, instrumento ou outro documento criado ou firmado em relação a este Plano ou o DIP Financing, incluindo sem limitação o direito de rescindir tais contratos ou ingressar com litígios em quaisquer jurisdições para proteção e eficácia dos direitos deste Plano ou do DIP Financing ou para exigir esses direitos, ações ou causas de ações ligadas, decorrentes ou relacionadas ao desrespeito de quaisquer termos e condições pelas RECUPERANDAS, contidos neste Plano, no DIP Financing ou em qualquer contrato, instrumento ou outro documento criado ou firmado e relacionado a este Plano, ou ao DIP Financing, pelo qual tal parte é obrigada.

**11.4.7.** As RECUPERANDAS e os Litigantes Atuais envidarão seus melhores esforços de forma comercialmente razoável para negociar de boa-fé o encerramento das Ações Pendentes em termos mutuamente aceitáveis nos Estados Unidos da América, nos Países Baixos e nas Ilhas Cayman, conforme o caso. Nada neste Plano deve ser interpretado como uma obrigação das RECUPERANDAS ou dos Litigantes Atuais em encerrar tais Ações Pendentes.

**11.4.8.** A Aprovação do Plano não impede os Credores Concursais e/ou as RECUPERANDAS de perseguir em qualquer jurisdição (inclusive no Brasil, nos Estados Unidos da América, nos Países Baixos, em Portugal ou no Reino Unido) quaisquer disputas, ações ou causas de ação contra os Litigantes Atuais, tampouco implica renúncia aos direitos ou remédios que os Credores Concursais e/ou as RECUPERANDAS tenham contra os Litigantes Atuais.

**11.5.  Reconstituição de Direitos**. Verificada a ocorrência de qualquer das Condições Resolutivas previstas na **Cláusula 12** e desde que o GRUPO OI não tenha obtido as dispensas necessárias nos termos da **Cláusula 12.2** e/ou hipótese de convolação da Recuperação Judicial em falência durante o prazo estabelecido no artigo 61 da LFR, os Credores Concursais terão reconstituídos integralmente todos os seus direitos e garantias nas condições originalmente contratadas, como se o Plano não tivesse sido aprovado, sendo restabelecidas todas as ações e pretensões contra o GRUPO OI, e assegurado o direito de ajuizar ou prosseguir com qualquer ação judicial ou extrajudicial contra o GRUPO OI, deduzidos os valores eventualmente pagos na forma deste Plano e no curso da Recuperação Judicial e ressalvados os atos validamente praticados no âmbito da Recuperação Judicial e deste Plano, observado o disposto nos artigos 61, § 2º e 74, da LFR.

**11.6.  Formalização de Documentos e Outras Providências.** O GRUPO OI, os adquirentes de quaisquer ativos de propriedade de qualquer das RECUPERANDAS e os Credores e seus representantes e advogados deverão praticar todos os atos e firmar

todos os contratos e outros documentos que, na forma e na substância, sejam necessários ou adequados para cumprimento e implementação do disposto neste Plano.

**11.7.    Modificação do Plano**. Aditamentos, alterações ou modificações ao Plano podem ser propostas a qualquer tempo após a Homologação Judicial do Plano, desde que tais aditamentos, alterações ou modificações sejam (i) submetidos à votação na Assembleia de Credores, observando-se o quórum requerido pelos artigos 45 e 58, caput e §1º, da LFR.

> **11.7.1. Efeito Vinculativo das Modificações do Plano**. Os aditamentos, alterações ou modificações ao Plano vincularão o GRUPO OI, seus Credores Concursais e seus respectivos cessionários e sucessores, a partir de sua aprovação pela Assembleia de Credores na forma dos artigos 45 ou 58 da LFR.

**11.8.    Manutenção do Direito de Petição e Voz e Voto em Assembleia de Credores**. Para fins deste Plano e enquanto não verificado o encerramento da Recuperação Judicial, os Credores --- inclusive os Credores Quirografários Bondholders Qualificados que venham a converter parte de seus Créditos Quirografários Bondholders Qualificados em capital da Oi na forma do Aumento de Capital – Capitalização de Créditos--- preservarão o valor e quantidade de seus Créditos Concursais para fins de direito de petição, voz e voto em toda e qualquer Assembleia de Credores posterior à Homologação Judicial do Plano, independentemente da conversão dos Créditos Quirografários Bondholders Qualificados em Novas Ações Ordinárias – I  e respectiva quitação.

**11.9.    Equivalência econômica no cumprimento do Plano**. Na hipótese de qualquer das operações previstas no presente Plano, que não envolva pagamento em dinheiro aos Credores Concursais, não ser possível de ser implementada pelas RECUPERANDAS para qualquer Credor Concursal, seja pelo transcurso dos prazos previstos para a implementação de tais operações ou por razões regulamentares, as RECUPERANDAS adotarão as medidas necessárias com o objetivo de assegurar um resultado econômico equivalente para os Credores Concursais.

**11.10. <u>Quitação</u>.** Os pagamentos realizados na forma estabelecida neste Plano acarretarão, de forma automática, proporcional ao valor efetivamente recebido e independente de qualquer formalidade adicional, a quitação plena, rasa, irrevogável e irretratável de todo e qualquer Crédito Concursal contra as RECUPERANDAS, seja por obrigação principal ou fidejussória, inclusive em relação a Encargos Financeiros, de modo que os Credores Concursais nada mais poderão reclamar contra as RECUPERANDAS relativamente aos Créditos Concursais, a qualquer tempo, em juízo ou fora dele.

**11.11. <u>Ratificação de Atos</u>.** A Aprovação do Plano pela Assembleia Geral de Credores implicará a aprovação e ratificação de todos os atos regulares de gestão praticados e medidas adotadas pelas RECUPERANDAS no curso da Recuperação Judicial, incluindo, mas não se limitando aos atos necessários à reestruturação na forma proposta neste Plano, a celebração do Contrato de Backstop, bem como todos demais atos e ações necessárias para integral implementação e consumação deste Plano e da Recuperação Judicial, os quais ficam expressamente autorizados, validados e ratificados para todos os fins de direito, inclusive e especialmente dos artigos 66, 74 e 131 da LFR.

**11.12. <u>Isenção de Responsabilidade e Renúncia</u>.**

> **11.12.1.    <u>Isenção de Responsabilidade e Renúncia das Partes Isentas.</u>** Em decorrência da Aprovação do Plano, os Credores expressamente liberam as Partes Isentas de toda e qualquer responsabilidade pelos atos regulares de gestão praticados e obrigações contratadas antes ou depois da Data do Pedido até a data da Aprovação do Plano, inclusive com relação à reestruturação prevista neste Plano, conferindo às Partes Isentas quitação ampla, rasa, geral, irrevogável e irretratável de todos os direitos e pretensões patrimoniais, penais e morais porventura decorrentes dos referidos atos a qualquer título, observado o disposto na **Cláusula 11.4**.

> > **11.12.1.1.    A** Aprovação do Plano representa igualmente expressa e irrevogável renúncia por parte dos Credores aos direitos em que se fundam quaisquer reivindicações, ações ou direitos de ajuizar, promover, dar prosseguimento ou reivindicar, judicial ou extrajudicialmente, a qualquer título e sem reservas ou ressalvas,

75

em quaisquer jurisdições, a reparação de danos e/ou outras ações ou medidas promovidas contra as Partes Isentas em relação aos atos praticados e obrigações assumidas pelas Partes Isentas, inclusive em virtude de e/ou no curso da Recuperação Judicial. Os Credores, conforme aplicável, tomarão as medidas cabíveis para que os *trustees* nomeados nos processos de falência holandeses da OI COOP e da PTIF encerrem todos os litígios contra as Partes Isentas ou façam com que tais litígios sejam encerrados, observado o disposto na **Cláusula 11.4**.

**11.12.1.2.** <u>**Isenção de Responsabilidade e Renúncia dos Investidores Backstoppers**</u>. Em decorrência da Aprovação do Plano, cada uma das sociedades integrantes do GRUPO OI e seus sucessores, e o Credores, expressamente liberam as Partes Isentas Investidores Backstoppers de toda e qualquer responsabilidade pelos atos praticados, incluindo a celebração do Contrato de Backstop, e obrigações contratadas antes ou depois da Data do Pedido até a data da Aprovação do Plano, inclusive com relação à reestruturação prevista neste Plano, ressalvando-se as obrigações previstas no presente Plano e no Contrato de Backstop, conferindo às Partes Isentas Investidores Backstoppers quitação ampla, rasa, geral, irrevogável e irretratável de todos os direitos e pretensões patrimoniais, penais e morais porventura decorrentes dos referidos atos a qualquer título.

## 12.    CONDIÇÕES RESOLUTIVAS DO PLANO

**12.1.** <u>**Condições Resolutivas.**</u> São condições resolutivas do Plano, cuja ocorrência acarretará a resolução automática do Plano e de suas estipulações, com a consequente manutenção e/ou reconstituição dos direitos e garantias dos Credores nas condições originariamente contratadas, como se o Plano não tivesse sido aprovado, nos termos desta **Cláusula 12.1**:

(i) a inocorrência da reestruturação dos Créditos Quirografários Bondholders Qualificados na forma da **Cláusula 4.3.3.2** até 31 de julho de 2018;

76

(ii) a inocorrência do Aumento de Capital Capitalização de Créditos conforme o disposto na **Cláusula 4.3.3.5** até 31 de julho de 2018**;** e

(iii)      a inocorrência do Aumento de Capital Novos Recursos conforme o disposto na **Cláusula 6** até 28 de fevereiro de 2019.

**12.2.   Dispensa das Condições Resolutivas.** Os Credores podem, em deliberação dos titulares da maioria simples dos Créditos presentes à Assembleia de Credores convocada para essa finalidade, aprovar a dispensa ou modificação, total ou parcial, da(s) condição(ões) resolutiva(s) descritas na **Cláusula 12.1** acima.

**12.3.   Resolução do Plano.** Caso resolvido o Plano, caberá à Assembleia de Credores deliberar (i) sobre a aprovação de modificação ao Plano, observado o quórum de aprovação de Plano estabelecido nos artigos 45 e 58, § 1º, da LFR, ou (ii) pela decretação da falência pelo Juízo da Recuperação.

**13.   DISPOSIÇÕES GERAIS**

**13.1.   Condições suspensivas.** A eficácia deste Plano está condicionada a *(i)* Aprovação do Plano; e *(ii)* Homologação Judicial do Plano e a eficácia da implementação das medidas previstas neste Plano está condicionada ao cumprimento das exigências e condições legais, regulamentares e estatutárias aplicáveis.

**13.2.   Obrigações de Fazer e Não-Fazer.** Por meio deste Plano, as RECUPERANDAS comprometem-se a, durante o curso da Recuperação Judicial, (a) conduzir os negócios do GRUPO OI de acordo com o curso ordinário de suas operações; (b) observar todos os termos, condições e limitações estabelecidos neste Plano; e (c) cumprir com todas as obrigações assumidas neste Plano.

**13.2.1.** Sem prejuízo do disposto na **Cláusula 13.2** acima, as RECUPERANDAS obrigam-se a adotar as medidas que estejam ao seu alcance e sejam necessárias para que este Plano seja reconhecido como eficaz, exequível e

77

vinculante nas jurisdições estrangeiras aplicáveis, na medida em que tal reconhecimento se faça necessário para a implementação das medidas previstas neste Plano em relação aos respectivos Credores, observado o disposto na **Cláusula 11.4**.

**13.3.    Encerramento da Recuperação Judicial.** A Recuperação Judicial será encerrada mediante a verificação do cumprimento de todas as obrigações previstas no Plano que se vencerem até 2 (dois) anos contados da Homologação Judicial do Plano.

**13.4.    Meios de Pagamento.** Exceto para os Credores Trabalhistas partes em Processos, que sempre receberão mediante depósito judicial nos autos dos respectivos Processos, salvo se houver previsão diversa no Plano, os valores devidos aos Credores Concursais serão pagos mediante *(a)* a transferência direta de recursos à conta bancária do respectivo Credor Concursal, por meio de documento de ordem de crédito (DOC), ou de transferência eletrônica disponível (TED), *(b)* por Ordem de Pagamento a ser sacada diretamente no caixa de instituição financeira pelo respectivo Credor Concursal, conforme o caso, servindo o comprovante da referida operação financeira como prova de quitação do respectivo pagamento; ou, ainda, *(c)* outros meios necessários para pagamento dos Créditos Concursais Agências Reguladoras.

13.4.1. Os pagamentos previstos neste Plano serão realizados somente após a disponibilização e envio pelos Credores Concursais, com exceção dos Credores Trabalhistas partes em Processos, de seus dados cadastrais atualizados e informações de conta bancária na plataforma eletrônica a ser disponibilizada pela Oi no endereço eletrônico www.recjud.com.br. Caso o Credor Concursal não disponibilize e envie as referidas informações em tempo hábil para que as RECUPERANDAS possam realizar o respectivo pagamento, nas datas e prazos previstos neste Plano, não será considerado descumprimento de Plano. Não haverá incidência de multas, atualização monetária ou encargos moratórios em relação aos pagamentos que não tenham sido efetuados nas datas e prazos previstos neste Plano em virtude de os Credores Concursais não terem disponibilizado e enviado tempestivamente as referidas informações.

**13.5.   Datas de Pagamento.** Na hipótese de qualquer pagamento ou obrigação prevista neste Plano estar prevista para ser realizada ou satisfeita em um dia que não seja um Dia Útil, o referido pagamento ou obrigação poderá ser realizado ou satisfeito, conforme o caso, no Dia Útil imediatamente seguinte, sem que isso caracterize impontualidade das RECUPERANDAS ou implique incidência de Encargos Financeiros. Da mesma forma, tendo em vista eventuais obrigações de pagamento dependentes de atos ainda não performados, as RECUPERANDAS envidarão todos os esforços para realizar os pagamentos na data mais breve possível, de acordo com a sistemática deste Plano.

**13.6.   Comunicações.** Todas as notificações, requerimentos, pedidos e outras comunicações ao GRUPO OI, requeridas ou permitidas por este Plano, para serem eficazes, devem ser feitas por escrito e serão consideradas realizadas quando *(i)* enviadas por correspondência registrada, com aviso de recebimento, ou por *courier*, e efetivamente entregues; ou *(ii)* enviadas por e-mail com comprovante de entrega, observando-se os dados de contato a seguir:

> **Oi S.A.**
> Rua Humberto de Campos, 425
> Protocolo – Recuperação Judicial
> Leblon
> Rio de Janeiro – RJ
> CEP 22430-190
> E-mail: rjoi@oi.net.br

**13.7.   Divisibilidade das Previsões do Plano.** Na hipótese de qualquer termo ou disposição do Plano ser considerada inválida, nula ou ineficaz pelo Juízo da Recuperação Judicial, a validade e eficácia das demais disposições não serão afetadas, devendo as RECUPERANDAS propor novas disposições para substituírem aquelas declaradas inválidas, nulas ou ineficazes, de forma a manter o propósito do estabelecido neste Plano.

**13.8.   Cessão de Créditos.** Exceto se disposto de forma contrária neste Plano, os Credores poderão ceder seus Créditos Concursais a outros Credores ou a terceiros, e a cessão somente produzirá efeitos desde que *(i)* as RECUPERANDAS, o Administrador

79

Judicial e o Juízo da Recuperação Judicial sejam informados; e *(ii)* os cessionários firmem declaração por escrito atestando o recebimento de uma cópia do Plano e reconhecendo que o Crédito Concursal cedido estará sujeito às disposições do Plano. O disposto nos itens "i" e "ii" acima não se aplica aos Créditos Quirografários Bondholders Qualificados nem às Novas Notas, que poderão ser cedidos livre e independentemente de prévia notificação e/ou concordância das RECUPERANDAS.

**13.9.  Alterações Anteriores à Aprovação do Plano.** As Recuperandas se reservam o direito, na forma da Lei, de alterar este Plano até a data da Aprovação do Plano, inclusive de modo a complementar o protocolo com documentos adicionais e traduções de documentos correlatos.

**13.10.  Poderes do GRUPO OI para implementar o Plano**

**13.10.1.**    A Aprovação do Plano seguida da Homologação Judicial do Plano dará poderes à Oi, por meio de seus representantes legais, para tomar todas as medidas necessárias para a implementação do Plano, inclusive, do ponto de vista societário, para assinar os boletins de subscrição, em nome e para o benefício dos Credores Quirografários Bondholders que reestruturarem seus Créditos na forma prevista na **Cláusula 4.3.3.1.1**, relativos às ações a serem emitidas e entregues pela Oi sob a forma de ADRs em pagamento de tais Créditos, observado o disposto na **Cláusula 11.4**.

**13.10.2.**    Após a Homologação Judicial do Plano, o GRUPO OI fica desde já autorizado a adotar todas as medidas necessárias para (i) submeter a Aprovação do Plano ao processo de insolvência em curso perante a *Bankruptcy Court of the Southern District of New York* (*Chapter 15)*, com o objetivo de conferir efeitos ao Plano em território norte-americano, vinculando os Credores ali domiciliados e estabelecidos, bem como (ii) iniciar e/ou dar andamento a outros procedimentos judiciais, extrajudiciais ou administrativos, sejam de insolvência ou de outra natureza, em outras jurisdições além da República Federativa do Brasil, incluindo no território norte-americano e holandês, conforme necessário, para a implementação deste Plano, incluindo, mas não se limitando, aos processos de insolvência

ou procedimentos necessários à implementação das disposições deste Plano, notadamente nos termos da legislação aplicável dos Estados Unidos da América, das Ilhas Virgens Britânicas e da Holanda. Os processos auxiliares no exterior não poderão alterar os termos e as condições deste Plano, observado o disposto na **Cláusula 11.4**.

**13.11.** **Lei Aplicável.** Os direitos, deveres e obrigações decorrentes deste Plano deverão ser regidos, interpretados e executados de acordo com as leis vigentes na República Federativa do Brasil, ainda que os Créditos sejam regidos pelas leis de outra jurisdição e sem que quaisquer regras ou princípios de direito internacional privado sejam aplicadas.

**13.12.** **Resolução de Conflitos e Eleição de Foro.** Todas as controvérsias ou disputas que surgirem ou estiverem relacionadas a este Plano, incluindo pretensões de Credores relativas ao valor dos seus respectivos Créditos Concursais, poderão ser previamente submetidas a procedimento de Mediação, na forma do regulamento da Câmara de Mediação e Arbitragem da Fundação Getúlio Vargas/RJ ou alternativamente do Núcleo Permanente de Métodos Consensuais de Solução de Litígios do Tribunal de Justiça do Estado do Rio de Janeiro. Caso as controvérsias ou disputas em questão não sejam solucionadas na Mediação, serão elas resolvidas *(i)* pelo Juízo da Recuperação Judicial, até o encerramento do processo de Recuperação Judicial com trânsito em julgado da decisão homologatória; e *(ii)* por qualquer juízo empresarial do Foro Central da Comarca do Rio de Janeiro, após o encerramento do processo de Recuperação Judicial com trânsito em julgado da decisão homologatória.

O Plano é firmado pelos representantes legais devidamente constituídos do GRUPO OI.


Rio de Janeiro, 20 de dezembro de 2017.


_____
**OI S.A. – em recuperação judicial**


_____
**TELEMAR NORTE LESTE S.A. – em recuperação judicial**


_____
**OI MÓVEL S.A. – em recuperação judicial**


_____
**COPART 4 PARTICIPAÇÕES S.A. – em recuperação judicial**


_____
**COPART 5 PARTICIPAÇÕES S.A. – em recuperação judicial**


_____
**PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. – em recuperação judicial**


_____
**OI BRASIL HOLDINGS COÖPERATIEF U.A. – em recuperação judicial**

<br>

ANEXO 1.1

DEFINIÇÕES

"**Acionistas**" significa os acionistas diretos ou indiretos da OI, incluindo as pessoas físicas que sejam, direta ou indiretamente, acionistas controladores da OI e seus sucessores de qualquer natureza.

"**Ações Pendentes**" significa quaisquer medidas judiciais ou extrajudiciais pendentes na data do Plano ou em data anterior nos Estados Unidos da América, na Holanda e nas Ilhas Cayman, que tenham como partes quaisquer das RECUPERANDAS e dos Litigantes Atuais.

"**Ações PTIF**" significa as 134.819.390 ações ordinárias de emissão da OI detidas pela PTIF, sob a forma de ADRs, atualmente mantidas pela Oi em tesouraria.

"**Acordos de Acionistas**" significa os acordos firmados entre os Acionistas sobre a compra e venda de ações de emissão das RECUPERANDAS, preferência para adquiri-las, exercício do direito a voto, ou do poder de controle, que deverão ser observados pela companhia quando arquivados na sua sede, conforme os termos do art. 118 da Lei das S.A.

"**Administrador Judicial**" significa o Escritório de Advocacia Arnold Wald, com sede na Av. Pres. Juscelino Kubitschek, 510, 8º andar, São Paulo- SP, CEP 04543-906, conforme nomeado pelo Juízo da Recuperação Judicial, nos termos da decisão proferida em 22 de julho de 2016.

"**ADR**" significa *American Depositary Receipts*, modalidade pela qual as ações da OI são negociadas na NYSE.

"**Advogados Trabalhistas**" significa os respectivos advogados dos Credores Trabalhistas Depósito Judicial constituídos nos autos, inclusive aqueles titulares de honorários de sucumbência.

"**Afiliadas**" significa, com relação a qualquer Pessoa, qualquer Pessoa direta ou indiretamente Controladora, Controlada ou sob Controle comum dessa Pessoa.

"**Alienação de Ativos**" significa as operações de alienação de ativos nos termos da Cláusula 5.1.

83

"**ANATEL**" significa a Agência Nacional de Telecomunicações, criada pela Lei nº 9.472 de 16 de julho 1997.

"**Aprovação do Plano**" significa a aprovação deste Plano pelos Credores Concursais na Assembleia Geral de Credores, na forma do art. 45 ou 58, §1º da LFR. Para os efeitos deste Plano, considera-se que a Aprovação do Plano ocorrerá na data da Assembleia Geral dos Credores que aprovar o Plano. Na hipótese de aprovação nos termos do art. 58, §1º da LFR, considera-se a Aprovação do Plano na data da decisão que conceder a Recuperação Judicial.

"**Assembleia Geral de Credores**" significa qualquer assembleia geral de credores realizada nos termos do Capítulo II, Seção IV da LFR.

"**Ativo Não Relevante**" significa bens ou ativos de qualquer RECUPERANDA com Valor Justo de Mercado que não ultrapasse 5% (cinco por cento) da linha de "Ativos" constante das demonstrações financeiras consolidadas anuais da Oi no exercício fiscal anterior.

"**Ativo Relevante**" significa bens ou ativos de qualquer RECUPERANDA com Valor Justo de Mercado que ultrapasse 5% (cinco por cento) da linha de "Ativos" constante das demonstrações financeiras consolidadas anuais da Oi no exercício fiscal anterior.

"**Aumento de Capital Capitalização de Credito**" significa um aumento de capital de Oi, subscrito pelos Credores Quirografários Bondholders Qualificados, integralizados mediante capitalização dos Créditos Quirografários dos Bondholders Qualificados, na forma do Artigo 171, §2º da Lei das Sociedades por Ações e demais disposições legais aplicáveis, nas condições previstas na **Cláusula 4.3.3.5**.

"**Aumento de Capital Novos Recursos**" significa um aumento de capital de Oi, subscrito pelos Investidores Backstoppers nos termos do Contrato de Backstop, integralizados mediante emissão privada (ou seja, sem registro na CVM) de novas ações ordinárias, na forma do Artigo 170, §1º da Lei das Sociedades por Ações e demais disposições legais aplicáveis, nas condições previstas na **Cláusula 6**.

"**Autoridades Governamentais**" significa o governo da República Federativa do Brasil ou de qualquer outra jurisdição ou qualquer subdivisão política do mesmo, inclusive federal, estadual ou municipal, qualquer autarquia, agência, secretaria, departamento

ou órgão de tal governo ou de subdivisão política do mesmo, incluindo o Ministério Público, a Polícia Federal, a Secretaria da Receita Federal do Brasil, o Instituto Nacional do Seguro Social, o Banco Central do Brasil, a Comissão de Valores Mobiliários, a ANATEL, o Tribunal de Contas da União, qualquer juízo ou tribunal, judicial, administrativo ou arbitral, qualquer entidade reguladora ou autorreguladora.

"**Banda Larga nas Escolas**" significa o programa lançado pelo Governo Federal por meio do Decreto nº 6.424/2008 que permite às empresas exploradoras do serviço de telefonia fixa trocarem a obrigações de instalarem postos de serviços telefônicos (PST) nos municípios pela instalação de infraestrutura de rede para suporte a conexão à internet em alta velocidade em todos os municípios brasileiros e conexão de todas as escolas públicas urbanas com manutenção dos serviços sem ônus até o ano de 2025.

"**B3**" significa a B3 S.A. – Bolsa, Brasil, Balcão.

"**BNDES**" significa o Banco Nacional de Desenvolvimento Econômico e Social.

"**Bondholder**" significa o titular de um Crédito Quirografário dos Bondholders.

"**Bondholders Não-Qualificados**" significa, exclusivamente para fins deste Plano, aqueles investidores pessoas físicas titulares de Créditos Quirografários dos Bondholders em valor de até USD750.000,00 (setecentos e cinquenta mil Dólares Norte-Americanos).

"**Bondholders Qualificados**" significa, exclusivamente para fins deste Plano, aqueles investidores pessoas físicas ou jurídicas titulares de Créditos Quirografários dos Bondholders em valor superior a USD750.000,00 (setecentos e cinquenta mil Dólares Norte-Americanos) e que, caso sejam residentes na União Europeia, comprovem o cumprimento das exigências legais aplicáveis, especialmente a condição de investidor qualificado, nos termos da *Prospectus Directive* do Espaço Econômico Europeu (*EEA*).

"**Bônus de Subscrição**" significa os valores mobiliários descritos na **Clausula 4.3.3.6.**

"**Brasil Telecom**" significa a Brasil Telecom S.A., originada da privatização da antiga empresa estatal Telecomunicações Brasileiras S.A., e que deu origem ao atual GRUPO OI.

**"CAPEX"** significa investimentos realizados para adquirir bens físicos ou serviços que vão expandir a capacidade da Oi (consolidando suas controladas) de gerar lucro. É a sigla da expressão inglês *"capital expenditure"*.

"**Chapa Consensual**": significa a chapa consensual de 11 (onze) membros titulares e respectivos suplentes que formará o Novo Conselho de Administração e será formada de acordo com o procedimento previsto na **Cláusula 9.3** deste Plano.

**"Código Civil"** significa a Lei nº 10.406, de 10 de janeiro 2002.

"**Conselho de Administração Transitório**" significa o Conselho de Administração da Oi a ser composto na forma prevista na **Cláusula 9.2**.

"**Consultoria de RH**" significa a Spencer Stuart ou outra consultoria de Recursos Humanos de primeira linha aceitável aos Investidores Backstoppers.

**"Contas 4373 Elegíveis":** São as contas de investimento de investidores estrangeiros nos termos da Resolução do Banco Central do Brasil no. 4.373 de 29 de setembro de 2014 abertas ou que venham a ser abertas pelos Credores Quirografários nos termos da regulação em vigor perante as instituições financeiras que venham a ser oportunamente informada pelo Grupo Oi em comunicado ou edital específico para viabilizar a subscrição das Debêntures Conversíveis / bônus de subscrição, a tempo e modo devidos, conforme aplicável. Contas 4373 Elegíveis são e serão Contas 4373 cujos custodiantes determinem que as Debêntures Conversíveis/bônus de subscrição se qualificam como investimento previsto pela Resolução 4373 com a aplicação da alíquota zero do Imposto sobre Operações Financeiras (IOF) sobre operações efetivas ou simultâneas de cambio para ingresso de recursos no País, conforme a regulamentação aplicável.

**"Contrato Backstop"** significa o contrato celebrado em 19 de dezembro de 2017 entre as Recuperandas e os Investidores Backstoppers, por meio do qual as Recuperandas e os Investidores Backstoppers assumiram obrigações no âmbito do Aumento de Capital Novos Recursos, o qual é parte integrante do **Anexo 6.1**.

**"Controle"** significa, nos termos do art. 116 da Lei nº 6.404/76, (i) a titularidade de direitos de sócios que assegurem ao seu titular, de modo permanente, a maioria dos votos nas deliberações sociais e o poder de eleger a maioria dos administradores da sociedade; e (ii) o uso efetivo de tal poder para dirigir as atividades sociais e orientar o

funcionamento dos órgãos da sociedade. As expressões e termos "Controlador", "Controlado por", "sob Controle comum" e "Controlada" têm os significados logicamente decorrentes desta definição de "Controle".

"COPART 4" significa a COPART 4 PARTICIPAÇÕES S.A. – em recuperação judicial, sociedade anônima de capital fechado, inscrita no CNPJ/MF sob o nº 12.253.691/0001-14, com sede e principal estabelecimento na Rua General Polidoro, 99, 4º andar, parte, Botafogo, Rio de Janeiro-RJ, CEP 22280-004.

"COPART 5" significa a COPART 5 PARTICIPAÇÕES S.A. – em recuperação judicial, sociedade anônima de capital fechado, inscrita no CPNJ/MF sob o nº 12.278.083/0001-64, com sede e principal estabelecimento na Rua General Polidoro, 99, 5º andar, parte, Botafogo, Rio de Janeiro-RJ, CEP 22280-004.

"Créditos" significa os Créditos Concursais e os Créditos Extraconcursais.

"Créditos Classe III" significa os Créditos Concursais previstos nos arts. 41, inciso III, e 83, inciso VI, da LFR contra as RECUPERANDAS, detidos por Pessoas que não sejam quaisquer das próprias RECUPERANDAS.

"Créditos com Garantia Real" significa os Créditos Concursais garantidos por direitos reais, nos termos do art. 41, inciso II da LFR.

"Créditos Concursais" significa os créditos e obrigações de fazer sujeitos aos efeitos deste Plano, vencidos ou vincendos, cujos respectivos contratos, obrigações e/ou fatos geradores ocorreram antes da Data do Pedido, independentemente de estarem ou não relacionados na Relação de Credores do Administrador Judicial. Os Créditos Concursais são todos os Créditos referidos neste Plano, independentemente de sua natureza, à exceção dos Créditos Extraconcursais.

"Créditos Concursais Agências Reguladoras" significa Créditos Concursais não tributários de titularidade de agências reguladoras ou decorrentes de obrigações impostas em razão de deliberação de agências reguladoras, incluindo a ANATEL. Não estão incluídos nos Créditos Concursais Agências Reguladoras eventuais multas administrativas já consideradas indevidas por decisão proferida no âmbito do Superior Tribunal de Justiça.

"**Créditos Concursais Agências Reguladoras Líquidos**" significa os Créditos Concursais Agências Reguladoras inscritos em dívida ativa da União.

"**Créditos Concursais Agências Reguladoras Ilíquidos**" significa os Créditos Concursais Agências Reguladoras não inscritos em dívida ativa da União.

"**Créditos Extraconcursais**" significa os créditos detidos contra as RECUPERANDAS que não se sujeitam aos efeitos deste Plano em razão (i) do seu fato gerador ser posterior à Data do Pedido, ou (ii) de se enquadrarem no art. 49, §§ 3º e 4º da LFR, ou qualquer outra norma legal que os exclua dos efeitos deste Plano.

"**Créditos Financeiros**" significa os Créditos Concursais decorrentes de operações realizadas no âmbito do Sistema Financeiro Nacional com instituições financeiras.

"**Créditos Ilíquidos**" significa os Créditos Concursais *(i)* objeto de ação judicial e/ou de arbitragem, iniciada ou não, derivados de quaisquer relações jurídicas e contratos existentes antes da Data do Pedido; ou *(ii)* em relação a cujo valor haja pendência de resolução de controvérsia ou disputa; ou *(iii)* aqueles que, ainda que não se enquadrem nos itens *(i)* e *(ii)* acima, por qualquer razão não constem da Relação de Credores do Administrador Judicial.

"**Créditos Intercompany**" significa os créditos das RECUPERANDAS decorrentes de mútuos realizados entre si como forma de gestão de caixa e transferência de recursos entre as diferentes sociedades que compõem o GRUPO OI, inclusive com recursos decorrentes de operações realizadas no mercado internacional pelas RECUPERANDAS.

"**Créditos ME/EPP**" significa os Créditos Concursais detidos por microempresas ou empresas de pequeno porte, definidos conforme a Lei Complementar nº 123/2006, nos termos do art. 41, inciso IV da LFR.

"**Créditos Quirografários**" significa os Créditos ME/EPP, os Créditos Classe III e os Créditos Concursais Agências Reguladoras.

"**Créditos Quirografários Depósito Judicial**" significa os Créditos ME/EPP Depósito Judicial e os Créditos Classe III Depósito Judicial.

"**Créditos Quirografários dos Bondholders**" significa os Créditos Quirografários relativos a títulos referentes às emissões de dívida pela PTIF e Oi Coop, garantidos pela

88

Oi, e emitidos pela Oi e garantidos pela Telemar, listadas adiante, emitidos e negociados no exterior e regulados por leis estrangeiras, bem como sujeitos às leis e demais normas aplicáveis nas jurisdições onde tais títulos são negociados: (i) 9.75% Senior Notes 2016 emitidas pela Oi, (ii) 5.125% Senior Notes 2017 emitidas pela Oi e garantidas pela Telemar, (iii) 9.500% Senior Notes 2019 emitidas pela Oi e garantidas pela Telemar, (iv) 5.500% Senior Notes 2020 emitidas Oi e garantidas pela Telemar, (v) 5.625% Senior Notes 2021 emitidas pela Coop e garantidas pela Oi, (vi) 5.750% Senior Notes 2022 emitidas pela Coop e garantidas pela Oi, (vii) 6.250% Notes 2016 emitidas pela PTIF e garantidas pela Oi, (viii) 5.242% Notes 2017 emitidas pela PTIF e garantidas pela Oi, (ix) 4.375% Notes 2017 emitidas pela PTIF e garantidas pela Oi, (x) 5.875% Notes 2018 emitidas pela PTIF e garantidas pela Oi, (xi) 5.000% Notes 2019 emitidas pela PTIF e garantidas pela Oi, (xii) 4.625% Notes 2020 emitidas pela PTIF e garantidas pela Oi, e (xiii) 4.500% Notes 2025 emitidas pela PTIF e garantidas pela Oi.

"**Créditos Quirografários dos Bondholders Não-Qualificados**" significa os Créditos Quirografários dos Bondholders detidos por Bondholder Não-Qualificados.

"**Créditos Quirografários dos Bondholders Qualificados**" significa os Créditos Quirografários dos Bondholders detidos por Bondholder Qualificados.

"**Créditos Retardatários**" significa os Créditos Concursais que forem habilitados após a publicação da Relação de Credores do Administrador Judicial na imprensa oficial na forma do disposto no artigo 7º, §2º da LFR.

"**Créditos Trabalhistas**" significa os Créditos Concursais derivados da legislação do trabalho ou decorrentes de acidente de trabalho, nos termos do art. 41, inciso I da LFR.

"**Crédito Trabalhista Fundação Atlântico**" significa o Crédito Trabalhista de titularidade da Fundação Atlântico de Seguridade Social, entidade de previdência privada vinculada ao GRUPO OI.

"**Credores**" significa todos os credores referidos neste Plano.

"**Credores com Garantia Real**" significa os titulares de Créditos com Garantia Real.

"**Credores Concursais**" significa os titulares de Créditos Concursais.

"**Credores Extraconcursais**" significa os titulares de Créditos Extraconcursais.

**"Credores Fornecedores Parceiros"** significa os Credores Quirografários Classe III e/ou ME/EPP que mantenham o fornecimento às RECUPERANDAS de bens e/ou serviços, conforme aplicável, sem alteração injustificada dos termos e condições praticados até a Data do Pedido pelos respectivos Credores Classe III em relação às RECUPERANDAS e que não possuam qualquer tipo de litígio em curso contra qualquer das RECUPERANDAS, exceto em caso de incidente relacionado ao Processo de Recuperação Judicial.

**"Credores Quirografários"** significa os Credores Quirografários ME/EPP e os Credores Quirografários Classe III.

**"Credores Quirografários Bondholders"** significa os titulares de Créditos Quirografários dos Bondholders.

**"Credores Quirografários Classe III"** significa os titulares de Créditos Classe III.

**"Credores Quirografários ME/EPP"** significa os titulares de Créditos ME/EPP.

**"Credores Quirografários Parceiros Depósitos Judiciais"** significa os titulares de Créditos Classe III ou ME/EPP que, cientes de que a existência de litígios contra as RECUPERANDAS implica em dispêndio de recursos e prejudica a liquidez do GRUPO OI, concordam expressamente com os valores dos respectivos Créditos Classe III ou ME/EPP, conforme aplicável, reconhecidos pelas RECUPERANDAS, inclusive aqueles indicados na Lista do Administrador Judicial, neste último caso quando o Crédito Classe III ou ME/EPP em questão venha a se tornar Credor Quirografário Parceiro Depósito Judicial na forma da **Cláusula 4.3.2.2**, e renunciam ao direito de oferecer, propor ou prosseguir em ações, habilitações, divergências, impugnações de crédito, ou qualquer outra medida (inclusive recursos) que visem a majorar os valores dos seus respectivos Créditos Classe III ou ME/EPP, conforme aplicável e conforme reconhecidos pelas RECUPERANDAS, inclusive aqueles indicados na Lista do Administrador Judicial, neste último caso quando o Crédito Classe III ou ME/EPP em questão venha a se tornar Credor Quirografário Parceiro Depósito Judicial na forma da **Cláusula 4.3.2.2**, e que se enquadrem no disposto na **Cláusula 4.3.2**.

**"Credores Retardatários"** significa os titulares dos Créditos Retardatários.

**"Credores Trabalhistas"** significa os titulares de Créditos Trabalhistas.

**"Credores Trabalhistas Depósitos Judiciais"** significa os Credores Trabalhistas que são partes de processos judiciais envolvendo as RECUPERANDAS, em cujos autos tenham sido realizados Depósitos Judiciais.

"**Data da Emissão das Notes**" significa a data da emissão das Novas Notes.

**"Data do Pedido"** significa a data do ajuizamento do pedido de recuperação judicial, qual seja, 20 de junho de 2016.

"**Decisão Bondholders**" significa a decisão proferida pelo Juízo da Recuperação Judicial dispondo acerca do procedimento e a respectiva documentação a ser submetida pelos Bondholders para individualização dos Bonds por eles detidos para fins de exercício individualizado do direito de petição, voz e voto.

**"Depósito Judicial"** significa os depósitos judiciais efetuados pelo GRUPO OI no âmbito de ações judiciais de qualquer natureza, os quais serão utilizados no pagamento de determinados créditos, conforme estabelecido neste Plano.

**"Despesa Financeira Consolidada"** significa, em qualquer período, sem duplicação, a soma da despesa consolidada com juros da OI pelo período de quatro trimestres sobre qualquer uma das suas dívidas contraídas por meio de empréstimo pagáveis em dinheiro (pagas ou capitalizadas) na medida em que tal despesa foi deduzida (e não novamente adicionada) no cálculo do resultado operacional consolidado.

**"Dia Útil"** significa todo e qualquer dia que não um sábado, domingo ou feriado na cidade do Rio de Janeiro, Estado do Rio de Janeiro.

"**Diretores Conselheiros"** significa os diretores estatutários sem designação especifica da Oi que foram nomeados e empossados após agosto de 2017.

"**Diretores Transição**" significa os diretores estatutários da OI que estavam no exercício de suas atividades em data anterior a agosto de 2017 e o atual Diretor Presidente.

**"Dólar Norte-Americano"** ou **"USD"** significa a moeda corrente nos Estados Unidos da América.

**"EBITDA"** significa, para os 4 (quatro) últimos e consecutivos trimestres fiscais da Oi, cada qual um "período contábil", o somatório (sem qualquer duplicidade) (i) do

resultado antes dos tributos sobre o lucro consolidado para determinado período contábil (ajustado pelos ganhos ou perdas extraordinários); (ii) dos seguintes fatores deduzidos para fins de determinação do resultado antes dos tributos sobre o lucro: (1) depreciação e amortização consolidados ocorridos naquele mesmo período contábil; (2) Despesas Financeiras Consolidadas deduzidas das receitas financeiras consolidadas. Representa o EBITDA de rotina, conforme apresentado no relatório da administração contido nas demonstrações financeiras consolidadas da Oi.

"**Efeito Adverso Relevante**" significa, em relação às sociedades integrantes do GRUPO OI, qualquer mudança ou efeito que, tanto individualmente ou em conjunto com outros fatores, tenha um efeito adverso relevante na situação financeira e nas operações das sociedades integrantes do GRUPO OI como um todo, ou o efeito adverso relevante na habilidade das sociedades integrantes do GRUPO OI de implementar, consumar e/ou cumprir qualquer de suas obrigações nos termos deste Plano, desde que, no entanto, para os propósitos desta definição, nenhuma mudança, efeito, evento ou ocorrência surja ou resulte de qualquer das situações a seguir, sozinhas ou combinadas, constituam ou sejam levadas em consideração na determinação de ter sido ou possa ser um Efeito Adverso Relevante: (i) mudanças gerais, desenvolvimentos ou condições em qualquer economia nacional, regional ou mundial ou nas indústrias em que as sociedades integrantes do GRUPO OI operem, exceto na medida que as sociedades integrantes do GRUPO OI sejam afetadas desproporcionalmente por tais mudanças, desenvolvimentos ou condições; e (ii) financeiras ou outra condição política ou de mercado no país que as sociedades integrantes do GRUPO OI operem.

"**Encargos Financeiros**" significa qualquer correção monetária, juros, multa, penalidades, indenização, inflação, perdas e danos, juros moratórios e/ou outros encargos de natureza semelhante.

"**Estatutos Sociais**" significa os estatutos sociais ou documento constitutivo assemelhado da OI, TELEMAR, OI MÓVEL, COPART 4, COPART 5, PTIF e OI COOP e suas Afiliadas.

"**Euro**" ou "**EUR**" significa a moeda corrente na União Europeia.

"**GRUPO OI**" significa a OI, TELEMAR, OI MÓVEL, COPART 4, COPART 5, OI COOP E PTIF.

"**Homologação Judicial do Plano**" significa a decisão judicial proferida pelo Juízo da Recuperação que concede a Recuperação Judicial, nos termos do art. 58, *caput* ou §1º da

LFR. Para os efeitos deste Plano, considera-se que a Homologação Judicial do Plano ocorre na data da publicação, no diário oficial, da decisão de primeiro grau concessiva da Recuperação Judicial, contra a qual, após decorridos os prazos para interposição dos recursos cabíveis, não haja recurso com efeito suspensivo pendente de julgamento. No caso de ser indeferida na primeira ou na segunda instância a concessão, considerar-se-á como Homologação Judicial do Plano, respectivamente, a data da disponibilização, no diário oficial, de eventual decisão de segundo grau, ou de instância superior, em qualquer caso monocrática ou colegiada – o que primeiro ocorrer – que assim deliberar, contra a qual, após decorridos os prazos para interposição dos recursos cabíveis, não haja recurso com efeito suspensivo pendente de julgamento.

"**INSS**" significa o Instituto Nacional do Seguro Social, vinculado ao Ministério do Trabalho e Previdência Social.

"**Investidores Backstoppers**" significa os investidores identificados no Contrato de Backstop, que se comprometeram a prontamente fornecer ou obter compromissos firmes de garantia da subscrição integral do Aumento de Capital Novos Recursos.

"**IPCA**" significa o Índice de Preço ao Consumidor Amplo, medido mensalmente pelo IBGE (Instituto Brasileiro de Geografia e Estatística).

"**Juízo da Recuperação Judicial**" significa o juízo da 7ª Vara Empresarial da Comarca da Capital – RJ.

"**Laudos**" significa os laudos econômico-financeiro e de avaliação dos bens e ativos do GRUPO OI, elaborados nos termos do artigo 53, incisos II e III da LFR.

"**Lei**" significa qualquer lei, regulamento, ordem, sentença ou decreto expedido por qualquer Autoridade Governamental.

"**Lei das S.A.**" significa a Lei nº 6.404, de 15 de dezembro 1976.

"**Lei Geral de Telecomunicações**" significa a Lei nº 9.472, de 16 de julho de 1997.

"**LFR**" significa a Lei nº 11.101, de 9 de fevereiro de 2005.

"**LIBOR**" significa a taxa interbancária de Londres (*London Interbank Offered Rate*) para Dólares Norte-Americanos e Euros, publicada pela Reuters (ou outra fonte disponível comercialmente que forneça tais cotações), de 6 (seis) meses.

"**Litigantes Atuais**" significa os Credores Concursais que na data deste Plano estejam litigando contra qualquer das Recuperandas, suas Afiliadas e/ou seus Diretores, atuais ou passados, nos Estados Unidos da América, nos Países Baixos (Holanda) ou nas Ilhas Cayman e os credores, conforme definidos no contrato de crédito relativo ao Sr. J.R. Berkenbosh em sua qualidade de agente fiduciário ("trustee") no procedimento de falência da Oi Brasil Holdings Cooperatief U.A., datado de 4 de julho de 2017, contra o acervo em liquidação por falência da COOP (o "DIP Financing").

"**Mediação/Conciliação/Acordo**" significa qualquer procedimento a ser instaurado nos termos da Lei nº 13.140, de 26 de junho de 2015.

"**Ministério das Comunicações**" significa o órgão do poder Executivo Brasileiro criado pelo Decreto-lei nº 200, de 25 de fevereiro de 1967, que regula os serviços de telecomunicações, postais e radiodifusão.

"**Notificação Opção de Pagamento**" significa a notificação a ser enviada pelos Credores Quirografários Bondholders, com exceção dos Bondholders Não-Qualificados titulares de Créditos Quirografários dos Bondholders até R$50.000,00 (cinquenta mil Reais), no prazo de até 15 (quinze) dias corridos contados da Homologação Judicial do Plano, na forma do **Anexo 4.5.5** e nos termos da **Cláusula 4.5.5,** para manifestar seu interesse em aderir a uma das Opções de Pagamento dos Credores Quirografários Bondholders definidas na **Cláusula 4.3.3.**

"**Novas Notes**" significa as Notes a serem emitidas nos termos da **Cláusula 4.3.3.3**.

"**Novo Conselho de Administração**" significa o Conselho de Administração da Oi a ser composto na forma prevista na **Cláusula 9.2.1**.

"**NYSE**" significa a *New York Stock Exchange*, a bolsa de valores de Nova York.

"**OI**" significa a OI S.A. – em recuperação judicial, sociedade anônima de capital aberto, inscrita no CNPJ/MF sob o nº 76.535.764/0001-43, com sede e principal estabelecimento na Rua do Lavradio nº 71, Centro, Rio de Janeiro - RJ, CEP 20230-070.

"**Oi Coop**" significa a Oi Brasil Holdings Coöperatief U.A. – em recuperação judicial, pessoa jurídica de direito privado constituída de acordo com as Leis da Holanda, inscrita no CNPJ/MF sob o nº 16.770.090/0001-30, com sede em Amsterdam, Schiphol Boulevard 231, B tower, 5º andar, 1118 BH Schiphol, e principal estabelecimento na cidade do Rio de Janeiro - RJ.

"**Oi Móvel**" significa a Oi Móvel S.A. – em recuperação judicial, sociedade anônima de capital fechado, inscrita no CNPJ/MF sob o nº 05.423.963/0001-11, com sede no Setor Comercial Norte, Quadra 3, Bloco A, Edifício Estação Telefônica, térreo (parte 2), Brasília - DF, no Setor Comercial Norte, Quadra 3, Bloco A, Edifício Estação Telefônica, térreo (parte 2), CEP 70.713-900.

"**OPEX**" significa o resultado dos custos contínuos que uma empresa tem para se manter funcionando. É a sigla da expressão em inglês "*operational expenditure*".

"**Partes Isentas**" significa as Recuperandas, suas Afiliadas, controladas, subsidiárias, coligadas, entidades associadas, e outras sociedades pertencentes ao mesmo grupo, e seus respectivos acionistas, diretores, conselheiros, funcionários, advogados, assessores, agentes, mandatários e representantes, incluindo seus antecessores e sucessores.

"**Partes Isentas Investidores Backstoppers**" significa os Investidores Backstoppers e as entidades por eles controladas, subsidiárias e afiliadas, e outras sociedades pertencentes ao mesmo grupo societário e econômico, seus diretores, conselheiros, acionistas minoritários, parceiros, empregados e assessores e sucessores.

"**Partes Protegidas**" significa em relação aos Litigantes Atuais suas empresas subsidiárias, controladas, coligadas, controladoras, sucedidas e sucessoras, atuais ou pretéritos, bem como mandatários, diretores, administradores, gerentes, fundadores, sócios, membros, empregados, agentes, representantes, membros de conselho consultivo, assessores financeiros, advogados, contadores, consultores, bancos de investimento e outros profissionais, na capacidade de assessores das partes envolvidas, e em relação às RECUPERANDAS suas empresas subsidiárias, controladas, coligadas, controladoras, sucedidas e sucessoras, atuais ou pretéritos, bem como mandatários, diretores, administradores, gerentes, fundadores, membros, empregados, agentes, representantes, assessores financeiros, advogados, contadores, consultores, bancos de investimento e outros profissionais, na capacidade de assessores das partes envolvidas

**"Pessoa"** significa qualquer indivíduo, firma, sociedade, companhia, associação sem personalidade jurídica, parceria, *trust* ou outra pessoa jurídica ou de decisão administrativa que não seja objeto de questionamento no Poder Judiciário.

**"Petição Conjunta ME/EPP ou Classe III"** significa a petição conjunta a ser apresentada nos termos da **Cláusula 4.3.2.6**, no formato e teor a serem divulgados pelas Recuperandas.

**"Período de Transição"** significa o período compreendido entre a data de Aprovação do Plano, a ocorrência e conclusão do Aumento de Capital Capitalização de Créditos, 12 (doze meses) contados da Homologação do Plano ou 28 de fevereiro de 2019, o que ocorrer primeiro.

**"Plano ou PRJ"** significa este plano de recuperação judicial conjunto, incluindo todos aditamentos, modificações, alterações e complementações, e incluindo todos anexos e documentos mencionados nas cláusulas deste Plano.

**"Plano Geral de Metas de Universalização"** significa os planos que preveem as obrigações de universalização, que são periodicamente revistos por meio da edição de decretos pelo Governo Federal (atualmente, está em vigor o PGMU III aprovado pelo Decreto nº 7.512, de 30 de junho 2011, com metas para o período entre 2011 e 2016).

**"Plano Geral de Outorgas"** significa o plano que definiu as regiões e setores para concessões e autorizações do Serviço Telefônico Fixo Comutado, instituído pelo decreto nº 6.654, de 20 de novembro de 2008.

**"Plano Nacional de Banda Larga"** significa uma iniciativa do Governo Federal criada pelo Decreto nº 7.175, de 12 de maio de 2010, que tem como objetivo principal massificar o acesso à internet em banda larga no país, principalmente nas regiões mais carentes da tecnologia.

**"Portugal Telecom"** significa a Portugal Telecom, empresa portuguesa de telecomunicações.

**"Processos"** significa todo e qualquer litígio, em esfera judicial, administrativa ou arbitral (em qualquer fase, incluindo execução/cumprimento de sentença) em curso na Data do Pedido envolvendo discussão relacionada a qualquer dos Créditos Concursais

perante o Poder Judiciário ou Tribunal Arbitral, conforme o caso, inclusive reclamações trabalhistas.

**"Programa de DR"** significa o programa de certificados de depósito (*Depositary Receipts - DR*), emitidos no exterior por instituição depositária.

**"PTIF"** significa a PORTUGAL TELECOM INTERNATIONAL FINANCE B.V. – em recuperação judicial, pessoa jurídica de direito privado constituída de acordo com as Leis da Holanda, com sede em Amsterdam, Naritaweg 165, 1043 BW, e principal estabelecimento na cidade do Rio de Janeiro - RJ.

**"Real"** significa a moeda corrente na República Federativa do Brasil.

"**Receita Líquida da Venda de Ativos**" significa os recursos da alienação de ativos líquidos dos custos diretos relacionados a respectiva operação (incluindo custos com assessoria legal, contábil e financeira e comissão e vendas) e qualquer realocação de despesas incorridas, e tributos e taxas pagas ou a pagar em decorrência da respectiva alienação de ativos.

"**Reconhecimento do Plano na Jurisdição do Credor**" significa toda e qualquer decisão ou ordem judicial necessária para que este Plano possa produzir seus regulares efeitos na jurisdição aplicável ao Credor em questão.

**"Recuperação judicial"** significa este processo de recuperação judicial, autuado sob o nº 0203711-65.2016.8.19.0001, em curso perante o Juízo da Recuperação Judicial.

**"RECUPERANDAS"** significa a OI, TELEMAR, OI MÓVEL, COPART 4, COPART 5, OI COOP e PTIF.

**"Regiões I, II e III"** significa as regiões do território brasileiro dividias pelo Plano Geral de Outorgas para concessões e autorizações do Serviço Telefônico Fixo Comutado, sendo que a Região I compreende 16 estados localizados nas regiões Norte, Nordeste e Sudeste do Brasil, a Região II compreende o Distrito Federal e nove estados localizados nas regiões Norte, Centro-Oeste e Sul, e a Região III compreende o Estado de São Paulo.

**"Relação de Credores do Administrador Judicial"** significa a lista de credores elaborada pelo Administrador Judicial na forma do artigo 7, §2º da LFR.

97

"**Reorganização Societária**" significa a reorganização societária a ser realizada nos termos da **Cláusula 0** deste Plano.

"**Reunião de Credores**" significa a reunião de Credores Elegíveis para deliberação de assuntos previstos neste Plano, cuja convocação, instalação e deliberação observará a **Cláusula 8.1.**

"**Saldo de Caixa**" significa a soma das seguintes contas do balanço patrimonial ativo consolidado: 1.01.01 Caixa e Equivalentes de Caixa; e 1.01.02 Aplicações Financeiras, apurados nos Demonstrativos Financeiros Padronizados – DFPs consolidadas da Oi.

"**Saldo de Caixa Mínimo**" com relação a qualquer exercício fiscal, significa o maior valor entre: (1) 25% da soma do OPEX e do CAPEX para o respectivo exercício fiscal, calculado anualmente com base nas demonstrações financeiras consolidada anuais da Oi para o respectivo exercício fiscal; ou (2) R$ 5.000.000.000,00 (cinco bilhões de Reais). Adicionalmente, durante (i) os 5 (cinco) exercícios fiscais seguintes ao exercício em que for concluído o Aumento de Capital – Novos Recursos, quaisquer recursos oriundos de Aumento de Capital – Novos Recursos serão adicionados ao cálculo do Saldo de Caixa Mínimo; e (ii) os 4 (quatro) exercícios fiscais seguintes ao exercício em que eventualmente for concluído um aumento de capital da Oi, quaisquer recursos oriundos do respectivo aumento de capital serão adicionados ao cálculo do Saldo de Caixa Mínimo.

"**SELIC**" significa a taxa média ajustada dos financiamentos diários apurados no Sistema Especial de Liquidação e Custódia para títulos federais, cuja aplicação observa a Lei nº 10.522, de 19 de julho de 2002.

"**Taxa de Câmbio**" significa, para qualquer evento (exceto nos casos de Taxa de Câmbio Conversão e Taxa de Câmbio Votação), a taxa de fechamento de venda de dólares dos Estados Unidos da América/Real e Euro/Real, conforme aplicável, divulgada pelo Banco Central em seu sítio de internet, na seção Cotações e Boletins, opção "Cotações de Fechamento de Todas as Moedas em uma Data", ou qualquer outra taxa que venha a substituí-la, e a taxa de fechamento de venda de Euro/dólares dos Estados Unidos da América, divulgada no sistema de informações da Bloomberg.

"**Taxa de Câmbio Conversão**" significa a taxa de fechamento de venda do dia 11 de dezembro de 2017 de dólares dos Estados Unidos da América/Real e Euro/Real, conforme aplicável, divulgada pelo Banco Central em seu sítio de internet, na seção

Cotações e Boletins, opção "Cotações de Fechamento de Todas as Moedas em uma Data", ou qualquer outra, taxa que venha a substituí-la, e a taxa de fechamento de venda do dia 11 de dezembro de 2017 de Euro/dólares dos Estados Unidos da América, divulgada no sistema de informações da Bloomberg.

"**Taxa de Câmbio Votação**" significa a taxa de fechamento de venda do Dia Útil imediatamente anterior à Assembleia Geral de Credores que deliberar sobre a aprovação do Plano de dólares dos Estados Unidos da América/Real e Euro/Real, conforme aplicável, divulgada pelo Banco Central em seu sítio de internet, na seção Cotações e Boletins, opção "Cotações de Fechamento de Todas as Moedas em uma Data", ou qualquer outra, taxa que venha a substituí-la.

"**TELEMAR**" significa a TELEMAR NORTE LESTE S.A. – em recuperação judicial, sociedade anônima de capital fechado, inscrita no CNPJ/MF sob o nº 33.000.118/0001-79, com sede e principal estabelecimento na Rua do Lavradio nº 71, Centro, Rio de Janeiro - RJ, CEP 20230-070.

"**TR**" significa a taxa de referência instituída pela Lei nº 8.177/91, conforme apurada e divulgada pelo Banco Central do Brasil, cujo produto agregar-se-á ao saldo do valor nominal do Crédito para fins de cálculo do valor pecuniário das obrigações previstas neste Plano, e que será devido nas datas de pagamento aqui estabelecidas. No caso de indisponibilidade temporária da TR, será utilizado, em sua substituição, o último número-índice divulgado, calculado *pro rata temporis* por Dias Úteis, porém, não cabendo, quando da divulgação do número-índice devido, quaisquer compensações financeiras. Na ausência de apuração e/ou divulgação do número-índice por prazo superior a 5 (cinco) Dias Úteis após a data esperada para sua divulgação, ou, ainda, no caso de sua extinção ou por imposição legal ou determinação judicial, a TR deverá ser substituída pela substituta determinada legalmente para tanto.

"**Trustee dos Bonds**" significa o The Bank of New York Mellon e Citicorp Trustee Company Ltd., agentes fiduciários nos termos das Escrituras de Emissão dos Bonds, conforme o caso, bem como as sociedades que são por eles direta ou indiretamente controladas, seus diretores, administradores e funcionários, ou outro agente que venha a ser indicado em substituição ao The Bank of New York Mellon e/ou Citicorp Trustee Company Ltd. nos termos das Escrituras de Emissão dos Bonds.

"**UPI**" significa as unidades produtivas isoladas que serão alienadas nos termos do artigo 60 da LFR.

**"<u>Valor Justo de Mercado</u>"** significa, com relação a qualquer ativo, o preço (que, para evitar dúvidas, levará em conta qualquer passivo associado com ativo relacionado) que seria pago por um comprador disposto para um vendedor disposto não afiliado em uma operação comercial que não envolva sequestro de bens ou coação de qualquer parte, determinado em boa-fé pelo Conselho de Administração da Oi.

**ANEXO 2.6**
**LAUDOS**

**ANEXO 3.1.3**
**Ativos**

Alienação, direta ou indiretamente, dos seguintes ativos:

**UNITEL, S.A.**, sociedade de direito angolano, com o número de identificação fiscal 5410003144, registrada na Conservatória do Registro Comercial de Luanda sob o número 44/199, com sede na Talatona, Sector 22, via C3, Edifício UNITEL, Luanda Sul, Angola.

**BRASIL TELECOM CALL CENTER S.A.,** sociedade anônima inscrita no CNPJ/MF sob o nº 04.014.081/0001-30 e na Junta Comercial do Estado de Goiás sob o NIRE 53 3 0000758-6, com sede na Rodovia BR 153, Km 06, S/N, Bloco 03, Vila Redenção, na cidade de Goiânia, Estado de Goiás, CEP 74.845-090.

**TIMOR TELECOM, S.A.**, sociedade anônima, pessoa coletiva nº 1014630, registrada na Direção Nacional do Comércio Doméstico sob o número 01847/MTCI/XI/2012, com sede na Rua Presidente Nicolau Lobato, Timor Plaza, 4º andar, em Díli, Timor Leste.

A formalização da alienação dos bens localizados nos endereços listados abaixo está sujeita à prévia verificação da inexistência de impedimentos ou vedações de natureza administrativa ou judicial:

- BR 101 KM 205 (Barreiros/Almoxarifado), no Estado de Santa Catarina e registrado sob a matrícula nº 40564;
- Av Madre Benvenuta, no Estado de Santa Catarina e registrado sob a matrícula nº 48391;
- Rua Cel Genuino, no Estado do Rio Grande do Sul e registrado sob as matrículas nº 8.247, 24.697, 24.698, 24.699, 11.046, 11.047;
- Av. Joaquim de Oliveira, no Estado do Rio Grande do Sul e registrado sob a matrícula nº. 114.947;
- Avenida Lauro Sodre nº 3290, no Estado de Rondônia e registrado sob a matrícula nº 24743;
- Rua Gabriel de Lara, no Estado do Paraná e registrado sob a matrícula nº 16059;
- Rua Neo Alves Martins nº 2263, no Estado do Paraná e registrado sob a matrícula nº 58948;

- Travessa Teixeira de Freitas nº 75 (Complexo Merces F), no Estado do Paraná e registrado sob as matrículas nº 36731, 36732, 36733, 36734, 36735, 36736, 36737, 36738, 36739, 36740 e 36741;
- Avenida Teixeira de Freitas nº 141 (Complexo Merces G), no Estado do Paraná e registrado sob a matrícula nº 15049;
- Rua Visconde Nacar nº 234 (Complexo Merces B), no Estado do Paraná e registrado sob a matrícula nº 26912;
- Rua Visconde do Rio Branco nº 397 (Complexo Merces A), no Estado do Paraná e registrado sob a matrícula nº 13940;
- Avenida Goias, no Estado de Goiás e registrado sob as matrículas nº 42.041 e 42.042;
- Avenida Getulio Vargas S/N, no Estado de Roraima e registrado sob as matrículas nº 46.241, 46.242, 46.243 e 46.244;
- Rua Sabino Vieira / Rua Chaves De Faria nº 85/ R.S.L. Gonzaga nº 275, no Estado do Rio de Janeiro e registrado sob a matrícula nº 55316;
- Rua Dr. Miguel Vieira Ferreira (Rua Uranos 1139), no Estado do Rio de Janeiro e registrado sob a matrícula nº 51186;
- Estr. Pau da Fome nº 2716, no Estado do Rio de Janeiro e registrado sob a matrícula nº 105885;
- Avenida Nossa Senhora de Copacabana n° 462 A, lj e, s/lj, no Estado do Rio de Janeiro e registrado sob a matrícula nº 67704;
- Rua dos Limoeiros nº 200, no Estado do Rio de Janeiro e registrado sob a matrícula nº 10409;
- Camaragibe - Estrada de Aldeia - Km-125, no Estado de Pernambuco e registrado sob a matrícula nº 2503;
- Rua do Principe nº 156 e nº 120, no Estado de Pernambuco e registrado sob a matrícula nº 24857;
- Rua Itambe nº 200, no Estado de Minas Gerais e registrado sob a matrícula nº 38227;
- Rua Vitorio Nunes Da Motta nº 220, Enseada do Suá no Estado do Espírito Santo e registrado sob a matrícula nº 52265;
- Rua Silveira Martins, Cabula, nº 355 no Estado da Bahia e registrado sob a matrícula nº 76908;

- Rua Prof. Anfrisia Santiago nº 212, no Estado da Bahia e registrado sob a matrícula nº 12798;
- Avenida Getulio Vargas - BL. A, nº 950, no Estado do Amazonas e registrado sob a matrícula nº 14610;
- Rua Goias, S/N, Farol, no Estado de Alagoas e registrado sob a matrícula nº 75071;
- Rua Zacarias da Silva, Lote 2, Barra da Tijuca (Alvorada), na cidade e Estado do Rio de Janeiro e registrado sob a matrícula nº 381171;
- Rua Senador Pompeu, nº 119 - 5º andar, Centro, na cidade e Estado do Rio de Janeiro e registrado sob a matrícula nº 106766;
- Rua Alexandre Mackenzie, nº 75, Centro, na cidade e Estado do Rio de Janeiro e registrado sob as matrículas nº 274011, 274012, 274013, 274014, 274015, 274039, 274040, 274041, 274042;
- Rua do Lavradio, nº 71, Centro (Arcos), na cidade e Estado do Rio de Janeiro e registrado sob a matrícula nº 70149;
- Rua Araribóia, nº 140, São Francisco, na cidade de Niterói, Estado do Rio de Janeiro e registrado sob a matrícula nº 10770;
- Rua Assai, s/n, Jardim Pindorama, na cidade de São Félix do Araguaia, Estado de Mato Grosso e registrado sob a matrícula nº 3825;
- Rua Sena Madureira, nº 1070, na cidade de Fortaleza, Estado de Ceará e registrado sob a matrícula nº 1409;
- Rua Manoel P. da Silva (Cap. Pereirinha, S/N), na cidade de Corumbá, Estado de Mato Grosso do Sul e registrado sob as matrículas nº 24.969, 24.970, 24.971, 24.972 e 24.973;
- Av Nicanor de Carvalho, nº 10, na cidade de Corumbá, Estado de Mato Grosso do Sul e registrado sob a matrícula nº 12295;
- Pq. Triunfo de Cotegipe, S/N – João Dantas, na cidade de Alagoinhas, Estado da Bahia e registrado sob a matrícula nº 775;
- Estrada Velha do Amparo, KM 4, na cidade de Friburgo, Estado do Rio de Janeiro e registrado sob a matrícula nº 5283;
- Av. Prudente de Morais, nº 757 B, Bairro Tirol, na cidade de Natal, Estado do Rio Grande do Norte e registrado sob a matrícula nº 28639;
- Av. Afonso Pena, nº 583, na cidade de Manaus, Estado do Amazonas e registrado sob a matrícula nº 7496;

- Rua Leitão da Silva, nº 2.159, Itararé (CONJED), na cidade de Vitória, Estado do Espírito Santos e registrado sob as matrículas nº 46.977 e 46.978;
- BLOCO C, QUADRA 02, SETOR COMERCIAL CENTRAL, Planaltina, na cidade de Brasília, Distrito Federal e registrado sob a matrícula nº 801;
- Rua Padre Pedro Pinto nº1460, Venda Nova (ISFAP), na cidade de Belo Horizonte, Estado de Minas Gerais e registrado sob a matrícula nº 4187;
- Rua 2 De Setembro, nº 733, Campo De Futebol, na cidade de Blumenau, Estado de Santa Catarina e registrado sob a matrícula nº 598;
- BR 116, KM 159, Rua Cel Antônio Cordeiro, 3950, Altamira, na cidade de Russas, Estado do Ceará e registrado sob a matrícula nº 180;
- Rua Correa Vasques,69, Cidade Nova, na cidade e Estado do Rio de Janeiro e registrado sob as matrículas nº 40962, 40963, 40964, 40965, 40966, 40967, 40968, 40969, 40970, 40971, 40972, 41190;
- Rua Walter Ianni, Anel Rodoviário, KM 23,5 - Bairro Aarão Reis/São Gabriel (PUC MINAS), na cidade de Belo Horizonte, Estado de Minas Gerais e registrado sob a matrícula nº 27601.

**ANEXO 4.2.4**

**CRÉDITOS COM GARANTIA REAL**

**ANEXO 4.3.1.2(A1)**

**OPÇÃO DE REESTRUTURAÇÃO I – CRÉDITOS EM REAIS**

## ANEXO 4.3.1.2(A2)

### OPÇÃO DE REESTRUTURAÇÃO I – CRÉDITOS EM REAIS

**ANEXO 4.3.1.2(B)**

**OPÇÃO DE REESTRUTURAÇÃO I – CRÉDITOS EM DÓLARES NORTE-AMERICANOS**

## ANEXO 4.3.3.1(F)

### INSTRUMENTO CRÉDITOS QUIROGRAFÁRIOS DOS BONDHOLDERS NÃO-QUALIFICADOS

## ANEXO 4.3.3.3.(F)

### CRÉDITOS QUIROGRAFÁRIOS DOS BONDHOLDERS QUALIFICADOS – NOVAS NOTES

<u>ANEXO 4.3.3.5(C)</u>
CONDIÇÕES PRECEDENTES

São condições precedentes para o Aumento de Capital Capitalização de Créditos conforme disposto na **Cláusula 4.3.3.5(c)** do Plano, que deverão ser verificadas ou formal e expressamente dispensadas pelos Credores Quirografários Bondholders Qualificados em Reunião de Credores, conforme previsto no **Anexo 8.1**, as seguintes Condições Precedentes:

*(i)*       o Plano ter sido aprovado pela Assembleia Geral de Credores, na forma do artigo 45 da LFR;

*(ii)*      ter havido a Homologação Judicial do Plano sem qualquer ressalva, modificação ou restrição que afete, direta ou indiretamente, qualquer direito dos Credores Quirografários Bondholders Qualificados na forma do Plano, individual ou coletivamente considerados, desde que

> *(ii.a)* não haja recurso interposto contra a decisão de Homologação Judicial do Plano (artigo 58 da LFR) ao qual tenha sido atribuído efeito suspensivo ou, caso tenha sido atribuído efeito suspensivo ao recurso, tenha sido reconsiderada ou revogada a decisão que atribuiu o efeito suspensivo por outra decisão singular ou colegiada; ou

> *(ii.b)* não haja nenhuma ação judicial ou administrativa em que tenha sido pleiteada e concedida medida liminar, antecipação de tutela e/ou qualquer medida ou segurança semelhante que tenha o efeito de suspender ou inviabilizar a Homologação Judicial do Plano e/ou a implementação, no todo ou em parte, deste Plano ou, caso seja concedida a referida medida liminar, antecipação de tutela e/ou qualquer medida ou segurança semelhante, a concessão seja reconsiderada ou revogada pela autoridade jurisdicional competente

*(iii)*     não ter havido nenhuma violação a qualquer obrigação assumida pelo Grupo Oi nos termos do ou como consequência deste Plano;

*(iv)*

*(iv.a)* a ANATEL, representada pela Advocacia Geral da União, não tenha apresentado novas contestações ou recursos em juízo ou insistido nas contestações ou recursos em juízo existentes na data de Aprovação do Plano em relação a este Plano ou à reestruturação objeto deste Plano, inclusive a novação e/ou a reestruturação dos Créditos Concursais Agências Reguladoras, na forma da **Cláusula 4.3.4**; ou

*(iv.b)* a ANATEL não tenha proferido em sede de processo administrativo decisão determinando a intervenção ou atos equivalentes afetando as concessões e/ou autorizações operadas pelo Grupo Oi ou que possam resultar em um Efeito Adverso Relevante;

*(v)*        os Créditos Concursais Agências Reguladoras tenham sido novados e reestruturados nos termos deste Plano;

*(vi)*        tenham sido obtidas todas as autorizações regulatórias e legais necessárias para implementação do Aumento de Capital – Capitalização de Créditos, incluindo mas não se limitando às autorizações da ANATEL e, se aplicável, do CADE;

*(vii)*        não existam ações, condenações ou contingências trabalhistas, previdenciárias, tributarias, cíveis e/ou ambientais, administrativas e/ou de qualquer outra natureza, incluindo mas não se limitando a investigações anticorrupção ou ações similares contra o Grupo Oi, que tornem as Recuperandas responsáveis pelo pagamento de qualquer quantia superior a R$ 10 bilhões de reais, individualmente consideradas, e/ou que resultem ou possam resultar em um Efeito Adverso Relevante.

## ANEXO 7.1
### REORGANIZAÇÕES SOCIETÁRIAS

- Incorporação da Oi Internet S.A. na Oi ou Telemar ou Oi Móvel;
- Incorporação da Oi Móvel na Telemar ou na OI;
- Incorporação da Telemar na Oi;
- Incorporação da Paggo Administradora Ltda. na Oi Móvel;
- Incorporação da Brasil Telecom Comunicação Multimídia Ltda. na Telemar ou na Oi;
- Incorporação da Copart 4 na Telemar;
- Incorporação da Copart 5 na OI;
- Incorporação ou versão de ativos da SEREDE - Serviços de Rede S.A. em uma ou mais Recuperandas;
- Incorporação ou versão de ativos da Rede Conecta Serviços de Rede S.A. em uma ou mais Recuperandas;
- Qualquer reorganização que não cause Efeito Adverso Relevante nas sociedades integrantes do GRUPO OI e que não modifique substancialmente a natureza dos negócios das sociedades integrantes do GRUPO OI.

114

ANEXO 8.1.

REUNIÃO DE CREDORES

**1.1.    Representação dos Credores.** Em até 15 (quinze) dias contados da Homologação do Plano, os Credores Quirografários Bondholders Qualificados deverão enviar comunicado ao GRUPO OI, nos termos da **Cláusula 13.6** do Plano para indicar o(s) procurador(es) habilitados a representá-los nas Reuniões de Credores que vierem a ser convocadas nos termos do Plano, com os seguintes dados: (i) qualificação completa; (ii) telefone; (iii) endereço eletrônico (*email);* e (iv) endereço.

**1.2.**    O GRUPO OI ficará desobrigado de convocar para as Reuniões de Credores os Credores Quirografários Bondholders Qualificados que não observarem o prazo acima estipulado, sendo que a ausência de convocação de tais Credores não configurará descumprimento, pelo GRUPO OI, das obrigações assumidas nesta Cláusula.

> **1.2.1.**    Qualquer alteração nos dados enviados pelos Credores Quirografários Bondholders Qualificados ao GRUPO OI deverá ser imediatamente comunicada ao GRUPO OI, mediante nova comunicação nos termos da **Cláusula 13.6** do Plano. A impossibilidade de convocação do Credor Quirografário Bondholder Qualificado, em razão da ausência de tal comunicação, não será interpretada como descumprimento, pelo GRUPO OI, de sua obrigação de convocar os Credores Quirografários Bondholders Qualificados para a Reunião de Credores.

**1.3.    Regras de Convocação, Instalação e Deliberação.** As regras de convocação, instalação e deliberação da Reunião de Credores são as seguintes:

(i) a convocação será feita com, no mínimo, 8 (oito) dias de antecedência para a primeira convocação e 5 (cinco) dias para a segunda convocação;

(ii) a Reunião de Credores instalar-se-á, em primeira convocação, com a presença de Credores Quirografários Bondholders Qualificados titulares de mais de 50% (cinquenta por cento) dos Créditos Quirografários Bondholders Qualificados ou, em segunda convocação, com qualquer quórum;

(iii) o voto de cada Credor Quirografário Bondholder Qualificado será proporcional ao valor de seu respectivo Crédito. Os Créditos em moeda estrangeira deverão ser convertidos pela Taxa de Câmbio Conversão;

(iv) salvo se de outra forma previsto neste Plano, as deliberações serão tomadas pelos Credores Quirografários Bondholders Qualificados que representem mais da metade (50% + R$ 1,00) do valor total dos Créditos Quirografários Bondholders Qualificados presentes à Reunião de Credores;

(v) as Reuniões de Credores deverão ocorrer sempre na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, na República Federativa do Brasil, em local a ser definido oportunamente pelo GRUPO OI;

(vi) a convocação dos Credores Quirografários Bondholders Qualificados será feita pelo GRUPO OI, por iniciativa própria ou a pedido de Credores Quirografários Bondholders Qualificados representando ao menos 20% (vinte por cento) dos Créditos Quirografários Bondholders Qualificados, através de comunicação enviada por e-mail a qualquer dos procuradores indicados pelo Credor Quirografário Bondholder Qualificado para este fim, nos termos da **Cláusula 13.6** do Plano. Caso o GRUPO OI, solicitado por Credores Quirografários Bondholders Qualificados representando ao menos 20% (vinte por cento) dos Créditos Quirografários Bondholders Qualificados, deixe de convocar a Reunião de Credores em até 5 (cinco) Dias Úteis contados da respectiva solicitação, tais Credores Quirografários Bondholders Qualificados poderão convocar a Reunião de Credores em nome próprio, devendo ser reembolsados, pelo GRUPO OI, pelos custos incorridos; e

(vii) naquilo que não estiver expressamente disposto neste Anexo, serão aplicadas por analogia as regras previstas na LFR para instalação e deliberação em Assembleia Geral de Credores.

<u>ANEXO 9.2.</u>
### MEMBROS DO CONSELHO DE ADMINISTRAÇÃO TRANSITÓRIO

1. José Mauro Mettrau Carneiro da Cunha, CPF nº 299.637.297-20 – Presidente

2. Ricardo Reisen de Pinho, CPF nº 855.027.907-20 – Vice-Presidente

3. Marcos Duarte Santos, CPF nº 014.066.837-36

4. Luis Maria Viana Palha da Silva, CPF nº 073.725.141-77

5. Pedro Zañartu Gubert Morais Leitão, passaporte português nº M655076

6. Helio Calixto da Costa, CPF nº 047.629.916-00

7. Marcos Rocha, CPF 801.239.967-91

8. Eleazar de Carvalho Filho, CPF: 382.478.107-78

9. Marcos Grodetzky, CPF 425.552.057-72


Nas ausências ou impedimentos temporários do Presidente do Conselho de Administração Transitório, este será substituído em suas funções e prerrogativas pelo Vice-Presidente do Conselho de Administração Transitório.